# 23-1246

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

JOHN DOE,

Plaintiff-Appellant,

v.

NEW YORK UNIVERSITY,

Defendant-Appellee.

_____

On Appeal from the United States District Court for the

Southern District of New York No. 1:20-cv-01343(MKV)

_____

**BRIEF OF THE PLAINTIFF-APPELLANT**

_____

Norman A. Pattis

**PATTIS & ASSOCIATES, LLC**

Counsel of Record

383 Orange St.

New Haven, CT 06511

Phone: 203-393-3017                                    **TO BE ARGUED BY**:

Fax: (203) 393-9745                                     **NORM PATTIS**

Email: npattis@pattislaw.com

i

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS……………………………………………….. ii

TABLE OF AUTHORITIES…………………………………………… iii

INTRODUCTION…………………………………………………… 1

JURISDICTION……………………………………………………… 2

STATEMENT OF THE ISSUES……………………………………….. 3

STATEMENT OF THE CASE……………………………………….. 3

SUMMARY OF THE ARGUMENT………………………………… 7

ARGUMENT…………………………………………………… 16

    I.    The University's Failure To Provide Due Process
            In This Case Resulted In A Sustained And Prejudicial
            Assault On The Plaintiff's Right  Free From Gender Bias
            Title IX……………………………………………………….. 16

    II.   The Trial Court Erred In Granting Summary Judgment
            As To The Promissory Estoppel Claim…………………… 38

CONCLUSION……………………………………………………….. 43

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS…... 45

CERTIFICATE OF SERVICE………………………………………… 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 Page

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)…………………... 16

*Bouboulis v. Transp. Workers Union of Am.,*

    442 F.3d 55 (2d Cir. 2006)…………………………………………... 16

*Cacchillo v. Insmed, Inc.*, 551 F. App'x 592 (2d Cir. 2014) ……………. 38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………16

*Cybercrhon Corp v. Calldata Sys. Dev., Inc.*, 47 F.3d 39 (2d Cir. 1955)..  38

Doe v. Colgate Univ., 457 F. Supp. 3d 164,

    reconsideration denied, 2020 WL 343827 (N.D.N.Y, 2020)…….. 30

*Khan v. Yale Univ.*, 85 F 4th 86 (2d Cir. 2023)…………..…………... 8, 9

*Khan v. Yale Univ.*, 347 Conn. 1 (2023)…………………..…………… 8

*Lafler v. Cooper*, 566 U.S. 156 (2012)………………………………….. 41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574, (1986)…………………………………………… 16

*Missouri v. Frye*, 566 U.S. 134 (2012)…………………………………... 41

*Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204 (2d Cir. 2021)………………. 16

*Radwan v. Manuel*, 55 F. 4th 101, 130 (2022)………………………... 19, 32

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006)……………………… 16

*Thomas v. Roach*, 165 F.3d 137 (2nd Cir. 1999)…..…………………… 16

*Vengalattore v. Cornell Univ.*, 36 F.4th 87 (2d Cir., 2022)………………… 6

*Yusuf v. Vassar Coll.*, 715 715 (2d Cir 1994)…………………………19, 32

**Statutes and Rules**

Fed. R. Civ. P. 56(e)……………………………………………… 5, 18

28 U.S.C. Section 1291……………………………………………… 3

28 U.S.C. Section 1331……………………………………………… 2

Title IX, 20 U.S.C. Section 1681 et seq…………………………,3, *passim*

**Other Authorities**

Evan Gerstmann's *Campus Sexual Assault: Constitutional Rights and Fundamental Fairness* (2019)

Kate Fitzgibbon and Sandra Walkate,

*Gender, Crime and Criminal Justice (*2018)…………………………… 31

## <u>INTRODUCTION</u>

This case is an appeal from the District Court's granting summary judgment to New York University in a case brought by John Doe, a student expelled after a hearing for violating the University's Title IX policies. The allegations against Mr. Doe were lodged by another student, Jane Roe.

The University investigated, lodged administrative charges against Mr. Doe, appointed him a faculty "facilitator" to assist him in the process, and held a hearing. In the end, the University found against Mr. Doe, and expelled him. When Mr. Doe sought to file a cross-complaint against Ms. Roe for her conduct, University officials told him to wait until his complaint had been heard and that his issues with Ms. Roe would arise during the course of his hearing. After the hearing against Mr. Doe, he was told the University would not process a complaint against Ms. Roe because he had been expelled.

Mr. Doe then retained counsel and appealed within the University process. In the end, his expulsion was sustained.

Mr. Doe brought an action against the University in the United States District Court for the Southern District of New York alleging gender bias in application of the Title IX process, a violation of New York City Human Rights

Law, and a claim of promissory estoppel. The District Court dismissed one claim of promissory estoppel, permitting a second to proceed to discovery.

After extensive discovery, a different District Court judge, Judge Vyskocil, to whom the case had been transferred after denial of the motion to dismiss, granted the University's summary judgment as to all remaining counts. Judgment entered in favor of the University.

Mr. Doe appeals from the grant of summary judgment, contending that, despite a robust record highlight many facts in dispute, the trial court failed both to account for material disputes of fact, but also refused to give Mr. Doe the benefit of reasonable inferences from those facts.

The standard of review in an appeal from summary judgment is de novo,

Mr. Doe seeks vacatur of the District Court judgment, remand for further proceedings, and transfer of the case to a different judge.

## **JURISDICTION**

This matter was filed in the United States District Court for the Southern District of New York, raising a federal question. The District Court had federal question jurisdiction under 28 U.S.C. Section 1331. Upon entry of a final judgment, the appellant filed a Notice of Appeal and has perfect this brief in

accordance with the rules of this Court. This Court has jurisdiction pursuant to 28 U.S.C. Section 1291.

## STATEMENT OF THE ISSUES

**III.** **Whether The University's Failure To Provide Due Process In This Case Resulted In A Repeated, Sustained And Prejudicial Assault On The Plaintiff's Right To A Fair Hearing Under Title IX**

**IV.** **Whether The University's Failure To Provide Due Process In This Case Resulted In A Repeated, Sustained And Prejudicial Assault On The Plaintiff's Right To A Fair Hearing Under Title IX**

## STATEMENT OF THE CASE

This is a case about a bad break up of two students at New York University, hereinafter "NYU," one, the woman, was treated as a victim; the other, the male, John Doe, was treated as a pariah and expelled from NYU. On appeal, Mr. Doe challenges a District Court decision granting the University's motion for summary judgment as to his Title IX, 20 U.S.C. Section 1681 et seq., due process and related claims. He contends the trial court failed to take account of material facts in dispute and failed to give him the benefit of reasonable inferences based on the record before the Court. He asks for vacatur of the judgment and a remand for further proceedings before a different judge.

