# 23-1246-cv

## United States Court of Appeals

*for the*

## Second Circuit

JOHN DOE,

*Plaintiff-Appellant,*

– v. –

NEW YORK UNIVERSITY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
### Volume 1 of 3 (Pages SA-1 to SA-229)

JEFFREY METZLER
MAX WINOGRAD
PILLSBURY WINTHROP SHAW PITTMAN LLP
*Attorneys for Defendant-Appellee*
31 West 52nd Street
New York, New York 10019
(212) 858-1000

CP COUNSEL PRESS   (800) 4-APPEAL • (328907)

i

## TABLE OF CONTENTS

**Page**

Declaration of Jeffrey P. Metzler, for Defendant,
in Support of Motion for Summary Judgment,
entered June 22, 2022
(Omitted herein)

Exhibit 1 to Metzler Declaration -
Investigation Report Parts A through H ................. SA-1

Exhibit 3 to Metzler Declaration -
NYU Procedures .................................................... SA-348

Exhibit 13 to Metzler Declaration -
Transcript of NYU Administrative Hearing, dated
February 23, 2022 ................................................. SA-360

SA-1

# Exhibit 1, Part A



**Office of Equal Opportunity**
**Office of the President**
726 Broadway, 7th Floor
New York, NY 10003

# INVESTIGATION SUMMARY REPORT

TO:         Craig Jolley, Director, Office of Student Conduct & Community Standards;

Cc:         Mary Signor, Executive Director & Title IX Coordinator, Office of Equal Opportunity

FROM:     Samuel Hodge, Title IX Investigator, Office of Equal Opportunity; Lauren Stabile, Deputy Title IX Coordinator, Office of Equal Opportunity; and Jacqueline Cornell, Title IX Investigator, Office of Equal Opportunity

DATE:     October 23, 2018

RE:         Complaint of Sexual Misconduct by ▮Jane Roe▮ against ▮John Doe▮

---

## I.  INTRODUCTION & ALLEGATION(S) PRESENTED

This memorandum summarizes the allegation(s), factual background, and witness statements concerning a report made by student ▮Jane Roe▮ ("Ms. ▮Roe▮"), alleging sexual misconduct in violation of <u>NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy</u> (see Attachment A) by student ▮John Doe▮ ("Mr. ▮Doe▮").  Specifically, Complainant has alleged that on multiple occasions between fall 2016 and spring 2018 Respondent engaged in misconduct, including the following:

1. On, about, and between fall 2016 and spring 2018, on and off-campus, Respondent placed his lips on Complainant's face, without her affirmative consent.

2. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually exploited Complainant by taking photographs, disseminating photographs, and threatening to disseminate photographs of her nude body, without her knowledge or affirmative consent.

3. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his hand on her breasts – both over and under her clothing - without her affirmative consent.

SA-3

4. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his hand on her vagina - both over and under her clothing - without her affirmative consent.

5. On or about spring 2017, at the Weinstein Residence Hall, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his penis on her body, without her affirmative consent.

6. On, about, and between fall 2016 and spring 2018, on and off-campus, Respondent stalked Complainant by following Complainant and repeatedly messaging, calling and threatening Complainant, which caused Complainant to fear bodily injury and experience substantial emotional distress.

7. On, about, and between fall 2016 and spring 2018, on multiple occasions, Respondent engaged in relationship violence by threatening physical harm to himself and verbally abusing Complainant.

8. On or about April 29, 2018, at University Hall, Respondent violated the No-Contact Directive put in place on April 22, 2018, by speaking and placing his hand on Complainant.

9. On or about May 2, 2018, off-campus on a public street, Respondent violated the No-Contact Directive put in place on April 22, 2018 by following Complainant.

## II.   INVESTIGATION SUMMARY

The interviews noted below were conducted by Samuel Hodge, Title IX Investigator, Office of Equal Opportunity, Lauren Stabile, Deputy Title IX Coordinator, Office of Equal Opportunity and Jacqueline Cornell, Title IX Investigator, Office of Equal Opportunity (collectively, "Title IX Investigators"):

| Date: | Location: | Interviewee: |
|---|---|---|
| May 17, 2018 | 726 Broadway, rm. 723 | Jane Roe ▓, Complainant (accompanied by Christine Janick, Support Person |
| July 10, 2018 | 726 Broadway, rm. 723 | John Doe ▓, Respondent (accompanied by Allen McFarlane, Advisor) |
| August 10, 2018 | 726 Broadway, rm. 723 (via Skype) | ▓, Witness |
| August 21, 2018 | 726 Broadway, rm. 734 (via Skype) | ▓, Witness |
| September 6, 2018 | 726 Broadway, rm. 723 | ▓, Witness |

Page 2 of 20

CONFIDENTIAL STUDENT RECORD

The following items are referenced in the Investigation Summary and are attached at the end of the memorandum:

A. <u>NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy</u> (effective October 13, 2016; August 25, 2017 and April 19, 2018);

B. Written statement and related emails/messages/images/videos (submitted by Complainant);

C. No-Contact Directive emails to Respondent and Complainant, dated April 22, 2018;

D. Written statement and related messages/images (submitted by Respondent);

E. Messages and images provided to Ms. ████ from the Complainant (submitted by Ms. ████ );

F. Department of Public Safety Uniform Incident/Offense Report, dated April 30, 2018;

G. Complainant's Response to the Investigation Summary Draft Report, dated October 22, 2018; and

H. Respondent's Response to the Investigation Summary Draft Report, dated October 22, 2018.

**III.** **<u>NARRATIVE SUMMARY OF INTERVIEWS CONDUCTED</u>**

The summaries below have been assembled by allegation and, where possible, in chronological order of alleged incident. Except where specifically noted, the dates of these incidents are approximate. Additionally, the summaries below were compiled using the written notes taken during the course of the interviews of the parties and/or witnesses with the Title IX Investigators, and do not represent verbatim transcripts. When statements are attributed to individuals, such statements are related in general substance, unless otherwise indicated.

A. **<u>Summary of Interview with</u>** Jane Roe . **Complainant**

Ms. Roe is a junior at NYU's Gallatin School of Individualized Study and currently studying Ecological Design & Global Health. During Ms. Roe 's freshman year (i.e. 2016-2017), she lived at NYU's Weinstein Hall ("Weinstein") and lived in University Hall ("UHall") her sophomore year (2017-2018).

CONFIDENTIAL STUDENT RECORD

SA-5

Ms. [Roe] stated that she met Mr. [Doe] in the summer of 2015 during an internship at Yale University. She stated that they lived approximately forty minutes away from each other in Connecticut, and after the internship ended continued to speak on the phone and text message. She remembered that they "developed a friendship" and "connected" talking about their similar backgrounds.

Ms. [Roe] stated that she knew by January 2016 that Mr. [Doe] "liked" her. Ms. [Roe] stated that he would ask her out "a lot." Ms. [Roe] stated that she eventually relented and "finally agreed" to go out with him. However, she characterized the development between them as "somewhat between a relationship and friendship." Ms. [Roe] stated that her parents were "very strict" and did not like that she talked to Mr. [Doe]. Ms. [Roe] stated that to she created a *Facebook*[1] account using an alias, that her parents could not access, to speak with Mr. [Doe].

Ms. [Roe] recalled that during her final year of high school she met up with Mr. [Doe] at an amusement park, but otherwise did not see him much. She stated that once she moved to New York for college, Mr. [Doe], who was a freshman at University of Connecticut ("UConn"), visited occasionally on the weekends. Ms. [Roe] stated that she "did not like him coming" and sometimes told him "no," when he asked to come.

Ms. [Roe] stated that Mr. [Doe] visits to NYU have all "smushed" together in her memory. Ms. [Roe] remembered that when Mr. [Doe] did visit, he would generally sleep in the residence hall lounge, not her room. She stated that sometimes she would fall asleep with him in the lounge. They "kissed, but not much more than that." Ms. [Roe] remembered that "sometimes" she kissed back, and other times Mr. [Doe] "forced [her] to kiss him." Ms. [Roe] stated that she would "push back" away from him, but he would not stop. Ms. [Roe] stated that she would also wake up to Mr. [Doe] kissing her. She explained that sometimes he would kiss her while she slept and take pictures without her knowledge.

Ms. [Roe] stated that on several occasion she would wake up to Mr. [Doe] "touching [her] in ways [she] did not want." When asked to elaborate, Ms. [Roe] explained that Mr. [Doe] would place his hands on her breasts and vagina over and under her clothing. When Ms. [Roe] would confront Mr. [Doe], he would claim that it was an "accident."

Ms. [Roe] recounted that in early spring 2017 Mr. [Doe] "forced" her into her shower with him. She stated that he "dragged" her into the shower by her arm as she pleaded with him to stop. Mr. [Doe] repeatedly told her that "it would be okay." Ms. [Roe] stated that Mr. [Doe] had a "weird thing for wetness." She recalled that she was wearing a tank top and leggings and he was naked. Ms. [Roe] stated that Mr. [Doe] forced her to kiss him and "rubbed" his erect penis on her. Ms. [Roe]

---

[1] Facebook is a social networking website that allows registered users to create profiles, upload photos and video, and send messages to other users.

CONFIDENTIAL STUDENT RECORD

NYU_00009758

SA-6

stated that she repeatedly told Mr. ████ "I don't want to do [this]." Mr. ████ responded, "It's fine, you're okay.  It's not a big deal."

Ms. ████ stated that after the shower she told Mr. ████ how the experience was "affecting" her and he apologized.

Ms. ████ maintained that her relationship with Mr. ████ was "more of a friendship" and that she "tried to cut it off many times." Ms. ████ experienced a past distressing event during her freshman year.  She explained that when she attempted to break up with Mr. ████, he would threaten to "tell people" about what happened to her if she ended the relationship.

Ms. ████ stated that she "finally broke off" the relationship in March 2017.  She described Mr. ████ as "very angry." She stated that Mr. ████ "created a new phone number" and contacted her mom "pretending to be a friend," telling her mother that she had gotten "drunk," was "depressed" and had "done things with people that were very concerning." Ms. ████ recalled that Mr. ████ "frequently" threatened to send photographs or call her parents and "tell them something." On more than one occasion, Mr. ████ sent photographs to her parents, which depicted the two of them together.  She stated that her parents confronted her and were "angry" at her.  Ms. ████ explained that her parents did not like Mr. ████ and did not approve of her interacting with him.

Ms. ████ stated that after the break-up she "tried to stop talking" to Mr. ████ which she said was difficult because he was "going crazy" and "angry." She recalled that when they did speak he cried a lot.

In Summer 2017 they began to speak more frequently. Ms. ████ stated that Mr. ████ told her that he was going to transfer to NYU.  She told him that she did not want him to transfer schools.  After a discussion, Mr. ████ stated that he would remain at UConn.

Ms. ████ stated that she was surprised to learn in fall 2017 that Mr. ████ had transferred schools.  She recalled that she was sitting in her dorm room when Mr. ████ "accidentally" video called her.  When she answered, she observed him to be in Washington Square Park. Ms. ████ stated that Mr. ████ asked to speak to her "one last time" and told her that she could "cut him off" afterwards. Ms. ████ told Mr. ████ that she did not want to speak to him.  She described herself as shocked and "angry" when she learned he transferred.

Ms. ████ stated that she had few interactions with Mr. ████ for a time, but she did not "completely" cut off talking to Mr. ████  She stated that they continued to exchange text messages.  She explained that she was worried about what Mr. ████ would do if she did stop talking to him (i.e. contact her parents, send them pictures or something else).

CONFIDENTIAL STUDENT RECORD

SA-7

Ms. ███ recalled that Mr. ███ "kept apologizing" and promised that he "would not do that stuff again." Ms. ███ stated that she relented and told him that they could be friends again. She stated that it was a "good friendship" for a while. She stated that Mr. ███ would be "annoyed" if she did something he did not approve. Ms. ███ stated that it "became too much interaction" and she attempted to cut down the amount of time they spent together, but "it didn't work." Ms. ███ stated that they had several mutual friends, which complicated her desire to see him less.

Ms. ███ stated that she would sleep over in his dorm room "frequently" but they were "not intimate." Towards the end of fall 2017, however, they were "intimate a few times." When asked by the Title IX Investigators how they were intimate, she stated that they kissed. Ms. ███ described their relationship as friends and it was "clear they were not in a [romantic] relationship." Ms. ███ stated that she slept over at Mr. ███'s dorm "sometimes" but it was "just kissing." She stated that when they would be "intimate" she would "zone out." Ms. ███ stated that Mr. ███ never "restrained" her or "anything." At the end of fall 2017 Ms. ███ "called it off" with Mr. ███

Ms. ███ stated that Mr. ███ was generally "manipulative" and "controlling." She learned that while she slept at his dorm room, he moved her shirt up while she slept and took photographs of her breasts without her consent. She learned about the photographs he had taken, when during an argument, he disclosed that he had them and threatened to send them to her parents. She explained that her parents had access to her email and phone messages and checked them regularly. Mr. ███ would email or text her, "you left clothes, socks because you were sleeping over." Ms. ███ stated that Mr. ███ knew that the messages could be seen by her parents and that they would make them angry with Ms. ███. Ms. ███ stated that she was afraid of what Mr. ███ would tell her parents if she did not speak with him. Ms. ███ stated that she felt "trapped in the situation."

Ms. ███ and Mr. ███ shared several mutual friends. Ms. ███ stated that some she met through Mr. ███ and they "preferred" to hang out with her. When they all hung out with each other, Mr. ███ would send "angry texts" to Ms. ███ if she made or laughed at jokes at his expense or "acted too close" to one of the friends. Ms. ███ stated that Mr. ███ was jealous.

Subsequent to being interviewed by the Title IX Investigators, Ms. ███ submitted a statement and timeline with corresponding text messages and video files (see Attachment B). In addition to what Ms. ███ disclosed in her submission, she shared the following in her interview with the Title IX Investigators:

- Ms. ███ stated that on approximately March 10, 2018, she was with Mr. ███ and some friends playing games in the residence hall. Ms. ███ stated that she laughed at a joke about Mr. ███ which caused him to become "really angry." She remembered that the group had decided to go to a different residence hall, and she intended to go with them. Ms. ███ stated

that Mr. ██Doe██ did not want her to go. She recalled that the group of friends left and she remained in her dorm room. She stated that Mr. ██Doe██ began "banging" on her dorm room door, "shaking the door handle," and texting her to open the door. Ms. ██Roe██ described her state of mind in that moment as "scared" because Mr. ██Doe██ was "angry." Ms. ██Roe██ stated that she called one of her friends to come to her dorm to pick her up. She recalled that her friend, ██████ ██████ ("Mr. ██████") came to her door and asked her to come to Rubin Hall with her. Ms. ██Roe██ stated that Mr. ██Doe██ indicated that he would go too. She stated that throughout the night, Mr. ██████ texted her "aggressively," but she ignored his messages. Ms. ██Roe██ stated that afterwards she told Mr. ██Doe██ that she needed some "distance." Ms. ██Roe██ stated that she had to tell Mr. ██Doe██ several times that she did not want to speak to him.

- On March 12, 2018, Mr. ██Doe██ took Ms. ██Roe██ out for dinner to celebrate her birthday. Ms. ██Roe██ stated that Mr. ██Doe██ paid for the meal and told her that he does "all this stuff for you and you don't appreciate me."

- On April 6, 2018, Ms. ██Roe██ went to Lipton Hall to "hangout" with some of her friends. Ms. ██Roe██ stated that Mr. ██Doe██ showed up without being invited and told Ms. ██Roe██ that it was "not okay" that she was socializing with others without him present. Ms. ██Roe██ stated that Mr. ██Doe██ sent threatening emails and messages to her.

- On April 7, 2018, Ms. ██Roe██ stated that she was at Lipton Hall studying with a friend. Mr. ██Doe██ showed up without being invited and demanded to speak to her alone about how her actions "affected him." He told her that it would be their "last conversation." Ms. ██Roe██ stated that she had no idea how Mr. ██████ knew where she was studying. Ms. ██Roe██ stated that she spoke with Mr. ██Doe██ for around three hours. Mr. ██Doe██ told her that she cannot stop talking to him. Ms. ██Roe██ stated that he threatened her and told her that he was "going to contact [her] every day and make [her] life a living hell if [she] don't talk to me."

- On April 20, 2018, Mr. ██Doe's██ birthday, Ms. ██Roe██ was "hanging out" with some of her friends, which made Mr. ██Doe██ "really angry." Ms. ██Roe██ stated that Mr. ██Doe██ told her that he was going to make her life a "living hell— if you thought what I did before was bad…" Ms. ██Roe██ stated that Mr. ██Doe██ gave her an ultimatum to meet him or he would call and send photographs to her parents. Ms. ██Roe██ stated that she met up with Mr. ██Doe██ and he was "super angry with [her]." Ms. ██Roe██ stated that Mr. ██Doe██ videotaped her, and she was "visibly upset." Mr. ██Doe██ stared into the camera on his phone and stated, "Well, look who's here. She's not supposed to talk to me." Mr. ██Doe██ threatened to send the video to Ms. ██Roe██ parents. Mr. ██Doe██ told Ms. ██Roe██ "you have to sleep over in my room." Ms. ██Roe██ stated that Mr. ██Doe██ "got really close to [her] face," she punched

CONFIDENTIAL STUDENT RECORD

SA-9

him twice and pushed him away from her. Ms. [Roe] remembered that Mr. [Doe] [Doe's] was "yelling angrily in [her] face," at the time. Ms. [Roe] slept in Mr. [Doe's] room that evening, but the two were not intimate.

- On April 22, 2018, Ms. [Roe] reported her concerns about Mr. [Doe] to the Department of Public Safety and a no-contact directive ("NCD") was issued. See Attachment C.

- Ms. [Roe] stated that after the NCD was issued she received numerous text messages and phone calls from numbers she did not recognize and received voicemails from Mr. [Doe]. See Attachment B. Ms. [Roe] stated that Mr. [Doe] messaged her mother on *Facebook* using a new *Facebook* account. See Attachment B. Ms. [Roe] stated that Mr. [Doe] told her mother that [Jane] is under the influence of alcohol and drugs—all her friends drink and smoke too."

- On April 29, 2018, inside of UHall, Mr. [Doe] approached Ms. [Roe] from behind and tapped her on her back. He told her that "what you did isn't right and you're going to pay for this." Ms. [Roe] stepped away from him and he responded "okay, I'm going to follow you." Ms. [Roe] stated that she started to gather her things to leave and he stepped on her backpack and stated, "You can't leave until we talk." Ms. [Roe] stated that she went to NYU's Department of Public Safety office, along with Mr. [Doe] and reported that he was violating a NCD. See Attachment F.

- On May 2, 2018, Ms. [Roe] stated that she was followed by Mr. [Doe] in Washington Square Park. Ms. [Roe] stated that she then walked down Macdougal Street and went into a restaurant. She stated that she observed Mr. [Doe] pacing in front of a restaurant. See Attachment B. Ms. [Roe] stated that she felt "stressed and anxious" about Mr. [Doe's] conduct after the NCD was issued.

B. **Summary of Interview with** [John Doe] **, Respondent**[2]

Mr. [Doe] is a junior at NYU's College of Arts and Science. Mr. [Doe] transferred to NYU in fall 2017, after completing his first year at the University of Connecticut. Mr. [Doe] is currently studying Global Public Health and Chemistry, and is on a "pre-med track." During Mr. [Doe's] 's sophomore year (i.e. 2017-2018), he lived at NYU's University Hall.

---

[2] After his interview with the Title IX Investigators, Mr. [Doe] provided a written statement (Attachment D), outlining his relationship with Ms. [Roe]. This statement has been incorporated into this report by reference, and the content of said statement is further addressed in the summary of Mr. [Doe's] interview statement.

CONFIDENTIAL STUDENT RECORD

NYU_00009762

SA-10

Mr. ▮ stated that he met Ms. ▮ in August 2015, while participating in a research internship, *Discovery to Cure*, at Yale University. Mr. ▮ stated that, subsequently, he reached out to Ms. ▮ regarding interest in her blog, and that they began communicating regularly from that point. Mr. ▮ stated that, from approximately August through December 2015, he and Ms. ▮ developed a friendship through speaking via text message. He also stated that in November 2015 they began to speak via phone. Mr. ▮ explained that while their relationship was primarily "virtual" in nature, he saw Ms. ▮ at a Physics competition at Yale in October 2015.

According to Mr. ▮ on or about January 6, 2016, he asked Ms. ▮ to begin a romantic relationship; she asked to think about it, and after a day or so, agreed. Mr. ▮ stated that, nevertheless, their relationship remained primarily "virtual." Mr. ▮ stated that Ms. ▮ s parents were not supportive of their relationship and called him a "time waster," and monitored Ms. ▮'s phone/communications. Mr. ▮ stated that as a result, they would often speak on the phone late at night (e.g. "2 a.m."), and communicate via *WhatsApp*, so that it was less likely that they would be "caught." Mr. ▮ stated that, despite their efforts, Ms. ▮ parents found out that they were continuing their relationship, despite their expressed concerns, and Ms. ▮ father called him several times and accused him of "harassing" his daughter. Mr. ▮ stated that Ms. ▮ followed up with him the next day, apologized for her father's actions, and told him that she loved him and wanted to maintain their relationship, despite her parents' disapproval. See Attachment D.

Mr. ▮ stated that throughout the remainder of their senior year of high school[3], he and Ms. ▮ continued to text one another and speak on the phone late at night, as well as regularly express that they loved one another. Then, in April 2016, two days after Mr. ▮'s birthday (i.e. on or about April 23, 2016), Ms. ▮ terminated their relationship, indicating that she was "bad" for him.