John Doe and Jane Roe were both students at New York University, hereinafter "NYU," in 2017 and 2018. Prior to attending NYU, the couple was involved in a consensual, romantic relationship. That relationship continued, and

3

then ended at NYU, and Jane Roe thereafter initiated a complaint against John Doe under the University's Title IX enforcement process. Mr. Doe sought to cross-complaint against Ms. Roe, but the University did not open an investigation, stating that Mr. Doe's claims about Ms. Roe would be considered during the hearing on Ms. Roe's complaint. After reviewing the allegations against Mr. Doe, a faculty advisor then assured him that the result of the complaint against him by Ms. Roe would not result in his expulsion from the University as there was no allegation of non-consensual intercourse or the use of a weapon. In reliance on these assurances, Mr. Doe deferred any effort to press his claims against Ms. Roe and adopted a less than aggressive defense.

When Mr. Doe was expelled, he sought to make a formal complaint under the Title IX enforcement process against Ms. Roe, but was told that it was too late to do so, as he had been expelled. In the end, Mr. Doe was expelled, and a permanent record of the expulsion was placed upon his record. Ms. Roe's misconduct went unaddressed by the University.

Even during the hearing against Mr. Doe, there was no meaningful cross-examination of Ms. Roe; Mr. Doe's witnesses were not called or even interviewed. The University even failed to investigate Mr. Doe's extraordinary claim that Ms. Roe used a pseudonymous social media account to communicate with him about her sexual preferences and to otherwise manipulate and humiliate him.

4

In the end, the University followed a distressing pattern of expelling men for conduct that would not result in the suspension of a woman. In the relevant four-year period preceding Ms. Roe's complaint, no woman was ever expelled for allegations similar to those made against Mr. Doe. Men, however, were expelled.

Mr. Doe filed an action in the United States District Court for the Southern District of New York, alleging violation of Title IX of the Education Amendments of 1972, the New York City Human Rights Law, and promissory estoppel.

The University immediately moved to dismiss the action, and, in a thorough ruling denying almost all of the relief sought by NYU, U.S.D.J. Gregory H. Woods ordered that the case proceed on all but one promissory estoppel claim. Docket Entry, hereinafter "DE" 40, Joint Appendix, hereinafter "JA" 274. After discovery, a different judge, U.S.D.J. Mark Kay Vyskocil, granted summary judgment in a brief memorandum of decision. JA 239. Judge Vyskocil's decision seemingly ignored the glaring disputes of material fact presented by the parties' papers. Hundreds of statements of material facts were presented to the District Court in the parties Rule 56 papers.[1] The Court appears to have selected only the facts favoring

---

[1] The parties placed 343 material facts before the Court in three separate pleadings. The defendants initial Rule 56 statement appears at DE 86. The plaintiff's response and assertion of his own statements in dispute appears at DE 96. The defendant's reply to the plaintiff's statements appears at DE 111. The final docket entry, III,

the moving party, refusing even to consider the material facts Mr. Doe raised, and refusing to give him the benefit of inferences to which he was entitled in a motion for summary judgment against him.

Judgment entered in favor of NYU. Simply put, the two court rulings described parallel universes, and cannot be reconciled. Judge Vyskocil's decision failed to grant the plaintiff the benefit of material facts clearly in dispute, facts which, if decided in favor of the plaintiff, would have entitled him to judgment as a matter of law.

In denying the motion to dismiss, Judge Wood noted that the plaintiff had articulated claims which, if supported by the evidence, could result in a verdict for Mr. Doe. After completion of discovery and submission of exhaustive summary judgment pleadings, Judge Vyskocil ignored obvious disputes of material fact, credited only those facts which supported judgment for NYU and dismissed the action. The order granting summary judgment reads like a conclusory trial brief by a party, not the reasoned analysis of a jurist applying both the substantive law

---

incorporates all of the language included in the previous two pleadings and is the sole Rule 56 statement included in the joint appendix. JA 114-238. There were thousands of pages of exhibit, both public and filed under seal appended to the Rule 56 statements. The appellant has not reproduced those in the joint appendix and will not object if the appellee sees the need to produce a supplemental appendix referring to one or more of them. Mr. Doe complained in his papers that many of the facts relied upon by NYU in its moving papers were not part of the Title IX process and were therefore immaterial. Paras, 58-61, 105-112, JA, 139-142,158-162.

Mr. Doe thereafter filed a notice of appeal and tenders this brief in accordance with the rules of this Court. He seeks a vacatur of the judgment in favor of the defendant and a remand for further proceedings and trial.

## SUMMARY OF THE ARGUMENT

Although New York University, hereinafter the "University," is a private institution, it accepts federal funds, and therefore is obligated to provide students equal educational opportunities; the University cannot discriminate on the basis of gender, and it must, under Title IX, accord students elementary due process in resolving claims against the students. *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 92-93 (2d Cir., 2022). The University is also governed by the requirements of the New York City Human Rights Law and the common law of the State of New York.

In this case, John Doe claims violations of Title IX, and the New York human rights law, claims which substantially mirror one another;[2] he also asserts a claim of promissory estoppel against the university based on the clear and definite assurances the advisor gave him about the outcome of the Title IX proceedings.

All of the claims arise from the University's expulsion of him after an investigation that fell far short of the requirements of due process and a hearing

---

[2] The parties below did not dispute that the NYCHRL applied in this context. The Court treated the NYCHRL claim as "indistinguishable" from his Title IX claim. JA 251, fn. 12.

process that fell far short of any conceivable notion of a quasi-judicial proceeding. *Khan v. Yale Univ.*, 85 F 4th 86 (2d Cir. 2023); *Khan v. Yale Univ.*, 347 Conn. 1 (2023).

There was no meaningful cross examination of the complainant. Indeed, when Mr. Doe tendered questions to hearing officers to pose to the complainant, the University hearing officers failed to ask many of them. The hearing took place while Mr. Doe was in a different time zone and on a different continent on a pre-planned semester abroad. His request to postpone the hearing until his return to the United States was denied. The University also denied his request to adjourn the hearing when technical difficulties with the connection between his remote location and the University hearing site interfered with his ability to participate in the hearing. The University failed to call witnesses Mr. Doe asked to be present, failing even to interview the witnesses. In almost every material respect, the hearing process failed to provide the sort of due process this Court took notice of in its recent decision involving a Yale student, Saifullah Khan. *Khan v. Yale Univ.*, 85 F 4th 86 (2d Cir. 2023).

Mr. Doe filed an action in the United States District Court for the Southern District of New York seeking relief. The University moved to dismiss all counts, but succeeded only in obtaining the dismissal of one of two promissory estoppel counts. After extensive discovery, the University moved for summary judgment.

The trial court, Vyskocil, J., granted the motion in its entirety. In so doing, the trial court ignored material facts in dispute. Had the court applied the appropriate standard, recognizing both the material facts in dispute as apparent from the parties' Rule 56 statements, and had it given the plaintiff the benefit of the inferences to which he was entitled, summary judgment would have been denied as to the claims of a violation of due process, gender-based discrimination and promissory estoppel. Instead, the trial court indulged in what a trial court must not do in the context of summary judgment – it made credibility decisions that are the sole province of jurors.