Mr. ▮ stated that, nevertheless, he and Ms. ▮ remained in contact. Mr. ▮ stated that on or about June 1, 2016, Ms. ▮ had a class trip to *Six Flags*, and, as it was his "Senior Skip Day," he met her there and they spent the day together. Mr. ▮ described this day as the first time that he and Ms. ▮ "were physically intimate" - explaining that they kissed and hugged on this occasion. Mr. ▮ stated that, thereafter, through the Summer of 2016, they continued their relationship, spoke regularly, and remained romantic with one another.

In fall 2016, Mr. ▮ and Ms. ▮ each started at their respective colleges - Mr. ▮ at University of Connecticut, and Ms. ▮ at NYU. They stayed in touch, but, according to Mr. ▮ during this time, Ms. ▮ was trying to "annoy" him so that he would "break up" with her. Mr. ▮ stated that, during this time, Ms. ▮ experienced a distressing event that she had reported to local law

---

[3] Mr. ▮ described that both he and Ms. ▮ attended separate schools, both in Connecticut.

CONFIDENTIAL STUDENT RECORD

NYU_00009763

SA-11

enforcement; as a result, despite her trying to get him to end their relationship, he continued to be there for her and support her in the aftermath of the distressing event.

Mr. ████ stated that the first time he visited Ms. ████ at NYU was in October 2016, and that, thereafter, over the course of this year, he visited Ms. ████ at NYU approximately eight or nine times.  Mr. ████ stated that he cannot currently remember the details of all of these visits, but described the "general jist" was that they would "make out," with "clothes off" (i.e. both being in their respective underwear "at worst" - with one occasion when Ms. ████ bra came off), and showered together approximately three times.  Mr. ████ stated that, while showering together, Ms. ████ would leave her clothes on⁴ and he would be in his underwear or nude.  He also stated that, during these showers, Ms. ████ would "soap" his genitals "for cleanliness purposes;" one such time, his underwear came off, after Ms. ████ told him that she was comfortable with this.  According to Mr. ████ during these visits, he and Ms. ████ would also sleep next to one another - sometimes in places like the laundry room, and "make out in her bed."  He also described that, at times, Ms. ████ would be sexually "aggressive" and that "sometimes clothes would come off," but then she would later change her persona and question her intimate actions, asking questions such as, "Did I do that?"

Additionally, Mr. ████ stated that, during this time, he would receive text messages from an unidentified individual/number, posing as a friend of Ms. ████, who would make suggestions as to intimate acts he should try with Ms. ████  During his interview with the Title IX Investigators, Mr. ████ expressed that, in retrospect, he now questions whether this was a third party, or Ms. ████ herself.⁵  Mr. ████ also stated that, during his visits at NYU, Ms. ████ would make efforts to conceal the fact that he was visiting her.  For example, she would have a friend sign him in, "never introduced" him to her friends (or even told him who her friends were), and have him hang out in public/common areas (e.g. the laundry room).  According to Mr. ████ Ms. ████ claimed that this was a continued effort to hide their relationship from her parents.  Mr. ████ stated that, on one occasion, after one of Ms. ████ friends saw his arm around Ms. ████ the friend texted Ms. ████ and asked if he was bothering her.  Mr. ████ stated that it was interactions like this, combined with Ms. ████ efforts at "hiding" their relationship that caused him to ask her why her friends "hate [him];" she responded that, in a "moment of panic" she had told them that he "dragged [her] in the shower" and forced himself on her, and that they were not in a relationship together.

As to Ms. ████ instant allegations regarding an incident with Mr. ████ that took place in her shower, Mr. ████ stated that he "never" dragged her into the shower.  Mr. ████ stated that the closest he came to this is during the first time he showered with Ms. ████ when he "pulled" her in the shower (he is uncertain of the

---

⁴ Mr. ████ stated that the reason for this was to prevent "things" from "slipping in," as both had concerns regarding pregnancy.

⁵ Mr. ████ stated that once over the winter 2017-2018 he saw the anonymous number on Ms. ████ phone, which led to "doubt" that this person existed (i.e. separate from Ms. ████ ).

SA-12

date, but knows that it was sometime in fall 2016).  He described that, leading up to this, Ms. [Roe] had "soaped" his entire body, while Mr. [Doe] was in the shower and she was standing outside of it.  Mr. [Doe] stated that, after she had washed his body, he grabbed her arm and gave it "a little tug;" Mr. [Doe] described this as a "playful" gesture. According to Mr. [Doe] in response, Ms. [Roe] "backed away" and stated, "I don't want to do that." Mr. [Doe] stated that Ms. [Roe] seemed to be "panicked" about this, but then proceeded to shampoo his hair. Mr. [Doe] also stated that, subsequently, Ms. [Roe] joined him in the shower; Mr. [Doe] maintained that, other than kissing "a couple times" while in the shower, this was not a sexual act.

Mr. [Doe] stated that, on or about March 7th, he visited Ms. [Roe] at NYU, and that, shortly thereafter, she "broke up" with him over text.  According to Mr. [Doe] Ms. [Roe] cited the reason for the break-up as their relationship being "too much," and expressed that she wanted them to remain friends.  As such, after this conversation, they continued to call one another every day.  Mr. [Doe] further stated that he also visited Ms. [Roe] in late March/early April, and that on this visit they kissed, even though they remained broken up.

Mr. [Doe] stated that, around this time, he applied to NYU.  He stated that Ms. [Roe] was aware that he was applying to NYU, as she had reviewed his college admittance essay; however, as Ms. [Roe] was upset that he was coming to NYU (even "threatening" to not be friends with him if he transferred), he did not tell her of his ultimate decision to come to NYU.[6]

Mr. [Doe] also stated that, it was around this time when Ms. [Roe] had begun "drinking a lot." Mr. [Doe] stated that he was "worried" about her wellbeing, and, as a result, anonymously contacted her parents, as he "didn't know who else to reach out to"; he informed them that Ms. [Roe] was "struggling" and "needed support." Mr. [Doe] stated that, in response, Ms. [Roe] 's parents seemed to "genuinely care,"[7] but he ultimately ceased communication with them because he "panicked." Mr. [Doe] stated that, one day after he contacted Ms. [Roe] s parents, Ms. [Roe] found out, and was "quite mad," "expressing that he had no right to do that." Mr. [doe] stated that, despite this argument, their friendship continued, and they remained in contact over the summer, even while Ms. [Roe] was abroad in India.

Once at NYU, both Mr. [Doe] and Ms. [Roe] lived in UHall – Mr. [Doe] on the 5th floor and Ms. [Roe] on the 2nd floor.  Mr. [Doe] stated that, initially, Ms. [Roe] was upset with him and declined his romantic gestures, such as when he left her earrings outside of her residence door.  Mr. [Doe] stated that, shortly thereafter, she called him to help clean up her room after a glass broke and he ended up spending the night in her room; Mr. [Doe] clarified that he slept in Ms. [Roe] 's room that night but does not recall if they were physically intimate.  Nevertheless, according to Mr.

---

[6] Mr. [Doe] stated that Ms. [Roe] only confirmed this information two days prior to moving into NYU, when she "FaceTimed" Mr. [Doe] while he was standing in a New York City park.

[7] Mr. [Doe] stated that this was surprising to him in light of what Ms. [Roe] had previously shared with him about her interactions with her parents.

CONFIDENTIAL STUDENT RECORD

Doe "things started to pick up from there," and he and Ms. Roe maintained an intimate relationship moving forward.

Mr. Doe stated that, over the next few months, on a number of occasions, Ms. Roe would sleep over in his bed and the two would be physically intimate. He further described that at times, Ms. Roe would sleep over five nights out of the week. He also stated that their intimacy increased during this time period, as they showered in their underwear together and Ms. Roe performed oral sex on him on multiple occasions. Mr. Doe also stated that he "tried to pleasure her" by rubbing her vagina with his fingers both over and under her clothing, during at least two interactions. Additionally, Mr. Doe stated that on two occasions he stuck his penis into Ms. Roe's vagina, but they did not continue as he "could not keep it up;" thereafter, both agreed to not attempt to have sexual intercourse again.

Mr. Doe stated that, despite their increased intimacy, Ms. continued to deny their relationship in public, and "made believe" Mr. Doe was bothering her when around others. Mr. Doe stated that he continued to "let it go" because he thought it was about maintaining privacy from her parents and he "blindly trusted her."

Mr. Doe stated that, on or about March 2018, their relationship began to deteriorate. Mr. Doe stated that the primary point of contention between them was over how Ms. interacted with Mr. Doe friends; specifically, Mr. Doe described that Ms. would share embarrassing information about him with them, that Mr. Doe had asked her to keep private, and would continue to misrepresent their relationship to others. Mr. Doe stated that he confronted Ms. about these behaviors and sent her a lot of "aggressive" text messages one evening, because he was "upset."

According to Mr. Doe over spring break, both apologized and attempted to reconcile. However, when they got back to school, Ms. Roe resumed avoiding Mr. Doe and they only socialized with others present. Mr. Doe stated that he and Ms. Roe ultimately agreed to stop talking on or about April 6, 2018. He stated that also around this time, his friends "dropped him" - "one by one" – as a result of his relationship issues with Ms. Roe.

Mr. Doe stated that, despite the contention in their relationship, he still cared about Ms. Roe and expressed his affection, such as through the organization of a birthday dinner at *Max Brenner*. According to Mr. Doe Ms. Roe did not appreciate this gesture.

Mr. Doe stated that, subsequently, on April 21, 2018, he became very upset after Ms. Roe did not acknowledge his birthday. Mr. Doe stated that he texted Ms. Roe in a "fit of rage," from both his phone and anonymous numbers and this led to a "heated" in-person conversation between them at UHall. He stated that, during this altercation, he and Ms. Roe "locked heads" and Ms. Roe repeatedly punched him with her fist in his chest. According to Mr. Doe when he asked Ms. Roe

CONFIDENTIAL STUDENT RECORD                                                      NYU_00009766

why she did this, she stated that it was "self-defense –that she thought [he] was going to do something." Mr. ▮Doe▮ stated that this confrontation lasted for approximately five hours, that he took two videos during their argument, and when it was over, Ms. ▮Roe▮ was distressed and crying, so he offered for her to stay in his room. Mr. ▮Doe▮ stated that Ms. ▮Roe▮ did stay over, and he walked Ms. ▮Roe▮ back to her room a few hours later and both apologized to one another.

Mr. ▮Doe▮ admitted that he violated the no-contact directive in place in the instant matter. He stated that he contacted Ms. ▮Roe▮ parents sometime between April 22, 2018 and April 30, 2018, because he was again concerned about Ms. ▮Roe▮ wellbeing. Mr. ▮Doe▮ also stated that on or about April 22, 2018, he "tapped" Ms. ▮Roe▮ on the back, when he saw her while she was in UHall. Mr. ▮Doe▮ stated that his *emotions got the best of [him]* and he wanted to tell Ms. ▮Roe▮ that what she was doing by ending their relationship was "really wrong" and to let her know that she owed him money from things he paid for during their relationship. Mr. ▮Doe▮ also acknowledged that his *WhatsApp* blurb was directed at Ms. ▮Roe▮, because he knew she would see it, and he wanted to communicate with her.

As to Ms. ▮Roe▮'s other allegations, Mr. ▮Doe▮ stated the following:

- He denied stalking her in Lipton Hall ("Lipton"). Mr. ▮Doe▮ stated that he had gone to Lipton to study and once there, saw Ms. ▮Roe▮ socializing with others, including ▮▮▮▮ an "acquaintance" of Mr. ▮Doe▮ Mr. ▮Doe▮ stated that Ms. ▮Roe▮ was laughing at him, and when he approached her, Ms. ▮Roe▮ told him to leave and not to contact her. Mr. ▮Doe▮ stated that, in response, he told Ms. ▮Roe▮ that he was not going to stop contacting her because their issues were "not resolved" and they "needed to sort [them] out." He stated that the conversation ultimately ended when it was interrupted by their "large friend group." Before leaving Ms. ▮Roe▮ Mr. ▮Doe▮ told her "it's not over," referring to their conversation.

- During his interview with the Title IX Investigators, Mr. ▮Doe▮ reviewed text messages submitted by Ms. ▮Roe▮ (see Attachment B), regarding "making her life hell." Mr. ▮Doe▮ acknowledged that he sent them and stated that it was a "poor gesture," and that he sent these messages because he was upset about her "lying about everything."

- Mr. ▮Doe▮ stated that he has photos of Ms. ▮Roe▮ sleeping; he said that he took these after Ms. ▮Roe▮ feel asleep on the phone while they were talking via FaceTime. Mr. ▮Doe▮ stated that he took these photos because he thought that Ms. ▮Roe▮ appeared "adorable" and "distressed" and wanted to show Ms. ▮Roe▮ how she looked. Mr. ▮Doe▮ denied taking photos of Ms. ▮Roe▮ while she was in her bra or without a shirt on. He further elaborated that he used to have two photos - one of Ms. ▮Roe▮ sleeping with her stomach exposed and the other showing "excessive cleavage" and her nipple visible - but that he deleted those photos after Ms. ▮Roe▮ learned of them.

CONFIDENTIAL STUDENT RECORD                                    NYU_00009767

SA-15

- Mr. ▮Doe▮ denied touching Ms. ▮Roe▮ with his erect penis in a shower during her first year at NYU.  He stated that the only thing he could think of is if his erect penis touched her in the shower "by accident" due to the small space. He distinguished this, stating that, since he has been at NYU, over the past year, Ms. ▮Roe▮ has performed oral sex on him while in the shower and rubbed her buttocks on his erect penis.

- Mr. ▮Doe▮ denied ever kissing Ms. ▮Roe▮ in her sleep and stated that she did this to him and told him that she did so.

C.  **Summary of Interview with** ▮▮▮▮ ▮▮▮▮ **Witness**

Ms. ▮▮▮ is a junior at NYU's College of Arts and Science.  Ms. ▮▮▮ stated that she met Ms. ▮Roe▮ during freshman Welcome Week in fall 2016.  Ms. ▮Roe▮ is her "closest friend."  She explained that they bonded over their shared background, movie interests, and interest in exploring the city.

Ms. ▮▮▮ stated that she met Mr. ▮Doe▮ through Ms. ▮Roe▮  She learned of Mr. ▮Doe▮ "about two weeks" after freshman week.  Ms. ▮▮▮ estimated that Mr. ▮Doe▮ visited Ms. ▮Roe▮ six times in fall 2016 and spring 2017.  When Mr. ▮Doe▮ visited, she mainly talked to him about cricket, and not much else.

Ms. ▮▮▮ stated that she became closer to Ms. ▮Roe▮ because of "this situation," referring to Ms. ▮Roe's▮ allegations against Mr. ▮Doe▮  When asked by the Title IX Investigators for her impressions of Mr. ▮Doe▮ Ms. ▮▮▮ stated, "To be frank, [Ms. ▮Roe▮ told me stuff about him that made me bias against him."  Ms. ▮▮▮ stated that when she met Mr. ▮Doe▮ it was a "light atmosphere," without much "tension," however she remembered thinking that Ms. ▮Doe▮ seemed uncomfortable.  Ms. ▮Doe▮ remembered that during one of his initial visits to New York she observed Mr. ▮Doe▮ "flick" Ms. ▮Roe▮ in the face when he was annoyed, which made Ms. ▮Doe▮ uncomfortable.

According to Ms. ▮▮▮ Ms. ▮Roe▮ did not want Mr. ▮Doe▮ to visit New York or come to her dorm room.  She stated that Ms. ▮Roe▮ a strong student, was concerned about her school work.  Ms. ▮▮▮ stated that Ms. ▮Roe▮ "did not consider [Mr ▮Doe▮ ] her boyfriend," rather she considered him someone she was "close" with.

Ms. ▮▮▮ stated that later in their freshman year, in the residence hall laundry room, she observed Mr. ▮Doe▮ "whack" Ms. ▮Roe▮ in the arm, which made her uncomfortable.  Ms. ▮▮▮ stated that Ms. ▮Roe▮ "did not have a say" for when Mr. ▮Doe▮ would appear in New York.  Ms. ▮▮▮ stated that Ms. ▮Roe▮ repeatedly told her that she did not want Mr. ▮Doe▮ to visit.

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009768

SA-16

Ms. ███ never saw Ms. ███Roe███ and Mr. ███Doe███ kiss, but did see them hold hands. Ms. ███Roe███ told her that Mr. ███Doe███ had kissed her in the past and it was "not consensual or kinda [*sic*] not really."

Ms. ███ stated that Ms. ███Roe███ told her that Mr. ███Doe███ was going to transfer from UConn to NYU, which upset her. Ms. ███Roe███ told her that she did not want him to move to New York. Ms. ███ stated that Mr. ███Doe███ told Ms. ███Roe███ he would not transfer, but once he did that's when, according to Ms. ███, "things started to go downhill." Ms. ███ stated that Ms. ███Roe███ got "quite upset" when she learned Mr. ███Doe███ transferred and "did not want anything to do with him."

Ms. ███ stated that it was hard for Ms. ███Roe███ to separate herself from him because they shared the same friend group, he joined the same clubs and changed his major to have similar courses as her. Ms. ███ stated that Ms. ███Roe███ "tried her best" to not interact with him, but she wanted the relationship to be "cordial," not "hostile."

Ms. ███ stated that during their sophomore year there were a lot of "rumors" about Ms. ███Roe███ and Mr. ███Doe███. Ms. ███ stated that Mr. ███Doe███ told friends that he was "dating" Ms. ███Roe███ and the two were "boyfriend and girlfriend." Ms. ███ stated that Mr. ███Doe███ was "spreading lies," which made Ms. ███Roe███ "angry and annoyed."

In March 2018, Ms. ███ along with several other friends, Ms. ███Roe███ and Mr. ███Doe███ went out to celebrate Ms. ███Roe's███ birthday. Ms. ███ stated that there was "tension" between Ms. ███Roe███ and Mr. ███Doe███. She recalled that Mr. ███Doe███ "kept trying to talk" to Ms. ███Roe███. Ms. ███ stated that it "took a lot of effort" to get Mr. ███Doe███ away from Ms. ███Roe███ that evening.

Ms ███ stated that Mr. ███Doe███ was "getting more and more desperate to talk to ███Jane███ and make sure she listen[ed] to him" after the birthday party. Ms. ███Roe███ told Ms. ███ about an incident where Mr. ███Doe███ came to her dorm room and "banged on the door repeatedly and sat outside" waiting on her to open the door.

Ms. ███ stated that after spring break there was an "incident in Carlyle." Ms. ███Roe███ went to Carlyle to study. Mr. ███Doe███ was also present and studying at a nearby table. Ms. ███Roe███ told Ms. ███ that it was "fine" that he was there, so long as he did not come to her table. Ms. ███ stated that Mr. ███Doe███ did come to their table and "tried to get ███Jane███ to leave with him to talk." Ms. ███ recalled Ms. ███Roe███ stating to Mr. ███Doe███ that she was leaving and Mr. ███Doe███ then stated that he would also leave. Ms. ███Roe███ stated that she would stay, and Mr. ███Doe███ then stated that he would stay. Ms. ███ stated that this back and forth happened several times. Ms. ███ stated that Ms. ███Roe███ tried to "sneak away" when he was distracted, but he "chased" after her. Ms. ███ told Mr. ███Doe███ that he was "not respecting" Ms. ███Roe███ and needed to stop. Ms. ███ recalled that that evening she "comforted" Ms. ███Roe███.

CONFIDENTIAL STUDENT RECORD

SA-17

Ms. ███ stated that "maybe two weeks" before finals in spring 2018 Ms. Roe told her that had gotten a No Contact Directive against Mr. Doe. Ms. ███ recalled an incident where she, ███ ("Mr. ███"), and Ms. Roe were studying for finals in UHall and Mr. Doe approached them. She remembered that there was a printer in the room and Mr. Doe came in to pick something up off the printer, but rather than leave the room, he stayed and tried to talk to Ms. ███. Ms. ███ stated that he was "quite angry" and "basically started poking" Ms. Roe. She observed Mr. Doe "all tensed up." Ms. ███ remembered that Mr. Doe told Ms. Roe "you can't do this to me" and then "poke[d]" her on the shoulder. Ms. ███ observed Ms. Roe to be "nervous," "afraid," "annoyed" and "exhausted."

Ms. ███ stated that Mr. Doe "pretended" was not there and that he dismissively stated "Do you hear something?" when Mr. Doe spoke. Ms. ███ stated that she told Mr. Doe that they were all leaving and then walked with Ms. Roe to find a DPS officer. Ms. ███ stated that Mr. Doe followed them to the DPS officer and was "pretty angry" and had an "aggressive tone of voice." See Attachment F.

Ms. ███ stated that she observed Mr. Doe to be "manipulative" and attempt to "blackmail" Ms. Roe. Ms. ███ stated that she was aware that Mr. Doe had threatened to contact Ms. Roe parents, whom he knew did not approve of his interactions with Ms. ███. Ms. ███ stated that she was also aware that Mr. Doe had sent "threatening messages," called Ms. Roe repeatedly from various numbers, and followed Ms. Roe on the street. See Attachment D.[8] Ms. ███ stated that Ms. Roe disclosed to her that Mr. Doe at some point in spring 2018, physically assaulted her by shaking her "violently" and "maybe" sexually assaulted her, "but not rape." Ms. ███ stated that she did not know all of the details regarding Ms. Roe allegations against Mr. Doe.