The record makes clear that John Doe and Jane Roe were a couple in distress at the time of their break-up while students at NYU. They met while high school students at an internship, and, from its inception, there were signs of significant trouble. Ms. Roe told Mr. Doe that her parents would not approve of her relationship with him, even of her communicating with him. So she used a pseudonymous social media account to maintain contact. This practice of pseudonymous contact evolved to the point at which Ms. Roe used a false name and anonymous account to communicate her sexual preferences to Mr. Doe, to humiliate him and to attempt to manipulate him, even during the investigation of John Doe.

Ms. Roe enrolled at NYU for her freshman year; John Doe attended Connecticut University. The couple remained in contact. After Ms. Roe reported to John Doe that she had been sexually assaulted by four NYU students – a claim for which there exists no documentary support anywhere – Mr. Doe's sympathies were aroused; her alleged assault was one of the factors that let Mr. Doe to seek to transfer to NYU.[3] He visited Ms. Roe on campus on several occasions, and, occasionally, she encouraged him to remain longer on campus. Ms. Roe encouraged him to apply to the University, even reading his application and admissions essay. Mr. Doe was admitted to NYU for the 2017-2018 academic year. Only after he was admitted to NYU did Ms. Roe begin to express misgivings about their attending college at the same institution.

Mr. Doe was assigned a single room in a university dormitory and sought to transfer from that room to another, in part to save the additional expense of a single room. He entered a room transfer protocol, and the only person who was willing to swap rooms with him was a resident of Ms. Roe's dormitory. Mr. Doe moved into the same dormitory in which Ms. Roe lived.

Ms. Roe spent as many as five nights a week in Mr. Doe's room, up to the time that the relationship deteriorated and reached a breaking point in March 2018.

---

[3] She later admitted lying to Mr. Doe about the alleged perpetrators having been arrested. There is no record even of a report to police.

Thereafter, the couple traded stormy and tempestuous emails and text messages. Ms. Roe began to spread false and defamatory comments about Mr. Doe to their joint friends, including claims that he had blackmailed her into remaining in the relationship by threatening to disclose it to her parents; she even resorted to using homophobic slurs against Mr. Doe. He responded with hurt, and, at times, anger. In one confrontation, she hit him repeatedly, later claiming it was in self-defense; Mr. Doe neither assaulted her nor threatened do so. Prior to the break-up, Ms. Roe continued to use a pseudonymous social media account, "Sally Soe," to convey her sexual preferences to Mr. Doe.

In April 2018, Ms. Roe initiated a complaint with Title IX officials against Mr. Doe. When he inquired about the possibility of a cross-complaint against her, university officials told him it was premature, and that he should wait to file against her until the proceeding against him concluded. He asked for, and received, a university advisor on the Title IX proceedings and was told by that advisor that he faced at most a one-semester suspension as the charges against him involved neither the use of a weapon nor non-consensual sex. Shortly after the Title IX complaint was filed, Ms. Roe sought, and obtained, a mutual No Contact Order (NCO), and the University issued one. Mr. Doe violated it with several text messages. When Mr. Doe complained that Ms. Roe appeared to be stalking him at a local park, the University police refused to investigate.

11

Mr. Doe met with University officials as the investigation began. They told him that the NCO claims should not be critical as he was open, honest and forthcoming about his behavior. He described his contact with Ms. Roe as efforts to get her to stop defaming him, to try to make peace, and to apologize. He also made officials aware of Ms. Roe's use of "Sally Soe" to manipulate him and to convey sexual information to him: the university failed to investigate these claims to determine what light they would shed not just on Ms. Roe's credibility but also on the nature of the relationship from which the two were having difficulty extricating themselves.

Mr. Doe left the New York campus in August 2018 to begin a semester abroad in Australia. He asked that any proceedings be stayed until he could return to campus. The University denied the request.

In October 2018, the university issued a final report, adding five additional counts to the four initially lodged. Mr. Doe had difficulty accessing and reading the report and made the university aware of that. Mr. Doe asked that the hearing be adjourned until he could return to the United States to attend personally; another request the university denied. The university agreed to continue the hearing on the matter until early December 2018, permitting Mr. Doe to participate via Skype while in Australia. At the December hearing, the plaintiff did not have access a physical copy of the report, although other hearing participants did have access to

it. He also had Internet connectivity issues and was forced to juggle two devices to follow the hearing itself as he tried to access the report. His request to adjourn the hearing as a result of these issues was denied.

At neither the hearing itself nor in the investigation of the allegations against him did the university call or even interview witnesses Mr. Doe sought to call. He was denied the right to cross-examine his accuser; the university even refused to ask all of the questions he propounded for her. It was a mail-order proceeding with a predestined result.

After being told that the hearing would not result in a suspension and that his candor regarding the NCO issues would not rebound to his detriment, Mr. Doe was surprised to learn that he was, in fact, to be expelled, with a notice of his expulsion placed on his record. Stunned by the unfairness, he sought to bring his complaint against Ms. Roe to the university, but the University refused to hear it, claiming that, while it could do so, it had never before acted on a complaint brought by an expelled student.

On appeal to the university, Mr. Doe relied upon procedural and substantive claims that the process used to expel him was infirm, that the university engaged in gender discrimination on the basis of disparate impact and that the punishment was disproportionate to the offense. He lost his appeal, and brought this action.

The District Court received hundreds of material facts set forth by the parties. Those papers more than demonstrated that there were material facts in dispute in this case. Yet the Court ignored them. Indeed, one reads the Memorandum of Decision granting summary judgment in vain to find even an intimation of many of the facts recited in this summary. It is as if the troubled nature of the relationship between the parties, and their obvious difficulties in extricating themselves from it, was more than the Court could endure. The federal courts are not customarily engaged in the mechanics of bad relationships ending amid mutual recriminations, claims and counterclaims.

What both members of this couple needed was counseling on a difficult break up. The District Court was perhaps correct in referring to the relationship as sordid, but the Court's refusal to acknowledge what Jane Roe contributed to the sordidness is shocking. Mr. Doe contends that he is entitled to trial and to a jury's determination of whether NYU violated its duties to provide fair procedures under state and federal law and whether the manner that NYU handled these proceedings induced Mr. Doe to rely to his detriment on the representations of university officials at a critical moment in his educational career. His transcript now informs the world he was expelled; Jane Roe has not been held accountable for her treatment of Mr. Doe.

Despite claims that Ms. Roe physically assaulted him, used a pseudonymous social media account to stalk him and sexually to harass him, maligned him with homophobic slurs to their classmates, and otherwise sought to dominate and control his access to social media, the university refused to open an investigation against Ms. Roe, leading the plaintiff to believe his cross-complaints would be dealt with in the course of Ms. Roe's complaints against him. At the very least, the university could have, and should have, conducted an investigation that made it possible for Mr. Doe to impeach Ms. Roe's credibility – the use of her sexual avatar to convey her desires to Mr. Doe alone would have been fodder for even fumbling cross-examination of a complainant. The university didn't bother to look into this extraordinary conduct, viewing it as immaterial.