D. **Summary of Interview with ███ | ███ Witness**

Mr. ███ is a rising sophomore at NYU's College of Arts and Science. Mr. ███ stated that he met Mr. Doe during Welcome Week of his sophomore year (i.e. fall semester of 2017). He stated that they played soccer together and developed a friendship, as Mr. Doe was "very informative" and a helpful resource to him, particularly regarding ways to save money. Mr. ███ stated that he met Ms. Roe through Mr. Doe but is uncertain of when exactly they met. Mr. ███ described Ms. Roe as a "friend" and stated that they are still in contact with one another. Mr. ███ stated that he is no longer in touch with Mr. Doe and "cut off" their friendship, in response to the relationship issues between Ms. Roe and Mr. Doe.

---

[8] Ms. ███ stated that Ms. Roe provided her with numerous photographs and screenshots of her conversations with Mr. Doe.

CONFIDENTIAL STUDENT RECORD                                          NYU_00009770

SA-18

Mr. ███ stated that over the 2017-2018 academic year, he observed Ms. ███ and Mr. ███ interact with one another on several occasions. He described that he never observed them be "affectionate" with one another and described Mr. ███ as "very possessive" of Ms. ███ Mr. ███ specifically recalled a time in March or April of 2018 when he and Ms. ███ were having a "jam session" – in which they were listening to Indian music late at night – when Mr. ███ started texting Ms. ███ Mr. ███ stated that he saw Mr. ███ texts on Ms. ███ phone, and they said in substance, "You don't have time for me, but you have time for jam sessions?" Mr. ███ further described that he witnessed Mr. ███ yell at Ms. ███ in public; he could not remember a specific incident, but recalls Mr. ███ shouting at Ms. ███ in his presence.

Mr. ███ stated that he believed the relationship between Ms. ███ and Mr. ███ to be "toxic." As a result, he and their other friends, arranged a meeting to try to intervene and create a "peaceful resolution." He stated that they all met during the Spring 2018 semester, and Ms. ███ and Mr. ███ confronted one another and ultimately agreed to not contact one another. According to Mr. ███ despite this agreement, Mr. ███ "forcefully" joined him, Ms. ███ and others at a "jam" session the next day. Mr. ███ described this as Mr. ███ "disrupting the peace" in their friend group and found his behavior to be "very distrustful," as a result, Mr. ███ stopped communicating with Mr. ███

Mr. ███ stated that, at some point, Ms. ███ shared with him that Mr. ███ would "forcefully harass her" and had "physically held her" without her consent; Mr. ███ did not provide further details. According to Mr. ███ Ms. ███ also shared with him and others in their friend group that Mr. ███ was "stalking" her and sent photos to him and others to corroborate her suspicions.

Mr. ███ stated that approximately two weeks before finals, during the end of April, he and Ms. ███ were studying with others in Lipton Hall. Then, "out of nowhere," Mr. ███ approached Ms. ███ Mr. ███ tried to ignore him and suggested to Ms. ███ that they go somewhere else to study, but Mr. ███ "forced" Ms. ███ to have "one final conversation" with him about their relationship. Mr. ███ stated that Mr. ███ and Ms. ███ then proceeded to have a conversation, and he walked over to another part of the room to give them privacy. Mr. ███ stated that before he left Lipton, approximately 45 minutes after their conversation had started, he observed Ms. ███ crying as she was talking to Mr. ███ Mr. ███ then left and Ms. ███ and Mr. ███ stayed behind and continued their conversation.

Mr. ███ stated that, subsequently, while he was studying with Ms. ███ in UHall, Mr. ███ again approached Ms. ███ Mr. ███ stated that Mr. ███ walked into the room, got something off of the printer, and then approached Ms. ███ and tried to have a conversation with her. Mr. ███ stated that Ms. ███ tried to ignore Mr. ███ but he persisted in trying to speak with her. Specifically, Mr. ███ observed Mr. ███ step on the straps of Ms. ███ bag so that she could not put it on, while she was trying to leave and get away from him. In

response to Ms. ███ Roe ███ having difficulty with her bag, Mr. ███ observed Mr. ███ Doe ███ "grin." Ms. ███ Roe ███ and Mr. ███ then went upstairs and reported the interaction to NYU's Department of Public Safety.  See Attachment F.

E.  **Summary of Interview with** ████ █████

████ █ is a senior, pursuing Acting in Tisch and Economics in CAS.   Mr. ████ lived in UHall during the 2017-2018 academic year, and his roommate during this time was Mr. ███ Doe ███.

Mr. ████ stated that he met Mr. ███ Doe ███ in fall 2017 on the day he moved into UHall.  Mr. ████ stated that he and Mr. ███ Doe ███ did not spend much time together, as Mr. ████ was only in their shared room approximately twice a week, and spent the remainder of his time at his girlfriend's off-campus apartment.  Mr. ████ further described that, when he was in their room, he was often on his laptop or asleep; as a result he and Mr. ████ stated that he and Mr. ███ Doe ███ were "not close."  Mr. ███ Doe ███ did not socialize together and he never met any of Mr. ███ Doe's ███ friends.

Mr. ████ also stated that he and Mr. ███ Doe ███ are not currently in touch with one another.  Mr. ████ did, however, run into Mr. ███ Doe ███ over the summer (i.e. 2017) in Washington Square Park; during this brief interaction, Mr. ███ Doe ███ told Mr. ████ about the instant Title IX matter and alerted him that he may be contacted to participate in the investigation.  Mr. ████ clarified that, during this conversation, Mr. ███ Doe ███ did not "try to sway" him, and was apologetic about involving him in this matter.

Mr. ████ stated that the name ███ Jane ███ Roe ███ is not familiar to him, but that he is "terrible" with names.  He clarified, however, that he believes that Mr. ███ Doe ███ mentioned the name "███ Jane ███" to him at least once.  Mr. ████ described that during the Fall 2017 semester and beginning of the Spring 2018 semester, Mr. ███ Doe ███ frequently had "a girl" in their room that Mr. ████ described as an "Indian woman with black hair."  Mr. ████ stated that there was "only ever one girl [that Mr. ███ Doe ███ brought to the room" and Mr. ████ would see this individual there "a couple of times a week."  Mr. ████ stated that, when he saw Mr. ███ Doe ███ and this other individual together, they were almost always "cuddling in bed" or asleep; he further clarified that one person would always have an arm around the other.  Mr. ████ stated that he knows that this other individual would sometimes have her arm around Mr. ███ Doe ███ because he remembers that the first time he saw them in bed "it looked like ███ John ███ had 3 arms."  Mr. ████ also stated that, he does not know what "the girl" was wearing while she and Mr. ███ Doe ███ were in bed together, because she was always under the covers, but that Mr. ███ Doe ███ would be "shirtless a lot," (Mr. ████ stated that he could not see his lower half).  Mr. ████ stated that he never observed any other intimate interactions between Mr. ███ Doe ███ and this other person.

CONFIDENTIAL STUDENT RECORD

SA-20

Mr. ███ later stated that he believes that he met this guest of Mr. ███ Doe ███ on one occasion, but believes that they just had "introductions" and exchanged "pleasantries." Mr. ███ described that "some time in" the first semester (i.e. fall 2017), after he asked Mr. ███ Doe ███ "who is that girl who is always in your bed," Mr. ███ Doe ███ told him that they "used to date, but broke up, and then got together again." According to Mr. ███ during this conversation, Mr. ███ Doe ███ also told him that their relationship was "secret;" Mr. ███ could not remember further details, but believes that Mr. ███ Doe ███ had shared that the relationship was secret because the female's parents and/or friends "hated" Mr. ███ Doe ███.

Mr. ███ also recalled a conversation with Mr. ███ Doe ███ during the middle of the second semester (i.e. spring 2018). Mr. ███ described, that in the context of talking about why Mr. ███ Doe ███ had had a "shit day," Mr. ███ Doe ███ told him that all of his friends were mad at him for something that "she" did to him, and that "she" would not talk about it with Mr. ███ Doe ███.

## IV.   REVIEW PERIOD

In accordance with the University's procedures with regard to investigations under the Sexual Misconduct, Relationship Violence, and Stalking Policy, the parties had the opportunity to review the Investigation Summary Draft Report, were invited to submit any additional comments, edits, or amendments, and told that they could identify any further witnesses or information, for consideration by the Title IX Investigators.

During the review period, Ms. ███ Roe ███ provided a response (via email) annexed hereto as Attachment G and Mr. ███ Doe ███ provided a response (via email) annexed hereto as Attachment H.

## V.   APPLICABLE POLICY & STANDARD OF REVIEW

The current policy in effect (Sexual Misconduct, Relationship Violence, and Stalking Policy, effective date April 19, 2018) holds that the issue of whether there was a violation will be determined under the policy or policies in effect at the time the alleged conduct occurred. Accordingly, all of the applicable polices for this matter are contained (collectively) in Attachment A.

Additionally, under the applicable procedures, the Title IX Investigators are required to make a determination as to whether there is "sufficient evidence" to be considered by an adjudicator. This initial determination is not a finding as to whether a Policy violation has occurred, is not an ultimate credibility assessment of the parties and/or witnesses (if applicable), nor is it a "charging" decision for purposes of an adjudication of the matter (if applicable); these later assessments are made at the consideration and discretion of NYU's Office of Student Conduct and Community Standards ("OSCCS"). Instead, the instant determination solely addresses the issue of whether a reasonable fact-finder (i.e.

CONFIDENTIAL STUDENT RECORD

SA-21

the person serving as the Adjudicator at the hearing) could determine that there is sufficient evidence to support a finding that a violation of the Policy has occurred.

VI.   **DETERMINATION**

**After a thorough investigation, careful review of the testimonial and documentary evidence, and consideration of the totality of circumstances, the Title IX Investigators, in consultation with other University administrators, have determined that there is sufficient evidence to be considered by an adjudicator as to whether Mr. ▊Doe▊ violated the University's Sexual Misconduct, Relationship Violence, and Stalking Policy.**

Accordingly, this matter is being referred to the Office of Student Conduct & Community Standards for further action, in accordance with the applicable University policy and procedures.

CONFIDENTIAL STUDENT RECORD

SA-22

1

# ATTACHMENT A

CONFIDENTIAL STUDENT RECORD

NYU_00009775

SA-23

**2**

## New York University
### UNIVERSITY POLICIES

| | |
|---|---|
| **Title:** | Sexual Misconduct, Relationship Violence, and Stalking Policy |
| **Effective Date:** | October 13, 2016 |
| **Supersedes:** | Sexual Misconduct, Relationship Violence, and Stalking Policy dated September 30, 2015 |
| **Issuing Authority:** | Deputy Chief of Staff, Office of the President<br>Senior Vice President for Student Affairs |
| **Responsible Officers:** | Director of the Office of Student Conduct and Community Standards<br>Title IX Coordinator |

### I.   STATEMENT OF POLICY

New York University, including its Schools and other units, Global Network University sites, and all University Affiliates (together, "NYU") seeks to maintain a safe learning, living, and working environment. To that end, this policy prohibits Sexual Misconduct, which includes Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. This policy also prohibits Relationship Violence, Stalking, and Retaliation against an individual for making a good faith report of conduct prohibited under this policy. These prohibited forms of conduct are unlawful, undermine the character and purpose of NYU, and will not be tolerated.

NYU adopts this policy with a commitment to: (1) preventing Sexual Misconduct, Relationship Violence, Stalking, and Retaliation (together, "Prohibited Conduct"); (2) fostering a community in which such conduct is not tolerated; (3) cultivating a climate where all individuals are well-informed and comfortable in reporting Prohibited Conduct; and (4) identifying the standards by which violations of this policy will be evaluated. This policy defines Prohibited Conduct; outlines available resources and reporting options available to students and employees; and references the applicable investigative and disciplinary procedures. NYU will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and address its effects. NYU also conducts prevention, awareness, and training programs for students and employees to facilitate the goals of this policy.

NYU does not discriminate on the basis of sex or gender in its education or employment programs and activities.

This policy is designed to comply with applicable legal requirements including Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"); and, in New York with the New York State and City human rights laws.

This policy applies to all Prohibited Conduct occurring on or after the effective date of this policy. In the case of Prohibited Conduct occurring before the effective date of this policy where either (a) the report of such Prohibited Conduct is made on or after the effective date of this policy or (b) the report was made before the effective date of this policy but the report has not resolved as of the effective date of the policy,

1

   NYU_00009776

SA-24

**3**

the issue of whether there was a violation of NYU policy will be determined under the policy or policies in effect at the time the conduct occurred but the procedures under this policy will apply (except that the procedures in effect immediately prior to the effective date will apply where a hearing had been scheduled prior to the effective date).

## II.     TO WHOM THE POLICY APPLIES

This policy applies to NYU students ("Students"); NYU employees, including faculty and visiting faculty, professional staff, and administrators ("Employees"); contractors, vendors, or other third parties within NYU's control ("Third Parties"); and visitors or guests of NYU (together, "Covered Persons"). This policy pertains to acts of Prohibited Conduct committed by Students, Employees and Third Parties when:

(1) the conduct occurs on NYU premises;

(2) the conduct occurs in the context of an NYU employment or education program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or

(3) the conduct occurs outside the context of an NYU employment or education program or activity, but (i) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (ii) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

Other forms of discrimination, including discrimination based on race, religion, and disability, as well as any other form of sex-based discrimination not covered by this policy, are addressed by: (1) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees, (2) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students, and (3) the Compliance Complaint Policy. This policy supersedes any conflicting information contained in those policies with respect to the definitions or procedures relating to Prohibited Conduct. A Covered Person who has a question about which policy applies in a specific instance can contact NYU's Title IX Coordinator (212-998-2352).

This policy and its related procedures may also, at NYU's discretion, apply to alleged violations by the Respondent of other NYU policies if, in NYU's judgment, those other allegations are directly related to the reported Prohibited Conduct.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific investigative and disciplinary procedures for Prohibited Conduct under this policy are based on the status of the Respondent. Each set of procedures is guided by the principles of fairness and respect for a Complainant and a Respondent. Where a Respondent is both a Student and an Employee, (a) the Student-Respondent procedures will apply if the Respondent is a full-time Student but not a full-time Employee, (b) the Employee-Respondent Procedures will apply if the Respondent is a full-time Employee but not a full-time Student, or (c) NYU's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates and the role most applicable in the incident). However, irrespective of which of the Student-Respondent or Employee-Respondent procedures applies in such cases, either of the sanctions applicable to Students or Employees can be imposed. Please note that the NYU Langone Medical Center has its own procedures and the procedures below do not apply to NYULMC.

NYU applies the preponderance of the evidence standard when determining whether this policy has been violated.

2

SA-25

4

| Procedures for Reports of Prohibited Conduct Committed by Students | Procedures for Reports of Prohibited Conduct Committed by Employees | Procedures for Reports of Prohibited Conduct Committed by Third Parties |
|---|---|---|
| See Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Students | See Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Employees | Contact NYU's Title IX Coordinator who will identify the appropriate procedures that apply based on the role of the Third Party and the nature of any contractual relationship with NYU. |

## IV.   ENFORCEMENT

A Student or Employee determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU.  Third Parties who violate this policy may have their relationship with NYU terminated and/or their privilege of being on NYU premises withdrawn.  NYU reserves the right to take action against a Covered Person who commits an act of Prohibited Conduct outside the scope of this policy.

## V.   TITLE IX COORDINATOR

The Executive Director of the Office of Equal Opportunity serves as NYU's Title IX Coordinator.  The Title IX Coordinator is charged with monitoring compliance with Title IX; providing education, training, and notifications; overseeing complaints; and coordinating NYU's investigation, response, and resolution of all reports under this policy.  The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures.

Concerns about NYU's application of Title IX, the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Clery Act; and, in New York, the New York State and City human rights laws under this policy may be addressed to NYU's Title IX Coordinator, the NYU Office of Equal Opportunity, the United States Department of Education, Clery Act Compliance Division, or the United States Department of Education, Office for Civil Rights, at OCR@ed.gov or (800) 421-3481.

## VI.   RESOURCES AND REPORTING OPTIONS

NYU offers resources for both Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the investigation and resolution of a report of Prohibited Conduct.  For comprehensive information on emergency assistance; hospitals; on-campus, community, Portal Campus and Study Away Site Confidential Resources; and available support with academics, housing, and work:

- Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

- Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

- Third Parties should contact the Title IX Coordinator to discuss available campus resources and reasonably available assistance.

CONFIDENTIAL STUDENT RECORD

SA-26

5

A. **PROTECTIVE MEASURES AND ACCOMMODATIONS:**

Upon receipt of a report involving a Student or Employee Complainant, NYU will take and/or make available reasonable and appropriate measures to protect the Complainant and the Complainant's access to NYU employment or education programs and activities, prevent retaliation, and avoid an ongoing hostile environment, which may include protective measures before the final outcome of an investigation. Such protective measures and accommodations, which may be temporary or permanent, may include separation orders, residence modifications, academic accommodations or assistance, work schedule modifications, transportation assistance, and other reasonable and appropriate measures. Reasonable and appropriate protective measures and accommodations are available for Student and Employee Complainants regardless of whether an investigation under the applicable procedures is pursued. NYU also will take and/or make available such measures and accommodations for Student and Employee Respondents where reasonable and appropriate under the circumstances. NYU will maintain the privacy of any accommodations or protective measures provided under this policy to the extent practicable.

For Third Party Complainants, NYU will provide reasonable protective measures as appropriate and available, based on consideration of the role of the Third Party and the nature of any contractual relationship with NYU.

Violating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy.

B. **PRIVACY AND CONFIDENTIALITY:**

NYU is committed to protecting the privacy of Covered Persons involved in a report under this policy. NYU also is committed to providing assistance to help Covered Persons make informed choices. With any report under this policy, NYU will make reasonable efforts to protect the privacy interests of Covered Persons involved in a manner consistent with the need for a careful assessment of the allegation and reasonable steps available to eliminate the reported conduct, prevent its recurrence, and address its effects.

Privacy and confidentiality have distinct meanings under this policy.

**Privacy:** Privacy generally means that information related to a report of misconduct will be shared with a limited circle of individuals who "need to know" in order to assist in the active review, investigation, resolution of the report, and related issues. All NYU employees who are involved in NYU's Title IX response receive specific training and guidance about safeguarding private information in accordance with applicable laws.

The privacy of Student education records will be protected in accordance with NYU's Guidelines for Compliance with the Family Educational Rights and Privacy Act (FERPA). The privacy of an individual's medical and related records generally are protected in the United States by the Health Insurance Portability and Accountability Act (HIPAA), excepting health records protected by FERPA. Access to personnel records in New York is restricted in accordance with NYU's Policy on Employee Files. Laws in other relevant jurisdictions may provide privacy protections.

**Confidentiality:** Confidentiality means that information shared by an individual with designated campus or community professionals cannot be revealed to any other individual without express permission of the individual, or as otherwise permitted by law. Those campus and community

4

NYU_00009779

SA-27

**6**

professionals include medical providers, mental health providers, counselors in the Center for Sexual Misconduct Support Services, and ordained clergy, all of whom normally have privileged confidentiality that is recognized by New York State law. These individuals are prohibited from breaking confidentiality unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18, or (iv) as otherwise required or permitted by law or court order. Laws in other relevant jurisdictions may provide confidentiality protections.

**Employee Responsibility to Report Allegations:** It is important to understand the different responsibilities of NYU Employees who respond to disclosures of incidents of Prohibited Conduct. There are three general classifications of individuals on campus with whom a Covered Person can discuss an incident of Prohibited Conduct:

(1) Confidential Resources (individuals with legally-protected confidentiality);

(2) Reporting Options (designated offices or individuals where a report can be made); and

(3) Employees designated as Responsible Employees (those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees).

The respective ability of these categories of individuals to maintain a Complainant's confidentiality differs. Confidential Resources can maintain the confidentiality of a Complainant's disclosures, subject to the exceptions discussed above. While private, Reporting Options and Responsible Employees are required to immediately share all known details of incidents of Prohibited Conduct with the Title IX Coordinator. Even University officers and employees who cannot guarantee confidentiality will maintain a Complainant's privacy to the extent reasonably possible. The information provided to a non-confidential resource will be relayed only as necessary for the Title IX Coordinator to coordinate an investigation and/or seek a resolution.

**Clery Act Reporting:** Pursuant to the Clery Act, NYU includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education, but does so in an anonymized manner that does not include the specifics of the crime or any identifying information about persons involved in an incident.

**C. CONFIDENTIAL RESOURCES:**

Confidential Resources for Students include the Wellness Exchange (212-443-9999) and the Center for Sexual Misconduct Support Services (212-443-9999). For a complete list of NYU and community-based Confidential Resources for Students, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

Confidential Resources for Employees include the Employee Assistance Program (800-437-0911). For a complete list of NYU and community-based Confidential Resources for Employees, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

**D. REPORTING:**

NYU strongly encourages Covered Persons who become aware of an incident of Prohibited Conduct to report the incident to local law enforcement by contacting 911 (or equivalent in other jurisdictions) and to NYU by contacting one of the following NYU Reporting Options:

5

CONFIDENTIAL STUDENT RECORD

NYU_00009780

SA-28

7

| Title IX Coordinator<br>212-998-2352 | Office of Student Conduct and Community Standards<br>212-998-4403 |
|---|---|
| The Office of Equal Opportunity<br>212-998-2370 | Residential Life and Housing<br>212-998-4600 |
| NYU Department of Public Safety<br>212-998-2222 | Human Resources Officer of the School or Administrative Department |

There is no time limit on reporting violations of this policy, although NYU's ability to respond may be limited as evidence may be less available and memories may fade, and Respondents may no longer be affiliated with NYU.

**Student Amnesty Policy:** The health and safety of every student at NYU is of utmost importance. NYU recognizes that Students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to Relationship Violence, Stalking, or Sexual Assault, occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. NYU strongly encourages Students to report incidents of Prohibited Conduct to NYU officials. NYU will not subject a bystander, Complainant, or other individual making a report who discloses any incident of Prohibited Conduct to NYU's officials or law enforcement to disciplinary action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the Prohibited Conduct.