It is impossible to read this record and not suspect that NYU exercises a double standard when it comes to Title IX claims – believe the woman and let the man be damned.

Drawing all reasonable inferences in favor of the non-moving party on its consideration of the university's motion for summary judgment, the District Court should have denied the motion for summary judgment. Mr. Doe was denied a right to attend his own hearing in person, denied effective cross-examination of the complaining witness against him, denied equal access to the hearing that eventually took place, denied the right to call and question witnesses in his own

15

defense, and was misled by a faculty advisor about the seriousness of the charges against him, thus lulling him into a false sense of complacency. In the end, he was expelled, despite evidence that similarly situated females at the university suffered far less serious sanctions.

## **ARGUMENT**

**V.** **The University's Failure To Provide Due Process In This Case Resulted In A Sustained And Prejudicial Assault On The Plaintiff's Right To Be Free From Gender Bias Under Title IX**

### **A. Standard of Appellate Review**

Appellate Courts review a district court's grant of summary judgment de novo. *Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 208 (2d Cir. 2021).

### **B. The Legal Standard Applicable to the District Court's Evaluation of the Defendant's Motion for Summary Judgment**

To prevail on a motion for summary judgment, a movant must show that there are no genuine issues of material fact and that the moving party is entitled to that judgment as a matter of law. *Thomas v. Roach*, 165 F.3d 137, 142 (2nd Cir. 1999). "In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir.

2006) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Although the nonmovant bears the burden of proof at trial, the movant must show "prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id*. at 272-73 (citing *Celotex,* 477 U.S. at 323). Once the movant makes a showing in either manner, the nonmovant must then "point to record evidence creating a genuine issue of material fact." *Id*. (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)). Both the movant and nonmovant must point to specific evidence in the record to meet their respective burdens. C*elotex,* 477 U.S. 324*; Matsushita*, 475 U.S. at 586).

**C. The Court Failed to Give Any Weight to the Plaintiff's Proof Regarding the Nature of the Proceedings, Promissory Estoppel and Gender Discrimination and Granted Summary Judgment When It Should Not Have Done So**

Almost the first sentence of Judge Vyskicol's opinion granting summary judgment set the tone for all that follows: "Plaintiff John Doe was an NYU student who had a long and sordid relationship (if it could be called that) with another NYU student, referred to as Jane Doe." The Court goes on to say "[i]t largely suffices to say that the relationship was toxic and that, as a result, Jane filed a complaint against Plaintiff…." JA 239.

The Court just as easily could have written the following: The plaintiff was lured to NYU by a young woman who made false claims of rape in an effort to engaged his sympathy, manipulated him by means of a fictitious social media account instructing him on how best to satisfy her sexually, commandeered his bed as often as five nights per week, physically assaulted him, isolated him from their social network of friends by making false and humiliating claims about his sexuality and sexual orientation, and then complained about him to university officials in an effort to have him expelled from NYU. The university turned a blind toward the young woman's repeated acts of misconduct and deceit and expelled the male.

Rather than permitting a jury to decide which of these opposing narratives was true, the Court chose sides, making credibility determinations that have no place in evaluating a motion for summary judgment. What's more, the Court abandoned its responsibility to engage in a critical appraisal of the issues of material fact the parties placed before it, noting, *in a footnote* to its brief opinion, "[t]he following facts are taken from the parties' Local Civil Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motion, and the exhibits attached thereto. The facts are undisputed unless otherwise indicated." JA 240.   In so doing, the Court chose to highlight those facts most damning to the plaintiff, and ignoring the claims and assertions he claimed were material. The non-moving party is, as a matter of law, entitled to far more than such treatment.

Mr. Doe contends that on the record before the District Court that was ample evidence to support both an actual innocent theory of gender bias and a claim of selective enforcement. "In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense. In the second category, the plaintiff alleges selective enforcement [in that] the severity of the penalty and… the decision to initiate the proceeding was affected by [his] gender." *Yusuf v. Vassar Coll.*, 715 715 (2d Cir 1994); *Radwan v. Manuel*, 55 F. 4th 101, 130 (2022).

1. **The District Court's Selective Narrative Ignored Substantial and Material Facts In Dispute That Support Denial of Summary Judgment**

   a. **The District Court's Selective Reading of the Facts**

The District Court summarized the evidence as follows, JA 240-245:

Jane Roe and John Doe had a long and sordid relationship.[4] The Court continues, it "largely suffices to say the relationship was toxic." JA 240. The Court then marshaled the evidence in a light that reflected Jane Roe's theory of the case, and the reasons for NYU's decision to expel the plaintiff.

The parties met when they were in high school and stayed in close contact at their respective colleges. Ms. Roe was a freshman at NYU; Mr. Doe attended college elsewhere. Para. 35, JA 129.[5]

After their freshman year, Mr. Doe transferred to NYU, and "specifically requested (without Jane's knowledge)" to be housed in her dormitory. Paras. 48-52, JA 134-136.

Ms. Roe needed some space and told Mr. Doe so; he responded with over 100 unanswered messages and threats of self-harm. Paras. 53-58, JA 136-138. Mr.

---

[4] The Court's bias against the plaintiff is obvious *ab initio*. After referring to the relationship, the Court notes, parenthetically "if it could be called that." JA 240,

[5] Mr. Doe cites to the Statements of Material Facts submitted by the parties in Joint Appendix in an effort to spare this Court the task of looking first at the District Court opinion, and then at the material on which the Court relied.

20

Doe continued with this tactic over time, sending more messages and threats of self-harm, even threatening to give compromising information to her parents. Paras 60-62, 77, JA 140-141, 147.

"At some point" Mr. Doe took pictures of her partially exposed torso "supposedly" for use for his own sexual pleasure. Para. 59, JA 139-140.

In one heated discussion in a stairwell, Ms. Roe punched Mr. Doe, a punch she claims was done in self-defense. Paras. 99-101, JA 155-157.

Mr. Doe violated a no contact directive issue by the university the very day it was issued. Paras. 117-23, JA 164-166.

Mr. Doe met with a NYU administrator and told her about Ms. Roe's "alleged[]" physical and verbal abuse of him. He was informed he could file a cross-complaint against Ms. Roe, and that his complaint would be heard at the end of the proceedings she initiated against him. He elected not to do so. Para. 131, JA 169. The administrator informed Mr. Doe that Ms. Roe's complaints against him could result in his expulsion.

After the complaint was filed, university investigators met with Ms. Roe; they then informed Mr. Doe, in writing, that activities in violation of the schools Sexual Misconduct, Relationship Violence, and Stalking Policy, could result in disciplinary action, including separation from NYU. Paras. 1, 27, 148, JA 116, 127,

176-177. Mr. Doe was informed he could have an "advisor of choice" to accompany him to an interview. Paras. 149-150. JA 176. The investigators informed him he could have a university "facilitator" as advisor, and Mr. Doe agreed to have a facilitator. His facilitator was a man named Allen McFarlane. Para. 154, JA 178.