**Bad faith reports:** Submitting a false report or providing false or misleading information in bad faith or with a view to personal gain in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanction. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are determined not to be accurate.

## VII.   PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sexual orientation, gender, gender identity, or gender expression of the Complainant or Respondent. Prohibited Sexual Misconduct includes the following specifically defined forms of behavior: Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. Also prohibited are Relationship Violence, Stalking, and Retaliation.

Whether a Covered Person has violated this policy is determined based on all of the available facts and circumstances including but not limited to: statements of the Complainant and Respondent; statements by any witnesses to the alleged incident(s); documentary or physical evidence; the presence or absence of corroborating information; and relevant information about pre-and post-incident behavior and/or actions.

   A. **Sexual or Gender-Based Harassment: Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when one or more of the following conditions are present:

      (i) Submission to or rejection of such conduct is either an explicit or implicit term or condition of an individual's employment or advancement in employment, evaluation of academic work or

CONFIDENTIAL STUDENT RECORD

NYU_00009781

SA-29

8

advancement in an academic program, or basis for participation in any aspect of a NYU program or activity (quid pro quo);

(ii) Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual (quid pro quo); or

(iii) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective - a reasonable person's view - and subjective - the Complainant's view - standard (hostile environment).

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

Examples of conduct that may constitute Sexual or Gender-Based Harassment include but are not limited to:

- Sexual Assault, Sexual Exploitation, Relationship Violence, or Stalking as defined by this policy;

- Physical conduct, including unwelcome touching or sexual advances within the working, living, or learning environment;

- Verbal conduct, including lewd or sexually suggestive comments, jokes, or innuendoes or unwelcome comments about an individual's sexual orientation or gender identity; or

- Written conduct, including letters, notes, or electronic communications containing comments, words, jokes, or images that are lewd or sexually suggestive or relate in an unwelcome manner to an individual's sexual orientation or gender identity.

**B. Sexual Assault:**  Sexual Assault means Non-Consensual Sexual Intercourse or Non-Consensual Sexual Contact as defined below.

1.  **Non-Consensual Sexual Intercourse:** Non-Consensual Sexual Intercourse is having or attempting to have sexual intercourse with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated.  Sexual intercourse includes anal, oral or vaginal penetration, however slight, with a body part (e.g., penis, finger, hand or tongue) or an object.

2.  **Non-Consensual Sexual Contact:** Non-Consensual Sexual Contact is having or attempting to have sexual contact with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated.  Sexual contact includes touching, fondling or other intentional contact with the breasts, buttocks, groin, or genitals (over or under an individual's clothing) for purposes of sexual gratification or when such private body parts are otherwise touched in a sexual manner.

CONFIDENTIAL STUDENT RECORD

NYU_00009782

C. **Sexual Exploitation:** Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another individual's nudity or sexuality, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

Examples of Sexual Exploitation include but are not limited to:

- Voyeurism (such as watching or taking pictures, videos, or audio recordings of another person engaging in a sexual act, in a state of undress, or in a place and time where such person has a reasonable expectation of privacy such as a changing room, toilet, bathroom, or shower, each without the affirmative consent of all parties);

- Disseminating, streaming, or posting pictures or video of another in a state of undress or of a sexual nature without the person's affirmative consent;

- Administering alcohol or drugs to another person for the purpose of making that person vulnerable to non-consensual sexual activity;

- Exposing one's genitals to another person without affirmative consent;

- Prostituting another individual; or

- Knowingly exposing another individual to a sexually transmitted infection or virus without the other individual's knowledge.

D. **Relationship Violence:** Relationship Violence includes any act of violence or threatened act of violence, including Sexual Misconduct, Stalking, or Physical Assault, against a person who is, or has been involved in a sexual, dating, domestic, or other intimate relationship with that person. Physical Assault includes threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person under circumstances that reflect a direct connection to the intimate relationship in question.

E. **Stalking:** Stalking occurs when a person engages in a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress.

Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property. Substantial emotional distress means significant mental suffering or anguish.

Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.

F. **Retaliation:** Retaliation means any adverse action taken against an individual for making a good faith report of Prohibited Conduct or participating in any investigation or proceeding under this policy. Retaliation includes threatening, intimidating, harassing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.

CONFIDENTIAL STUDENT RECORD                                        NYU_00009783

SA-31

**10**

## VIII.   RELATED DEFINITIONS: CONSENT, FORCE, AND INCAPACITATION:

**A. Affirmative Consent:**  Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity.  Affirmative consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.  Silence or lack of resistance, in and of itself, does not demonstrate consent.  The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

Consent cannot be obtained: (1) through the use of force or coercion; or (2) by taking advantage of the incapacitation of another individual.  Consent also cannot be given by someone who is under the legal age to consent in the applicable jurisdiction at the time of an incident.

In evaluating whether affirmative consent was given, consideration will be given to the totality of the facts and circumstances, including but not limited to the extent to which a Complainant affirmatively gives words or actions indicating a willingness to engage in sexual activity; whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the Respondent, demonstrating an incapacity to consent.

Relying solely on nonverbal communication may result in a violation of this policy.  It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and clarifies, verbally, the willingness to continue.

Consent may be initially given, but withdrawn at any time.  When consent is withdrawn or can no longer be given, sexual activity must cease.  Prior consent does not imply current or future consent; consent to any sexual act or prior consensual sexual activity does not necessarily constitute consent to any other sexual act.  Even in the context of an ongoing relationship, consent must be freely sought and given for each instance of sexual activity.

**B. Force or Coercion:**  Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual activity.  There is no requirement that a party resists the sexual advance or request, but resistance will be viewed as a clear demonstration of non-consent.

Coercion is conduct, including intimidation and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to overcome the individual's freedom of will and to compel the individual to engage in sexual activity.

**C. Incapacitation:**  An individual who is incapacitated lacks the ability to knowingly choose to participate in sexual activity or make informed, rational judgments and thus cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, being involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring.  Mentally helpless means a person is rendered temporarily incapable of appraising or controlling one's own conduct. Physically helpless means a person is physically unable to communicate unwillingness to an act.

Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication.  The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait, combativeness, or emotional volatility.  Evaluating incapacitation also requires

9

NYU_00009784

SA-32

**11**

an assessment of whether a Respondent knew or should have been aware of the Complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the Respondent's position. Being intoxicated or impaired by drugs or alcohol is never an excuse for committing Prohibited Conduct and does not diminish one's responsibility to obtain informed and freely given consent. In other words, consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

### IX.  VIOLATIONS OF LAW:

Behavior that violates this policy also may violate the laws of the local jurisdiction in which the incident occurred and subject a Respondent to criminal prosecution by the presiding authority.

The New York State Penal Code describes prohibited Sex Offenses in §§ 130.00 to 130.91 and 130.95 to 130.96 and prohibited Stalking Offenses in §§ 120.45 – 120.60. Covered Persons studying, working, or engaging in other activities at one of NYU's portal campuses, Global Network University sites, or other locations outside of New York State are governed by the applicable laws regarding sexual assault and other criminal offenses implicated by this policy. NYU's education and prevention programs related to its portal campuses and Global Network University sites will include definitions of prohibited conduct and consent in the applicable jurisdiction.

Behavior that violates this policy also may subject a Respondent to civil liability.

### X.   STUDENTS' BILL OF RIGHTS:

Under this policy, all students have the right to:

1. Make a report to local law enforcement and/or state police.

2. Have disclosures of Relationship Violence, Stalking, and Sexual Assault treated seriously.

3. Make a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process and/or the criminal justice process free from pressure by NYU.

4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.

5. Be treated with dignity and to receive from NYU courteous, fair, and respectful health care and counseling services, where available.

6. Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations.

7. Describe the incident to as few NYU representatives as practicable and not be required to unnecessarily repeat a description of the incident.

8. Be reasonably protected from Retaliation by NYU, any student, the Respondent, and/or their friends, family and acquaintances within NYU's jurisdiction.

9. Access to at least one level of appeal of a determination in matters involving Student conduct.

10

10. Be accompanied by an advisor of choice who may assist and advise a Complainant or Respondent throughout the disciplinary process including during all meetings and hearings related to such process.

11. Exercise civil rights and practice of religion without interference by the investigative or disciplinary process of NYU.

## XI.   CONSENSUAL RELATIONSHIPS:

Sexual behavior that is welcome or consensual by all involved parties does not constitute Prohibited Conduct. However, consensual sexual relationships in situations where one individual has power or authority over another may result in claims of Prohibited Conduct, and/or may give rise to complaints by others of disparate treatment. Examples of such relationships may include: a professor and his/her Student, a supervisor and a subordinate Employee, or a coach and team member. If such a consensual relationship occurs, any situation of authority should be discontinued immediately.

## XII.   PREVENTION AND AWARENESS PROGRAMS:

NYU is committed to the prevention of Prohibited Conduct through education and awareness programs. Incoming first year students and new employees are offered primary prevention and awareness programming as part of their orientation and returning staff and students are offered ongoing training and related programs. For a description of NYU's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students, and Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## XIII.   ADDITIONAL POLICY DEFINITIONS:

"Complainant" means the Covered Person who presents as the victim of any Prohibited Conduct under the policy, regardless of whether that individual makes a report or seeks action under the policy.

"Confidential Resource" means an NYU employee or community resource with statutorily protected confidentiality. This includes medical providers, mental health providers, rape crisis counselors, and ordained clergy.

"NYU" means the Schools and other units of NYU, NYU's Global Network University sites, and all University affiliates.

"Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

"Reporting Option" means individuals or departments designated by NYU to receive reports of Prohibited Conduct.

"Respondent" means the Covered Person(s) who has been accused of violating the policy.

"Responsible Employee" means those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees. This includes the NYU Title IX Coordinator; Public Safety Officers; senior staff members in Residence Life, Student Affairs, Student Activities, and Athletics; administrators in the Office of Community Standards; senior administrators in each of the Schools within NYU; Resident Assistants (RAs), and athletic team coaches.

CONFIDENTIAL STUDENT RECORD

NYU_00009786

**13**

"School" for purposes of this policy means each NYU school, college and institute that functions similarly to a school or college (e.g., IFA, ISAW, Courant, and CUSP), each NYU portal campus (e.g., New York and Abu Dhabi), and other global sites as designated by the Provost.

## XIV.   RELATED POLICIES:

Bullying, Threatening, and Other Disruptive Behavior Guidelines

Code of Ethical Conduct

Compliance Complaint Policy

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students

CONFIDENTIAL STUDENT RECORD                                                                NYU_00009787

**14**

## NEW YORK UNIVERSITY
## UNIVERSITY POLICIES

| | |
|---|---|
| **Title:** | Sexual Misconduct, Relationship Violence, and Stalking Policy |
| **Effective Date:** | April 19, 2018 |
| **Supersedes:** | Sexual Misconduct, Relationship Violence, and Stalking Policy dated August 25, 2017 |
| **Issuing Authority:** | Deputy Chief of Staff, Office of the President<br>Senior Vice President for Student Affairs |
| **Responsible Officers:** | Director of the Office of Student Conduct and Community Standards<br>Title IX Coordinator |

### I.    STATEMENT OF POLICY

New York University, including its Schools and other units, Global Network University sites, and all University Affiliates (together, "NYU") seeks to maintain a safe learning, living, and working environment. To that end, this policy prohibits Sexual Misconduct, which includes Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. This policy also prohibits Relationship Violence, Stalking, and Retaliation against an individual for making a good faith report of conduct prohibited under this policy. These prohibited forms of conduct are unlawful, undermine the character and purpose of NYU, and will not be tolerated.

NYU adopts this policy with a commitment to: (1) preventing Sexual Misconduct, Relationship Violence, Stalking, and Retaliation (together, "Prohibited Conduct"); (2) fostering a community in which such conduct is not tolerated; (3) cultivating a climate where all individuals are well-informed and comfortable in reporting Prohibited Conduct; and (4) identifying the standards by which violations of this policy will be evaluated. This policy defines Prohibited Conduct; outlines available resources and reporting options available to students and employees; and references the applicable investigative and disciplinary procedures. NYU will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and address its effects. NYU also conducts prevention, awareness, and training programs for students and employees to facilitate the goals of this policy.

NYU does not discriminate on the basis of sex or gender in its education or employment programs and activities.

This policy is designed to comply with applicable legal requirements including Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"); and, in New York with the New York State and City human rights laws.

This policy applies to all Prohibited Conduct occurring on or after the effective date of this policy. In the case of Prohibited Conduct occurring before the effective date of this policy where either (a) the report of such Prohibited Conduct is made on or after the effective date of this policy or (b) the report was made before the effective date of this policy but the report has not resolved as of the effective date of the policy, the issue of whether there was a violation of NYU policy will be determined under the policy or policies in effect at the time the conduct occurred but the procedures under this policy will apply (except that the procedures in effect immediately prior to the effective date will apply where a hearing had been scheduled prior to the effective date).

1

CONFIDENTIAL STUDENT RECORD

SA-36

**15**

## II.    TO WHOM THE POLICY APPLIES

This policy applies to NYU students ("Students"); NYU employees, including faculty and visiting faculty, professional staff, and administrators ("Employees"); contractors, vendors, or other third parties within NYU's control ("Third Parties"); and visitors or guests of NYU (together, "Covered Persons"). This policy pertains to acts of Prohibited Conduct committed by Students, Employees and Third Parties when:

(1) the conduct occurs on NYU premises;

(2) the conduct occurs in the context of an NYU employment or education program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or

(3) the conduct occurs outside the context of an NYU employment or education program or activity, but (i) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (ii) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

Other forms of discrimination, including discrimination based on race, religion, and disability, as well as any other form of sex-based discrimination not covered by this policy, are addressed by: (1) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees, (2) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students, and (3) the Compliance Complaint Policy. This policy supersedes any conflicting information contained in those policies with respect to the definitions or procedures relating to Prohibited Conduct. A Covered Person who has a question about which policy applies in a specific instance can contact NYU's Title IX Coordinator (see section D below (Reporting) for Title IX Coordinator contact information).

This policy and its related procedures may also, at NYU's discretion, apply to alleged violations by the Respondent of other NYU policies if, in NYU's judgment, those other allegations are directly related to the reported Prohibited Conduct.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific investigative and disciplinary procedures for Prohibited Conduct under this policy are based on the status of the Respondent. Each set of procedures is guided by the principles of fairness and respect for a Complainant and a Respondent. Where a Respondent is both a Student and an Employee, (a) the Student-Respondent procedures will apply if the Respondent is a full-time Student but not a full-time Employee, (b) the Employee-Respondent Procedures will apply if the Respondent is a full-time Employee but not a full-time Student, or (c) NYU's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates and the role most applicable in the incident). However, irrespective of which of the Student-Respondent or Employee-Respondent procedures applies in such cases, either of the sanctions applicable to Students or Employees can be imposed. Please note that the NYU Langone Medical Center has its own procedures and the procedures below do not apply to NYULMC.

NYU applies the preponderance of the evidence standard when determining whether this policy has been violated.

2

SA-37

**16**

| Procedures for Reports of Prohibited Conduct Committed by Students | Procedures for Reports of Prohibited Conduct Committed by Employees | Procedures for Reports of Prohibited Conduct Committed by Third Parties |
|---|---|---|
| See Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Students | See Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Employees | Contact NYU's Title IX Coordinator who will identify the appropriate procedures that apply based on the role of the Third Party and the nature of any contractual relationship with NYU. |

## IV.     ENFORCEMENT

A Student or Employee determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU. Third Parties who violate this policy may have their relationship with NYU terminated and/or their privilege of being on NYU premises withdrawn. NYU reserves the right to take action against a Covered Person who commits an act of Prohibited Conduct outside the scope of this policy.

## V.     TITLE IX COORDINATOR

Mary Signor, the Executive Director of the Office of Equal Opportunity serves as NYU's Title IX Coordinator. The Title IX Coordinator is charged with monitoring compliance with Title IX; providing education, training, and notifications; overseeing complaints; and coordinating NYU's investigation, response, and resolution of all reports under this policy. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures.

Concerns about NYU's application of Title IX and its implementing regulations; the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Clery Act; and, in New York, the New York State and City human rights laws under this policy may be addressed to NYU's Title IX Coordinator or the NYU Office of Equal Opportunity. Inquiries concerning the Violence Against Women Reauthorization Act of 2013 or the Clery Act may also be referred to the United States Department of Education, Clery Act Compliance Division, while inquiries concerning the application of Title IX and its implementing regulations may also be referred to the United States Department of Education, Assistant Secretary, Office for Civil Rights, at OCR@ed.gov or (800) 421-3481.

## VI.     RESOURCES AND REPORTING OPTIONS

NYU offers resources for both Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the investigation and resolution of a report of Prohibited Conduct. For comprehensive information on emergency assistance; hospitals; on-campus, community, Portal Campus and Study Away Site Confidential Resources; and available support with academics, housing, and work:

- Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

- Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

- Third Parties should contact the Title IX Coordinator to discuss available campus resources and reasonably available assistance.

3

CONFIDENTIAL STUDENT RECORD

SA-38

17

**A. PROTECTIVE MEASURES AND ACCOMMODATIONS:**

Upon receipt of a report involving a Student or Employee Complainant, NYU will take and/or make available reasonable and appropriate measures to protect the Complainant and the Complainant's access to NYU employment or education programs and activities, prevent retaliation, and avoid an ongoing hostile environment, which may include protective measures before the final outcome of an investigation. Such protective measures and accommodations, which may be temporary or permanent, may include separation orders, residence modifications, academic accommodations or assistance, work schedule modifications, transportation assistance, and other reasonable and appropriate measures. Reasonable and appropriate protective measures and accommodations are available for Student and Employee Complainants regardless of whether an investigation under the applicable procedures is pursued. NYU also will take and/or make available such measures and accommodations for Student and Employee Respondents where reasonable and appropriate under the circumstances. NYU will maintain the privacy of any accommodations or protective measures provided under this policy to the extent practicable.

For Third Party Complainants, NYU will provide reasonable protective measures as appropriate and available, based on consideration of the role of the Third Party and the nature of any contractual relationship with NYU.

Violating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy. The Title IX Coordinator will determine and identify the appropriate procedures to be followed for such a violation depending on the timing and circumstances of the reported violation.

**B. PRIVACY AND CONFIDENTIALITY:**

NYU is committed to protecting the privacy of Covered Persons involved in a report under this policy. NYU also is committed to providing assistance to help Covered Persons make informed choices. With any report under this policy, NYU will make reasonable efforts to protect the privacy interests of Covered Persons involved in a manner consistent with the need for a careful assessment of the allegation and reasonable steps available to eliminate the reported conduct, prevent its recurrence, and address its effects.

Privacy and confidentiality have distinct meanings under this policy.

**Privacy:** Privacy generally means that information related to a report of misconduct will be shared with a limited circle of individuals who "need to know" in order to assist in the active review, investigation, resolution of the report, and related issues. All NYU employees who are involved in NYU's Title IX response receive specific training and guidance about safeguarding private information in accordance with applicable laws.

The privacy of Student education records will be protected in accordance with NYU's Guidelines for Compliance with the Family Educational Rights and Privacy Act (FERPA). The privacy of an individual's medical and related records generally are protected in the United States by the Health Insurance Portability and Accountability Act (HIPAA), excepting health records protected by FERPA. Access to personnel records in New York is restricted in accordance with NYU's Policy on Employee Files. Laws in other relevant jurisdictions may provide privacy protections.

**Confidentiality:** Confidentiality means that information shared by an individual with designated

4

campus or community professionals cannot be revealed to any other individual without express permission of the individual, or as otherwise permitted by law. Those campus and community professionals include medical providers, mental health providers, counselors in the Center for Sexual Misconduct Support Services, and ordained clergy, all of whom normally have privileged confidentiality that is recognized by New York State law. These individuals are prohibited from breaking confidentiality unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18, or (iv) as otherwise required or permitted by law or court order. Laws in other relevant jurisdictions may provide confidentiality protections.

**Employee Responsibility to Report Allegations:** It is important to understand the different responsibilities of NYU Employees who respond to disclosures of incidents of Prohibited Conduct. There are three general classifications of individuals on campus with whom a Covered Person can discuss an incident of Prohibited Conduct:

    (1) Confidential Resources (individuals with legally-protected confidentiality);

    (2) Reporting Options (designated offices or individuals where a report can be made); and

    (3) Employees designated as Responsible Employees (those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees).

The respective ability of these categories of individuals to maintain a Complainant's confidentiality differs. Confidential Resources can maintain the confidentiality of a Complainant's disclosures, subject to the exceptions discussed above. While private, Reporting Options and Responsible Employees are required to immediately share all known details of incidents of Prohibited Conduct with the Title IX Coordinator. Even University officers and employees who cannot guarantee confidentiality will maintain a Complainant's privacy to the extent reasonably possible. The information provided to a non-confidential resource will be relayed only as necessary for the Title IX Coordinator to coordinate an investigation and/or seek a resolution.

**Clery Act Reporting:** Pursuant to the Clery Act, NYU includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education, but does so in an anonymized manner that does not include the specifics of the crime or any identifying information about persons involved in an incident.