Mr. McFarlane told the plaintiff that the charges would "under no circumstances" result in his expulsion. Para. 319, JA 230.[6] Mr. McFarlane and Mr. Doe with an investigator. When Mr. Doe described the physical and verbal abuse Ms. Roe directed at him, the investigator told him Mr. Doe he could file a cross complaint. Mr. Doe did not do so. Paras, 161-162, 304, JA 189, 227.

After interviewing the partes and witness, an investigative report was sent to Mr. Doe and Ms. Roe. Paras. 174-175, JA 183-184. Mr. McFarlane reviewed the report and told Mr. Doe he would not be expelled. Mr. Doe sent additional evidence to investigators after receiving the preliminary report, and the report was finalized. Paras. 176, 183, 189, JA 184, 185-187, 189-190. There after a hearing was held and was adjudicated by the Director of the Office of Student Conduct. Paras. 189, 191, 206-208, JA 189-190, 195-196.

---

[6] Immediately after concluding that this was an undisputed fact, the Court then refers to it as a "(supposed) promise." JA 242. This remark illustrates the Court's seeming inability to give the non-moving party's facts the required weight.

The hearing officer found that Mr. Doe had engaged in sexual harassment, sexual exploitation and stalking as defined under NYU's Misconduct Policy. Para. 235, JA 204. The hearing officer concluded that there was insufficient evidence to sustain a claim of sexual assault. Para 241, JA 241. As the District Court put it, "[t]he hearing did not go well for the plaintiff." JA 243.

Mr. Doe retained counsel and filed an appeal, claiming "procedural errors (such as the fact that the hearing did not investigate Plaintiff's allegations against Jane," that previous relevant evidence was unavailable at the time of the hearing,[7] and that the sanction was disproportionate to the offenses.) Paras. 249-252, JA 208-210. The appellate panel denied the appeal. Para. 256, JA 211.

When Mr. Doe then tried to file a complaint against Ms. Roe with NYU, NYU declined to accept it because, according to a university official, the university had "never accepted a complaint from an expelled student against a current student." Para. 266, JA 214-215.

## 2. The Material Facts The District Court Ignored Or Glossed Over

John Doe's and Jane Roe's actual relationship, as reflected in the facts before the District Court, was far more nuanced than the one-sided recitation of facts in

---

[7] The District Court sarcastically characterizes this evidence in the following terms in yet another parenthetical aside: "(such as *even more* text messages between Plaintiff and Jane)" (emphasis in original). JA, 243.

the Court's memorandum in support of its order granting summary judgment. Had the Court addressed these material facts in dispute, there is little question that the case would have been ordered to proceed to trial. Despite the conclusory nature of the District Court's memorandum of decision granting NYU's motion for summary judgment, the parties actually filed hundreds of pages of Rule 56 statements of material facts and counterstatements of facts in dispute. The statements of facts reflect a troubled relationship and the end of romantic relationship that was confusing for both parties. None of this is suggested or even acknowledged in the District Court's memorandum of decision. Mr. Doe contends that the university's treatment of Jane Roe as a victim, and its refusal to investigate the extent to which Mr. Doe was a victim of Ms. Roe's conduct, reflects a systematic bias in favor of female complainants.

Experienced litigators know a simple truth: In any despite between private parties, the first person to complain to authorities most often becomes the victim. In cases such as these, the truth is far more complex, and NYU and the District Court chose to ignore that truth. In this case, a difficult and at times bizarre relationship that ended amid confusion and recrimination ended with the first-to-complain treated as a victim, and her former lover expelled. A jury should have been permitted to consider the following facts:

Ms. Roe and Mr. Doe met as high school students at an internship and became close. Ms. Roe explained that because she came from a deeply conservative family, her parents would not approve of her contacting him or her having a relationship at all. But she wanted a relationship and used an alias account on Facebook to foster it. Paras. 35-37, JA 129-130, These communications evolved to the point at which Ms. Roe adopted a fictitious persona, Sally Soe, who would communicate Jane's preferred sexual practices to Mr. Doe. Paras. 15, 35, 37, 160, JA 122-123, 128, 129-130,180. Indeed, Mr. Doe contends Ms. Roe even contacted him using a pseudonym while the no contact order was in place. Para. 169, JA 182-183.

The couple entered colleges at separate universities, with Ms. Roe entering NYU and Mr. Doe attending Connecticut university. Para. 42, JA 132. During her freshman year, Ms. Roe reported to Mr. Doe she had been sexually assaulted by four NYU students. Mr. Doe decided to attend to NYU, in part in response to the report of the sexual assault. Paras. 43, 133, JA 132-133, 170 There is no evidence this alleged assault actually ever took place. Para. 303, JA 226. Indeed, Ms. Roe later admitted lying about the fact her assailants were arrested. Id.

Mr. Doe visited NYU at mutually agreeable times and visited Ms. Roe. She would at times ask him to extend his stay at the university. Paras. 42, 43, JA 132-133, He showed her his application to NYU, even sharing his admission essay with

25

her. She expressed support for the transfer. Id. Once he was admitted, however, Ms. Roe changed her position, and made efforts to prevent his transferring to NYU. Para. 46, JA 18.

Once Mr. Doe arrived at NYU he was assigned a single room in a university dormitory, resulting in an additional expense of $10,000. He used a campus-sponsored swap board to arrange a change of rooms. The only swap he could arrange led him to a room in Ms. Roe's dormitory. Para. 49, JA 134-135. Ms. Roe slept in Mr. Doe's dorm room with him as many as five times per week during the fall 2017 semester and continued to spend the night there until sometime during March 2018, when the relationship crumbled. Para. 52, JA 136. During this period, she maligned and ridiculed Mr. Doe to their circle of friends, telling others she remained in the relationship with him because he blackmailed her. Among the comments she would make about him were homophobic slurs. Paras 65, 67-77, 90, JA 142-148, 152. These remarks hurt and confused Mr. Doe. Para. 85, JA 150.

The relationship deteriorated in the Spring of 2018, but Ms. Roe sent Mr. Doe "mixed signals," continuing to sleep in his room. Para. 63, JA 141-142. Both members of the couple caused difficulties for one another during this period. Para. 219, JA 199.

When Ms. Roe first complained about Mr. Doe to NYU, she explicitly sought to prevent NYU from inquiring into potential misconduct prior to the spring of 2018. Para. 12, JA 120-121. Even so, NYU looked back into the couple's past, reaching all the way back to 2016, a period that long-predated either party's arrival at NYU. Id. On May 22, 2018, NYU levied four charges against Mr. Doe, adding five more charges after it completed its investigation. Para. 146, JA 174-75.