C. **CONFIDENTIAL RESOURCES:**

Confidential Resources for Students include the Wellness Exchange (212-443-9999) and the Center for Sexual Misconduct Support Services (212-443-9999). For a complete list of NYU and community-based Confidential Resources for Students, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

Confidential Resources for Employees include the Employee Assistance Program (800-437-0911). For a complete list of NYU and community-based Confidential Resources for Employees, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

D. **REPORTING:**

NYU strongly encourages Covered Persons who become aware of an incident of Prohibited Conduct to report the incident to local law enforcement by contacting 911 (or equivalent in other jurisdictions) and to NYU by contacting one of the following NYU Reporting Options:

CONFIDENTIAL STUDENT RECORD

| Mary Signor<br>Title IX Coordinator<br>212-998-6807<br>726 Broadway, 7th Floor<br>New York, NY 10003<br>mary.signor@nyu.edu | Office of Student Conduct and<br>Community Standards<br>212-998-4403 |
|---|---|
| The Office of Equal Opportunity<br>212-998-2370 | Residential Life and Housing<br>212-998-4600 |
| NYU Department of Public Safety<br>212-998-2222 | Human Resources Officer of the School<br>or Administrative Department |

There is no time limit on reporting violations of this policy, although NYU's ability to respond may be limited as evidence may be less available and memories may fade, and Respondents may no longer be affiliated with NYU.

**Student Amnesty Policy:** The health and safety of every student at NYU is of utmost importance. NYU recognizes that Students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to Relationship Violence, Stalking, or Sexual Assault, occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. NYU strongly encourages Students to report incidents of Prohibited Conduct to NYU officials. NYU will not subject a bystander, Complainant, or other individual making a report who discloses any incident of Prohibited Conduct to NYU's officials or law enforcement to disciplinary action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the Prohibited Conduct.

**Bad faith reports:** Submitting a false report or providing false or misleading information in bad faith or with a view to personal gain in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanction. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are determined not to be accurate.

## VII.    PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sexual orientation, gender, gender identity, or gender expression of the Complainant or Respondent. Prohibited Sexual Misconduct includes the following specifically defined forms of behavior: Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. Also prohibited are Relationship Violence, Stalking, and Retaliation.

Whether a Covered Person has violated this policy is determined based on all of the available facts and circumstances including but not limited to: statements of the Complainant and Respondent; statements by any witnesses to the alleged incident(s); documentary or physical evidence; the presence or absence of corroborating information; and relevant information about pre-and post-incident behavior and/or actions.

A.    **Sexual or Gender-Based Harassment: Sexual Harassment** is any unwelcome sexual advance,

6

SA-41

**20**

request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when one or more of the following conditions are present:

(i) Submission to or rejection of such conduct is either an explicit or implicit term or condition of an individual's employment or advancement in employment, evaluation of academic work or advancement in an academic program, or basis for participation in any aspect of a NYU program or activity (quid pro quo);

(ii) Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual (quid pro quo); or

(iii) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective - a reasonable person's view - and subjective - the Complainant's view - standard (hostile environment).

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

Examples of conduct that may constitute Sexual or Gender-Based Harassment include but are not limited to:

- Sexual Assault, Sexual Exploitation, Relationship Violence, or Stalking as defined by this policy;

- Physical conduct, including unwelcome touching or sexual advances within the working, living, or learning environment;

- Verbal conduct, including lewd or sexually suggestive comments, jokes, or innuendoes or unwelcome comments about an individual's sexual orientation or gender identity; or

- Written conduct, including letters, notes, or electronic communications containing comments, words, jokes, or images that are lewd or sexually suggestive or relate in an unwelcome manner to an individual's sexual orientation or gender identity.

**B. Sexual Assault:**  Sexual Assault means Non-Consensual Sexual Intercourse or Non-Consensual Sexual Contact as defined below.

1. **Non-Consensual Sexual Intercourse:** Non-Consensual Sexual Intercourse is having or attempting to have sexual intercourse with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated. Sexual intercourse includes anal, oral or vaginal penetration, however slight, with a body part (e.g., penis, finger, hand or tongue) or an object.

2. **Non-Consensual Sexual Contact:** Non-Consensual Sexual Contact is having or attempting to have sexual contact with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated. Sexual contact includes touching, fondling or other intentional contact with the breasts, buttocks, groin, or genitals (over or under an individual's clothing) for purposes of sexual gratification or when

7

NYU_00009794

SA-42

**21**

such private body parts are otherwise touched in a sexual manner.

C. **Sexual Exploitation:** Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another individual's nudity or sexuality, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

Examples of Sexual Exploitation include but are not limited to:

- Voyeurism (such as watching or taking pictures, videos, or audio recordings of another person engaging in a sexual act, in a state of undress, or in a place and time where such person has a reasonable expectation of privacy, such as a changing room, toilet, bathroom, or shower, each without the affirmative consent of all parties);

- Disseminating, streaming, or posting pictures or video of another in a state of undress or of a sexual nature without the person's affirmative consent;

- Administering alcohol or drugs to another person for the purpose of making that person vulnerable to non-consensual sexual activity;

- Exposing one's genitals to another person without affirmative consent;

- Prostituting another individual; or

- Knowingly exposing another individual to a sexually transmitted infection or virus without the other individual's knowledge.

D. **Relationship Violence:** Relationship Violence refers to any act of violence or threatened act of violence against a person who is, or has been involved in a sexual, dating, domestic, or other intimate relationship with that person, or who shares a child in common with that person. Relationship Violence commonly involves violence and abuse committed by a person to exert power and abuse over a current or former intimate partner. Relationship Violence may include acts of Sexual Misconduct, Physical Assault, Sexual Exploitation, or Stalking.

As used here, Physical Assault means threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person under circumstances that reflect a direct connection to the intimate relationship in question.

E. **Stalking:** Stalking occurs when a person engages in a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress.

Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property. Substantial emotional distress means significant mental suffering or anguish.

Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.

8

SA-43

**22**

F. **Retaliation:** Retaliation means any adverse action taken against an individual for making a good faith report of Prohibited Conduct or participating in any investigation or proceeding under this policy. Retaliation includes threatening, intimidating, harassing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.

The Title IX Coordinator will determine and identify the appropriate procedures to be followed for an allegation of Retaliation depending on the timing and circumstances of the allegation.

VIII. **RELATED DEFINITIONS: CONSENT, FORCE, AND INCAPACITATION:**

A. **Affirmative Consent:** Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Affirmative consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

Consent cannot be obtained: (1) through the use of force or coercion; or (2) by taking advantage of the incapacitation of another individual. Consent also cannot be given by someone who is under the legal age to consent in the applicable jurisdiction at the time of an incident.

In evaluating whether affirmative consent was given, consideration will be given to the totality of the facts and circumstances, including but not limited to the extent to which a Complainant affirmatively gives words or actions indicating a willingness to engage in sexual activity; whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the Respondent, demonstrating an incapacity to consent.

Relying solely on nonverbal communication may result in a violation of this policy. It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and clarifies, verbally, the willingness to continue.

Consent may be initially given, but withdrawn at any time. When consent is withdrawn or can no longer be given, sexual activity must cease. Prior consent does not imply current or future consent; consent to any sexual act or prior consensual sexual activity does not necessarily constitute consent to any other sexual act. Even in the context of an ongoing relationship, consent must be freely sought and given for each instance of sexual activity.

B. **Force or Coercion:** Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual activity. There is no requirement that a party resists the sexual advance or request, but resistance will be viewed as a clear demonstration of non-consent.

Coercion is conduct, including intimidation and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to overcome the individual's freedom of will and to compel the individual to engage in sexual activity.

C. **Incapacitation:** An individual who is incapacitated lacks the ability to knowingly choose to participate in sexual activity or make informed, rational judgments and thus cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, being involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring. Mentally helpless means a person is rendered temporarily

9

CONFIDENTIAL STUDENT RECORD

NYU_00009796

SA-44

**23**

incapable of appraising or controlling one's own conduct. Physically helpless means a person is physically unable to communicate unwillingness to an act.

Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait, combativeness, or emotional volatility.   Evaluating incapacitation also requires an assessment of whether a Respondent knew or should have been aware of the Complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the Respondent's position.   Being intoxicated or impaired by drugs or alcohol is never an excuse for committing Prohibited Conduct and does not diminish one's responsibility to obtain informed and freely given consent.   In other words, consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

## IX.   VIOLATIONS OF LAW:

Behavior that violates this policy also may violate the laws of the local jurisdiction in which the incident occurred and subject a Respondent to criminal prosecution by the presiding authority.

The New York State Penal Code describes prohibited Sex Offenses in §§ 130.00 to 130.91 and 130.95 to 130.96 and prohibited Stalking Offenses in §§ 120.45 – 120.60.  Covered Persons studying, working, or engaging in other activities at one of NYU's portal campuses, Global Network University sites, or other locations outside of New York State are governed by the applicable laws regarding sexual assault and other criminal offenses implicated by this policy.   NYU's education and prevention programs related to its portal campuses and Global Network University sites will include definitions of prohibited conduct and consent in the applicable jurisdiction.

Behavior that violates this policy also may subject a Respondent to civil liability.   Records of University proceedings under this Policy may be subpoenaed in connection with a criminal prosecution and/or civil litigation.

## X.   STUDENTS' BILL OF RIGHTS:

Under this policy, all students have the right to:

1.   Make a report to local law enforcement and/or state police.

2.   Have disclosures of Relationship Violence, Stalking, and Sexual Assault treated seriously.

3.   Make a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process and/or the criminal justice process free from pressure by NYU.

4.   Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.

5.   Be treated with dignity and to receive from NYU courteous, fair, and respectful health care and counseling services, where available.

6.   Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations.

10

NYU_00009797

7. Describe the incident to as few NYU representatives as practicable and not be required to unnecessarily repeat a description of the incident.

8. Be reasonably protected from Retaliation by NYU, any student, the Respondent, and/or their friends, family and acquaintances within NYU's jurisdiction.

9. Access to at least one level of appeal of a determination in matters involving Student conduct.

10. Be accompanied by an advisor of choice who may assist and advise a Complainant or Respondent throughout the disciplinary process including during all meetings and hearings related to such process.

11. Exercise civil rights and practice of religion without interference by the investigative or disciplinary process of NYU.

## XI.   CONSENSUAL RELATIONSHIPS:

Please see the University's Policy on Consensual Intimate Relationships.

## XII.   PREVENTION AND AWARENESS PROGRAMS:

NYU is committed to the prevention of Prohibited Conduct through education and awareness programs. Incoming first year students and new employees are offered primary prevention and awareness programming as part of their orientation and returning staff and students are offered ongoing training and related programs. For a description of NYU's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students, and Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## XIII.   ADDITIONAL POLICY DEFINITIONS:

"Complainant" means the Covered Person who presents as the victim of any Prohibited Conduct under the policy, regardless of whether that individual makes a report or seeks action under the policy.

"Confidential Resource" means an NYU employee or community resource with statutorily protected confidentiality. This includes medical providers, mental health providers, rape crisis counselors, and ordained clergy.

"NYU" means the Schools and other units of NYU, NYU's Global Network University sites, and all University affiliates.

"Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

"Reporting Option" means individuals or departments designated by NYU to receive reports of Prohibited Conduct.

"Respondent" means the Covered Person(s) who has been accused of violating the policy.

"Responsible Employee" means those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees. This includes the NYU Title IX Coordinator; Public Safety Officers; senior staff members in Residence Life, Student Affairs, Student Activities,

11

CONFIDENTIAL STUDENT RECORD

**25**

and Athletics; administrators in the Office of Community Standards; senior administrators in each of the Schools within NYU; Resident Assistants (RAs), and athletic team coaches.

"School" for purposes of this policy means each NYU school, college and institute that functions similarly to a school or college (e.g., IFA, ISAW, Courant, and CUSP), each NYU portal campus (e.g., New York and Abu Dhabi), and other global sites as designated by the Provost.

XIV.   **RELATED POLICIES:**

Bullying, Threatening, and Other Disruptive Behavior Guidelines

Code of Ethical Conduct

Compliance Complaint Policy

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students

12

CONFIDENTIAL STUDENT RECORD

# Exhibit 1, Part B



9/27/2018                    New York University Mail – Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **26**

**NYU**                                                    Samuel Hodge

## Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
1 message

**Mary Signor**                                                    Thu, Sep 27, 2018 at 4:20 PM
Reply-To:
To: Samuel Hodge

--------- Forwarded message ---------
From: **Lauren Silverstein**
Date: Sat, Apr 28, 2018 at 12:47 PM
Subject: Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: Colleen M Maeder                            , Mary Signor

--------- Forwarded message ---------
From: Jane Roe
Date: Sat, Apr 28, 2018 at 12:39 PM
Subject: Re: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: Bret R Beaufeaux
CC: Lauren Silverstein

Dear Bret,

Last night I got several calls from an unknown number, which I'm quite sure was John because I've never gotten that many calls without a caller ID in a row in any other circumstance.

While we were dating / friends, we couldn't communicate when I went home to my parents because they weren't okay with us dating, and they used to check my phone. At that time, if anything important came up, John used to set a status on WhatsApp to let me know what was up. After I got the calls last night, I checked his WhatsApp status (although I didn't extend any contact whatsoever), and he had put up emergency symbols. This morning, his status changed to "This could be catastrophic for you because of a mistake I made, I don't care what's in place you need to be aware."

I also got a text message from another number, which I'm quite sure is him as well. Before the no-contact order, he used to create new numbers with an app to contact me as I had blocked him. The text message also showed an emergency symbol. I am attaching screenshots of all of this in this email.

Best Regards,
Jane

Bret

https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1612793386798543288%7Cmsg-f%3A1612793457252...    1/4

SA-49



9/27/2018                    New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **27**

On Mon, Apr 23, 2018 at 9:02 PM, ████ Roe ████ ████████████ wrote:
Dear Bret,

I received contact from ████ today. A while ago, Indian Cultural Exchange, an NYU club, hosted an event called Spring Bazaar. ██ is on the executive board of this club. Today I got an email through the club OrgSync account, inviting me to join the club. The email was by ███ and it was thanking me for coming to the event. Upon checking with my other friends at the event, I found out that none of them had gotten the email. I just forwarded the email that I received to you.

Best Regards,
████

On Sun, Apr 22, 2018 at 10:32 PM Bret R Beaufeaux ██████████ wrote:

**NEW YORK UNIVERSITY**
A private university in the public service

**Office of Residential Life & Housing Services**

**April 22, 2018**

Dear Jane Roe

**I have received a report detailing an incident that occurred on April 22, 2018 through electronic means of communication. During this incident it is alleged that you have received multiple communications which have made you feel uncomfortable.**

**While this matter is being resolved, please be advised that a "no-contact directive" has been put in place between you and John Doe Therefore, you are not to initiate or facilitate any form of communication or interaction with John Doe including those made through virtual means (text messages, e-mail, Facebook, Twitter, other social networking websites, etc.) or by 3rd parties on your behalf. Any such attempts to do so may be construed as harassment and will subject you to disciplinary action.**

**A staff member from the Office of Residential Life and Housing Services or the Office of Community Standards and Compliance will be in contact with you in the coming days to discuss next steps in this process.**

**In the meantime, should you have any questions or concerns, please let me know. As we discussed, you may reach me by contacting the U-Hall RA on-duty through the Public Safety Officer stationed on the ground level. Lastly, please note that Wellness is available as a confidential resource to you as well.**

**Sincerely,**

**Bret Beaufeaux**

**Residence Hall Director**

—
**Bret Beaufeaux [he/him/his]**

https://mail.google.com/mail/u/1?k=d64bf88649&view=pt&search=all&permthid=thread-f%3A16127933867965432887C7Cmsg-f%3A16127934572523...    2/4

9/27/2018                    New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **28**



Residence Hall Director
Coral Tower & Second Street Re idence Hall

Office of Residential Life & Housing Services
New York University

--
**Bret Beaufeaux [he/him/his]**

Re idence Hall Director
Coral Tower & Second Street Residence Halls

Office of Residential Life & Housing Services
New York Univer ity

Lauren Silverstein
*she/her/hers pronouns*
Residence Hall Director, University Hall
New York University

Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity



NOTICE: This e-mail (including any attachments) is intendec solely for the designated recipient(s) and may contain
privileged, proprietary, confidential or otherwi e private information  Unauthorized u e, copying, di clo ure or di tribution

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009802

SA-51

9/27/2018                    New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE          **29**

of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

**4 attachments**



IMG_0569.PNG
260K

IMG_0568.PNG
388K

IMG_0571.PNG
499K

IMG_0554.jpg
65K

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009803



NYU_00009804

31



SA-54



NYU_00009806

SA-55



33

Text Message
Today 12:00 PM



  

9/27/2018                        New York University Mail - Fwd: Our Meeting on Monday, April 30                        **34**

**♀ NYU**                                                          Samuel Hodge ████████

## Fwd: Our Meeting on Monday, April 30
1 message

Mary Signor ████████                                                 Thu, Sep 27, 2018 at 4:23 PM
Reply-To:
To:        ████████

---------- Forwarded message ----------
From: [Jane] [Roe] ████████████████
Date: Tue, May 8, 2018 at 12:18 AM
Subject: Re: Our Meeting on Monday, April 30
To: Mary Signor ████████████

Dear Mary,

I have a secondary Facebook account by the nickname ████████." My parents used to have access to my
primary Facebook, so I used to use my other account to communicate with ████ and anyone else that I needed to without
them reading the messages. Until the point that the no-contact order issued, I was using the secondary account to talk to
████████ knew the password to this account as well, and was somehow able to change the password back any time I
used to change it. He was also able to unblock himself any time I blocked him because he had the password. The
messages I sent in the previous email where the contact name is ████" are messages from him to that account. The
texts attached in the previous message are from before the no-contact directive. "████" was the nickname he had set for
himself in our chat (you will be able to see in the messages attached in this email that the texts were coming from his
account, and that the nickname was set to ████"

Today I logged into my secondary ████████" Facebook account. I saw that he had sent messages to me on
April 22nd, April 27th, and April 29th. He must have seen my account go online, because he logged into my account and
started sending messages from me to him, pretending to be me. Then he messaged me back from his account, clarifying
for some reason that it was him talking to himself. He then kept repeatedly logging me out of my own account. I'm sure if
you look into the IP addresses from which those messages were sent, it will be evident that they weren't by me. I also
took a screenshot which shows that the account was logged into from an iPhone 8, which is his phone, not mine.

I don't think he's in the right state of mind, as he's continuing to contact me. I just wanted to email you and let you know of
this. I was wondering if there is any action you can take at this point, because he's contacting me repeatedly, and not
letting me log into my own account. I'm not sure what the purpose of a no-contact directive is if he can keep breaking it
without any consequences, and this is causing me a great deal of stress.

Best Regards,
[Jane]

On Sun, May 6, 2018 at 7:46 PM, [Jane] [Roe] ████████████        wrote:
    Dear Mary,

    Just as a follow-up to my previous email, I just realized that I forgot to send you the text screenshots that I have. I have
    many more screenshots than what I've attached, which I can show to anyone who is investigating the case. I'm also
    attaching the video I told you about, which he took threatening to send to my parents or friends as it showed me with
    him. To clarify, the last screenshot was a message sent to my mom.

    Best Regards,
    [Jane]

    On Wed, May 2, 2018 at 9:51 PM, [Jane] [Roe] ████████████        wrote:
        Dear Mary,

        ████████████████████████████████████ He was following me even
        today.

CONFIDENTIAL STUDENT RECORD                                                              NYU_00009808

9/27/2018                              New York University Mail - Fwd: Our Meeting on Monday, April 30                              **35**

Also, as I mentioned earlier, ▮▮▮▮ was following me at Washington Square Park today. As I was walking, I saw him looking me from a distance. I know he is allowed to be in the same area as me as long as he doesn't talk to me, but I became uncomfortable and moved locations at the park. Each time I moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. Then I left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When I entered a restaurant, he was pacing outside of it across the street. I then went to Lipton hall to see my friend, and I was eating in the dining hall when he arrived there as well. I was able to take some pictures of this happening. I am attaching them here. I am starting to feel increasingly stressed and anxious because of this. Is there anything you can do to make him stop doing this?

Best,
▮▮▮▮

CONFIDENTIAL STUDENT RECORD                                                                                   NYU_00009809

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    36



CONFIDENTIAL STUDENT RECORD                                                                                          NYU_00009810

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **37**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009811

9/27/2018                New York University Mail - Fwd: Our Meeting on Monday, April 30                38



CONFIDENTIAL STUDENT RECORD                                    NYU_00009812

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30          **39**



CONFIDENTIAL STUDENT RECORD                                                      NYU_00009813

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    40



CONFIDENTIAL STUDENT RECORD                                                                NYU_00009814

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    41



CONFIDENTIAL STUDENT RECORD                    NYU_00009815

9/27/2018                 New York University Mail - Fwd: Our Meeting on Monday, April 30                 42



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A1612793622578...        9/18

CONFIDENTIAL STUDENT RECORD                                          NYU_00009816



CONFIDENTIAL STUDENT RECORD

NYU_00009817



CONFIDENTIAL STUDENT RECORD                                                  NYU_00009818

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    5



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009819

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    46



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009820

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    47



CONFIDENTIAL STUDENT RECORD                                                      NYU_00009821

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **48**



CONFIDENTIAL STUDENT RECORD                                              NYU_00009822

9/27/2018        New York University Mail - Fwd: Our Meeting on Monday, April 30        49



CONFIDENTIAL STUDENT RECORD        NYU_00009823

**SA-72**

9/27/2018                New York University Mail - Fwd: Our Meeting on Monday, April 30                **50**



--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity



NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

4 attachments

     **IMG_0766.PNG**
     656K

CONFIDENTIAL STUDENT RECORD                                                          NYU_00009824

SA-73

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **51**



IMG_0763.PNG
728K

IMG_0762.PNG
777K

Screen Shot 2018-05-07 at 11.40.46 PM.png
195K

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009825

SA-74



52

NYU_00009826

SA-75



**53**



APR 22, 10:55 PM

Well

There goes ra position

APR 27, 9:39 PM

?