Mr. Doe was informed of the investigation by university officials and informed of his right to have a representative assist him in the proceedings. Para. 34, JA 14. When Mr. Doe informed administrators that he wanted to bring a complaint against Ms. Roe, an administrator told him that any complaint against Ms. Roe "would be handled at the end of any proceedings against [him] and therefore [he] can and should wait until the end of any proceedings against [him]." Para. 15, JA, 122-123. When he asked for a university representative to assist him, the representative, Allan McFarlane, told him, after learning about the case, "there is no way you'll be expelled and the worst-case scenario will be at worst a one-semester suspension." Para. 27, JA 127. Mr. McFarlane explained that expulsion was the sanction in cases involving the use of a weapon or non-consensual intercourse. Para. 147, JA 175. Mr. McFarlane's assessment of the risks he faced as a result of the proceeding were material factors in Mr. Doe's decision to proceed to a hearing with Mr. McFarlane, rather than a lawyer. Paras 151-153, 156, JA 176-

27

178.  McFarlane's role was to "offer [g]uidance related to what happens in [Title IX] proceedings." Para, 34, JA 128.

During the course of the university's investigation of Ms. Roe's allegations, a mutual no contact order was issued against both students with respect to one another. Para. 177, JA 164. Mr. Doe texted a note to Ms. Roe immediately thereafter saying "Well / [sic] there goes the RA position." Para. 118, JA 164-165. He sent her another text messages days later and once "lost it" when he saw her in a common area of their dormitory. He also tried to contact her to try to "fix" things and to apologize. Paras. 119-127, JA 165-167. Mr. Doe also contacted Ms. Roe's parents during this period, reporting his fear that Ms. Roe was struggling with drug and alcohol use. Para. 124, JA 166. On another occasion, they saw one another in Washington Park after the order issued. Mr. Doe complained to campus police that he believed Ms. Roe was trying to force a confrontation with him. The officers refused to take a complaint. Paras. 134-137, JA 170-172. When questioned about this, Mr. Doe admitted the contact and was told by university officials that because he was "up front and honest, … [the NCO violations] shouldn't be an issued in these proceedings." Para. 159, JA 179.

After an internal investigation, the university produced a written draft investigative report. By the time this report issued, Mr. Doe had left the New York campus for a semester abroad in Australia. Para. 19, JA 124. He had limited access

28

to the report, photos and other evidence marshalled against him while in Australia. Paras. 163, 164, JA180-181. Mr. Doe asked for the hearing to be postponed until he returned to the United States, and the university denied that request. Para, 24, 205, JA 126, 195. While in Australia, Mr. Doe reported the difficulties he had accessing and reviewing the report to NYU, and the university gave Mr. Doe and Ms. Roe more time to review it and comment on it. Paras. 177, 181, JA 184-186. A final investigative report issued on October 23, 2018; at that time, the university added five additional claims to the complaint against Mr. Doe. Para. 189, JA 189-190.

The hearing was initially set for November 19, 2018, and thereafter, at Mr. Doe's request, continued until December 10, 2018. He participated remotely. Para. 205, JA 195.

At the hearing, logistical difficulties with the video feed made the hearing hard for Mr. Doe to follow. He asked for the adjournment of the proceedings so that he could participate fully. That request was denied. Paras. 212, 213, 231 JA 196-197, 203. Mr. Doe did not have the right to question his accuser, and, when he propounded questions he wanted his accuser to answer, not all of those questions were asked. Para. 210, JA 196. He did not have a paper copy of the final investigative report at his hearing, as did the others who participated, and was required to juggle computer screens in an attempt to follow both the proceedings

29

and the references to the report at the hearing. Paras. 15, 177, JA 122-123, 184.
Although Mr. Doe identified four witnesses – his mother and three individuals
from the CT university he attended before coming to NYU – but NYU did not
interview any of them or call them as witnesses.  Paras. 174, 180, JA 183-4, 185-
186.

According to data provided to Mr. Doe as part of the disciplinary process,
for the period from the 2015/2016 academic year through the 2019/2020 academic
year, NYU did not expel any female student after being found responsible for
sexual misconduct.  The majority of females found guilty of such misconduct were
sanctioned with either probation or suspension. Para. 276, JA 218. This includes
claims of relationship violence (probation), sexual harassment (probation), and,
stalking and sexual exploitation (suspension). During this period, a total of four
NYU students were expelled; all were male. Paras. 277-281, JA 218-219.

### D. Why The Court Erred In Granting Summary Judgment In Title IX Claims

When considered in the light most favorable to the non-moving party, there
can be little doubt that NYU reached an erroneous outcome and that gender bias
was a motivating factor in the outcome, which are the two requirements a plaintiff
must show to raise a viable Title IX claim. *Doe v. Colgate Univ.*, 457 F. Supp. 3d
164, 170 (N.D.N.Y. 2020), reconsideration denied, 2020 WL 343827 (N.D.N.Y,

June 30, 2020). John Doe and Jane Roe were in a troubled relationship. The relationship ended poorly. But only the female participant in the relationship was regarded as a victim; the male was expelled. This is the sort of selective enforcement that prohibited by Title IX: "To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and treated more favorably by the university." *Id,* p. 172

The Title IX process in this instance appears to be a textbook example of the #MeToo rallying cry – "believe the women," this time filtered through an unstated, but ever-present prism of a theory of "coercive control,"[8] a body of social science research suggesting that men often harass and intimidate women through overt and covert means of controlling them.

---

[8] Theories of coercive control were all the rage among activists at the time this case was litigated. A leading example of the sort of theorizing that supports a theory that men somehow are more prone to use implicit threats to coerce and control women is found in Kate Fitzgibbon and Sandra Walkate, *Gender, Crime and Criminal Justice (*2018). The theory posits that men are more disposed to use violence against women, that the courts and adjudicatory process turn a blind eye to subtle forms of control short of obvious violence, and that sophisticated intervention when controlling behavior is first identified could well prevent significant violence later on, including homicide. The university all but signaled its reliance on this "theory" in its findings as to Mr. Doe: "[he intentionally attempted to create circumstances where he could control and manipulate the Complainant's life." The fact finder somehow how found this to be "unwelcome conduct of a sexual nature," Para. 238, JA 205., because the "unwelcomed conduct was a product of their prior dating, intimate and sexual relationship." Id.

The following factors support Mr. Doe's contention that the university's mind was made up at the inception of the proceedings and was affected in substantial part by his gender of Title IX." *Yusuf v. Vassar Coll.*, 715 715 (2d Cir 1994); *Radwan v. Manuel*, 55 F. 4th 101, 130 (2022). On the record before the District Court, a jury could easily have concluded that this was simply a case about a bad break up and was not sexual in such a way as to fall under NYU's rules proscribing sexual harassment. Para. 250, JA 208-209.

1. **There Are Disputes Of Fact About Whether There Was Evidence That Mr. Doe Engaged In Sexual Misconduct In Violation Of NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy**

In compliance with its obligations under Title IX, the University maintained and enforced a Sexual Misconduct, Relationship Violence and Stalking Policy, Para. I, JA 116. Prohibited conduct under the policy includes "Sexual or Gender-Based Harassment," defined as "any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical or otherwise, when … such conduct … interferes with an individual's learning, working, or living environment." Para. 4, JA 117. The policy also prohibits Sexual Exploitation, which includes "non-consensual use of another individual's nudity or sexuality," such as "taking pictures … of another person … where such person has a reasonable expectation of privacy without the affirmative consent of all parties." Para. 5, JA 117. The policy also prohibits stalking, defined

32

as engaging in a course of conduct likely to cause another to experience fear or substantial emotion distress by means of two or more acts involving, following, monitoring, observing, surveilling, threatening another person. Para. 3, JA 116.