APR 29, 12:29 PM

I really need to talk to you

I'm really calm

I hope you won't report me

But I really need to talk to you

I've made a terrible mistake

CONFIDENTIAL STUDENT RECORD

NYU_00009827

SA-76

54



APR 22, 10:55 PM

Well

There goes ra position

APR 27, 9:39 PM

?

APR 29, 12:29 PM

I really need to talk to you

I'm really calm

I hope you won't report me

But I really need to talk to you

I've made a terrible mistake

7:22 PM

Ok so I'm screwed

Lol

CONFIDENTIAL STUDENT RECORD

NYU_00009828

55

Recommended

**Choose friends to contact if you are locked out**
Nominate 3 to 5 friends to help if you are locked out of your account. We recommend this to everyone.

Edit

Where you're logged in

**Mac · New York, NY, United States**
Chrome · Active now

**iPhone 8 · New York, NY, United States**
Messenger · A few seconds ago

• • •

▶ See more

Login

**Change password**
It's a good idea to use a strong password that you don't use elsewhere

Edit

**Log in using your profile picture**
On · Tap or click your profile picture to log in, instead of using a password

Edit

Two-factor authentication

◉ Use two-factor authentication

● Chat

SA-77

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          **56**

**NYU**                                                                    Samuel Hodge ▉▉▉▉▉▉▉

---

## Fwd: Our Meeting on Monday, April 30
1 message

**Mary Signor** ▉▉▉▉▉▉▉                                                   Thu, Sep 27, 2018 at 4:22 PM
Reply-To: ▉▉▉▉▉▉▉
To: Samuel Hodge ▉▉▉▉▉▉▉

---------- Forwarded message ----------
From: Jane Roe ▉▉▉▉▉▉▉▉▉▉▉
Date: Sun, May 6, 2018 at 7:46 PM
Subject: Re: Our Meeting on Monday, April 30
To: Mary Signor ▉▉▉▉▉▉▉

Dear Mary,

Just as a follow-up to my previous email, I just realized that I forgot to send you the text screenshots that I have. I have many more screenshots than what I've attached, which I can show to anyone who is investigating the case. I'm also attaching the video I told you about, which he took threatening to send to my parents or friends as it showed me with him. To clarify, the last screenshot was a message sent to my mom.

Best Regards,
Jane

On Wed, May 2, 2018 at 9:51 PM, Jane Roe ▉▉▉▉▉▉▉▉▉ wrote:
Dear Mary,

Thank you for your email. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. He was following me even today.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Also, as I mentioned earlier, ▉▉ was following me at Washington Square Park today. As I was walking, I saw him looking me from a distance. I know he is allowed to be in the same area as me as long as he doesn't talk to me, but I became uncomfortable and moved locations at the park. Each time I moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. Then I left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When I entered a restaurant, he was pacing outside of it across the street. I then went to Lipton hall to see my friend, and I was eating in the dining hall when he arrived there as well. I was able to take some pictures of this happening. I am attaching them here. I am starting to feel increasingly stressed and anxious because of this. Is there anything you can do to make him stop doing this?

Best,
Jane

CONFIDENTIAL STUDENT RECORD                                                        NYU_00009830

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    57



CONFIDENTIAL STUDENT RECORD                    NYU_00009831

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **58**



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A1612793646012...   3/16

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009832

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                                   **59**



CONFIDENTIAL STUDENT RECORD                                                               NYU_00009833

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **60**



CONFIDENTIAL STUDENT RECORD                                              NYU_00009834

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    61



9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    62



CONFIDENTIAL STUDENT RECORD                    NYU_00009836

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **63**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009837

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **64**



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A1612793646012...   9/16

CONFIDENTIAL STUDENT RECORD                                    NYU_00009838

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30



CONFIDENTIAL STUDENT RECORD                                    NYU_00009839

SA-88

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    66



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A161279364601    11/16

CONFIDENTIAL STUDENT RECORD                                                                NYU_00009840

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          **67**



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1598899325732313411%7Cmsg-f%3A161279364601...   12/16

SA-90

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          **68**



CONFIDENTIAL STUDENT RECORD                                                                      NYU_00009842

SA-91

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **69**



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599890325732313411%7Cmsg-f%3A161279364601...    14/16

CONFIDENTIAL STUDENT RECORD                                                                NYU_00009843

9/27/2018                     New York University Mail - Fwd: Our Meeting on Monday, April 30

**70**

On Wed, May 2, 2018 at 8:45 PM Mary Signor ███████████████ wrote:
Dear ███



--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity



NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

**5 attachments**

2018-04-02-PHOTO-00016722.jpg
88K

CONFIDENTIAL STUDENT RECORD                                             NYU_00009844

9/27/2018                      New York University Mail - Fwd: Our Meeting on Monday, April 30                      **71**



IMG_0338.PNG
586K

IMG_0330 (1).PNG
594K

2018-04-02-PHOTO-00016713.jpg
112K

2018-04-28-PHOTO-00027670.jpg
75K

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009845

SA-94



**72**

Wake up

Wake the fuck up

You told me your wait

And you came back

Bull fucking shit

I'm going to find your doorbalell

In five seconds

I will tell ██████

Every fucking thing

If you don wake up

And talk to me

In 10 minutes

I swear

I will

I'm so fucking pissed off

You're be

Say something ⊙

CONFIDENTIAL STUDENT RECORD                                    NYU_00009846

SA-95



**73**

Hello, I don't mean to be a bother. I think ███ may be under the influence of drugs or alcohol based on what I've heard from people. I know she is having a hard time with everything right now and I am quite worried. She's had some self harmful tendencies and I do not wish to get myself involved. However it is important that she is ok and I hope you can make sure of that. If all is well and you know of the situation then that is good.

Her friends were also my friends and they smoke a lot. I got word from others that she had become part of that. I'm not sure if it's true I've just seen her get very depressed when under the influence and wouldn't want anything

      

CONFIDENTIAL STUDENT RECORD

SA-96

**74**



NYU_00009848



**75**

I've lost the plot

You scare me as much as I scare you

Sometimes

Because I know that in your hand

You can say something

That will actually make me kill myself

Just out of shame

It's not even a threat

You have something on me

You could do something

Where my instinct

Is just to kill myself

I'd rather die than have everyone known i bassaulted you

I can barely...

Are you ok

CONFIDENTIAL STUDENT RECORD

NYU_00009849

SA-98

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **76**

**NYU**                                                              Samuel Hodge ███████████

---

## Fwd: Our Meeting on Monday, April 30
1 message

**Mary Signor** ███████████                                    Thu, Sep 27, 2018 at 4:23 PM
Reply-To: ███████████
To: Samuel Hodge ███████████

--------- Forwarded message ---------
From: ██Jane██ ██Roe██ ███████████
Date: Thu, May 10, 2018 at 3:55 AM
Subject: Re: Our Meeting on Monday, April 30
To: Mary Signor ███████████

Dear Mary,

██John██ contacted me again and sent me the email that he was sending to his professor regarding struggling with Organic Chemistry and personal issues. He's tried to guilt me into talking to in the past by telling me he's academic struggling, and he"s just repeating this again. I'm attaching a screenshot of this.

Best,
██Jane██

On Tue, May 8, 2018 at 8:33 AM, Mary Signor ███████████ wrote:
Dear ██Jane██ -

Thank you for this information.

Best,
Mary

On Tue, May 8, 2018 at 12:18 AM, ██Jane██ ██Roe██ ███████████ wrote:
Dear Mary,

I have a secondary Facebook account by the nickname ███████████." My parents used to have access to my primary Facebook, so I used to use my other account to communicate with ██John██ and anyone else that I needed to without them reading the messages. Until the point that the no-contact order issued, I was using the secondary account to talk to ██John John██ knew the password to this account as well, and was somehow able to change the password back any time I used to change it. He was also able to unblock himself any time I blocked him because he had the password. The messages I sent in the previous email where the contact name is "████ are messages from him to that account. The texts attached in the previous message are from before the no-contact directive. ████ was the nickname he had set for himself in our chat (you will be able to see in the messages attached in this email that the texts were coming from his account, and that the nickname was set to ████).

Today I logged into my secondary ███████████" Facebook account. I saw that he had sent messages to me on April 22nd, April 27th, and April 29th. He must have seen my account go online, because he logged into my account and started sending messages from me to him, pretending to be me. Then he messaged me back from his account, clarifying for some reason that it was him talking to himself. He then kept repeatedly logging me out of my own account. I'm sure if you look into the IP addresses from which those messages were sent, it will be evident that they weren't by me. I also took a screenshot which shows that the account was logged into from an iPhone 8, which is his phone, not mine.

I don't think he's in the right state of mind, as he's continuing to contact me. I just wanted to email you and let you know of this. I was wondering if there is any action you can take at this point, because he's contacting me repeatedly, and not letting me log into my own account. I'm not sure what the purpose of a no-contact directive is if he can keep breaking it without any consequences, and this is causing me a great deal of stress.

Best Regards,

https://mail.google.com/mail/u/1?ik=d64b188849&view=pt&search=all&permthid=thread-f%3A1599699325732313411%7Cmsg-f%3A1612793701173...   1/17



9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **77**

Jane

On Sun, May 6, 2018 at 7:46 PM, Jane Roe ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
Dear Mary,

Just as a follow-up to my previous email, I just realized that I forgot to send you the text screenshots that I have. I have many more screenshots than what I've attached which I can show to anyone who is investigating the case. I'm also attaching the video I told you about, which he took threatening to send to my parents or friends as it showed me with him. To clarify, the last screenshot was a message sent to my mom.

Best Regards,
Jane

On Wed, May 2, 2018 at 9:51 PM, Jane Roe ▮▮▮▮▮▮▮▮ wrote:
▮▮▮▮▮▮

Also, as I mentioned earlier, John was following me at Washington Square Park today. As I was walking, I saw him looking me from a distance. I know he is allowed to be in the same area as me as long as he doesn't talk to me, but I became uncomfortable and moved locations at the park. Each time I moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. Then I left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When I entered a restaurant, he was pacing outside of it across the street. I then went to Lipton hall to see my friend, and I was eating in the dining hall when he arrived there as well. I was able to take some pictures of this happening. I am attaching them here. I am starting to feel increasingly stressed and anxious because of this. Is there anything you can do to make him stop doing this?

Best,
Jane

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009851

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **78**



CONFIDENTIAL STUDENT RECORD                    NYU_00009852



CONFIDENTIAL STUDENT RECORD                                                                    NYU_00009853

SA-102

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **80**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009854

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    81

CONFIDENTIAL STUDENT RECORD                                                     NYU_00009855

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **82**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009856

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          83



CONFIDENTIAL STUDENT RECORD                                                          NYU_00009857

SA-106

# Exhibit 1, Part C

SA-107

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **84**



https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A1612793701173...   9/17

CONFIDENTIAL STUDENT RECORD                                                                    NYU_00009858

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009859

SA-109

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    86

CONFIDENTIAL STUDENT RECORD                                    NYU_00009860

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          87

CONFIDENTIAL STUDENT RECORD                                                                      NYU_00009861

SA-111

9/27/2018                                    New York University Mail - Fwd: Our Meeting on Monday, April 30                                    88

CONFIDENTIAL STUDENT RECORD                                                                                   NYU_00009862

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **89**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009863

On Wed, May 2, 2018 at 8:45 PM Mary Signor ███████████ wrote:

CONFIDENTIAL STUDENT RECORD                                                  NYU_00009864



--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

CONFIDENTIAL STUDENT RECORD                                                                  NYU_00009865

SA-115

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **92**

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

**2 attachments**

IMG_0776.PNG
993K

IMG_0775.PNG
3776K

CONFIDENTIAL STUDENT RECORD                                                                NYU_00009866

SA-116

**93**



12:13 AM

Dear Professor Weck,
My name is John Doe and I am a student in Organic Chemistry. I recently came into to meet with you about my Grade on exam 1 which was a retake. As mentioned I am currently retaking the course and failed the exam miserably. I have been going through a significant issue in my life that has caused a lot of mental stress, I have been receiving counseling and my counselor has allowed me to include his contact info if you needed to contact him. I apologize for the inconvenience caused, but if there is anything that could be done, I would greatly appreciate it, below is the contact information.



Sincerely,
John Doe

CONFIDENTIAL STUDENT RECORD

NYU_00009867

SA-117



SA-118

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **95**

NYU                                                              Samuel Hodge ███████████

## Fwd: Our Meeting on Monday, April 30
1 message

**Mary Signor** ███████                                          Thu, Sep 27, 2018 at 4:23 PM
Reply-To: ██████████████
To: Samuel Hodge ███████████

---------- Forwarded message ----------
From: Jane   Roe ████████████████
Date: Sun, May 13, 2018 at 2:58 AM
Subject: Re: Our Meeting on Monday, April 30
To: Mary Signor ████████████████

Dear Mary,

There was a message sent from my secondary Facebook account to John's Facebook account today. I didn't send this message, and as I mentioned, he knows the password to the account and is somehow able to change it back every time I change it or try to delete the account. If you look into the IP address of the message, I'm sure you'll be able to see that it was from him that the message was sent. There was only one message that I could see, but I'm not sure if he has sent more and deleted them from my account. I don't want him pretending to be me, and so I thought I'd let you know.

Best,
Jane

On Thu, May 10, 2018 at 3:55 AM Jane Roe ████████████████ wrote:
> Dear Mary,
>
> John contacted me again and sent me the email that he was sending to his professor regarding struggling with Organic Chemistry and personal issues. He's tried to guilt me into talking to in the past by telling me he's academic struggling, and he"s just repeating this again. I'm attaching a screenshot of this.
>
> Best,
> Jane

On Tue, May 8, 2018 at 8:33 AM, Mary Signor ████████████ wrote:
> Dear Jane -
>
> Thank you for this information.
>
> Best,
> Mary

On Tue, May 8, 2018 at 12:18 AM, Jane Roe ████████████████ wrote:
> Dear Mary,
>
> I have a secondary Facebook account by the nickname ██████ ██████. My parents used to access to my primary Facebook, so I used to use my other account to communicate with John and anyone else that I needed to without them reading the messages. Until the point that the no-contact order issued, I was using the secondary account to talk to John. John knew the password to this account as well, and was somehow able to change the password back any time I used to change it. He was also able to unblock himself any time I blocked him because he had the password. The messages I sent in the previous email where the contact name is '████ are messages from him to that account. The texts attached in the previous message are from before the no-contact directive. '████ was the nickname he had set for himself in our chat (you will be able to see in the messages attached in this email that the texts were coming from his account, and that the nickname was set to ██████
>
> Today I logged into my secondary '████████ ██████ Facebook account. I saw that he had sent messages to me on April 22nd, April 27th, and April 29th. He must have seen my account go online, because he logged into my

CONFIDENTIAL STUDENT RECORD                                          NYU_00009869

SA-119

9/27/2018                        New York University Mail - Fwd: Our Meeting on Monday, April 30                        **96**

account and started sending messages from me to him, pretending to be me. Then he messaged me back from his account, clarifying for some reason that it was him talking to himself. He then kept repeatedly logging me out of my own account. I'm sure if you look into the IP addresses from which those messages were sent, it will be evident that they weren't by me. I also took a screenshot which shows that the account was logged into from an iPhone 8, which is his phone, not mine.

I don't think he's in the right state of mind, as he's continuing to contact me. I just wanted to email you and let you know of this. I was wondering if there is any action you can take at this point, because he's contacting me repeatedly, and not letting me log into my own account. I'm not sure what the purpose of a no-contact directive is if he can keep breaking it without any consequences, and this is causing me a great deal of stress.

Best Regards,
Jane

On Sun, May 6, 2018 at 7:46 PM, Jane Roe                                    wrote:
    Dear Mary,

    Just as a follow-up to my previous email, I just realized that I forgot to send you the text screenshots that I have. I have many more screenshots than what I've attached, which I can show to anyone who is investigating the case. I'm also attaching the video I told you about, which he took threatening to send to my parents or friends as it showed me with him. To clarify, the last screenshot was a message sent to my mom.

    Best Regards,
    Jane

    On Wed, May 2, 2018 at 9:51 PM, Jane Roe                                    wrote:
        Dear Mary,

        Also, as I mentioned earlier, John was following me at Washington Square Park today. As I was walking, I saw him looking me from a distance. I know he is allowed to be in the same area as me as long as he doesn't talk to me, but I became uncomfortable and moved locations at the park. Each time I moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. Then I left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When I entered a restaurant, he was pacing outside of it across the street. I then went to Lipton hall to see my friend, and I was eating in the dining hall when he arrived there as well. I was able to take some pictures of this happening. I am attaching them here. I am starting to feel increasingly stressed and anxious because of this. Is there anything you can do to make him stop doing this?

        Best,
        Jane

CONFIDENTIAL STUDENT RECORD                                                                NYU_00009870

SA-120

9/27/2018                              New York University Mail - Fwd: Our Meeting on Monday, April 30                              **97**



CONFIDENTIAL STUDENT RECORD                                                                    NYU_00009871



CONFIDENTIAL STUDENT RECORD                                                                        NYU_00009872



CONFIDENTIAL STUDENT RECORD                                        NYU_00009873

SA-123

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    100



CONFIDENTIAL STUDENT RECORD                                                        NYU_00009874

9/27/2018        New York University Mail - Fwd: Our Meeting on Monday, April 30        **101**



CONFIDENTIAL STUDENT RECORD        NYU_00009875

SA-125

9/27/2018                New York University Mail - Fwd: Our Meeting on Monday, April 30                **102**

CONFIDENTIAL STUDENT RECORD                                             NYU_00009876

SA-126

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          **103**

CONFIDENTIAL STUDENT RECORD                                    NYU_00009877

9/27/2018                     New York University Mail - Fwd: Our Meeting on Monday, April 30                     **104**



CONFIDENTIAL STUDENT RECORD                                                    NYU_00009878

9/27/2018                          New York University Mail - Fwd: Our Meeting on Monday, April 30                          **105**



CONFIDENTIAL STUDENT RECORD                                                                   NYU_00009879

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **106**



CONFIDENTIAL STUDENT RECORD                                                        NYU_00009880

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    **107**



CONFIDENTIAL STUDENT RECORD                    NYU_00009881

SA-131

9/27/2018                    New York University Mail - Fwd: Our Meeting on Monday, April 30                    108



On Wed, May 2, 2018 at 8:45 PM Mary Signor ███████████ wrote:
  Dear ████

██████████████████████████████████████

https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1599899325732313411%7Cmsg-f%3A161279372835…   14/16

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009882

9/27/2018 New York University Mail - Fwd: Our Meeting on Monday, April 30 **109**



--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, confidential or otherwise private information. Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments). Thank you.

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity



CONFIDENTIAL STUDENT RECORD NYU_00009883

9/27/2018           New York University Mail - Fwd: Our Meeting on Monday, April 30        **110**

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

**IMG_0901.jpg**
124K

CONFIDENTIAL STUDENT RECORD      NYU_00009884

SA-134



**111**

    

CONFIDENTIAL STUDENT RECORD

NYU_00009885

SA-135

# Exhibit 1, Part D

SA-136

**112**

# ATTACHMENT B

SA-137



9/28/2018                    New York University Mail - Re: Follow Up                    **113**

**NYU**                                                    Samuel Hodge ▮▮▮▮▮

**Re: Follow Up**
1 message

**Jane Roe** ▮▮▮▮▮▮▮▮                              Wed, Jul 25, 2018 at 6:34 PM
To: Samuel Hodge

Dear Sam,

I am attaching the Evidence for the Title IX case in this email. In the PDF, I've referred to various voicemails and videos, which you can listen and watch in a folder that I've shared with you via Google Drive. Let me know if you need anything else.

Best,
**Jane**

📄 Evidence.pdf

On Tue, Jun 12, 2018 at 11:20 AM, Samuel Hodge ▮▮▮▮▮▮ wrote:
**Jane** -

Could you call me regarding your class schedule in the fall?  I can be reached at ▮▮▮▮▮

Best,
Sam Hodge

--
Samuel Hodge
Title IX Investigator
Office of Equal Opportunity
New York University

CONFIDENTIAL STUDENT RECORD                                        NYU_00009887

114



CONFIDENTIAL STUDENT RECORD

SA-139

115

March 10

CONFIDENTIAL STUDENT RECORD

NYU_00009889

Case 23-1246, Document 86, 04/30/2024, 3621705, Page142 of 231

SA-140

116

Some friends and ███ were in my room with me. After everyone left, he stood outside my door, banging on it, shaking it, and messaging me to open it because he was angry that I had laughed at a joke a friend made about him (around 2-3 a.m.). I was extremely scared because he was sending me threatening messages. I told my friends about the situation, and ███ came to pick me up. He saw ███ outside my door. We left for Rubin, and ███ refused to leave, and accompanied us as we left. As we all hung out together, he sent me a constant stream of messages on WhatsApp that other friends saw popping up on my phone. All my messages from WhatsApp are deleted. I later told him I was really upset with what he did, because it made me scared to be around him.

The next evening, ███ asked ███ and I to come with him, ███ and ███ to Max Brenner. ███ turned this into a birthday celebration for me, which I was upset about because I didn't want him covering up for the previous night's incidents with grand gestures. ███ was unaware of this situation between ███ and I, so I didn't show that there was an issue.

NYU_00009890

SA-141

117

March 23

CONFIDENTIAL STUDENT RECORD

NYU_00009891

Case 23-1246, Document 86, 04/30/2024, 3621705, Page144 of 231

I said over Facebook messenger (with my secondary Facebook account with the name "[redacted]". My parents[18] used to be able to access my primary Facebook account, so I used this account to communicate with John and anyone else without them having access to the conversation) that I didn't want to hang out with him, and I asked for distance, and he admitted to assaulting me.