Mr. Doe was found by NYU to have "engaged in an extended pattern of conduct that would cause a reasonable person in the position of the Complainant to experience fear for their safety, substantial emotional distress, significant mental suffering, and anguish. This behavior included sexual harassment, sexual exploitation and stalking as defined under this policy." Para. 235, JA 204. There was insufficient evidence to support a finding of sexual assault. Para., JA 204.

The decision is puzzling. There was insufficient evidence to support a finding of sexual assault. Indeed, the record appears to be devoid of that allegation. Yet Mr. Doe was found to have engaged in conduct tinged with sexual animus. Under the overbroad interpretation of sexual harassment, sexual exploitation and stalking, any break-up between lovers at the university suddenly becomes fair game for an investigation of a Title IX violation. In this case, Mr. Doe had difficulty with the break up, but, on the facts presented by Mr. Doe, Ms. Roe had even more difficulties with the couple's relationship: she lied to her parents, used pseudonymous accounts to convey her sexual desires to Mr. Doe, lied about him to his friends, spread homophobic slurs about him, all the while appearing nightly in his dormitory room to spend the night with him. The impression one gets of this

33

relationship is one of claustrophobic horror, with both Mr. Doe and Ms. Roe perhaps captive to forces and attractions with which they were emotionally ill-equipped to contend. Transforming Ms. Roe into the victim of a Title IX violation under the guise of a sweeping and overbroad harassment policy and castigating Mr. Doe in the role of an abuser goes well beyond what the record supports in this case. Mr. Doe contends a jury should have had the right to sort out the truth of exactly what transpired here. NYU picked a side and rushed to judgment, with horrendous consequences for Mr. Doe.

### 2. There Was No Meaningful Investigation

Surely, Mr. Doe and Ms. Roe cannot be the only students to have endured a painful breakup of a romantic relationship while on campus. But it is a safe bet that this might be the only case in which one of the students, Ms. Roe, used a pseudonymous account to convey her sexual preferences and desires to her partner. The university's claim that this not a material fact in dispute is, candidly, ridiculous – the university failed to investigate Mr. Doe's contentions. At summary judgment, a party cannot bury its head in the sand and then claim the benefit of not having seen a thing. Paras. 288, 289, JA 22-222. The university chose to ignore this troubling and unusual conduct. This is especially significant because the university knew that Ms. Roe had a pattern and practice of engaging in deceit to communicate with Mr. Doe. At the inception of her relationship with him, a relationship forged

in high school, she insisted that her parents could know nothing of the couple's communications. That they would not approve. So she communicated anyhow, creating a false account. Ms. Roe was well-schooled in deception. Indeed, she seemingly made it a way of life. It is impossible to understand why the university thought the accuser's credibility was not an issue in this case. The only explanation is that NYU chose to believe her, thus depriving Mr. Doe of a meaningful hearing and effective cross examination since the university's "investigative report" failed critically to evaluate her claims.

### 3. Mr. Doe Was Given False Assurances By Folks Who Knew Better And Were Part Of NYU's Title IX Process

Mr. Doe was an undergraduate at the time the complaint against him was initiated. He met with university administrators to become oriented to the procedural gauntlet he faced. While he was told that he could have the representative of his choice in the hearings, he opted for a university official, Allan McFarlane, a man with experience in the Title IX arena. After telling Mr. McFarlane about the case, Mr. McFarlane told the plaintiff he would not be expelled; at worst, the plaintiff faced a one-semester suspension. To his credit, Mr. Doe never pretended to be blameless. He was prepared to accept that as an outcome and did not seek other legal counsel. Even when it came to allegations about his violation of the university's No Contact Order, Mr. Doe admitted several

violations, only to be told that his candor would likely transform the admissions into acts of small significance.

### 4.    The University Misled Mr. Doe As To His Cross-Complaint Rights

Mr. Doe did not dispute the right of the university to hold him accountable, but he insisted that Ms. Roe, too, be held accountable. When he discussed with university representatives filing charges against her, he was told any claims against her should be filed at the end of his case, and that his concerns about her conduct would be addressed during his hearing. When that did not take place, and he was notified of his expulsion, he sought to bring a complaint against Ms. Roe, and was told by the university that, in effect, he lacked standing because he had been expelled. In any other context, this would be regarded as an intolerable species of "mousetrapping." Drawing the inference to which he is entitled at the summary judgment phase of the proceeding, Mr. Doe is within his rights asserting that this deceit was used by the university because it did not care to hear from him. It was going to believe, and protect, the woman whom to decided was a victim before the investigation even began.

### 5.  There Was No Reason The Hearing Could Not Be Delayed So That Mr. Doe Could Attend It In Person

Mr. Doe left the United States in August 2018 to attend a semester abroad in Australia. He was off campus. There would be no contact with the victim until he

returned. Mr. Doe asked for permission to attend his own hearing. His request for a continuance was denied. While he was able to get a continuance of the hearing and a time change to accommodate the difference in time zone, he was kept from being physically present at his own hearing, where he could see exhibits, see witnesses, see the fact finders as they made credibility determinations vital to his interests. The university failed to grant his request to attend his own hearing, leaving him to participate from overseas by way of a faulty and frustrating Internet connection. When he complained about the connectivity at his hearing and requested adjournment, that request was also denied. Why the urgency? Why tolerate the inconvenience to Mr. Doe unless the university's purpose was to finish a bad piece of work with as little trouble and inconvenience as possible to Ms. Roe, regardless of the consequences for Mr. Doe?

### 6. No Right To Confront His Accuser Or To Cross Examine Her

Mr. Doe was denied any meaningful right to question his accuser. Not simply was he denied cross examination rights, a defect found fatal in a growing number of cases, even when he propounded questions to be asked of Ms. Roe, the university failed to ask many of the questions. In no other context would these be tolerated, and it ought not to be tolerated here.

### 7. The University's Pattern And Practice Of Dealing With Title IX Claims Is Tilted In The Direction Of Believing The Woman

The statistical evidence about the discipline imposed in Title IX cases raises issues of material fact about whether NYU engaged in gender discrimination. A jury should have been entitled to evaluate whether NYU could offer a persuasive non-gender based answer to the data.

According to data provided to Mr. Doe as part of the disciplinary process, for the period from the 2015/2016 academic year through the 2019/2020 academic year, NYU did not expel any female student after being found responsible for sexual misconduct. The majority of females found guilty of such misconduct were sanctioned with either probation or suspension. This includes claims of relationship violence (probation), sexual harassment (probation), and, stalking and sexual exploitation (suspension). During this period, a total of four NYU students were expelled; all were male.