NYU_00009892

119

10:20 PM
[redacted]
But I've also been good
And for a little while there
[redacted]
I didn't assault you
How
It's okay
It's fine
10:20 PM
[redacted]
How
I did once kind of
But like
I would respected you way more if you hadn't hidden it
And then come out and called me one
And I'm sorry
[redacted]
It hurts to hear ok
10:20 PM
you hadn't hidden it
And then come out and called me one
[redacted]
It hurts to hear ok
And I know hurt you
But every time you say it
I can't live with myself ok
No
I get it
I did it
Ok
I squeezed your breats
And I'm sorry
10:21 PM
I can't live with myself ok
No
I get it
I did it
Ok
I squeezed your breats
I got you in the shower
I put my hands places they shouldn't go
And I'm sorry
I assaulted you
It just sucks
To be called in a put in that class
With everyone else
I'm sorry then
It's okay
It's fine

Case 23-1246, Document 86, 04/30/2024, 3621705, Page146 of 231

120

By "they" he is referring to some (friends):



Note: ▮ was John "nickname" on Facebook Messenger. Messenger allows chats to change people's nicknames. For proof of this, refer to video "Proof that John is ▮ in Messenger" in folder.

NYU_00009894

SA-145

**121**

# March 30

Case 23-1246, Document 86, 04/30/2024, 3621705, Page148 of 231

122

■ messaged me on my phone from a different number (because I had blocked him and wasn't responding to Facebook Messages)



■ John sent me this message knowing that my messages go to my parents' devices. My parents didn't know I was in contact with John and John knew that I would get in a seriously difficult situation with my family if they were to find out. He sent these messages, implying that we'd been hanging out for several weekends, aware that my parents could read them.



NYU_00009896

SA-147

123

March 31

CONFIDENTIAL STUDENT RECORD

NYU_00009897

Case 23-1246, Document 86, 04/30/2024, 3621705, Page150 of 231

124

John had a conversation about me with some friends ( ▮ , ▮ and ▮ ) and messaged me about it. He talked about suicidal thoughts due to what had happened between us.



NYU_00009898

125

[redacted]
I hate myself
Like us being close
Incidents last year
Incidents this year
they wanted to call you right then and there
And ask for your consent
Consent
[redacted]
For me to say things
No they act like we aren't
They think I believe something is there
[redacted]
No they act like we aren't
They think I believe something is there
We aren't
Right
We aren't
Agh
Fuck me
You know
I went from 100 to 0 very fast lol
They're gone
You're not a close friend
Huhhh
I went from 100 to 0 very fast lol
They're gone
You're not a close friend
Huhhh
And now they want to invite [redacted] to everything
You know
[redacted]
They think I don't know you
I've given up [redacted]
I tried overdosing on pills two weeks ago
I tried choking myself by crushing my throat
I just
I can't do this anymore
[redacted]
I'm sorry
[redacted]
Hey [redacted]
I'm sorry for everything I've done. I'm sorry for hurting you time and time again. Lying to you assaulting you. Making you cry threatening you bullying you and everything. You're right I'm not a good person and I self pity myself for things that don't matter. I can't go to Mandhir I'm too bad a person. I can't become a doctor I'm too bad a person. I don't want any friends. I won't be at spring bazaar. [redacted] I'm a worthless piece of shit. I apologize for inflicting it upon you. In my heart I genuinely cared for you, but I masked that too with so much shit. [redacted] I've lost my will to be someone and to do something. I don't think I'm worth it and I hope one day you can forgive me.
[redacted]
I'm sorry
[redacted]

SA-150

126

April 1st

CONFIDENTIAL STUDENT RECORD

NYU_00009900

Case 23-1246, Document 86, 04/30/2024, 3621705, Page153 of 231

127

I went up to John room to talk to him because he said I had been evading him and all he wanted was a discussion. I was scared about what he was going to do, so I went to to talk to him.

CONFIDENTIAL STUDENT RECORD

NYU_00009901

SA-152

128

April 2nd

CONFIDENTIAL STUDENT RECORD

NYU_00009902

Case 23-1246, Document 86, 04/30/2024, 3621705, Page155 of 231

129

These messages were sent to my mom by John when I wasn't responding to his messages. He has contacted my parents in the past pretending to be concerned about me, knowing that these messages make them extremely angry at me (because it confirms that I talk to John I've told him many times that even if he is "concerned" he should go to my friends instead of my parents.



**Left screen:**

Verizon  7:06 PM  35%

John Doe

My apologies, I did not mean to call

Missed voice call at 2:11 AM

Missed voice call at 2:12 AM

We are all quite concerned, I hope everything is ok.

Hello, I am currently at work and missed your call. I hope all is well and apologize for the late texts last night.

I want to apologize for the havoc caused last night. I was very worried by a bunch of factors last night that I heard about from other friends. I apologize and mean no harm and only hope that Jane is ok. I'm sorry if everything was fine and I made a big deal over nothing, but that's not a risk I wanted to take.

**Right screen:**

Verizon  12:57 PM  62%

John Doe

Hello, I really don't mean to be a bother and understand that it may not be my place . However in this case I am not sure if Jane is ok and I just wanted to check in to make sure that everything is alright.

Missed voice call at 1:41 AM

My apologies, I did not mean to call

Missed voice call at 2:11 AM

Missed voice call at 2:12 AM

We are all quite concerned, I hope everything is ok.

Hello, I am currently at work and missed your call. I hope all is well and apologize for the late texts last night.

CONFIDENTIAL STUDENT RECORD

NYU_00009903

Case 23-1246, Document 86, 04/30/2024, 3621705, Page156 of 231

I also received several messages from ▉john▉ He scared me, saying that I would kill him by telling people he assaulted me [130] because he would kill himself if I didn't that information got out. He threatened to tell my parents and ▉▉▉▉ about our past "relationship" if I didn't come and talk to him. ▉▉▉▉ was my roommate and I didn't tell her about ▉John▉ and my past because she knows my mom well and I was afraid of any chance of the information getting to my parents (especially because ▉▉▉ isn't very supportive of relationships)



131

To clarify the above messages, I lied to John about being in Rubin because I was afraid he was going to get angry and find me.

Case 23-1246, Document 86, 04/30/2024, 3621705, Page158 of 231

132



SA-157

133

April 6st

Case 23-1246, Document 86, 04/30/2024, 3621705, Page160 of 231

134

John got angry after seeing me and some friends in a Snapchat post. We had an argument in front of our friends ( and ). He agreed to not talking to me in their presence. I made it clear that I was fine with him being friends with our mutual friends, but just that I would not hang out with them if he was there. He said he was not okay with me hanging out with them without him there.

SA-159

135

April 7th

NYU_00009909

Case 23-1246, Document 86, 04/30/2024, 3621705, Page162 of 231

136

I got emails from John (from more than one email ID) asking me to cut off from all my friends, or else he would make things difficult for me. I responded to a couple of them, and then stopped. His emails kept coming in. He tried to reach out to me through



NYU_00009910

137

(no subject)
John Doe
Hello, I would appreciate your confirmation. Withdraw like you did with all your friends from last year please, I am not going to communicate through [redacted] and [redacted] and I expect that you won't communicate with anyone either.

John Doe [redacted]
Jane Doe [redacted]
I want a confirmation from you.
John Doe
Jane
Hello,
I would like your confirmation or things are just going to implode among friends and with you. If you don't want my contact then you need to comply with this because that is the only way things will work. I need you out before you alienate me with everyone. I know that's your way and what you will do so I kindly ask that you comply respond and take the necessary action.

(no subject)
John Doe
John Doe
John Doe
Jane
Hello I want your confirmation or I want it through your "friends" please choose and do so by 1:45.

John Doe
John Doe
Jane
Hello I want your confirmation or I want it through your "friends" please choose and do so by 1:45.
John Doe
Jane
I also believe that it's imprudent of you to say that involving [redacted] was out of your control. When you didn't want [redacted] or [redacted] I found a way. I regret it now, the world aligns as per your will. So I again ask for your confirmation.

Case 23-1246, Document 86, 04/30/2024, 3621705, Page164 of 231

138



These are the messages I received from ▉ on my primary Facebook account.

SA-163

139

April 8th

CONFIDENTIAL STUDENT RECORD

NYU_00009913

Case 23-1246, Document 86, 04/30/2024, 3621705, Page166 of 231

140





We need to talk one last time. This is extremely important so please do contact me back. I promise this is it but please just please it's really important.

John contacted me telling me to to talk to him without other biased friends present. He somehow found ▮ and I in the commuter lounge, and made me talk to him. I agreed in fear that he would contact my parents otherwise, and hoping this would truly be the last conversation as he said. In our one-to-one conversation, he wanted to make clear to me how I hurt him by telling our friends about the things that happened between us, like the assault, etc., and how they alienated him. He was also unhappy that I hadn't talked to him properly. I tried to be understanding, and listened to him. He kept saying the conversation would end, but he kept extending it. We moved to a hallway one floor below the first floor in Lipton to talk. Have videos. I asked for him to not speak to me, but he wasn't agreeing. I left for Carlyle and he messaged me saying he needed to finish the conversation. I agreed to allow him to come. We finished the conversation, and I again reiterated that I didn't want to talk to him at the end. I recorded a few clips of the conversation while we were at Lipton.

NYU_00009914

SA-165

141



Refer to "April 8th Voicemail" in folder:

"Hello, um, I don't know why I trusted you. You're not a good person. I've taken the liberty of involving other people seeing as though you have done so to begin with. And uh, I wish you all the best, because at the end of it, you know, you _____* back issues that happened a long time ago, and you brought them into a lot of things. I _____ very small issues, which I don't appreciate. So again I'm telling you, if this is how it's going to go down, and you're not going to talk to me, then be warned I'm not going to be an easy person to deal with."

*When I put in a "_____" it's because I'm not sure exactly what he's saying.

142

Refer to "April 8th Video B" in folder:



Refer to "April 8th Video A" in folder:



CONFIDENTIAL STUDENT RECORD

Case 23-1246, Document 86, 04/30/2024, 3621705, Page169 of 231

143

Refer to "April 8th Voicemail to Mom A" in folder:

"Hello. I believe that there are many falsities and truths as to what's going on right now, and that the whole story is not known. I would like to make that transparent. Regardless of my flaws, it is not entirely built upon my flaws.

Your daughter has also done a lot of things that she has not owned up to you, and made choices that she's repeatedly denied to you. I don't appreciate being villainized for things that I have not done, and I don't appreciate being villainized based on her judgement of me. Um, I don't _____ but at the same time I do not appreciate people out there thinking that I'm something which I'm not, and this can be discussed I would appreciate it. Thank you."

NYU_00009917

Case 23-1246, Document 86, 04/30/2024, 3621705, Page170 of 231

144

Refer to "April 8th Voicemail to Mom B" in folder:

"Hello, so I understand I was blocked, but, then I think I have to I have to leave it as a voicemail. Um, I'm very tired of Jane telling you, my friends—the ones that I introduced to her and made part of the same group—and a bunch of people that she knows that I'm such a bad person. And if that was the case, then she wouldn't have come over to my room to sleep over almost five times a week last semester and the majority of this semester. If that was the case, and if you need proof. My roommate can tell you very openly, and he's a completely random roommate. If that was the case, then she wouldn't have that, she wouldn't have hung around me so much, she wouldn't have gone to see Hamilton with me. There's a lot of things she's done with me, and I don't appreciate being vilified for it all the time. I don't know if she's shared this with you—she claims she has. And, I have respect for you as her parents so I do not want to get into the details of everything that's happened, but, I think it is right that you understand that there is far more happening than she makes out and I don't want to disrespect anyone. But, in some ways I do think that it is necessary that her side is put, you know, equally next to mine, I because I don't appreciate being vilified. I have done some things which I regret, but I do not believe, that, you know, I believe that I have been a better person to her than has been out. I have helped her, a lot. And, I've been there for her. I've done a lot of things. I don't like, I don't like being portrayed to everyone she knows in the way that I am. I'm losing friends over it. I'm losing a lot of things over it, and I don't think it's right that she gets to tell everyone that. And, she's spoken to my parents on occasion. And, the biggest difference is that I have never said of the bad things about her, only the good things, and they think she's a wonderful person. And I know that I may never _____."

CONFIDENTIAL STUDENT RECORD

NYU_00009918

SA-169

145

April 9th

CONFIDENTIAL STUDENT RECORD

NYU_00009919

Case 23-1246, Document 86, 04/30/2024, 3621705, Page172 of 231

After the conversation, he sent me voice messages that said he still had to talk to me. He messaged me on my secondary [146] Facebook and I responded again, being scared. I tried to end the conversation peacefully so he wouldn't be aggravated.

**John Doe**
You're friends on Facebook

We need to talk

ok where you'll contact me

But we need to talk

so if you need anything

please text here

I know its easy for you to dismiss

but for one month

my anger has been all over the place

and its so hard to control it ya know

---

I hope all is ok

telek why i still text here

i guess

tdlk

I don't want to leave bed

i just want it to be over

i can't do it anymore

i just can't

telek why I'm talking here

i just can't do it

I hate myself

---

I'm even more alone now than I was before

And like I don't have a support system

I just don't

It's fine

Everything's gone

But it's fine

I just ick what to do

There's so much

And I feel awful

I feel awful because of what's happened ocohe

I feel awful for my actions

I just feel awful

I've never felt so shitty

Never ever

---

Where did it all go to the point

That we both ripped each other apart

Like so much

Where did that happen

I feel so exposed

So ripped apart

So vulnerable

you still go

To go back to people

And be normal

Cause you're a girl and they all pity you so much more and see me as a villain

I'm even more alone now than I was before

NYU_00009920

Case 23-1246, Document 86, 04/30/2024, 3621705, Page173 of 231



And I just don't know

I've told people the whole truth now

They know how shitty I am

I told the people that were like freaking helping me with it all

I just don't know

And like

I run

It was hard

Did you not get it

Like

Even asking ▮▮▮▮▮ for your hand bag

Or when to do mehendip

It felt so awful

Like

First you wouldn't talk to me while I was hurting

And that's how far you were going

Like I was so hurt

It hurt me so much

And I knew you say that you've always been there for me

But I feel like you're way more invested in others

You'd never cancel plans for my sake

And if you did come close I it

I always ended up having to console you at the end

Like nobody else has that

I just felt so betrayed by so many things

And I want to calm down

And I want to calm down

But how can I

▮▮▮▮ sends me snaps of you on purpose

Every time you hang out

He knows what he's doing

I've heard he has a crush on you

And I honestly feel like they're both putting a wedge between us

After everything last night

I'm trying to move forward c

But I'm still so hurt

There's so much snore

And it's like the same story

Just like you and

It hurts that you hang out with them

When they're that's way with me

You know why I started talking to ▮▮▮

I did it because you left me behind

Because I was angry at you

And now he and ▮▮▮ are talking

It's out there

She knows so much

Too much

I never wanted this

I didn't want it to be like this

I wouldn't have called your parents

I called them because you told me everything was fine

Because I felt so hurt that you had just labeled me as nothing more than a creep in your life

Case 23-1246, Document 86, 04/30/2024, 3621705, Page174 of 231



**4:29 AM**

I never told [ ] because I couldn't

But I wanted to tell her the truth

Because I felt

Like you'd labeled me as a monster again

And it also boody sucks

That you can contact me as you please

But I can't

Without causing a whole fracus

Like I just can't

Like you put everyone ahead of me again

I hurt last night when you said your friends would have defended you over anything

And that I was the "newbie"

It hurt when you laughed at me in front of everyone

**4:29 AM**

And then broke down

It makes me feel so insignificant

It's like socially you aint to prove you're above me

It feels shitty that at the end of the day

Now all of the people you know hate me

And now they all hung out together

Why didn't I get any of that yeah maybe I was bad

But I was also there a lot

I flipping introduced you and pushed you to be friends

But I'm pushed away again

Like you blame it on me ending upset with trivial things

But how would you have felt if I

**4:30 AM**

But how would you have felt if I made rape jokes in front of everyone

They hurt

Not because they're generally bad

But because you know that person knows your history

It hurt I see [ ] you and [ ] in 4 ppl

It hurts that they all lied to me

That I'm a joke

He acreum/hot red all my snapchats

And didn't I send them to you

So then where did they do

To

And who the fuck invited 4 ppl

When they knew we are having a discussion

**4:30 AM**

When they see tears

Like I just don't get it

What do you see in them now

That was so apathetic

I don't get it

Like do you not see how I needed to communicate

And that going through friends would be so complicated

[ ] hates it

[ ] ates it

Everyone hates it

Like could you not see that I was hurting

That I needed to talk

Did you not see that I didn't get a proper discussion

When you came up to my room in

VZW Wi-Fi 4:30 AM

[redacted]

When you came up to my room in the morning and I hadn't woken up

Didn't you see how scary it was to talk when you have that face

[redacted]

And expression

also like idek whats happening

your adanten everyone on ice hates me

but you wont tel me who

like it feels so fucking shity

i just want to run away from everything

like you know everyone who hates me

everyone you know hates me

Its such a simple equation

idek what the hell im doing

[redacted]

youll never even read this

VZW Wi-Fi 4:30 AM

[redacted]

Also

I was gonna go to that casino night thing

Idk what you're gonna do

Cause you're still going to hang out with everyone

[redacted]

No matter what's happened

I just don't know

I don't know

Thank you

Sorry I'm caught up

I'll talk soon

[redacted] keeps reacting to my messages

Him and [redacted] are taunting me

Idk what's happening

VZW Wi-Fi 4:30 AM

[redacted]

Idk what's happening

[redacted]

I'm sorry

I have like 10 min but not the necessary tools

I need to sort out emails

And then I just I can't take the taunting

Even [redacted] doesn't want to talk to me much anymore

And like idek

Are you with [redacted] that he's taunting me rn

Were you with them when they called me

Then why are they taunting me

VZW Wi-Fi 4:31 AM

[redacted]

[redacted]

Why did he screenshot my messages

Why did they bring [redacted] and [redacted] when we were having that discussion

Like

Why did they shout madarchod when I left

Why do they always do that

Why am I joke

It just

I'm not even blaming you

It's just so hurtful what's happening



Case 23-1246, Document 86, 04/30/2024, 3621705, Page176 of 231



NYU_00009924

Case 23-1246, Document 86, 04/30/2024, 3621705, Page177 of 231



NYU_00009925

152

[redacted]

[redacted]

I AM UNDERSTANDING

But there's so much to understand

And I don't feel like anything is getting through to you either

There is for me

Ok

I get you're hurt

But like

Can't I ask

[redacted]

[redacted]

So I don't get to discuss it

I'm hurt

And when I'm hurt

It doesn't matter

Because you're more hurt

You understand

How

What can you do

[redacted]

[redacted]

Real

So you'll hang out with them more

And make it more awkward for me

What

No

I'm asking

How are you going to mediate it

[redacted]

[redacted]

No

I'm asking

How are you going to mediate it

I'm not lying

I'm actually being completely honest once

Like why did you tell [redacted] emailed you

And that I called you

What place of yours was that

He saw

[redacted] was with him

When I emailed you

He was in uhall

At the cricket screening

Case 23-1246, Document 86, 04/30/2024, 3621705, Page179 of 231



NYU_00009927

154

4:24 AM
So again I was out numbered
You three are together
When I spoke to you and [redacted] and [redacted] I was outnumbered
You got to speak to him
Like
How did I
Huh
You know I was roaming around Lipton lost
And pissed off
And hurt
And they just happened to be
VZW Wi-Fi
4:24 AM
And they just happened to be leaving
?
Me?
Because I DIS
Because I DIS
DID
But don you see
How they all point in that direction
Like they're still being rude to me
Do they do that to you
Have they ever
But like it's everyone hanged up on me
But like it's everyone hanged up on me
Oh beehoo
Really
They hug
Cause [redacted] and [redacted] didn't
They never told me that

Case 23-1246, Document 86, 04/30/2024, 3621705, Page181 of 231



156

4:36 AM [redacted]

if youre not there when im there

why

are you

finishing on this note

[redacted]

im literally just trying to ask

and make things better

and this is the note you want to finish on

why cant i?

you have blamed me

4:35 AM [redacted]

isnt it better i understand that these things arent related to you

[redacted]

so i can expel negative energy

ZBTB7b

I finally got to speak to her, and my anger was because others were twisting what was happening and what was said

I finally talked to her for a long time yesterdayx
And like I think it both made sense to us
That everyone had twisted what was happeninf
Which made it worse

Hey man i just wanna day one thing. I know a lot has happened and it involved too many people. However after speaking to Jane it wasn't her or her doing. It was [redacted] and [redacted] who drove us even further apart. They made up

4:36 AM [redacted]

even further apart. They made up a lot of things and twisted truths. And I know I've flipped out a lot but I just have to make it clear to you. It wasn't Jane's fault, not one bit. It was a big misunderstanding because of others.