## VI. The Court Erred In Granting Summary Judgment As To The Promissory Estoppel Claim

The District Court also erred in refusing to account for the existence of material facts which, if decided in the favor of Mr. Doe, would have entitled him to judgment as a matter of law as to his claim of promissory estoppel. In addition, the Court once again refused to drawn inferences in favor of Mr. Doe, as is required by our law.

38

The District Court correctly recited the elements of a promissory estoppel claim under New York Law: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting estoppel by reason of the reliance." *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 591 (2d Cir. 2014)(quoting *Cybercrhon Corp v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1955))." JA 252.

The District Court assumed what the record before it compelled: that Mr. McFarlane made a clear and unambiguous promise and that the plaintiff was injured as a result of reliance on that promise. Yet even here, the District Court appeared to struggle with avoiding making credible determinations, calling both assumptions "dubious propositions." JA 252. The Court then rejected Mr. Doe's reliance on the assurances given him by Mr. McFarlane and others, asserting that his reliance was "unreasonable." Mr. Doe contends that the reasonableness of his reliance is an issue for jury determination, not determination by the Court at summary judgment.

The Court's decision is devoid of references to the specific assurances made to Mr. Doe, substituting, instead, a recitation of the university policies and procedures the Court believed undermined any claim to reasonable reliance. *Id.*, 252-253. The standard here is Mr. Doe's state of mind, and not the black letter of the university's policies. The simple fact is that university officials administer the

policy and are, presumably, familiar with the policy's operation and how the policy is put into effect.

Mr. McFarlane told Mr. Doe that, given the nature of the charges, there were no circumstances in which he would be expelled. Mr. McFarlane was, as argued supra., a university facilitator assigned the role of assisting Mr. Doe in defending himself. Paras. 149-150, 154, JA 176, 178. Mr. McFarlane told the plaintiff that the charges would "under no circumstances" result in his expulsion. Para. 319, JA 230.[9] Additionally, Mr. Doe and Mr. McFarlane met with a university investigator to review Ms. Roe's allegations. When Mr. Doe described the physical and verbal abuse Ms. Roe directed at him, the investigator told him Mr. Doe he could file a cross complaint. Mr. Doe did not do so. Paras, 161-162, 304, JA 189, 227. After interviewing the partes and witness, an investigative report was sent to Mr. Doe and Ms. Roe. Paras. 174-175, JA 183-184.. Mr. McFarlane reviewed the report and told Mr. Doe he would not be expelled. Mr. Doe sent additional evidence to investigators after receiving the preliminary report, and the report was finalized. Paras. 176, 183, 189, JA 184, 185-187, 189-190.

In reliance on what he was told by Mr. McFarlane, Mr. Doe travelled to Australia for a semester abroad. It is reasonable to infer that had he been accurately

---

[9] Immediately after concluding that this was an undisputed fact, the Court then refers to it as a "(supposed) promise." JA 242. This remark illustrates yet again the Court's seeming inability to give the non-moving party's facts the required weight.

informed of the potential seriousness of the consequences of the disciplinary hearing and not been lulled into a false sense of security, Mr. Doe may well have chosen to forego the semester abroad, to retain counsel, and to launch a more fulsome attack on Ms. Roe's claims, including the filing of his foregone complaint against her. Mr. Doe is entitled to the benefit of this inference at the summary judgment stage.

A useful analogy in evaluating the claim of bad advice arises in the context of plea advice offered to criminal defendants by counsel in the context of an ineffective assistance of counsel claim. Thus, where counsel gives bad advice on which a client relies in rejecting a plea, Courts evaluate the reasonableness of counsel's advice to the client. See *Lafler v. Cooper*, 566 U.S. 156 (2012) and *Missouri v. Frye*, 566 U.S. 134 (2012). In *Lafler*, counsel misadvised a client about whether the evidence was sufficient to support a conviction, telling the client that an attempted murder charge could not be supported by evidence that showed the victim was shot in the legs. This catastrophic bad advice led the client to elect trial, where he was convicted of attempted murder despite, apparently, being a bad shot.[10] The client sought collateral relief, which the Supreme Court granted. In *Frye,* counsel never informed a defendant of a plea which was more favorable than

---

[10] The victim was shot in the legs, not the torso.

the sentence imposed after conviction. The Supreme Court granted relief in this case as well.

In both cases, the Court held that the central role of counsel in the criminal justice system requires not the counsel get it right in every case, but that they inform a client of his options and offer reasonable advice to a client depending on counsel in dire circumstances. That is precisely the circumstance in which Mr. Doe found himself here. He was facing accusations with serious consequences and relied on a person familiar with the process to decide how best to respond. He was lured into a false sense of complacency, electing to face a potential suspension for conduct that was admittedly awkward by both parties in a bad break up. Had he known it was a fight to the death, an academic "death penalty," his resolve would have stiffened. It is reasonable to infer that we would have filed charges against Ms. Roe, more fully participated in the hearing by not traveling to Australia, retained counsel, and insisted on access to the full record prior to the hearing with ample time for he, and counsel, to prepare.

Mr. Doe concedes that this is not a case governed by Sixth Amendment standards. But he is mindful of the trend in courts nationwide to apply due process

to academic proceedings arising under Title IX.[11] He contends that a parallel right to effective assistance of a university adviser in encompassed within Title IX's due process rights.

## **CONCLUSION**

At most, this case was about a vexed and troubled relationship between two students that began in deceit, progressed through confusion and mutual recrimination, and ended in despair. The university's decision to transform it into grounds sufficient to expel one student, while turning a blind eye to the conduct of the other, is troubling. A jury could well conclude that when the university should have offered both students counseling, it transformed one of the students into a "victim," thereby victimizing the other. It cannot be said that a jury would not be within its rights to conclude that John Doe's rights were violated by NYU and that he is entitled to significant financial relief.

---

[11] A somewhat dated overview of the effort to incorporate constitutional standards of due process in the Title IX context can be found in Evan Gerstmann's *Campus Sexual Assault: Constitutional Rights and Fundamental Fairness* (2019).

Mr. Doe requests that this Court reverse the judgment in favor of the defendant, remand the case for further proceedings, and transfer the matter to a different judge.

**PLAINTIFF, JOHN DOE**

**By:    /s/ Norman A. Pattis, Esq.**

Norman A. Pattis, Esq.

**PATTIS & ASSOCIATES, LLC**

Counsel of Record

Bar # ct 13120

383 Orange St.

New Haven, CT  06511

Phone:  (203) 393-3017

Fax:  (203) 393-9745

npattis@pattislaw.com

44

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

The foregoing brief contains fewer than 50 pages, 10,471 words, and therefore complies with the type-volume limitations of Fed. R. App. R. 32(6). The motion has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

**/s/    Norman A. Pattis, Esq.**

Norman A. Pattis

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the above-captioned date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

**/s/    Norman A. Pattis, Esq.**

Norman A. Pattis