[redacted]

do you not see that youve impacted me

that after ranting me taken it all back

I DID

TO EVERONE IVE TALKED TO

they all are

because after talking to you

i am realizing that everything isnt

4:36 AM [redacted]

[redacted]

i am realizing that everything isnt your fault

in fact almost nothing is your fault

and ive pented up anger towards you

NO

[redacted] [redacted]

IM NOT SAYING THAT

no

no no

the reason i was angry at you

was because of them

because of what i was hearing

157

4:38 AM
because of what i was hearing
because of misconceptions
because in this whole month
[redacted]
i for once started listening to others and doubting you
yes i do
and i hope you can fix things
and i hope you realize that after everything theyve done to stick a wedge between us
hanging out with them is going to hurt even more than you hanging out with [redacted] and [redacted]
and i get that will never bother you
but its just all going to hurt
and im sorry for how ive reacted
4:36 AM
and im sorry for how ive reacted
it was out of hurt
a lot of hurt
[redacted]
ok im sorry then
ill need you to confirm gmail
with me
because there are going to be strings of emails
that you cant see
coming very soon
and you know that felt so shitty when you went into my fb multiple times.
i knew you had
12:42 PM
i knew you had
and it was fine for me
but then to bring up my convos in front of others
[redacted]
no
just all you have to do is send me a screenshot
because i stopped forwarding
your inbox
i can see if youve received recent emails
ok and i beg you please sleep in uhall and dont be scared
if you need pics of me else where
12:43 PM
but then to bring up my convos in front of others
[redacted]
no
just all you have to do is send me a screenshot
because i stopped forwarding
your inbox
i can see if youve received recent emails
ok and i beg you please sleep in uhall and dont be scared
if you need pics of me else where ill send you one every night so you know i wont do anything
ill buy a

158

12:43 PM

[redacted]

ill buy a security camera and you can watch me

anything

but please

your academics matter

[redacted]

and getting proper rest matters

no

a screen shot of the inbox

i turne... I did call your father

12:43 PM

[redacted]

a screen shot of the inbox

[redacted]

i turned it off

i just need to see that it is

ok

that looks fine

ok

please

slee... But it went to some teen...

12:43 PM

[redacted]

im sorry for the hassles ive caused

please [redacted]

please

i feel so sickened knowing you have to go elsewhere cause of me

what can i do

ill leave

ill sleep elsewher

you cant sleep in lounged

so you dont deserve that

even when i thought you did all the shit you didnt deserve it

and now that I know the truth

you def dont

please ill do anything

just pl... And that was awkward

12:43 PM

[redacted]

just please

stay in your bed

be peaceful

be comfortable

and get good sleep

I'll pay you

I'll give you food

idk

I'll do anything

Just please

[redacted]

Try

ive lost it dear

ill try ... And that was awkward

Case 23-1246, Document 86, 04/30/2024, 3621705, Page185 of 231

159



Ok ok but I'm just saying

Like if nana passed away

I would like to tell you know

Like something on those lines

And I hope that I see soar but there
for each other

In ways that aren't calling you with
no id

I'll leave it in my WhatsApp thing if I
really need you

And I won't abuse it

I promise

Take care of yourself

Ok but I'm saying if something
happens

That requires me to contact you

Like just in case

That's all

Like the 1% where it's actually
necessary

Not

Ok

That's fair

I won't abuse it

I promise

So you take care

Get your academics in focus

Wholesome

In some ways

Idk how you feel

But like

That just felt so

Good

I felt like

You're my friend

I felt hurt

Hurt for hurting you

Hurt for believing all those things

It feels so good

to know all this

You know

You're 20x the person I strive to be

And

take care

enjoy

and good luck

I hope we meet again

Wow

I think you're fine

Gone

But that just felt so

Wholesome

In some ways you can

Case 23-1246, Document 86, 04/30/2024, 3621705, Page186 of 231



And please be respectful among friends for me

They've done a lot to hurt me I realize now

And I just want respect because that will help me recover

And find peace in it all

And not go over the top with anger right now

Because as you said I'm hyper

And I want to calm down

I want to be better

And I genuinely will strive to do so in every way possible

For myself

GET THE WORLD MERI SHERRRR

may you always win

This is how it should have been a long time ago

And this is the right way

Idek what this feeling is lol

You're not talking to me

But I have so much respect for it

And feel so much better about it

So            let loose

To          that I heard some muffled things about her.

And they were discussing you

Just block her now in case on message

Idk what will I hurt you

Case 23-1246, Document 86, 04/30/2024, 3621705, Page187 of 231

Refer to "April 9th A Voicemail" in folder:

"Hello, hope you made it back first of all. Second of all, I heard them say on the group chat that what's done is done and trust you've made it forward to the right decision. I find that very rude. Clearly nothing reflected upon you, and I only assume that you told them you weren't going to talk to me anymore and you just realized that, so I really don't care. Third of all, yeah, I'm not done talking, you zoned out on me, therefore, that wasn't as per our conditions. There's a lot more you have to hear from me. No, not even that much more, just a little bit. And, um, yeah, I would say, uh, message me on Facebook or WhatsApp, pretty soon? There's a lot of cooling to do. Won't go ballistic. Or maybe I already am. But I will _____ it, and make an attempt to make it better. So, yeah. _____. Thank you, bye-bye."



NYU_00009935

162

Refer to "April 9th B Voicemail" in folder:

"Hello, um, please check Facebook or WhatsApp. There's still something I forgot to do yesterday that needs to be done. I'd appreciate if you just check one of those. Thank you, bye bye."



SA-187

163

April 10th

SA-188

Received more messages on secondary Facebook account. He kept saying it was urgent and that he did something which my parents would become really angry about. When I responded, he then told me that information about me had gotten to someone who could spread the word about. I told him that I didn't care what information got where, and I didn't want him to talk to me in regards to them. I discussed study abroad with him so that we wouldn't end up going abroad to the same place.

164



SA-189

165

April 11th

CONFIDENTIAL STUDENT RECORD

NYU_00009939

SA-190

166

We discussed study abroad over text (I believe WhatsApp) again so that he wouldn't come to the same place as me. He told me there wouldn't be a way for him to go abroad, which I suspected to be a lie because he kept trying to push me to go abroad in the fall (either so we end up in the same place abroad, or don't go abroad different semesters). I got a voicemail from him about it. After this conversation, I reiterated I didn't want to speak to him. Later that day, sent me this voicemail "accidentally." It was supposedly meant to be for his mom, but I suspect it was just a tactic to make me believe he was not going abroad. Now he is going abroad in the fall.



Refer to "April 11th Voicemail" in folder:

"Hi mom, um, I know you told me to leave a message. So essentially, what it boils down to is, I'm not entirely sure when I'm going abroad, or if that's a possibility anymore. It's just really complicated, and things stand, I'm not doing as well academically as I probably should be doing. Um, I know dad's going to be really mad. So, that'll be something to deal with later, even though save him some money. Uh, yeah, so, give me a call later, we can discuss it. I know you're busy with ▇▇▇ right now. Yeah, okay. bye, take care."

NYU_00009940

SA-191

167

April 12th

CONFIDENTIAL STUDENT RECORD

NYU_00009941

SA-192

Case 23-1246, Document 86, 04/30/2024, 3621705, Page194 of 231

168

Received messages on my [Jane] Roe [  ] (primary) Facebook account from him going by the name



NYU_00009942



169

3:14 AM
Home
I knew [redacted] in my life
Who cares for
[redacted]
I knew
[redacted]
You're not even a pudge anymore
You did it
You lost weight
You're like a
Egdup
The opposite
6:51 PM
Requests
And I'm sorry I ruined your relationship with the two people who matter most in your life
It's not comparable losing friend
I hope your parents and you are able to improve you relations
And I will stay out
I had no right to say all that
And no right to drag them all in
I'm sorry for the mess I've caused you
And I'm sorry to your parents
You deserve a lot more than what I've done
I'm sorry
I'm not keeping my cool
And it's only when I'm alone that I manage to regain composure
Delete
Reply
6:55 PM
Requests
I think I'm gonna give up
Trying
I don't think life is much better
I had a really nice day
I went to the gym
I was alone
I studied
Started grant apps
I even started conversing with this nice guy in orgo names [redacted]
But nope
Had to finish on a low
That's the [redacted] way
[redacted]
That's my fb password
If you ever wanna go on
Delete
Reply
6:57 PM
Requests
Sorry
I just figured if everyone hates me this much
They'd prob like you
Sorry
Whatever I will move on again I guess
I don't need shitty friends like that
It just hurt
Huhhh
That was the biggest 100 to 0 in my life
I guess you don't want to talk to me
Who would
Before I was talkative and aggressive
Now I spoil reputations
Delete
Reply

SA-193

Case 23-1246, Document 86, 04/30/2024, 3621705, Page196 of 231

170



NYU_00009944

SA-195

171

April 13th

CONFIDENTIAL STUDENT RECORD

NYU_00009945

Case 23-1246, Document 86, 04/30/2024, 3621705, Page198 of 231

172

Received messages on my primary Facebook account from ███████ ███████ asking to talk again.



NYU_00009946

SA-197

173

April 14th

Case 23-1246, Document 86, 04/30/2024, 3621705, Page200 of 231

asked if was going to an event later (on my ▮▮ Jane Roe ▮ Facebook account from ▮▮▮ and that 174 was contacting me only regarding that. He tried to say it was well-meaning. I told him I didn't want any contact regarding events, etc. I told him I needed him to stay away. After this conversation, I saw him sitting across from me in the park. He changed locations several times based on where I was facing, watching me. He changed locations every time I did. As I was leaving the park he started to follow, and I yelled at him to leave me alone and stop following me.

He also sent me a voicemail asking if I was going to a club event and we had an argument over messages where I told him I didn't want him contacting me to ask if I was going to be at events.





CONFIDENTIAL STUDENT RECORD

Case 23-1246, Document 86, 04/30/2024, 3621705, Page202 of 231

176

Refer to "April 14th Voicemail" in folder:

"Hi are you going to the BSA event that's coming up? I saw everyone hitting you know "going" so I was just curious. Bye bye."



SA-201

177

April 18th

CONFIDENTIAL STUDENT RECORD

NYU_00009951

Case 23-1246, Document 86, 04/30/2024, 3621705, Page204 of 231

178

Got a voice message asking me to not block him, saying he was curious as to why I was doing it.





Refer to "April 18th Voicemail" in folder:

"Um, please don't block, uh, I'm just curious as to why. Please let me know. Um, yeah, and I've been receiving calls, so I just wanted to make sure all's okay at your end. So, yeah, please let me know, if that's possible. Bye bye."

SA-203

179

April 19th

CONFIDENTIAL STUDENT RECORD

NYU_00009953

Case 23-1246, Document 86, 04/30/2024, 3621705, Page206 of 231

John asked [redacted] and [redacted] to contact me. I told them to not convey any more messages from him to me. Got several voice messages telling me to stop hiding from him and to respond to him in the next ten minutes. I messaged him on WhatsApp. He told me something went wrong with his family's phone service right after I talked to him, and that it was probably linked to me. I had no link to this, and I told him that. When I was at a South Asia Society event, he got angry that I was hanging out with people the night of his birthday.



SA-205

Case 23-1246, Document 86, 04/30/2024, 3621705, Page207 of 231

181

Refer to "April 19th Voicemail A" in folder:

"Hello, um, something happened, I need you to respond, um, very quickly. Bye."



Refer to "April 19th Voicemail B" in folder:

"Please don't complicate this more than it needs to be and please respond."





NYU_00009955

Case 23-1246, Document 86, 04/30/2024, 3621705, Page208 of 231

182

Refer to "April 19th Voicemail C" in folder:

"Hello, I would really really appreciate your response in the next ten minutes, or I will have to contact you by other means. Um, there's something that I really do need to talk to you about, and something that's caused a huge issue on my side. And so, please respond right away, and stop just hiding away from it. I'm just giving you one last opportunity so please do so. Yeah, you really need to respond. You really need to respond."



Case 23-1246, Document 86, 04/30/2024, 3621705, Page209 of 231



Don't screw up I won't contact you till Monday

And if appreciate it if you wished me a happy birthday before 12

It would be decent

Because you celebrated everyone elses

And I celebrated yours

Just by that metric. After all the damage you've caused

It'd be decent

Ooooh

You're with everyone lol

Hullaoooo

Yoeo

---

Text Message

Intriguing, you see the bias now. Nobody would believe me.

I think you should talk

Without getting loopy

Without getting aggressive

And just being human

I will do the same

Don't screw up I won't contact you till Monday

And if appreciate it if you wished me a happy birthday before 12

It would be decent

Because you celebrated everyone elses

And I celebrated yours

Case 23-1246, Document 86, 04/30/2024, 3621705, Page210 of 231

184



SA-209

185

April 21st

CONFIDENTIAL STUDENT RECORD

NYU_00009959

SA-210

186

I got threatening messages at about 12:30 a.m. from him from several different numbers, as well as a voicemail. He was angry that I was hanging out with some mutual friends after a club event that I organized on the night of his birthday. I was afraid so I told him I could talk to him in person if he wanted to. I was hoping to calm him down. He demanded I arrive at University Hall immediately, and said if I was late, he would contact my parents. I met him in UHall, and he threatened me and told me how angry I made him. He recorded a video of me with him, threatening to use it to send it to my parents to show I was with him. He threatened me that I could either choose to talk to him and keep my friends, or not talk to him and cut off from my friends. He told me he had an early bus, and told me I needed to go to bed, either in my room or his. I didn't want to leave for my room in case he would follow. As I was quite upset, I said "I kind of wish all of this didn't exist." He said he was worried about me and had me come to his room. I didn't know how to oppose because I was afraid of him. I slept in his room and left at 7:30 a.m.

Later in the day, I got messages from him from several other numbers, saying if I didn't talk to him, he would tell my parents that he was also there in several social gatherings with my friends, and other things about us. He sent the video he took of me in the night, saying he would send it to others. He said he had a deal for me. If I accepted this deal he would leave me alone. He said he wanted me to wish him a happy birthday, and that I should talk to him normally without getting upset or angry. I told him to leave me alone.

CONFIDENTIAL STUDENT RECORD

NYU_00009960

Case 23-1246, Document 86, 04/30/2024, 3621705, Page213 of 231

187

Refer to "April 21st
Voicemail B" in folder:

"You have ten minutes.
Respond. That is all.
_____."



Refer to "April 21st
Voicemail A" in folder:

"If you'd like to come up,
_____. Thought you
might want to, maybe?
Probably not. Kind of sucks,
huh? Oh well. You're right. I
have to take credit for
everything. I have to take
credit for _____. I'm
sorry. _____."

NYU_00009961

Case 23-1246, Document 86, 04/30/2024, 3621705, Page214 of 231

188

Empty voicemails I received after getting a missed calls:



NYU_00009962

SA-213

Case 23-1246, Document 86, 04/30/2024, 3621705, Page215 of 231



**John** was trying to threaten me by showing me what he could send to my parents. He was essentially saying to my parents "you saw this (picture without **John** picture, but here (the pictures *with* **John** was the real situation, and you didn't know about it." He was saying, for example " **Jane** sent you the picture with her two friends, but you didn't know the reality was that I was there too." He was trying to send the pictures of him to my parents as a retaliation for me not responding to him.

Case 23-1246, Document 86, 04/30/2024, 3621705, Page216 of 231

190

Refer to "April 21st Voicemail C" in folder:

"Hello, please respond. It's very quintessential. Bye-bye."

Refer to "April 21st Voicemail D" in folder:

"Hello, are you okay, please text back. I'm quite worried now, bye-bye."



Case 23-1246, Document 86, 04/30/2024, 3621705, Page217 of 231

191

Refer to "April 1st Video":

"Hello, guess who I'm with? Say "hi." Yup, 'supposed to stay away from me.' To all the friends she has, that, you know, you all agreed, we're not all going to talk to John To her parents—supposed to stay away from him. Not doing such a great job of that, are we now? To anyone else, yeah, I'm the villain. But, she's there. Let that stand. You know, today she's punched me five times. I did nothing. Today, she gets mad at me. Everything's my fault. And yet, I didn't do everything. Some thing's are her fault too. But it's my fault. She laughed when you guys were there and I was hurt, right? She laughed. And now she's crying. Where's the laughter? It's a high-stress situation. She's not laughing. Why isn't she laughing? She should be laughing, right? Laugh, right? Laugh. No, she won't laugh now. She'll just cry. She pities her. Always pities her."



NYU_00009965



Case 23-1246, Document 86, 04/30/2024, 3621705, Page218 of 231

Refer to "April 21ˢᵗ Voicemail E" in folder:

"Hello, talk now, please. Bye."

Refer to "April 21ˢᵗ Voicemail F" in folder:

"Hello, I'm sorry for the way I acted today. I'm sorry I've just been losing it. I'll stop contacting you. I won't contact your parents. I'm just really sorry. I'm really sorry. You didn't deserve that. I'm so sorry. I'm sorry. Good night, take care, and goodbye. I'm sorry."

SA-217

193

April 22st

Case 23-1246, Document 86, 04/30/2024, 3621705, Page220 of 231

194

I got many messages on my secondary Facebook, and told him to not talk to me anymore. He also messaged me through many different numbers, which kept changing once I blocked them. The no-contact order was issued afterwards.



NYU_00009968

Case 23-1246, Document 86, 04/30/2024, 3621705, Page221 of 231

195

**Panel 1 (2:17 PM)**

I hope that the good things will
stand. I know how I hurt you, but I
also know there is an immense
amount of good in me.

I know I can bring out the good

I always can

And I hope you will allow me to
show you the good.

Im sorry I called you a liar

I going out 3 times a night to tell
and ling to me is a lot

And perhaps it's not to you

I wouldn't know, I've never had
enough friends in my life to know

So I'm sorry for accusing you of
being a liar last night.

I'm not going to text [ ] or your
parents

I know you need those people in
your [ ]

**Panel 2 (2:17 PM)**

I know you need those people in
your life

And I'm sorry I contacted your
other friends

Like

I'm just sorry

I've made a mess of things

And like

I guess it just feels like it's screw
everything when

Idk

I just felt so vilified

I felt like you'd reduced me to your
villain

I looked to you for a set of
inspiration the last few years

And [ ]

**Panel 3 (2:18 PM)**

And it just felt destroyed

And then I just became a real villain

Just awful

Idk

everything feels so horrendous

Ive never felt so angry in my life

I was just livid

and the other mistake I made
was talking to others

because when I did

everything I trusted you on

began to nosedive fickle

its my fault too

Whe [ ]

**Panel 4 (2:18 PM)**

when you wouldn't talk to me

I asked others what was happening
and how I could fix I

and everyone else said things that
corrupted my mind

really corrupted

you idk?

You missed a call from [ ]

Ok

Idk

You switched accounts

Please read what I said

At [ ]

NYU_00009969

SA-220

196

2:18 PM [redacted]

[redacted]

You switched accounts

Please read what I said

At least

You missed a call from [redacted]

thank you

I need you to read this.

I'm going to remain calm

And I'm not going to get mad

I just need you to know this

And hope you understand it

[redacted]

Because last night I began to realize what was hurting you

[redacted]

4:00 PM [redacted]

[redacted]

I guess i also just need you to realize, not talking to me helps you and hurts ms, being friends withe veryone else at my expense helps you and hurts me. itd just be nice if both didnt hurt me and helped you, i wish there could be a balance

It was petty of me to expect you to wish me a happy birthday I guess

I just wished for something against hope

You still mean a lot to me

You always will

I'm sorry I've been so rotten

I just forgot who you were

I forgot

I'll try and fix things and explain what happened

4:00 PM [redacted]

[redacted]

I don't want you going down like that

?

did you read everything?

?

you didnt read everything then

im trying to remain calm yaar

but if you act like this

nothing will be solved

i just opened up and tried to tell you calmly what was happening and admit to faults

but then if you procede to end off just like that

4:00 PM [redacted]

just like that

dont you see how that can lead to anger?

dont yous eo how that can hurt?

dont you see how that makes me think that nothing got through to you?

you were willing to talk saturday when i was just mad

please be willing to talk when im not just mad

when im calmer

the world cant be yours im sorry

and im trying to come to something that is better

when youre mad you say "why does everything bad happen to me"

"i help people i try to be giving i try to be there"

Case 23-1246, Document 86, 04/30/2024, 3621705, Page223 of 231

197



Case 23-1246, Document 86, 04/30/2024, 3621705, Page224 of 231

Empty voicemails I received after getting a missed calls.

198



Note: He's referring to a call he received after I made the Public Safety report.

CONFIDENTIAL STUDENT RECORD

NYU_00009972

Case 23-1246, Document 86, 04/30/2024, 3621705, Page225 of 231

199

Refer to "April 22st
Voicemail A" in folder:

"Please respond."



Refer to "April 22st
Voicemail B" in folder:

"That was a dreadful thing to do. It was a very dreadful thing to do. You're not doing it out of concern, you're doing it as a threat, and I don't appreciate that. Bye-bye."

Note: John sent these messages to me once a mental health professional reached out to him after I made the report to the Office of Public Safety.



CONFIDENTIAL STUDENT RECORD

NYU_00009973

Case 23-1246, Document 86, 04/30/2024, 3621705, Page226 of 231

200

Refer to "April 22ˢᵗ
Voicemail C" in folder:

"Check Messenger. I'm only asking once. You have ten minutes."



Refer to "April 22ˢᵗ
Voicemail D" in folder:

Please respond on Facebook I'm begging you. Please respond. _____ . Just respond. _____ . Sorry.



Case 1:20-cv-01343-GHW   Document 94-2   Filed 07/07/22   Page 91 of 95

Case 23-1246, Document 86, 04/30/2024, 3621705, Page227 of 231

201

Refer to "April 22st
Voicemail E" in folder:

"Please I'm begging you. I just need ten minutes of your time. Please please please, ten minutes. You can leave as soon as they're over. Please text me back. Please, please."





NYU_00009975

SA-226

202

April 23th

CONFIDENTIAL STUDENT RECORD

NYU_00009976

A while ago, Indian Cultural Exchange, an NYU club, hosted an event called Spring Bazaar. ▮▮▮ is on the executive board of this club. I got an email through the club OrgSync account, inviting me to join the club. The email was by John and it was thanking me for coming to the event. Upon checking with my other friends at the event, I found out that none of them had gotten the email.



SA-228

204

April 27th

CONFIDENTIAL STUDENT RECORD

NYU_00009978

Case 23-1246, Document 86, 04/30/2024, 3621705, Page231 of 231

I got several calls from an unknown number, which I'm quite sure was John because I've never gotten that many calls[205] without a caller ID in a row in any other circumstance.



NYU_00009979