# 23-1246-cv

## United States Court of Appeals

*for the*

## Second Circuit

JOHN DOE,

*Plaintiff-Appellant,*

– v. –

NEW YORK UNIVERSITY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
### Volume 2 of 3 (Pages SA-230 to SA-460)

JEFFREY METZLER
MAX WINOGRAD
PILLSBURY WINTHROP SHAW PITTMAN LLP
*Attorneys for Defendant-Appellee*
31 West 52nd Street
New York, New York 10019
(212) 858-1000

CP COUNSEL PRESS    (800) 4-APPEAL • (328907)

**TABLE OF CONTENTS**

**Page**

Declaration of Jeffrey P. Metzler, for Defendant, in Support of Motion for Summary Judgment, entered June 22, 2022 (Omitted herein)

Exhibit 1 to Metzler Declaration - Investigation Report Parts A through H ................ SA-1

Exhibit 3 to Metzler Declaration - NYU Procedures .................................................. SA-348

Exhibit 13 to Metzler Declaration - Transcript of NYU Administrative Hearing, dated February 23, 2022 ................................................ SA-360

SA-230

# Exhibit 1, Part E

SA-231

206

April 28th

CONFIDENTIAL STUDENT RECORD

NYU_00009980

While we were dating / friends, John and I couldn't communicate when I went home to my parents because they weren't okay with us dating, and they used to check my phone. At that time, if anything important came up, John used to set a status on WhatsApp to let me know what was up. After I got the calls the previous night, I checked his WhatsApp status (although I didn't extend any contact whatsoever), and he had put up emergency / caution symbols. This morning, his status changed to "This could be catastrophic for you because of a mistake I made, I don't care what's in place you need to be aware." I received the same emergency / caution symbols from a text number several times. I got missed calls from this same number. I also got the same caution symbols from an Instagram account called [redacted] (a play on the name of my secondary FB account)

SA-233

208

April 29th

CONFIDENTIAL STUDENT RECORD

NYU_00009982

I got voicemails apologizing to me, as well as asking me to talk to him / read messages that he sent to my ████. Facebook. He came up to me in a study room in Uhall while I was studying with my friends. He tapped me on the should several times, trying to talk to me. He threatened me, saying something along the lines of "you shouldn't have done what you did, you're going to have to pay." When my friends and I got up to go, he stepped on my backpack, not letting me pull it. He laughed. I finally was able to pull it out from beneath his foot, and my friends and I started leaving. He said "well okay, I'm going to follow you then." We went up to the security guard and reported this incident.



Empty voicemail I received after getting missed calls.

CONFIDENTIAL STUDENT RECORD

NYU_00009983

Case 23-1246, Document 87, 04/30/2024, 3621706, Page8 of 233

This message was sent to my mom. I was never under the influence of drugs or alcohol this past semester as I don't drink. He knows this, and I don't know where he would have "heard from people" because everyone knows that I don't drink or use drugs. He knows that my parents are extremely strict and would get really angry if they found out this information.

I am not sure that this this is the exact date that this message was sent to my mom, but I know it was around this time.



Verizon LTE   1:48 PM   98%

‹ Requests

Hello, I don't mean to be a bother. I think Jane may be under the influence of drugs or alcohol based on what I've heard from people. I know she is having a hard time with everything right now and I am quite worried. She's had some self harmful tendencies and I do not wish to get myself involved. However it is important that she is ok and I hope you can make sure of that. If all is well and you know of the situation then that is good.

Her friends were also my friends and they smoke a lot. I got word from others that she had become part of that. I'm not sure if it's true I've just seen her get very depressed when under the influence and wouldn't want anything

CONFIDENTIAL STUDENT RECORD

Refer to "April 29th Voicemail A" in folder:



"Please listen to this message, please? I'm really sorry. I was watching the videos last night, um, from Saturday. I just saw you, and I can't forgive myself for what I did. For the pain I saw in your eyes. And I'm just really sorry that we had to go down that way. Um, I'm really sorry. That's not how I wanted to end things. And I know I'm not supposed to contact you right now. And I hope you won't use this against me, but I just had to apologize. I couldn't go on any longer and not talk. It just became too hard, and I'm sorry we got so angry, and I'm really sorry. Things aren't going well. I'm trying to get counseling, again. I'm really trying everything. But, I-I-don't know. I don't know. Please? Contact me once that you got this message. I'd just like to apologize to you. I just want to apologize to you. I-I- don't care about anything, about you reporting me, or you calling mental illness on me. I just want to apologize to you, because I shouldn't have done that you. I should have never done that to you and I shouldn't have hurt you like that. You mean a lot more to me than that. I'm sorry. Just please, please, I know what I'm doing is wrong right now, but I couldn't live with myself if I didn't apologize, I just couldn't. And I know it's wrong, but I just couldn't live with myself if I didn't apologize. I just couldn't. I'm sorry. Okay? I hope you can contact me. I'm not going to _____ saying that you can talk to me. I just want to apologize to you face to face just once. You deserve it. I shouldn't have done that. I'm sorry. I'm sorry."

NYU_00009985

Case 23-1246, Document 87, 04/30/2024, 3621706, Page10 of 233

SA-237

Refer to "April 29th Voicemail B" in folder:

"Hello, um, I guess you didn't listen to my last message, but, there's something else I need to tell you. It's not too late, it can be fixed, but I made a big mistake in panic. Please contact me, or don't, but please just read, on my Facebook or your Facebook. Um, something happened, and I don't want to say, because I don't know if you're going to use this message against me or not. Um, it's personal. I don't want to share with others, but, please, read something, read somewhere. Please, please, I'm sorry. I won't contact I'm sorry, just please. Okay? Sorry."

█████ is referring to sending the voicemails to my mom and the message where he said that I was under the influence of drugs and alcohol.

NYU_00009986

213

9:02 PM
Edit
All
Missed
No Caller ID
No Caller ID
No Caller ID
No Caller ID
No Caller ID
No Caller ID
No Caller ID

3:45 PM
Decline
Allow

8:49 PM
Please

214

I logged into my secondary "[redacted]" Facebook account. I saw that [redacted] had sent messages to me on April 22nd, April 27th, and April 29th. He must have seen my account go online, because he logged into my account and started sending messages from me to him, pretending to be me. (Until the point that the no-contact order issued, I was using the secondary account to talk to John. John knew the password to this account as well, and was able to change the password back any time I used to change it. He was also able to unblock himself any time I blocked him because he had the password to the account. I have provided evidence that he was logged into my account by showing a screenshot where you can see the account was logged into from my Mac and his iPhone 8—he has an iPhone 8 and I have an iPhone 7 Plus). Then he messaged me back from his account, clarifying for some reason that it was him talking to himself. He then kept repeatedly logging me out of my own account.

11:24 PM
You're friends on Facebook
Well
There goes ra position
?
I really need to talk to you
I'm really calm
I hope you won't report me
But I really need to talk to you
I've made a terrible mistake
11:27 PM
Well
There goes ra position
?
I really need to talk to you
I'm really calm
I hope you won't report me
But I really need to talk to you
I've made a terrible mistake
Ok so I'm screwed
Lol
11:58 PM
Well
Idk
It's confusing
But I assure you
It's me talking to me
In case this is misconstrued
To be Jane talking
Welp
I thought this account was gone on your end I was just venting, I'm not communicating with anyone or attempting to communicate with anyone
Recommended
Choose friends to contact if you are locked out
Edit
Where you're logged in
Mac · New York, NY, United States
iPhone 8 · New York, NY, United States
See more
Login
Change password
Edit
Log in using your profile picture
Edit
Two-factor authentication
Use two-factor authentication
Chat

SA-240

215

May 2nd

CONFIDENTIAL STUDENT RECORD

NYU_00009989

Case 23-1246, Document 87, 04/30/2024, 3621706, Page14 of 233

**216**

John was following me at Washington Square Park. As I was walking, I saw him looking me from a distance. I became uncomfortable and moved locations at the park. Each time I moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. Then I left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When I entered a restaurant, he was pacing outside of it across the street. I then went to Lipton hall to see my friend, and I was eating in the dining hall when he arrived there as well.



NYU_00009990

SA-242

217



SA-243

218







CONFIDENTIAL STUDENT RECORD

SA-244

219

May 8th

CONFIDENTIAL STUDENT RECORD

NYU_00009993

Case 23-1246, Document 87, 04/30/2024, 3621706, Page18 of 233

I logged into my secondary Facebook account and saw that ▮John▮ had sent one message that day and a few messages from days before. He has tried to guilt me before by saying that I was making his academics suffer, which is what I think he was trying to do here.

**220**



SA-246

**221**

■ NYU                                                           Colleen Maeder ▮▮▮▮▮

## [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE

Bret R Beaufeaux ▮▮▮▮▮                                   Tue, Apr 24, 2018 at 9:54 AM
To: Jane Roe
Cc: Lauren Silverstein ▮▮▮▮

Hi ▮▮▮

Thank you for providing me with this information. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮

On Mon, Apr 23, 2018 at 9:02 PM, ▮▮▮▮ ▮▮▮▮▮ wrote:
Dear Bret,

I received contact from John today. A while ago, Indian Cultural Exchange, an NYU club, hosted an event called Spring Bazaar. John is on the executive board of this club. Today I got an email through the club OrgSync account, inviting me to join the club. The email was by John and it was thanking me for coming to the event. Upon checking with my other friends at the event, I found out that none of them had gotten the email. I just forwarded the email that I received to you.

Best Regards,
Jane

On Sun, Apr 22, 2018 at 10:32 PM Bret R Beaufeaux ▮▮▮▮▮ wrote:

▮ **NEW YORK UNIVERSITY**
A private university in the public service

Office of Residential Life & Housing Services
726 Broadway, 7th Floor
New York, NY 10003
Office 212-998-4600 / Facsimile 212-995-4099

**April 22, 2018**

Dear Jane Roe

I have received a report detailing an incident that occurred on **April 22, 2018 through electronic means of communication**. During this incident it is alleged that **you have received multiple communications which have made you feel uncomfortable.**

While this matter is being resolved, please be advised that a "no-contact directive" has been put in place between you and John Doe   Therefore, you are not to initiate or facilitate any form of communication or interaction with John Doe   including those made through virtual means (text messages, e-mail, Facebook, Twitter, other social networking websites, etc.) or by 3rd parties on your behalf. Any such attempts to do so may be construed as harassment and will subject you to disciplinary action.

CONFIDENTIAL STUDENT RECORD

SA-247

**222**

A staff member from the Office of Residential Life and Housing Services or the Office of Community Standards and Compliance will be in contact with you in the coming days to discuss next steps in this process.

In the meantime, should you have any questions or concerns, please let me know. As we discussed, you may reach me by contacting the U-Hall RA on-duty through the Public Safety Officer stationed on the ground level. Lastly, please note that Wellness is available as a confidential resource to you as well.

Sincerely,

**Bret Beaufeaux**

**Residence Hall Director**

██████████████

--
**Bret Beaufeaux [he/him/his]**

Residence Hall Director
Coral Tower & Second Street Residence Halls

Office of Residential Life & Housing Services
New York University

██████████████

███████████

--
**Bret Beaufeaux [he/him/his]**



CONFIDENTIAL STUDENT RECORD

SA-248

# Exhibit 1, Part F

SA-249

**223**

# ATTACHMENT C

CONFIDENTIAL STUDENT RECORD

NYU_00009997

SA-250

9/27/2018                    New York University Mail – Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **224**

**NYU**                                                              Samuel Hodge ▓▓▓▓▓▓▓▓

# Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
1 message

**Mary Signor** ▓▓▓▓▓                                                        Thu, Sep 27, 2018 at 4:20 PM
Reply-To: ▓▓▓▓▓▓▓▓▓▓▓▓
To: Samuel Hodge ▓▓▓▓▓▓▓▓

---------- Forwarded message ----------
From: **Lauren Silverstein** ▓▓▓▓▓▓▓▓▓▓▓
Date: Sat, Apr 28, 2018 at 12:47 PM
Subject: Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: Colleen M Maeder ▓▓▓▓▓▓▓▓▓▓ Mary Signor ▓▓▓▓▓

▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓

---------- Forwarded message ----------
From: ▓ Jane Roe ▓ ▓▓▓▓▓▓▓▓▓▓▓
Date: Sat, Apr 28, 2018 at 12:39 PM
Subject: Re: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: Bret R Beaufeaux ▓▓▓▓▓▓▓▓
CC: Lauren Silverstein ▓▓▓▓▓▓▓▓

Dear Bret,

Last night I got several calls from an unknown number, which I'm quite sure was John because I've never gotten that many calls without a caller ID in a row in any other circumstance.

While we were dating / friends, we couldn't communicate when I went home to my parents because they weren't okay with us dating, and they used to check my phone. At that time, if anything important came up, John used to set a status on WhatsApp to let me know what was up. After I got the calls last night, I checked his WhatsApp status (although I didn't extend any contact whatsoever), and he had put up emergency symbols. This morning, his status changed to "This could be catastrophic for you because of a mistake I made, I don't care what's in place you need to be aware."

I also got a text message from another number, which I'm quite sure is him as well. Before the no-contact order, he used to create new numbers with an app to contact me as I had blocked him. The text message also showed an emergency symbol. I am attaching screenshots of all of this in this email.

Best Regards,
Jane

On Tue, Apr 24, 2018 at 9:54 AM, Bret R Beaufeaux ▓▓▓▓▓▓▓▓ wrote:
> Hi Jane
>
> Thank you for providing me with this information ▓▓▓▓▓▓▓▓▓▓▓▓
> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> ▓▓▓▓▓▓▓▓▓▓
>
> Best,
> Bret

CONFIDENTIAL STUDENT RECORD                                                              NYU_00009998

| SA-251 |

9/27/2018                           New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                           **225**

On Mon, Apr 23, 2018 at 9:02 PM, ███████ █████████ wrote:
Dear Bret,

I received contact from John today. A while ago, Indian Cultural Exchange, an NYU club, hosted an event called Spring Bazaar. John is on the executive board of this club. Today I got an email through the club OrgSync account, inviting me to join the club. The email was by John and it was thanking me for coming to the event. Upon checking with my other friends at the event, I found out that none of them had gotten the email. I just forwarded the email that I received to you.

Best Regards,
John

On Sun, Apr 22, 2018 at 10:32 PM Bret R Beaufeaux ████████ wrote:

**NEW YORK UNIVERSITY**
A private university in the public service

**Office of Residential Life & Housing Services**

**April 22, 2018**

Dear Jane Roe

I have received a report detailing an incident that occurred on **April 22, 2018 through electronic means of communication**. During this incident it is alleged that **you have received multiple communications which have made you feel uncomfortable.**

While this matter is being resolved, please be advised that a "no-contact directive" has been put in place between you and John Doe Therefore, you are not to initiate or facilitate any form of communication or interaction with John Doe including those made through virtual means (text messages, e-mail, Facebook, Twitter, other social networking websites, etc.) or by 3rd parties on your behalf. Any such attempts to do so may be construed as harassment and will subject you to disciplinary action.

A staff member from the Office of Residential Life and Housing Services or the Office of Community Standards and Compliance will be in contact with you in the coming days to discuss next steps in this process.

In the meantime, should you have any questions or concerns, please let me know. As we discussed, you may reach me by contacting the U-Hall RA on-duty through the Public Safety Officer stationed on the ground level. Lastly, please note that Wellness is available as a confidential resource to you as well.

Sincerely,

**Bret Beaufeaux**

**Residence Hall Director**

--
**Bret Beaufeaux [he/him/his]**

https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1612793386796543288%7Cmsg-f%3A16127934572523...   2/4

9/27/2018                     New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                     **226**

Residence Hall Director
Coral Tower & Second Street Re idence Hall

Office of Residential Life & Housing Services
New York University

--
**Bret Beaufeaux [he/him/his]**

Re idence Hall Director
Coral Tower & Second Street Residence Halls

Office of Residential Life & Housing Services
New York Univer ity

Lauren Silverstein
*she/her/hers pronouns*
Residence Hall Director, University Hall
New York University

Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity



NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain
privileged, proprietary, confidential or otherwi e private information  Unauthorized u e, copying, di clo ure or di tribution

CONFIDENTIAL STUDENT RECORD                                                                    NYU_00010000

SA-253

9/27/2018                    New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **227**

of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

**4 attachments**



**IMG_0569.PNG**
260K



**IMG_0568.PNG**
388K



**IMG_0571.PNG**
499K



**IMG_0554.jpg**
65K

CONFIDENTIAL STUDENT RECORD                    NYU_00010001

SA-254

9/27/2018                    New York University Mail – Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **228**

**NYU**                                                                              Samuel Hodge

# Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
1 message

**Mary Signor**                                                                Thu, Sep 27, 2018 at 4:19 PM
Reply-To:
To: Samuel Hodge

---------- Forwarded message ----------
From: **Colleen M Maeder**
Date: Thu, Apr 26, 2018 at 11:16 AM
Subject: Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: Mary Signor                              , Jacqueline Erb Cornell

**Colleen M Maeder**
Assistant Director, Student Conduct and Conflict Resolution
Office of Student Conduct and Community Standards
New York University

Notice: This e-mail and any attachments thereto are intended for use solely by the addressee(s) named herein, and the contents may contain legally privileged and/or confidential information. This e-mail should not be shown to or forwarded to anyone without the explicit, prior consent of the sender. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, copying, or other use of this e-mail and/or any of the attachments hereto, in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the undersigned immediately by telephone and permanently delete the original and all copies of this e-mail, the attachments thereto, and any printouts, in whole or in part, thereof. Thank you.

---------- Forwarded message ----------
From: **Bret R Beaufeaux**
Date: Thu, Apr 26, 2018 at 11:10 AM
Subject: Re: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE
To: John Doe
Cc: Lauren Silverstein

Hi John

Thank you for your email and your patience in having this matter addressed. I am including your Residence Hal Director, Lauren Silverstein, on this email. She will be able to provide you with more clarification on moving forward.

Regards,
Bret

https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permthid=thread-f%3A1612793386796543288%7Cmsg-f%3A1612793400424e...    1/3

SA-255

9/27/2018                    New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE                    **229**

On **Thu, Apr 26, 2018 at 11:03 AM,** John Doe ████████████ wrote:
Hello,
My name is John and I am responding to this no contact directive. I have received no follow up and find it a bit
disturbing that something has been put in place that would accuse me of harassment without understanding what the
circumstances are and what occurred. I have honored the agreement but feel that it is quite unfair that in 4 days I have
been unable to express what happened on my account. I hope this can be resolved quickly as it has occupied my mind
and with finals coming up I would like to be able to focus on my exams.

Sincerely,
John Doe

On Sun, Apr 22, 2018 at 10:26 PM Bret R Beaufeaux ████████████ wrote:

**NEW YORK UNIVERSITY**
A private university in the public service

**Office of Residential Life & Housing Services**
████████████

**April 22, 2018**

Dear ████ ████

I have received a report detailing an incident that occurred on **April 22, 2018
through electronic means of communication.** During this incident it is alleged that
**you have initiated multiple communications which have made the other person
uncomfortable.**

While this matter is being resolved, please be advised that a **"no-contact directive"**
has been put in place between you and Jane Roe. Therefore, you are not to
initiate or facilitate any form of communication or interaction with Jane
Doe including those made through virtual means (text messages, e-mail,
Facebook, Twitter, other social networking websites, etc.) or by 3rd parties on
your behalf. Any such attempts to do so may be construed as harassment and will
subject you to disciplinary action.

A staff member from the Office of Residential Life and Housing Services or the
Office of Community Standards and Compliance will be in contact with you in the
coming days to discuss next steps in this process.

In the meantime, should you have any questions or concerns, please let me know.
As we discussed, you may reach me by contacting the **U-Hall RA on-duty** through
the Public Safety Officer stationed on the ground level. Lastly, please note that
Wellness is available as a confidential resource to you as well.

Sincerely,

**Bret Beaufeaux**

**Residence Hall Director**

████████████

--

CONFIDENTIAL STUDENT RECORD                                              NYU_00010003

9/27/2018                          New York University Mail - Fwd: [IMPORTANT MESSAGE] NO CONTACT DIRECTIVE          **230**

**Bret Beaufeaux [he/him/his]**

Re idence Hall Director
Coral Tower & Second Street Residence Halls

Office of Residential Life & Housing Services
New York Univer ity



—
**Bret Beaufeaux [he/him/his]**

Residence Hall Director
Coral Tower & Second Street Residence Halls

Office of Re idential Life & Hou ing Service
New York University



Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain privileged, proprietary, confidential or otherwi e private information  Unauthorized u e, copying, di clo ure or di tribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

CONFIDENTIAL STUDENT RECORD                                                                                    NYU_00010004

**231**

# ATTACHMENT D

SA-258

**232**

My relationship with ██Jane██ ██Roe██ (complainant) began in January 2016, after meeting at an internship at Yale in August 2015. We began to text every day and became really close. Our intimacy first began on may 31st 2016 in a six flags field tripe where we both decided to meet on the basis of school field trips my mom drove me there and back while she came with her school. Our relationship almost ended as a result of her parents catching us, however ██Jane██ came back to me after that.

After the following summer in October 2016. █████████████████████████████ ████████████ I visited around 8 times throughout the year in order to help her. In each trip there was physical intimacy, kissing, sleeping together, showering together. I slept in the common area at this time. She consented to all of this at the time. I also spent a lot of time throughout the year caring for her and providing her comfort to which she has acknowledged.

Around April 2017, he broke up with me citing that he couldn't maintain a relation hip but wanted to remain friend  In may,  he al o broke contact with all her friend  at the Univer ity aying that  he no longer wanted to contact them

In the  ummer 2017 of which I had decided to tran fer to NYU,  he provided many threat  to prevent me from going to NYU and would often  cold me for wanting to do  o

Upon coming to NYU, phy ical intimacy came up again with much of the  ame behavior  My roommate can te tify to the number of time   he ha  lept over in my bed and to walking in on phy ically intimate moment

The deterioration in friend hip came in March 2018 when I attempted to introduce her to my friend  o that  he could meet more people  However it became fru trating when  he would  ay thing  about me that affected me negatively, which lead to me becoming very up et  In tead of talking to me however  he  hunned me and continued to hang out with the people I introduced her to and began saying even more things about me to the point that my friendship with those people has deteriorated. Her and her new friends have been actively saying bad things about me  ince

The ne t di agreement came on my birthday April 21 t 2018  I wa  vi ibly angered at her that  he wa  with everyone I knew and wouldn't even wi h me a happy birthday, e pecially given the fact that I  pent almo t 130 dollar  on her birthday in an attempt to make it a  enjoyable a po  ible getting her gift  and taking her out to dinner and de ert  In thi  e change we argued and cried  That night  he  lept over in my room a  well  She then reported me the day after due to multiple attempt  to contact her

**233**

After that I have avoided contact, despite us making being in the same room at times and crossing paths. There were moments I felt she was stalking me however as I saw her far too frequently.

Jane had two friends whom she always spoke badly of to through out the whole time. I always found it odd that she never once tried to change their opinion and instead defended their hatred of me despite me having never met them. Her parents also dislike me and she never tried to change that instead being very secretive. I wanted the relationship to be more open, but she was uncomfortable and told me not to. I let this go because of her situation, the assault, and her parents. I recently found out that she had told multiple students at the University that she was in a relationship with me due to blackmail, people who I only met this summer.

Jane logged into my Facebook in March and deleted all my messages and then claimed it was an accident. She had access to all my accounts and passwords and I believe used them at times to delete potential evidence.

There were many times I cared about her and did quite a lot. I would get her food at all hours and bring it to her if she was hungry. Talk to her at absurd hours through the night to comfort her. I tried to do whatever to help her because I knew she was suffering.

CONFIDENTIAL STUDENT RECORD

NYU_00010007

SA-260

234



January 16, 2016 at 11:43 AM

Hey John It's me. I'm so sorry about last night. I never wanted to make you go through all of that. Because of my stupidity, you had to bear with my parents' badgering and questioning. They saw one message from me and a whole bunch from you. Any texts after the ones you sent me in a row were from my mom, and the other number was my dad.

I tried to make it so you weren't portrayed in too bad of a light so they wouldn't look up your parents' numbers and get you in



Sprint 1:15 PM 64%

[redacted]

you sent me in a row were from my mom, and the other number was my dad.

I tried to make it so you weren't portrayed in too bad of a light so they wouldn't look up your parents' numbers and get you in trouble. I don't know what they said, but I hope it wasn't hurtful. Thank you for doing the best you could, and for being honest to them.

That was so undeniably selfish of me. Happiness from lies could never have been right. I not only serve to be a terrible representation of my family, I could never have been good for you. My mom

Write a message...

Sprint 1:15 PM 64%

[redacted]

I'm hurting him, too. I hurt them, and I would have hurt you through my selfishness. Thank you; you brought so much happiness to me in the past months. I'll always love you, and only hope that you don't do the same. I hope that you are well, and remain so. You won't hear from me after this. I promise.

January 16, 2016 at 12:55 PM

Also, if anything serious or important comes up, you can email me / Use google hangouts on my [redacted] email, but I promise I won't talk to you out of my own

Write a message...



SA-263

**237**



SA-264

**238**



CONFIDENTIAL STUDENT RECORD

SA-265

239



CONFIDENTIAL STUDENT RECORD

SA-266

**240**

# ATTACHMENT E

CONFIDENTIAL STUDENT RECORD

NYU_00010014

SA-267

9/17/2018                New York University Mail - Meeting Request Regarding NYU Title IX Investigation                **241**

**NYU**                                                             Samuel Hodge ▮▮▮▮▮▮▮

## Meeting Request Regarding NYU Title IX Investigation

▮▮▮ ▮▮▮ ▮▮▮▮▮                                                Tue, Aug 21, 2018 at 5:18 AM
To: Samuel Hodge ▮▮▮▮▮▮▮

Dear Sam,

I've attached materials that I think could help below. They are all screenshots that ▮▮▮ has sent to me. Sorry for the delay!

Thanks,
▮▮▮
[Quoted text hidden]

**28 attachments**



WhatsApp Image 2018-03-19 at 10.08.13 PM.jpeg
82K

What  App Image 2018 03 19 at 10 18 26 PM jpeg
88K

WhatsApp Image 2018-03-21 at 8.20.44 AM.jpeg
51K

What  App Image 2018 03 24 at 10 17 16 AM jpeg
97K

https://mail.google.com/mail/u/1?ik=d64bf88649&view=pt&search=all&permmsgid=msg-f%3A1609399656971021553&simpl=msg-f%3A16093996569 ...   1/6

CONFIDENTIAL STUDENT RECORD                                                    NYU_00010015

SA-268

9/17/2018                    New York University Mail - Meeting Request Regarding NYU Title IX Investigation                **242**



WhatsApp Image 2018-03-24 at 10.17.17 AM (1).jpeg
90K

WhatsApp Image 2018-03-24 at 10.17.17 AM.jpeg
95K

WhatsApp Image 2018-03-24 at 10.25.22 AM.jpeg
93K

WhatsApp Image 2018-03-24 at 10.25.23 AM (1).jpeg
88K

WhatsApp Image 2018-03-24 at 10.25.23 AM.jpeg
83K

CONFIDENTIAL STUDENT RECORD                                     NYU_00010016

SA-269

# Exhibit 1, Part G

SA-270

9/17/2018                         New York University Mail - Meeting Request Regarding NYU Title IX Investigation                    **243**



WhatsApp Image 2018-03-31 at 1.47.53 PM.jpeg
96K

WhatsApp Image 2018-04-02 at 3.10.46 PM.jpeg
112K

What App Image 2018 04 02 at 3 14 46 PM jpeg
112K

WhatsApp Image 2018-04-02 at 3.14.47 PM (1).jpeg
92K

WhatsApp Image 2018-04-02 at 3.14.47 PM.jpeg
88K

CONFIDENTIAL STUDENT RECORD                                                        NYU_00010017

SA-271

9/17/2018                     New York University Mail - Meeting Request Regarding NYU Title IX Investigation                **244**



WhatsApp Image 2018-04-02 at 3.14.48 PM.jpeg
101K

WhatsApp Image 2018-04-04 at 10.18.23 AM (1).jpeg
27K

WhatsApp Image 2018-04-04 at 10.18.23 AM.jpeg
27K

WhatsApp Image 2018-04-04 at 12.06.08 PM.jpeg
22K

WhatsApp Image 2018-04-08 at 1.05.24 AM.jpeg
90K

CONFIDENTIAL STUDENT RECORD                                                       NYU_00010018

SA-272

9/17/2018                    New York University Mail - Meeting Request Regarding NYU Title IX Investigation                    **245**





**WhatsApp Image 2018-04-08 at 12.43.40 AM.jpeg**
183K



**WhatsApp Image 2018-04-15 at 7.44.51 AM (1).jpeg**
214K



**WhatsApp Image 2018-04-15 at 7.44.51 AM.jpeg**
214K



**WhatsApp Image 2018-04-15 at 7.45.00 AM.jpeg**
307K

**WhatsApp Image 2018-04-15 at 7.45.15 AM (1).jpeg**
329K

CONFIDENTIAL STUDENT RECORD

NYU_00010019

SA-273

9/17/2018                          New York University Mail - Meeting Request Regarding NYU Title IX Investigation                          **246**



WhatsApp Image 2018-04-15 at 7.45.15 AM.jpeg
363K

WhatsApp Image 2018-04-22 at 8.31.07 AM.jpeg
99K

What App Image 2018 04 22 at 8 37 20 AM jpeg
114K

WhatsApp Image 2018-04-22 at 8.38.24 AM.jpeg
134K

CONFIDENTIAL STUDENT RECORD

NYU_00010020

Case 23-1246, Document 87, 04/30/2024, 3621706, Page47 of 233

247

But they're mine too

And they've all sided with me over you

And that's fine

And I don't want them to

I want them to be your friend

But it can't be at the expense of me

And I just hope you can respect that

NYU_00010021



CONFIDENTIAL STUDENT RECORD

NYU_00010022

Case 23-1246, Document 87, 04/30/2024, 3621706, Page49 of 233

ok

and if you coose to not be friends with me

i humble ask

you cut off contact

with all my friends

because if you dont

they will

dont do this in a fit of rage

talk to me

NYU_00010023

SA-277



NYU_00010024

SA-278



NYU_00010025

SA-279



CONFIDENTIAL STUDENT RECORD

NYU_00010026

SA-280



Verizon 10:21 PM 8% 254

< Home [redacted] >

Active now

I can't live with myself ok

No

I get it

I did it

Ok

I squeezed your breats

I got you in the shower

I put my hands places they shouldn't go

And I'm sorry

Ibassaulted you

It just sucks

To be called in a put in that class

With everyone else

I'm sorry then

For v

Aa It's okay

Aa It's fine

Aa

SA-282



It just sucks

To be called in a put in that class

With everyone else

I'm sorry then

For what I've done

I'm sorry

I said I didn't assault you

I did

I hurt you

I bullied you

And I assaulted you

And I'm sorry

Sorry

It's okay    It's fine

Verizon 1:46 AM 37% 256

< Home

[redacted] >

Active now

I went from 100 to 0 very fast lol

They're gone

You're not a close friend

Huhhh

And now they want to invite [redacted] to everything

You know

They think I don't know you

I've given up [redacted]

I tried overdosing on pills two weeks ago

I tried choking myself by crushing my throat

I just

I can't do this anymore

I'm sorry

Aa

SA-284



I've lost the plot ███

You scare me as much as I scare you

Sometimes

Because I know that in your hand

You can say something

That will actually make me kill myself

Just out of shame

It's not even a threat ███

You have something on me

You could do something

Where my instinct

Is just to kill myself

I'd rather die than have everyone knownibassaulted you

I can barely

Are you ok

Verizon 3:12 AM 87% 258

< Home [redacted] >
Active now

You don't follow any of it

I followed you through everything

You know I told someone what I'd doneyocyou lol

Even that I assaulted you

That yiud been raped

Every disagreement

And you know what

People say that It's fucking shitty what I've done

But recently you've been playing me like a puppet

You fucking liar

You're not in rubin

Missed Call Sun 4:45 AM

You missed a call from [redacted]

Call Back

Say something

Aa



SA-286



SA-287



NYU_00010034

Verizon 3:13 AM 88% 261

Home [redacted] Active now

I'm so fucking pissed off

You're behaving like a birch

I walked all the way

To Rubin

To talk

And you leave

Who do you think you are

[redacted] Like honestly

I'm giving you 5 minutes

And [redacted] will kno everything

Your parents will know everything

Press charges against me

[redacted] I don't give a fuck

[redacted] Missed Call Sun 4:54 AM

You missed a call from [redacted]

Call Back

Say something

Aa

Verizon
12:57 PM
62%
5
John Doe
262
Hello, I really don't mean to be a bother and understand that it may not be my place . However in this case I am not sure if Jane is ok and I just wanted to check in to make sure that everything is alright.
1:37 AM
Missed voice call at 1:41 AM
My apologies, I did not mean to call
1:41 AM
Missed voice call at 2:11 AM
Missed voice call at 2:12 AM
We are all quite concerned, I hope everything is ok.
3:40 AM
Hello, I am currently at work and missed your call. I hope all is well and apologize for the late texts last night.
12:41 PM

Verizon
12:57 PM
62%
5
John Doe
263
Hello, I really don't mean to be a bother and understand that it may not be my place . However in this case I am not sure if Jane is ok and I just wanted to check in to make sure that everything is alright.
1:27 AM
Missed voice call at 1:41 AM
My apologies, I did not mean to call
1:41 AM
Missed voice call at 2:11 AM
Missed voice call at 2:12 AM
We are all quite concerned, I hope everything is ok.
3:40 AM
Hello, I am currently at work and missed your call. I hope all is well and apologize for the late texts last night.
12:41 PM

SA-291



NYU_00010038

SA-292



Hello, I would appreciate your confirmation. Withdraw like you did with all your friends from last year please. I am not going to communicate through ███ and ██████ and I expect that you won't communicate with anyone either.



SA-293



I would have respected you more if you hadn't gone back and hung out last night. I also find it incredibly rude that you cooked for 5 hours and have your own group chat in which to exclude me. It's extremely rude to me especially given the fact you know I I'm friends with all of them. I have no interest in playing this divide. So I am asking you to not hang out with anyone period. You offered it and I would like you to do so.  Leave the group chat like you did when I was in it. And please, do not reduce me to someone who just bought you things. You came to my room many times at all hours I've helped you with papers applications and projects many times. I've been there for you many times. I'm asking you to respect this now because that would be right given that it is what you offered. Hang out with ███ and ███ but stay away from everyone else please.



SA-294



CONFIDENTIAL STUDENT RECORD

NYU_00010041

SA-295



CONFIDENTIAL STUDENT RECORD



Case 23-1246, Document 87, 04/30/2024, 3621706, Page69 of 233

NYU_00010043



270

NYU_00010044

SA-298



CONFIDENTIAL STUDENT RECORD

NYU_00010045

SA-299



Text Message
Today 12:24 AM

Hello ?

Well

I think if you thought what I did earlier on would cause problems

You're in for a real hell of a ride

I'll give you till 1

After that

It'll go bad

I want a response on WhatsApp in 9 minutes

Today 3:17 PM

Hi

This is the picture you received



CONFIDENTIAL STUDENT RECORD

NYU_00010046

SA-300



Text Message
Today 8:35 PM

Intriguing, you see the bias now. Nobody would believe me.

I think you should talk

Without getting loopy

Without getting aggressive

And just being human

I will do the sane

Don't screw up I won't contact you till Monday

And if appreciate it if you wished me a happy birthday before 12

It would be decent

   

      

CONFIDENTIAL STUDENT RECORD                                    NYU_00010047

SA-301



Intriguing, you see the bias now. Nobody would believe me.

I think you should talk

Without getting loopy

Without getting aggressive

And just being human

I will do the sane

Don't screw up I won't contact you till Monday

And if appreciate it if you wished me a happy birthday before 12

It would be decent

Because you celebrated everyone elses

And I celebrated yours

Just by that metric. After all the damage you've caused

SA-302

# ATTACHMENT F

CONFIDENTIAL STUDENT RECORD

NYU_00010049

SA-303

## UNIFORM INCIDENT/OFFENSE REPORT
### APPROVED (Thomas Schindler)

| 1 ORI # | 2 Date of Report | 3 Time of Report | Type of Report | 5 Agency Case Date | 6 Agency Case Number | 7 Suffix |
|---|---|---|---|---|---|---|
| NY0000000 | 04/30/2018 | 1:09 AM/PM/MIL | ☒ INCIDENT/OFFENSE ☐ SUPPLEMENT | | 2018-0752 | 1 |

| 8 Agency Name | 9 Sector |
|---|---|
| New York University Department of Public Safety | M |

**10 Type of Incident or Offense** ☒Felony ☐Misdemeanor ☐Attempted ☐Completed
Harassment - Intentionally anr Repeatedly Harassing Another by Follo
**11 Degree (Circle)** 1 2 3 4  **12 UCR Code**  **13 State Code/Local Ordinance** 064B-VW

**14 Type of Incident or Offense** ☐Felony ☐Misdemeanor ☐Attempted ☐Completed
**15 Degree (Circle)** 1 2 3 4  **16 UCR Code**  **17 State Code/Local Ordinance**

**18 Place of Occurrence** ☐ Check here if event occurred at victim's residence
UNIVERSITY HALL - 110 E 14TH ST, NEW YORK, NY 10003

Victim Demographics (Where victim is an individual)
19 Sex: ☒M ☐W ☐A  20 Race: ☒W ☐B ☐I  21 Ethnicity: ☐Hispanic ☐Other  22 ☐Multiple Victims ☐LE Officer  23 Age 19
24 Offender Suspected of Using: ☐Alcohol ☐Drugs ☐Computer Equipment ☐N/A  25 ☐Juvenile Gang ☐Adult Gang ☐None/Unknown  26 Hate Bias ☐Yes ☒No  27 Bias Code

29 Point of Entry ☐Door ☐Roof ☐Window ☐Other  30 Method of Entry ☐Forcible ☐Attempted Forcible ☐No Force  31 Local Use  32 Lighting 1 Natural 2 Moon 3 Artificial Exterior 4 Artificial Interior 5 Unknown
33 Weather 1 Clear 2 Cloudy 3 Rain 4 Fog 5 Snow 6 Hail 7 Unknown  34 Location Type (Circle) 01 Terminal 02 Bank 03 Bar 04 Church 05 Commercial 06 Construction 07 Conv. Store 08 Dept. Store 09 Drug Store 10 Field/Woods 11 Gov't/Public Building 12 Supermarket 13 Highway/Street 14 Hotel/Motel 15 Jail/Prison 16 Lake/Waterway 17 Liquor Store 18 Parking Lot/Garage 19 Storage Facility (20) Residence/Home 21 Restaurant 22 School/College 23 Service/Gas Station 24 Specialty Store 25 Other

35 Occurred from MM/DD/YY 04/30/2018  36 Time of Event 1:10 AM/PM/MIL  37 Day of Week S M T W T F S  1 2 3 4 5 6 7
38 Occurred to MM/DD/YY 04/30/2018  39 Time of Event 2:20 AM/PM/MIL  40 Day of Week S M T W T F S  1 2 3 4 5 6 7  41 # Premises Entered (Burglary)

42 Type Criminal Activity  A Buying/Receiving  B Cultivating/Manu  C Exploiting Children  D Distributing/Selling  E Exploiting Children  O Operating/Promoting  P Possessing/Concealing  T Transporting/Importing  U Using/Consuming
43 Victim Type ☐Individual B Business  F Financial (Bank) G Government  R Religious Org S Society

### PROPERTY

| 44 Loss Code | 45 Property Code | 46 Qty | 47 Property Description (Include Make, Model, Size Type, Serial #, Color, Drug Type, Drug Qty, Etc.) | 48 Dollar Value Stolen | Damaged | 49 Recovered Date | Value |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

☐ Continued on Supplement

Loss Code (Enter letter in loss code column): S Stolen R Recovered D Damaged/Destroyed C Confiscated/Seized  B Burned F Forged/Counterfeited N None
Property Code (Enter # in property type column): 01 Aircraft 02 Alcohol 03 Autos 04 Bicycles 05 Buses 06 Clothes 07 Computer 08 Consumables 09 Credit Card 10 Drugs 11 Drug Equip 12 Farm Equip 13 Firearms 14 Gambling Equipment 15 Heavy Construction 16 Household Goods 17 Jewelry 18 Livestock 19 Merchandise 20 Money 21 Negotiable Instrument 22 Nonnegotiable Instru 23 Office Equipment 24 Other Motor Vehicle 25 Purse/Wallet 26 Radios/TV/VCR 27 Recordings 28 RV's 29 Structure - Single Occupancy Dwelling 30 Structure - Other Dwelling 31 Structure - Other Commercial 32 Structure - Industrial/Manufacturing 33 Structure - Public/Community 34 Structure - Storage 35 Structure - Other 36 Tools - Power/Hand 37 Trucks 38 Vehicle Parts/Accessories 39 Watercraft 77 Other (40)

### VEHICLES

50 Stolen Vehicle Only ☐ Area Stolen ☐Residence ☐Business ☐Rural  51 Ownership verified by ☐Tag Receipt ☐Bill of Sale ☐Title ☐Other  52 Veh. Categories ☐Recovered ☐Stolen ☐Suspect's Vehicle  Victim's Vehicle ☐Unauthorized Use ☐Abandoned
53 Vehicle Year 54 Vehicle Make 55 Vehicle Model 56 Veh Num Stolen 57 Vehicle Description
58 Vehicle Style 59 Vehicle Color Top/Bottom 60 License 61 LST 62 LIY 63 Tag Color
64 Vehicle VIN Number 65 Warrant Signed ☐Yes ☐No Warrant Number
Motor Vehicle Recovery Only Required For 24XX UCR Code 66 Stolen in your jurisdiction? ☐Yes ☐No Where? 67 Recovered on your jurisdiction? ☐Yes ☐No Where?
68 Case # 69 SFX 70 Case # 71 SFX 72 Case # 73 SFX

### ADMINISTRATION

74 Case Status 1 Pending 2 Inactive (3) Closed  75 Multiple Cases Closed Listed Above ☐ Multiple Cases Closed Listed On Supplement ☐
77 Case Disposition 1 Cleared By Arrest (Juvenile) 2 Cleared By Arrest (Adult) 3 Unfounded 4 Exceptional Clearance (5) Administratively Cleared
78 Exceptional Clearance (Circle One) A Suspect/Offender Dead B Prosecution Declined C Other Prosecution D Extradition Denied E Victim Refused to Cooperate F Juvenile (No Custody) G Death of Victim
76 Entered NCIC ☐Yes ☐No  Date (MM/DD/YY)  NIC/AIN #.

| 79 Reporting Officer | Officer ID Number |
|---|---|
| Dennis Sanchez | N11218140 |
| Gary Van Miert | N11218584 |
| Saul Freund | N19053062 |
| Thomas Schindler | N10223803 |

80 Assisting Officer / 81 Supervisor Approval / 82 Watch Commander

CONFIDENTIAL STUDENT RECORD
NYU_00010050

**SA-304**

THIS SIDE OF FORM IS CONFIDENTIAL UNLESS RELEASED AT THE
DISCRETION OF THE CHIEF LAW ENFORCEMENT OFFICER

| Incident/Offense Report - Continued | 82 Date of Report (MM/DD/YY) 04/30/2018 | 84 Time of Report 1:09 AM PM Mil. | 85 Agency Case Number 2018-0752 | 86 Suffix 1 | 87 | Offender ☐ Check if Multiple ☐ Suspect ☐ Missing Person |

**VICTIM INFORMATION**

| 88 Reported By (Last, First, Middle Name) | | | Victim Or | 89 | | 90 | 91 Home Phone | | 92 Work Phone |
| | | | | | 88 Suffix | ☐ Resident ☐ Non-Resident | | 93 Other Phone |

| 94 Victim # 1 | 95 Victim (Last, First, Middle Name) Roe, Jane | 96 Suffix | 97 Address (Street, City, State, Zip) | 98 Home Phone | 99 Work Phone |
| | | | | | 100 Other Phone |

| 101 Employer/School Galliton | 102 Occupation | 103 Address (Street, City, State, Zip) | 104 Work Phone |
| | | | 105 Other Phone |

| 106 Sex ☐M ☐F | 107 Race ☐W ☐B ☐A ☐I | 108 ☐ English ☐ Spanish ☐ Other | 109 HGT | 110 WGT | 111 Date of Birth | 112 Age 19 | 113 Victim SSN | 114 Complainant SSN |

| 110 Multiple Victims ☐ | 111 ☐ | 116 Ethnicity ☐ Hispanic | 117 Injury ☐ Yes ☐ No | 118 Offender known to victim? ☐ Yes ☐ No | 119 Victim and? (Explain Relationship) Acquaintance | 120 Relationship Code AQ |
| LE Officer ☐ Other ☐ | | | | | |

| 121 Weapons Used ☐ Firearm ☐ Knife | ☐ Hands, Fist, Feet, Voice, etc. ☐ Other Dangerous | 122 Description of Weapons/Firearms/Tools Used In Offense Describe | ☐ Handgun ☐ Rifle ☐ Shotgun ☐ Unknown |

| 123 Place of Occurrence UNIVERSITY HALL - 110 E 14TH ST, NEW YORK, NY 10003 | (Enter exact street address here.) | 124 Type Injury | N None I Internal Injury M Minor Injury T Loss of Teeth | 125 Sector M |
| | | | B Broken Bones L Severe Laceration O Other Major Injury U Unconscious |

| 126 Circumstance: Homicide & Assault | 128 Assault ☐ Simple ☐ Aggravated | 129 Treatment for Assault? ☐ Yes ☐ No | 130 Verify for Rape Exam? ☐ Yes ☐ No | 131 Treatment for Rape? ☐ Yes ☐ No |
| 127 Location: Rape | | | | |

**SUSPECT INFORMATION**

| 132 Off # 1 | 133 Name (Last, First, Middle) Doe John | 134 SFX | 135 Alias | 137 Race ☐W ☐B | 138 Sex ☐M ☐F | 139 Date of Birth | 140 Age 20 |

| 141 Address (Street, City, State, Zip) | 142 HGT | 143 WGT | 144 Ethnicity ☐ Hispanic | 145 Language ☐ English ☐ Spanish ☐ Other |

| 146 Probable Destination | 147 Eye | 148 Hair | 149 Complexion | 150 Armed ☐ Yes ☐ No | Weapon |

| 151 Clothing | 153 ☐ Scars ☐ Marks ☐ Tattoos ☐ Amputations | 163 ☐ Arrested ☐ Wanted | Dual Arrest (Domestic Violence) ☐ |

| 154 Oth # 1 | 155 Name (Last, First, Middle) | 156 SFX | 157 Alias | 158 Social Security # | 159 Race ☐W ☐B ☐ Other | 160 Sex ☐M ☐F | 161 Date of Birth | 162 Age |
| | | | | | Asian | | |

| 163 Address (Street, City, State, Zip) | 164 HGT | 165 WGT | 166 Ethnicity ☐ Hispanic | 167 Language ☐ English ☐ Spanish ☐ Other |

| 168 Probable Destination | 169 Eye | 170 Hair | 171 Complexion | 172 Armed ☐ Yes ☐ No | Weapon |

| 173 Clothing | 174 ☐ Scars ☐ Marks ☐ Tattoos ☐ Amputations | 175 ☐ Arrested ☐ Wanted | Dual Arrest (Domestic Violence) ☐ |

**WITNESSES**

| Name (Last, First, Middle) | Sex | Race | Date of Birth | Address | Contact Telephone Numbers |
| 176 | 177 ☐M ☐F | 178 ☐W ☐B | 02/09/1998 | 180 | 181 Home |
| | | | | | 183 Other |
| 184 | 185 ☐M ☐F | 186 ☐W ☐B | 01/05/1999 | 189 | 189 Home |
| | | | | | 190 Work |
| | | | | | 191 Other |
| 192 | 193 ☐M ☐F | 194 ☐W ☐B | 195 | 199 | 197 Home |
| | | | | | 198 Work |
| | | | | | 199 Other |

| 200 Witness #1 SSN | 201 Witness #2 SSN | 202 Witness #3 SSN |

**NARRATIVE**

| 203 |
| On April 30, 20 8, PSO Van Miert reported a harassment in the lower level lounge University Hall. |
| |
| SUPP EMENT #   Dennis Sanchez -               04/30/20 8   03:32 |
| |
| Victim: University Hall resident Jane Roe                       |
| ). |
| |
| Offender: University Hall resident John Doe          |

| 204 Continued on Supplement ☐ Yes ☐ No | 205 Assisting Agency ORI | 206 Assisting Agency Case Number | 207 SFX | 208 Warrant Signed ☐ Yes ☐ No | Warrant # | 209 Add. Cases Closed Narrative ☐Y ☐N |

| I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying the agency if any stolen property or missing person herein reported is returned. | 210 | 211 Local Use |
| Signature | | 212 State Use |

CONFIDENTIAL STUDENT RECORD
NYU_00010051

SA-305

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 3 DATE AND TIME THIS REPORT 04/30/2018   1:09  ☐ AM  ☐ MIL.  ☐ PM | 4 CASE # 2018-0752 | 5 SFX |
|---|---|---|---|

**NARRATIVE**

Witnesses: Rubin Hall resident ▇▇▇ (▇▇▇)

▇▇▇

Others involved: Univesity Hall RA Ricky Pugalee ▇▇▇

On April 30, 20 8, PSO Van Miert reported a harassment in the lower level lounge University Hall. Details are as follows :

At approximately 0 09 hours, student Jane came up to the security desk from the student lounge in the lower level of U-Hall and reported a harassment to PSO Van Miert. Student Jane was accompanied by her two friends student ▇▇▇ and student ▇▇▇ Student John also came up to the security desk.

Student Jane explained to PSO Van Miert that student John was harassing her and violating the NO CONTACT D RECT VE (attached) given to student John by the office of Residential ife & Housing Services. Student Jane continued stating that student John tapped student Jane on the shoulder and told her that she owed student John money.

Student Jane also told PSO Van Miert that student John called her today and left her a voicemail message apologizing. Students ▇▇▇ and student ▇▇▇ were witnesses to the harassment. Sgt. Sanchez asked student John if he called student Jane student John confessed that he did call student Jane and left a message apologizing.

PSO Van Miert notified RA Ricky of the situation.

Sgt. Sanchez asked both student Jane and student John if they wanted to involve NYPD or wellness, both student Jane and student John refused. Sgt. Sanchez asked student Jane if she wanted to be relocated from her dorm for the night, student Jane refused. Student Jane informed Sgt. Sanchez that she would be staying with a friend at Rubin Hall.

At 0220 hours, Sgt. Sanchez transported student ▇▇▇ , ▇▇▇ and ▇▇▇ to Rubin Hall.

Student Jane informed Sgt. Sanchez that she reported student John for harassment before RMS (20 8-0696)

SUPP EMENT #2   Dennis Sanchez – ▇▇▇   04/30/20 8   04:

attachment

SUPP EMENT #3   Thomas Schindler – ▇▇▇   04/30/20 8   09:45

Reviewed.

TYPE OR PRINT IN BLACK INK ONLY

CONFIDENTIAL STUDENT RECORD

NYU_00010052

SA-306

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 3 DATE AND TIME THIS REPORT M D Y 04/30/2018   1:09 ☐ AM ■ PM ☐ MIL. | 4 CASE # 2018-0752 | 5 SFX |
|---|---|---|---|

SUPP EMENT #4   Karen Ortman –  ███████   04/30/20 8    4:58

Case# 20 8-0752

Karen Ortman <karen.ortman@nyu.edu>
2:58 PM (0 minutes ago)
to ██Jane██
Dear Ms. ███████

  am writing regarding your recent report to Public Safety, and was wondering if you would like to meet to discuss this matter further. Please let me know in response to this email.

Best,
---
Karen  . Ortman
Director,  nvestigative Services

Department of Public Safety
New York University
7 Washington Place, New York, NY  0003
o: 2 2.992.6403   c: 9 7.363.2880
Facebook    Twitter    Transportation

SUPP EMENT #5   Karen Ortman –  ███████   05/04/20 8    : 7

This case relates to Case# 20 8-0696, the basis for the Order of Protection in question.

On Friday, May 4, 20 8,  , Karen Ortman, met with NYU student/██Jane██  █Roe█ ████████████████████ regarding the harassment report  against NYU CAS student ██Jo█n Roe█ (██████████████████).

According to the complainant, she is currently involved in a Title  X investigation in which a No Contact Order has been issued. The complainant stated that the respondent continues to violate the Order that was issued on Monday, April 30, 20 8 and on Tuesday, May  , 20 8, the respondent followed the complainant.

The complainant said that she understands that the respondent goes to NYU and that he may be in the same public areas as she, but on Tuesday, he followed her throughout Washington Square Park (even though she purposely travelled different paths throughout), followed her down MacDougal Street, paced the sidewalk as she ate dinner at a restaurant with friends, and followed her back to  ipton Hall, where she went to get away from the respondent;  it was close by and she has friends that live there. The complainant took pictures of the respondent throughout this incident (attached to

TYPE OR PRINT IN BLACK INK ONLY

SA-307

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 3 DATE AND TIME THIS REPORT 04/30/2018  1:09  AM  PM  MIL | 4 CASE # 2018-0752 | 5 SFX |
|---|---|---|---|

this file).  n addition, the complainant advised Mary Signor, the Title  X Coordinator, of the respondent's actions (email attached below).

asked the complainant if she was interested in reporting to the NYPD at this time; she said that she was not, but if the respondent's behavior escalates, she will.  gave the complainant my business card, showed her how to download the Safe NYU app, and the meeting ended.

At this time, there are no further steps to be taken in  nvestigative Services; this case is a Title  X investigation and is now closed in  nvestigative Services (pending outreach from the complainant that she is interested in reporting to the NYPD).

Below is the email that the complainant sent to Mary Signor advising her of the violation of the Order:

Fwd: Our Meeting on Monday, April 30

 nbox

x

9:30 AM (39 minutes ago)

to me, Karen

--------- Forwarded message ---------

From: Jane   Roe

Date: Wed, May 2, 20 8 at 9:5  PM

Subject: Re: Our Meeting on Monday, April 30

To: <mary.signor@nyu.edu>

Dear Mary,

Thank you for your email. Due to the fact JOHN didn't stop contacting me even after the No-Contact Directive was issued,

He was following me even today.

TYPE OR PRINT IN BLACK INK ONLY

SA-308

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 3 DATE AND TIME THIS REPORT M  D  Y 04/30/2018   1:09 | ☐ AM  ☐ MIL. ☑ PM | 4 CASE # 2018-0752 | 5 SFX |
|---|---|---|---|---|

Also, as   mentioned earlier, ▮John▮ was following me at Washington Square Park today. As   was walking,   saw him looking me from a distance.   know he is allowed to be in the same area as me as long as he doesn't talk to me, but   became uncomfortable and moved locations at the park. Each time   moved, he changed locations to a spot where he could watch me. He would keep his back to me, pretending he couldn't see me, but whenever he thought   looked away, he would start watching me again, as well as following me. Then   left to go down MacDougal Street, hoping he wouldn't come there. He still followed me down the street. When   entered a restaurant, he was pacing outside of it across the street.   then went to   ipton hall to see my friend, and   was eating in the dining hall when he arrived there as well.   was able to take some pictures of this happening.   am attaching them here.   am starting to feel increasingly stressed and anxious because of this.   s there anything you can do to make him stop doing this?

Best,

▮Jane▮

TYPE OR PRINT IN BLACK INK ONLY

CONFIDENTIAL STUDENT RECORD

NYU_00010055

SA-309



CONFIDENTIAL STUDENT RECORD



CONFIDENTIAL STUDENT RECORD



CONFIDENTIAL STUDENT RECORD



CONFIDENTIAL STUDENT RECORD



CONFIDENTIAL STUDENT RECORD

SA-314



CONFIDENTIAL STUDENT RECORD

SA-315



CONFIDENTIAL STUDENT RECORD

SA-316

# Exhibit 1,
# Part H

SA-317



CONFIDENTIAL STUDENT RECORD

SA-318



SA-319



SA-320



SA-321

# ATTACHMENT G

CONFIDENTIAL STUDENT RECORD

NYU_00010067

10/23/2018                  New York University Mail - Re: Title IX Investigation: Review of Draft Report, C.0002610

                                          Samuel Hodge <sh189@nyu.edu>

## Re: Title IX Investigation: **Review of Draft Report, C.0002610**
1 message

Jane Roe [redacted] sh189@nyu.edu [redacted]                                 Mon, Oct 22, 2018 at 4:14 PM
To: Samuel Hodge <sh189@nyu.edu>
Cc: Mary Signor <mary.signor@nyu.edu>, Lauren Stabile <lauren.stabile@nyu.edu>

Hello,

I am attaching my responses, edits, and clarifications to the draft report in this email.

Best,
Jane

On Fri, Oct 12, 2018 at 2:53 PM Samuel Hodge <sh189@nyu.edu> wrote:
   Good afternoon,

   The draft review period has been extended to October 22, 2018.  As such, we are providing you with a *new* secure link
   to this draft report (below) for your review, which will remain active until October 22, 2018:

   **Link:** [redacted]
   **Password:** [redacted]

   **The draft report also references multiple recordings (i.e. Attachment B); these audio/video files can be
   accessed via the following link:**

   **Link:** [redacted]
   **Password:** [redacted]

   **The above-mentioned link is private and protected, as it is intended for your review purposes only (note, you
   may share the link with your advisor or support person).  As such, the document(s)/images cannot be downloaded,
   printed, photographed, distributed, or otherwise reproduced in any manner.**

   Best,
   Sam

   —
   **Samuel Hodge**
   **Title IX Investigator**
   **Office of Equal Opportunity**
   **New York University**

   726 Broadway, Seventh Floor
   New York, New York 10003
   Office: 212.992.6401
   Email: sam.hodge@nyu.edu

   On Fri, Oct 12, 2018 at 1:59 PM Mary Signor <mary.signor@nyu.edu> wrote:
      Dear [redacted]

      I am writing to inform you that the review period for the draft report has been extended slightly to **Monday, October
      22, 2018**.  Please submit your response, if any, on or before the close of business on October 22, 2018.

      Best,
      Mary

      On Tue, Oct 9, 2018 at 3:46 PM Mary Signor <mary.signor@nyu.edu> wrote:
         Dear Jane

CONFIDENTIAL STUDENT RECORD                                              NYU_00010068

SA-323

10/23/2018                        New York University Mail - Re: Title IX Investigation: Review of Draft Report, C.0002610

Please note that I have extended the draft report review period to Friday, October 19.  Please submit your response, if any, by that date.

Best,
Mary

On Tue, Oct 2, 2018 at 12:10 PM, Samuel Hodge <sh189@nyu.edu> wrote:

Dear Ms, ▉Roe▉

Our office has conducted a formal investigation of your sexual misconduct complaint made against ▉John Doe▉ in accordance with the University's Sexual Misconduct, Relationship Violence, and Stalking Policy.  We have completed a draft report summarizing the allegations and our investigation.  At this time, we are providing you with a secure link to this draft report (below) for your review:

*Link:* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
*Password:* ▉▉▉▉

The draft report also references multiple recordings (i.e. Attachment B); these audio/video files can be accessed via the following link:

*Link:* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
*Password:* ▉▉▉▉

The above-mentioned link is private and protected, as it is intended for your review purposes only (note, you may share the link with your advisor or support person).  As such, the document(s)/images cannot be downloaded, printed, photographed, distributed, or otherwise reproduced in any manner.

Please review the draft report (including the related attachments) and provide any edits, clarification, or comments (to your statement or others), as you feel is necessary.  You are also welcome to identify or provide any additional information or witnesses that you believe should be considered.  Typically, parties submit their responses via a return email, or a Word/PDF document with page numbers and quotations from the draft report referenced.  Additionally, if you choose to submit a response, we do not require any particular format for your response; however, we do ask that you submit any response in one complete document/file and that the response come from you, the party, directly.

After you have concluded your review, please provide your response, or indicate that you do not intend to respond, by Friday, October 12, 2018 or sooner, if possible.  At the conclusion of the review period, we will review the evidence to determine if there is sufficient evidence to refer this matter to the Office of Student Conduct and Community Standards for further action.

Additionally, please know that the no-contact directive between you and Mr. ▉Doe▉ remains in effect and that NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy expressly prohibits retaliation against witnesses, such as those who have participated in this investigation.
If you have any questions or concerns, other than those surrounding access to the above-referenced links/report, please contact Mary Signor, Title IX Coordinator (copied above).

Finally, if you would like to speak with a confidential resource for emotional support during the process, please contact the Wellness Exchange at 212-443-9999, which is available 24 hours a day/7 days a week.

Thank you for your patience and cooperation as we proceed through this process.

Best,
Sam

--
Samuel Hodge
Title IX Investigator
Office of Equal Opportunity
New York University

726 Broadway, Seventh Floor
New York, New York 10003
Office: 212.992.6401
Email: sam.hodge@nyu.edu

CONFIDENTIAL STUDENT RECORD                                    NYU_00010069

10/23/2018                    New York University Mail - Re: Title IX Investigation: Review of Draft Report, C.0002610

--
Mary Signor, Executive Director & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity
726 Broadway, Room 721
New York, NY  10003
**Direct Phone:  (212) 998-6807**
**Title IX Office:  (212) 998-2352**
**Facsimile:  (212) 995-4037**
Email:  mary.signor@nyu.edu

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain
privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or
distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please
notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

--
Mary Signor, Assistant Vice President of Equal Opportunity & Title IX Coordinator
New York University, Office of the President
Office of Equal Opportunity
726 Broadway, Room 721
New York, NY  10003
**Direct Phone:  (212) 998-6807**
**Title IX Office:  (212) 998-2352**
**Facsimile:  (212) 995-4037**
Email:  mary.signor@nyu.edu

NOTICE: This e-mail (including any attachments) is intended solely for the designated recipient(s) and may contain
privileged, proprietary, confidential or otherwise private information.  Unauthorized use, copying, disclosure or
distribution of this e-mail, in whole or in part, is strictly prohibited.  If you have received this e-mail in error, please
notify the sender immediately by reply e-mail and delete the original (including any attachments).  Thank you.

 **- Responses, Edits, and Clarifications to Title IX (AA-AJ) Report C.0002610.pdf**
88K

CONFIDENTIAL STUDENT RECORD                                                                    NYU_00010070

SA-325

Responses, Edits, and Clarifications to TIX Draft Report (AA-AJ)

I.   INTRODUCTION & ALLEGATION(S) PRESENTED

4. Mr. ▓Doe▓ did not place his hand on my vagina under my clothing without consent, only over my clothing. While there was non-consensual contact on my breasts both on and under my clothing, the contact on my vagina was only over my clothing.

I would also like to add that Mr. ▓Doe▓ tried to take off my clothing / underwear on one occasion.

Mr. ▓Doe▓ also violated the no-contact order on multiple occasions via text messages and calls.

II.   INVESTIGATION SUMMARY

The interview I had when I was accompanied by Christine Janick was not over Skype, it was in-person.

III.   NARRATIVE SUMMARY OF INTERVIEWS CONDUCTED
   A.  Summary of Interview with ▓Jane Roe▓ Complainant (Edits and Clarifications)

Initially, for several visits, I was okay with Mr. ▓Doe▓ visiting me on campus. Both of us had agreed on meeting. Once multiple incidents of sexual assault occurred, I started disliking him visiting. I told my friends about my discomfort. While I told him I didn't want him to visit, I often relented as he would say that the next time would be better.

We did generally fall asleep in the lounge, however, there was one occasion during which we slept in my room.

I also believe that Mr. ▓Doe▓ sent pictures of us to my parents but I am not entirely sure of this. My parents refused to show all of the messages that they received. They did, however, show me messages where he pretended to be an anonymous female friend, and told my parents that I was under the influence of alcohol, was depressed, needed help, etc. In those messages, Mr. ▓Doe▓ also asked my parents what they thought of Mr. ▓Doe▓ My parents weren't just angry about this, it severely marred our relationship.

It was strange that Mr. ▓Doe▓ wanted to transfer to NYU, because in the past, whenever I told him about the university, he spoke negatively of it. He said he hadn't even heard of NYU before I got accepted, and that upon driving through the campus, he found all the construction and lack of centralized campus horrible. He said he preferred the nature and laid back feeling at the

CONFIDENTIAL STUDENT RECORD

SA-326

University of Connecticut. He also frequently didn't speak well of Global Public Health, the major I was in at the time. He had almost a full tuition scholarship at the University of Connecticut, but has no scholarship at NYU, one of the most expensive schools in the country. This is why I was shocked when he transferred not only to NYU, but into the Global Public Health major (he was in a different major at the University of Connecticut). He also transferred into my residence hall. Once he transferred, he went through every floor of Uhall and found the door with my name on it, and left a present for me, which in anger, led me to looking for his room and leaving it there. I did not ask him to come help me clean up glass in the room, he was texting me about the situation and I told him I accidentally broke glass. He insisted on coming in my room and kept waiting outside, and coerced me to let him in. He refused to leave and stayed in my room that night.

After this, I decided to continue being friends with him and give in to him because it looked like it was going to be a lot easier than resisting him (he would threaten suicide and self-harm if I tried to stop talking to him).

It was actually in early February 2018 (when I discovered the photos) that I called things off with Mr. ▇Doe▇ not fall 2017.

I didn't learn about the photos he had taken for the first time during an argument. I actually learned about the photos when I took a photo of the view from his room on his phone, and when went back to look at it, saw a picture of me while sleeping. He was present in the room at the time, in the closet. I asked him about it, and he tried to cover up for it. Then I demanded him to show me his laptop and go through all the photos with me. I found multiple other pictures of me that he had, unbeknownst to me. Some had only my stomach showing, and there were others where you could see some of my breast. I made him delete the ones I could find, but I believe he might have had more, or still have the ones I saw on a Cloud or backup device.

I didn't want Mr. ▇Doe▇ to turn the dinner into a birthday celebration, so I was pretty unhappy when he paid for the dinner. He was trying to cover up for his actions by buying me expensive things.

I reported my concerns to the Office of Public Safety, not the Office of Equal Opportunity.

B. Summary of Interview with ▇John Doe▇ Respondent (Response)

I did not take only one day to think about the relationship. He asked multiple times leading up to this incident. I always said no, up to this incident around January, 6, 2016, where I relented and agreed.

SA-327

While the *Six Flags* trip was the first time that Mr. ▆▆▆▆ and I were physically intimate, on this meeting, he repeatedly asked me to move up my shirt and show him what was underneath. At one point, he hugged me from behind and forcefully lifted up my shirt. Similar to his fetish for "wetness" he found female stomachs / abdomens to be attractive. While I found this experience extremely uncomfortable, I hoped that he was doing it as a joke. It was also nearing the end of the trip, so he was about to leave, and I didn't know how to talk to him about it. In later discussions about the day, I didn't mention the incident to him.

I believe it was closer to 12-14 times that Mr. ▆▆▆▆ visited me, although I cannot be sure. While we did kiss, there was only one occasion during which my shirt came off (which was the one night that Mr. ▆▆▆▆ visited my room). Mr. ▆▆▆▆ accidentally broke the strap of my bra, so it came off for a moment but I put it back on. After this incident, I do remember being somewhat surprised about the incident which had occurred, and laughing incredulously about doing that.

The individual that Mr. ▆▆▆▆ says sent messages to him was definitely not me. I had no reason to suggest sexual acts to Mr. ▆▆▆▆ I was already uncomfortable with too much intimacy due to my traumatic experience with sexual assault in the fall and further in the past. I had to keep my clothes on in the shower, and I avoided having sex with Mr. ▆▆▆▆ I would not have felt hesitant about telling him about things I wanted to try, as he always wanted to try more things with me that I did with him. The person I believe Mr. ▆▆▆▆ is referring to was a friend of mine who attended another university in New York. She was excited about my relationship and would also recommend to me things I should try with him. Due to my situation with my parents, I had either not told my friends about Mr. ▆▆▆▆ visiting me, or informed the ones that did know of him that I didn't want them meeting him or him knowing about them. I always felt he would be jealous of my friends or try to intervene in our relationships (which ended up happening in the future once we had mutual friends. This was also part of the reason I did not want Mr. ▆▆▆▆ to transfer to NYU). My friend thought it would be funny to text him from an anonymous account. No "anonymous number" which he refers to was ever on my phone. I didn't like the content of the messages she sent and asked her to stop. I'm not sure if this is what Mr. ▆▆▆▆ is referring to.

I also told one friend about the shower incident, not in a moment of panic, but because it had affected me badly for a while.

I only recall two incidents where we showered together during my freshman year. While I did not particularly want to shower with him, he asked a few times and I agreed. The reason that I kept my clothes on was that I was not comfortable with them off, and felt too exposed around him. It reminded me too much of past incidents that were traumatic. He said he found the idea of me being in wet clothes attractive anyway, a statement which made me uncomfortable. While

SA-328

concern regarding pregnancy was always in the back of my mind, that was not the primary reason for keeping my clothes on. Once Mr. ▇▇Doe▇▇ took his underwear off, I didn't want to be rude and say that that I preferred him with his underwear on, so I said it was okay. While he did ask me to soap him and I complied, I do not recall specifically soaping his genitals. I remember him asking me to soap him while he had his underwear on once, which I did, but I'm not sure if the next time was with or without his underwear on. The second time we showered during his visit was when he dragged me by the arm into the tub despite me saying I did not want to come in. Leading up to this, I had not soaped him or engaged in any intimate or sexual activity. I was standing outside the shower while he was trying to get me inside. I eventually went in when he pulled on my arm hard, despite panicking. Despite Mr. ▇▇Doe▇▇ seeing my panic, as evidenced by his description of the incident, he did not stop. During this same event, he tried to take off my leggings and underwear in the shower as well. I told him to not do that, but he continued to. When I said it again, he stopped, saying "Okay, fine." Then he asked me to soap him again, to which I complied, not sure of how to deny him due to the preceding events.

There were two incidents during which I drank alcohol after in the spring of 2017. I usually don't drink, which is why these instances were unusual for me. Mr. ▇▇Doe▇▇ texted me during one of these incidents. He was extremely angry when he became aware I was under the influence. He was very possessive about me and didn't want me drinking in the company of others. That night, he gave my dad two missed calls from his number, and sent him a message (the contents of which I am unaware) as a threat to me. When he texted my mom later, he did express concern about me to maintain his persona of being my friend. However, he gave explicit details about my drinking and made up extraneous details that didn't actually happen. If he was genuinely concerned, he would have had no need to provide details about who was around, false information about "passing out" in the Weinstein lobby, etc. He knew that my parents were extremely strict about drinking. While my mom expressed concern to Mr. ▇▇Doe▇▇ she was furious with me. She came all the way to New York to see me, and it severely hurt our relationship. He intended to do this in retaliation for breaking up with him, and he disguised it under concern for me. Even if he did it out of concern, I told him he could reach out to anyone except my parents in the future, but he contacted my parents again later on.

When Mr. ▇▇Doe▇▇ transferred to NYU, he also started telling people that we were dating, which really bothered me.

After I began sleeping over at Mr. ▇▇Doe▇▇ room, he asked me to perform oral sex on him one time. I was reminded too much of instances with him the past and gagged, and told him I could not. I don't believe this happened more than once, although he asked me to afterwards on multiple occasions. There was one instant during which he wanted to, what he called, "pleasure me." When he tried to (only over my clothing and never under), I became uncomfortable again and asked him to stop, which he did. He also repeatedly asked during that instance, and later on,

SA-329

if he could use his tongue, and I told him no. I also showered with him on one occasion, during which I kept my clothes on. He took off my shirt, about which made me extremely uncomfortable, but I did not explicitly state in this instance due to panic. I also never rubbed my buttocks on his erect penis. His penis was never inside my vagina, and we never had sex. He had talked about trying to have sex but said he could not keep erect. He was embarrassed after I found out about this agreed that we wouldn't consider having sex. All of these instances occurred in a short span of a week to ten days.

During this time, I did not tell anyone that Mr. ▆Doe▆ was bothering me. I only told my friends that knew him that I didn't interact with them anymore. This was because, again, I didn't want my parents to find out about him. My friends were in touch with my parents, and my parents had asked them in the past about how / what I was doing. Once I found the photos on his phone, he started becoming increasingly possessive when I spent time with friends, and I tried to distance myself from his, is when I started telling my friends that I was uncomfortable with him. The only "embarrassing" information I shared about Mr. ▆Doe▆ to my friends was that he was extremely jealous of me. They asked who broke up with whom, and I told them that I did. Mr. ▆Doe▆ was very angry that I shared these pieces of information. He got angry when I laughed along with my friends once when they made a joke about him. However, often, when my friends joked about him, I defended him.

The reason Mr. ▆Doe▆ and my relationship deteriorated was because he didn't like how I behaved around our mutual friends. He didn't like that I acted like I was very close to them, and sometimes joined in banter and jokes directed at him, as they were at everyone else as well. I also grew increasingly uncomfortable with him and his actions, both present and in the past, which contributed to the deterioration of the relationship. I also lost multiple friends as this played out as well, which Mr. ▆Doe▆ knew about, so my intention was never to make him lose friends.

When he contacted my parents again, I had not been drinking alcohol or engaging in substance abuse. He claimed that he heard from friends that I was engaging in these activities, but I'm not sure which friends these are, because I don't drank and have never taken drugs, and don't to this day. He definitely didn't hear this from me, as I wasn't even talking to him at this time. Regardless of what he heard, it was not his place to reach out to my parents, considering we were no longer in contact, and I told him that if he was ever concerned, he could talk to anyone except my parents. Considering we had mutual friends / acquaintances at this point, he could have talked to any of them, and he was still in touch with a few.

During the conversation at Lipton, we didn't leave right as a group of friends arrived. He made me continue the conversation in a Lipton hallway.

SA-330

There were far more than two photos that Mr. ▮Doe▮ had. I had him delete dozens from his laptop when I learned of them.

During the incident when Mr. ▮Doe▮ dragged me into the shower, I clearly remember his erect penis rubbed on me. I never performed oral sex on Mr. ▮Doe▮ in the shower. I also never rubbed my buttocks on his erect penis.

He kissed me in my sleep on multiple occasions. I also have never kissed him in his sleep. Mr. ▮Doe▮ has stated at multiple points in time that I owe him money. When he initially said I owed him money, I paid it. All the money he says I owe him are from instances where he voluntarily paid for my meals, or events that we attended. If I had any knowledge that he was to demand this money from me later, I would not have engaged in those activities.

Attachment D (Response)

I never stalked Mr. ▮Doe▮ I feel that this statement is just his way to turn the situation around on me. I was far too afraid of him to want to follow him.

There were many incidents where I did not consent to our physically intimate actions.

When I broke up with Mr. ▮Doe▮ I did not want to remain friends. He responded with so many suicide threats and anger, that I felt compelled to remain in contact with him and say that I wanted to be friends.

The instance where I deleted a messenger chat with ▮John▮ was not to erase any evidence I had. This occurred far before I even thought of reporting him. When I thought of reporting him was when I started seeing him outside my classes and following me, after I had told him I didn't want to talk to him anymore. As he mentioned, this happened when I had his Facebook password. He told me to log on to read a conversation with someone. After logging on, I forgot to log out. I was at home in New Jersey and my mom asked to see my phone. In a haste, I deleted the conversation with me, so my mom wouldn't be suspicious in case she were to log on to the Facebook. I even explained this situation to Mr. ▮Doe▮ later on, and he was understanding. He laughed about it. He would often delete his conversation with me on my Facebook alias account, (which I asked him repeatedly not to do), so deleting our conversation in the circumstance I was in wasn't a big deal. Otherwise, I rarely logged into his accounts, and never deleted things that could be considered "evidence" from them.

The only threats I gave Mr. ▮Doe▮ in regards to coming to NYU was that I would stop talking to him.

SA-331

# ATTACHMENT H

CONFIDENTIAL STUDENT RECORD

NYU_00010077

SA-332

10/23/2018                                New York University Mail - response with images

NYU                                                    Samuel Hodge <sh189@nyu.edu>

## response with images
1 message

John Doe ████████████                                          Mon, Oct 22, 2018 at 10:29 PM
T: Samuel Hodge <sh189@nyu.edu>
Cc: Allen M McFarlane <amm1@nyu.edu>

Dear Mr. Hodge,
Please find me responses below, thank you for your time on this matter and I apologize for the delay in responding. I
hope you have a nice rest of the day.
Sincerely,
John Doe

📄 **response to draft report.docx**
2360K

CONFIDENTIAL STUDENT RECORD                                        NYU_00010078

SA-333

In response to page 3: There was no continuous asking out, it was only asked once and clearly stated that the complainant did not have to respond or decide right away.

In response to page 4: The complainant was aware of all my visits and it was mutually agreed at all times, at times she would even push me to stay for longer despite my parents telling me to come home. My mother can testify to this I have text evidence saying that she did enjoy me visiting and that she had a great time.

In response to page 5: The complainant had cut herself with glass when I saw her at NYU in the fall 2017. She then invited me to Panera Bread with her the day after. I had decided to stay away, she decided to get close again. She was also present when I invited my friends over to my apartment and came on her own will. The RA on duty found us in violation of the alcohol policy as my suitemate had left an empty bottle in the kitchen, and there should be a report under this.

In response to page 11: The complainant asked to have sex and that I attempt to pleasure her. It was a consensual action and one propagated by the complainant.

I have also met with the title XI officer at UCONN where I discussed what I was going through with the complainant and how much it had hurt me vicariously. An email was sent out regarding academic help for myself due to the nature of the situation.

I also spoke to a professor and academic advisor, Kaitlin Heenahan and Thomas Abbott respectively on many occasions to discuss my relationship with the complainant and how it was affecting me in many ways. I believe that there three people at UCONN offer insight into how the sexual assault that happened to the complainant in fall 2016 had affected me and the emotions and thoughts I was going through.

In response to the club email- I had sent it through orgsync along with the lists of people that had signed the paper at the event Spring Bazaar. Upon reviewing this allegation, I found that the complainants "other friends" who were at the event were all members of the page beforehand and were therefore not included in the invite.

In response to my messages on the fake account: The one on April 29th was before I made contact in person. I believed that I could fix things with her as I had known her for so long. Emotions betrayed logic and I contacted her.

The communication with my professor was sent to her by accident. I needed to save the email as I transferred it and used the fake account as it was a mutual account that both of us used. Upon seeing the complainant log in I called public safety and explained the nature of the message to which the sergeant on duty said that it would be fine and that I refrain from using the account in the future, which I did.

CONFIDENTIAL STUDENT RECORD

SA-334

I was unaware I sent the video of the bunny eating lettuce, it must have gone through as I was trying to send it to another friend whose last name starts with the same letters as the fake Facebook account.

In July 2018, I received texts from the mysterious third party whose name I still do not know. In these texts I was made to pity the complainant and told how poor her lifestyle and situation was over the summer and that she did not want to get me in trouble and was only panicked. I furthermore was told that she was not using the full range of evidence against me and that she did not want to push it any further. I have screenshots that I can submit if necessary.

In response to me messaging the complainants mother, I remained positive about the complainant in the contact and have this text, the complainants mother and father were listed  as Mr and Mrs. Wants to kill me, this was a joke after it was clear they disliked me.

CONFIDENTIAL STUDENT RECORD

NYU_00010080

SA-335



SA-336

CONFIDENTIAL STUDENT RECORD

NYU_00010082

SA-337





NYU_00010084

SA-339



SA-340



CONFIDENTIAL STUDENT RECORD

NYU_00010086

SA-341



CONFIDENTIAL STUDENT RECORD

SA-342



SA-343



CONFIDENTIAL STUDENT RECORD

NYU_00010089



NYU_00010090

SA-345



CONFIDENTIAL STUDENT RECORD

NYU_00010091



CONFIDENTIAL STUDENT RECORD

SA-347



SA-348

# Exhibit 3

SA-349

**REPORTING, INVESTIGATING, AND RESOLVING SEXUAL MISCONDUCT, RELATIONSHIP VIOLENCE, AND STALKING - COMPLAINTS AGAINST STUDENTS**

## INTRODUCTION

In an effort to maintain a safe learning, living, and working environment, NYU prohibits Sexual Misconduct, Relationship Violence, Stalking, and Retaliation ("Prohibited Conduct"), as set forth in the Sexual Misconduct, Relationship Violence, and Stalking Policy (the "Policy"). This document sets forth NYU's procedures for reporting, investigating, and resolving violations of the Policy where an incident involving a Student as a Respondent has been or will be reported to NYU ("Procedures"). These Procedures should be read in the context of the Policy and capitalized terms used in these Procedures are defined in the Policy.

Covered Persons who wish to make a report of Prohibited Conduct against a Student are encouraged to contact the NYU Title IX Coordinator, the NYU Office of Equal Opportunity ("OEO"), the NYU Department of Public Safety, the NYU Office of Student Conduct and Community Standards ("OSC"), or the other reporting options discussed in the Guides for Students and Employees cited below. At the same time, NYU seeks to be sensitive to those Complainants who seek access to Confidential Resources, but may not wish to report Prohibited Conduct. The following resources can assist Complainants in identifying Confidential Resources and University reporting options:

- Students may refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students;
- Employees may refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees; and
- Third Parties may contact NYU's Title IX Coordinator.

These Procedures apply when a report has been made to one of the NYU offices above or to a Responsible Employee at NYU.

## I. INITIAL RESPONSE AND TITLE IX ASSESSMENT:

When a Complainant or Covered Person reports an incident of Prohibited Conduct, NYU will take immediate and appropriate steps to investigate or otherwise determine what happened and work to resolve the matter promptly and equitably.

**A. Assessment:** Upon receipt of a report, the Title IX Coordinator will conduct an initial assessment. As part of the initial assessment, the Title IX Coordinator will:

1. Assess the nature and circumstances of the report.

2. Address immediate physical safety and emotional well-being needs.

3. Discuss the Complainant's expressed preference for the manner of resolution and any barriers to proceeding.

4. Notify the Complainant of the right to contact law enforcement in order to file criminal charges, decline to contact law enforcement, or seek an order of protection.

5. Notify the Complainant of the right to seek medical treatment, including the importance of

Effective: August 25, 2017

NYU_00029043

     preserving evidence.

6.    Assess for pattern evidence or other similar conduct by Respondent.

7.    Assess the reported conduct for any Clery Act obligations, including entry in the crime log or issuance of a timely warning.

8.    Provide the Complainant with written information about on-campus and off-campus resources and the range of appropriate and available protective measures based on the status of the Complainant.

9.    Advise that NYU's policy prohibits Retaliation.

**B.  Requests to Maintain Privacy or Not Seek Disciplinary Action:** If a Complainant who has reported an incident of Prohibited Conduct requests that his/her name or other identifying information not be shared with a Respondent, that no investigation into a particular incident be conducted, and/or that no disciplinary action be taken against the Respondent, NYU will balance this request against NYU's commitment to a safe, non-discriminatory learning, living, and working environment for all community members, including for the Complainant. In particular, NYU will take into account the extent to which a failure to investigate may not adequately mitigate a potential risk of harm to the Complainant or other members of the NYU community. The request may occur at any point after the report is made.

The request will be evaluated by the Title IX Coordinator in consultation with senior NYU administrators. When considering whether to honor a Complainant's request for privacy or that no Investigation or disciplinary action be pursued, NYU will consider a range of factors, including:

- the risk that the Respondent may commit additional acts of Prohibited Conduct or other violence, taking into consideration, among other matters, any known history of arrests, violence, or other complaints of Prohibited Conduct involving the Respondent, any threats of future violence made by the Respondent, and whether multiple Respondents were involved in the reported incident;
- whether the act of Prohibited Conduct was perpetrated with a weapon, was otherwise unusually violent, or whether other aggravating circumstances exist;
- whether the report reveals a pattern of Prohibited Conduct or represents an escalation in unlawful or Prohibited Conduct by the Respondent from previously noted behavior;
- whether the Complainant is or at the time of the incident was a minor; and
- whether NYU is able as a practical matter to pursue the investigation without the participation of the Complainant (e.g., whether there is other relevant evidence of the Prohibited Conduct such as security cameras, other witnesses, or physical evidence).

Where possible based on the facts and circumstances, NYU will seek action consistent with the Complainant's request to maintain his/her privacy and/or not conduct further Investigation. However, NYU will be limited in its ability to respond to the matter in other than potentially general ways such as providing targeted training or prevention programs or offering reasonably available protective measures or accommodations to the Complainant. Where NYU agrees to the Complainant's request to maintain his/her privacy and/or not conduct further investigation, the matter will be considered resolved with NYU taking, as appropriate, such general steps and such protective measures or accommodations. NYU recognizes that a Complainant may initially be hesitant to move forward, but later seek an Investigation. Where a report was closed because NYU

Effective: August 25, 2017

CONFIDENTIAL STUDENT RECORD                    NYU_00029044

SA-351

agreed to the Complainant's request to maintain his/her privacy and/or not conduct further Investigation, the matter may later be reopened at the discretion of the Title IX Coordinator.

Where the balance of factors requires that further investigation be conducted, that disciplinary action be taken, or that the identity of the Complainant be disclosed, NYU will inform the Complainant of its intent to investigate prior to commencing the investigation and/or of its intent to disclose the identity of the Complainant and will take reasonable and appropriate measures to protect and assist the Complainant. In such cases, NYU will also make reasonable efforts to protect the privacy of the Complainant consistent with the needs of the Investigation and resolution of the matter; however, an investigation normally involves speaking with the Respondent and others who may have relevant information about the incident and disclosing the identity of the Complainant as necessary in those conversations.

A Complainant may receive support and safety services regardless of their level of participation or engagement with these Procedures.

C. **Determination after Assessment:** After the initial assessment, the Title IX Coordinator will determine whether the circumstances warrant proceeding to an investigation. The Title IX Coordinator may consult with senior NYU administrators during the assessment. The determination as to how to proceed will be communicated to the Complainant in writing. Depending on the circumstances and requested resolution, the Respondent may or may not be notified of the report or resolution. A Respondent will be notified when NYU takes action that would impact a Respondent, such as protective measures that restrict the Respondent's movement on campus, the initiation of an Investigation, or the decision to seek to involve the Respondent in informal resolution.

Following this assessment, during an Investigation, or at any point in the Disciplinary Process, NYU may seek an Administrative Resolution that, as appropriate, endeavors to prevent future Prohibited Conduct and address its effects without conducting or concluding, as applicable, a formal Disciplinary Process against a Respondent. Alternatively, if appropriate, NYU may pursue an Investigation and Disciplinary Process.

D. **Protective Measures and Accommodations:**

During or subsequent to the assessment phase, NYU may take and/or make one or more of the following protective measures and accommodations, which may be temporary or permanent, for Student Complainants or Respondents, where reasonable and appropriate under the circumstances:

- Providing access to counseling services and assistance in setting up an initial appointment;
- Imposing an on-campus "no contact" directive;
- Rescheduling of exams and assignments;
- Providing alternative course completion options;
- Making changes in class schedule, including the ability to transfer course sections or withdrawal from a class without penalty;
- Making changes to a Student's University-sponsored or controlled housing, including assistance from staff in completing relocation;
- Limiting an individual's or organization's access to certain University facilities or activities pending resolution of the matter;
- Voluntary leave of absence;
- Providing an escort to ensure safe movement between classes and activities;

Effective: August 25, 2017

CONFIDENTIAL STUDENT RECORD

NYU_00029045

SA-352

- Providing medical services;
- Providing academic support services, such as tutoring;
- Imposing administrative leave or separation; and/or
- Imposing an interim suspension.

NYU will maintain the privacy of any accommodations or protective measures provided under the Policy to the extent practicable.

Both the Complainant and the Respondent may request review of the need for and/or modification of the terms of any interim measure, accommodation, or directive and can submit evidence in support of any such request. Requests for review/modification should be made to the NYU Office of Equal Opportunity. Requests will be handled within five business days, unless circumstances warrant extending that timeframe.

**Restricted/No Contact Requests:**

A Complainant who makes a report of Sexual Misconduct, Relationship Violence, and/or Stalking may request assistance in creating a safe distance between him/herself and the Respondent. A Respondent may also request the same assistance with respect to a Complainant. There are different forms of restricted contact directives that may be sought and/or imposed.

    a. **Institutional No-Contact Directive:** Upon request by the Complainant or Respondent, NYU will issue a directive to both students involved in an allegation of Sexual Misconduct, Relationship Violence, and/or Stalking to refrain from engaging in any form of contact with one another. NYU may also issue such a directive on its own initiative. The purpose of such a directive is to prevent one student from harassing another in person, in writing, by phone, by email, by texts or other electronic messaging, through social media, or through a third party. The secondary benefit of a No-Contact Directive is to help prevent "flare-ups" that can occur when two students engaged in an inter-personal dispute encounter one another. Unless otherwise modified in accordance with the procedure discussed above, under No-Contact Directives, if the Respondent and Complainant observe each other in a public place, it is the responsibility of the Respondent to leave the area immediately without directly contacting the Complainant.

    b. **Persona Non Grata Directive (PNG)**: NYU may issue a directive to one or both students involved in an allegation of Sexual Misconduct, Relationship Violence, and/or Stalking, that prevents that student from entering a designated University building or participating in a program, or activity. The purpose of such a directive is to provide each student with a degree of "safe space" and to prevent encounters that may give rise to conflicts or feelings of being unsafe.

    c. **Interim Suspension:** Where appropriate, including but not limited to when a Student Respondent is determined to present a threat to the health or safety of the NYU community, NYU may issue an interim suspension against the Student Respondent pending the outcome of the judicial process.

## II. ADMINISTRATIVE RESOLUTION:

NYU may seek a form of Administrative Resolution (which for purposes of these Procedures may include the possibility of Mediation) in place of an Investigation or Disciplinary Process.

Effective: August 25, 2017

Administrative Resolution is not appropriate for all cases of Prohibited Conduct, and NYU retains the discretion to determine which cases may be appropriate for Administrative Resolution and the type of Administrative Resolution process that may be appropriate in a specific case. Mediation (which is one form of Administrative Resolution), even where voluntary, may not be used in cases involving Sexual Assault.

Participation in Administrative Resolution (including the specific form of Administrative Resolution, such as Mediation) is voluntary.  NYU will not compel a Complainant or Respondent to engage in Administrative Resolution, will not compel a Complainant to directly confront the Respondent, and will allow a Complainant or Respondent to withdraw from participation in Administrative Resolution at any time.  NYU also reserves the right in its discretion to terminate an Administrative Resolution process at any time.  In addition, the Complainant, Respondent, and NYU must each agree before a case will be resolved through Administrative Resolution.

Administrative Resolution may involve individual and/or community remedies that are designed to address a report of Prohibited Conduct.  Interventions can include, among others: remedies designed to maximize the Complainant's access to educational, extracurricular, and/or employment activities; providing increased monitoring, supervision, and/or security at locations or activities where the misconduct occurred or is likely to reoccur; facilitating a voluntary meeting with the Complainant and the Respondent (in cases that do not involve Sexual Assault); conducting targeted or broad-based educational programming or training for relevant individuals or groups; requiring counseling; providing housing accommodations for Student Complainants; making academic accommodations for Student Complainants or providing workplace accommodations for Employee Complainants; imposing sanctions as set forth in the University Student Conduct Procedures, which include Warning, Censure, Disciplinary Probation, Restitution, Suspension of Privilege, Suspension from NYU, No Contact Directive, Dismissal from NYU, and Transcript Notation; and/or any other remedy that can be tailored to the involved individuals to achieve the goals of the Policy.

If an agreement acceptable to each of NYU, the Complainant, and the Respondent is reached through Administrative Resolution, the matter is considered to be resolved and the terms are implemented.  If an agreement is not reached, the matter will be referred for an Investigation or Hearing if appropriate.

The Title IX Coordinator will maintain records of all reports and conduct referred for Administrative Resolution, which typically will be completed within thirty days of the initial report.

## III. INVESTIGATION

Upon a determination by the Title IX Coordinator that a matter is to be investigated, the Investigation will proceed as follows:

A.  As a first step, the Title IX Coordinator will designate an investigator(s) from the Office of Equal Opportunity or an external agency ("Investigator") to conduct a prompt, thorough, and impartial Investigation of the report in the manner the Investigator deems appropriate.

B.  During the Investigation, the Complainant and Respondent will have an equal opportunity to be heard, to submit information and corroborating evidence, and to identify witnesses who may have relevant information. The Investigator will notify and seek to meet with all involved parties separately (e.g., the Complainant, the Respondent, and identified witnesses) and also will gather other evidence and information relevant to the determination as to whether or not a Policy violation has occurred. Witnesses cannot participate solely to speak about an individual's character; they must have information deemed relevant to the Investigation by the Investigator.

Effective: August 25, 2017

C.  A Complainant's or Respondent's prior sexual history with persons other than the other party involved in the investigation will not be considered as evidence during an Investigation or Hearing. However, where there is a current or ongoing relationship between the Complainant and the Respondent, and the Respondent alleges consent, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. As noted in the Policy, however, the mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent.

D.  The Investigator has the discretion to determine the relevance of any proffered evidence and may determine that certain types of evidence should be included or excluded in the determination of responsibility.

E.  Where reasonable under the circumstances, the Complainant and Respondent will be given written notice (which may be by electronic mail) in advance of any meeting that he/she is required or eligible to attend.

F.  Throughout the process, each of the Complainant and Respondent has the right to be accompanied by an advisor of his/her choice.  The advisor may be present at any meeting related to resolution of a report under the Policy, and may be anyone of the individual's choosing who is not otherwise a party or witness involved in the Investigation.  While the advisor may be present, the advisor may not speak or otherwise participate in the meetings and must comport him/herself in a manner that is not disruptive to the meetings.

G.  At the conclusion of the Investigation, the Investigator will prepare an Investigation report that summarizes the information gathered.  Both the Complainant and the Respondent will be given the opportunity to review the draft Investigation report, submit any additional comment or information to the Investigator, and identify any additional information or witnesses. The Investigator will designate a reasonable time for review and response.   The purpose of the draft report review period is to enable the Complainant and Respondent an opportunity to review the evidence gathered, to clarify and/or expand upon information contained in the report, and to provide additional evidence. Responses to the draft report must be submitted by the Complainant or Respondent (not by an advisor).  In the absence of good cause, information discoverable through the exercise of due diligence that is not provided to the Investigator at this juncture will not be considered by the Adjudicator.

H.  Upon receipt of any additional comments or information, the Investigator will issue a determination as to whether a reasonable fact-finder (i.e., the person serving as the Adjudicator at the hearing) could determine that there is sufficient evidence to support a finding that a violation of the Policy occurred.   In reaching this determination, the Investigator may consult with senior NYU administrators, including the designated member of the Provost's Office.

1.  If the Investigator determines that there is sufficient evidence for a reasonable fact-finder to find that a violation of the Policy occurred, the report will be submitted to OSC for further action as outlined in Section IV below.

2.  If the Investigator determines that there is insufficient evidence for a reasonable fact-finder to find that a violation of the Policy occurred, no further action will be taken except a copy of the report will be provided to OSC, the Complainant, and the Respondent. The Complainant may request Administrative Review of the Investigator's determination that no further action is warranted by submitting a written statement setting forth the basis for the request within

Effective: August 25, 2017

CONFIDENTIAL STUDENT RECORD

SA-355

five business days of the Investigator's determination. Administrative Review will be conducted by a panel selected by the Senior Vice President for Student Life or his/her designee ("Review Panel"). The Review Panel may consult with the Investigator, the Complainant, the Respondent, or any other individual. The Respondent also may submit a written statement of his or her position to the Review Panel within five (5) business days of being notified of the request for review. The Review Panel may agree with the investigative finding, request additional investigative follow-up, or direct that the report be forwarded to OSC for further action. The Review Panel will render a decision in writing to both the Complainant and Respondent within fifteen business days of the request for review.

I. The Investigation typically will be completed within thirty-five days from the date of the initiation of the Investigation. This timeframe may be extended for Administrative Resolution and also may be extended for good cause as necessary to ensure the integrity and completeness of the Investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to account for NYU breaks or vacations, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons. Any extension of the timeframes, other than for Administrative Resolution, and the reason for the extension, will be shared with the parties in writing.

J. At the request of law enforcement, NYU may agree to defer its Title IX Investigation until after the initial stages of a criminal investigation. NYU will nevertheless communicate with the Complainant regarding the availability of protective measures and accommodations and available courses of action under the Policy and these Procedures. NYU will promptly resume its Title IX Investigation as soon as it is notified by law enforcement that there is no longer a need to delay. Such delays will not last long longer than ten days, unless law enforcement requests and justifies a longer delay.

K. The Investigator may consult with senior NYU administrators during the Investigation.

## IV. HEARING AND APPEAL

The Hearing and Appeal process consists of: (A) Pre-Hearing Steps; (B) a Hearing; (C) a Determination of Violation and Sanctions; and (D) the Right to Appeal.

### A. Pre-Hearing Steps:

1. **OSC Review of Investigation report:** OSC will receive and review the Investigation report. The OSC Administrator may accept the report as rendered or may request that an Investigator conduct additional interviews or seek out other evidence as deemed to be appropriate. Any additional Investigation, and a supplemental report, should be completed promptly.

2. **Selection of Adjudicator:** The hearing will be adjudicated by an administrator designated by the University, typically the Director of the Office of Student Conduct and Community Standards or his/her designee. At the discretion of the OSC Administrator, the matter may also be referred to an external adjudicator with expertise in adjudicating cases of Prohibited Conduct (the designated administrator and external adjudicator are both referred to as the "Adjudicator"). Reasons for referring a hearing to an external adjudicator include but are not limited to the presence of a conflict of interest, when the Complainant is not a member of the NYU community, or when a matter presents complex evidentiary issues. All persons serving as an Adjudicator must have trauma-informed training or experience with respect to the adjudication of Prohibited Conduct and must also be impartial and free from bias or conflict of

Effective: August 25, 2017

CONFIDENTIAL STUDENT RECORD

interest.

3. **Notice of Hearing:** The Complainant and Respondent will be notified in writing of the date, time, and location of the hearing; the charges to be reviewed by the Adjudicator, including the date, time, location and factual allegations concerning the violation; the provisions of the Policy alleged to have been violated; and the sanctions that may be imposed. In general, the Respondent and Complainant will be provided the Notice of Hearing at least ten days prior to the date of the hearing. The time frame in which the hearing is conducted may be extended for good cause at the discretion of the OSC Administrator. Good cause may include the availability of the parties, the availability of witnesses, the timing of semester breaks, or any other extenuating circumstances. Hearings may be scheduled whenever the University is officially open (including Summer and Winter breaks).

4. **Pre-Hearing Review of Documents:** The Complainant and Respondent will each have the opportunity to review the final Investigation report, including any supplemental report, and any relevant documents that will be provided to the Adjudicator at least five business days in advance of the hearing. The Adjudicator also will be provided with the same set of materials at least five business days before the hearing.

5. **Witnesses:** The Adjudicator will identify any witnesses that he/she wishes to hear from at the hearing based on a review of the Investigation report. The Complainant and Respondent each have the right to request the presence of any additional witnesses at the hearing. However, the University cannot compel the attendance of any witness. Typically, only witnesses who were identified and interviewed as part of the Investigation may be called at the hearing. Under very limited circumstances, the Complainant, Respondent or Investigator may identify a witness with relevant information who has not previously been interviewed. In such case, the Adjudicator will determine if the new witness's participation at the hearing is relevant and appropriate under the circumstances, and if so, will refer the matter to the Investigator for additional investigation, and a supplemental report, which may delay the timing of the hearing.

6. **Request to Postpone Hearing:** Permission to postpone a hearing may be granted provided that the request to do so is based on a compelling emergency and where possible is provided to the OSC Administrator at least 48 hours prior to the time of the hearing.

B. **Hearing.**

1. **Timing:** Typically a hearing will be held within sixty days from the date of the initiation of the Investigation. This timeframe may be extended for Administrative Resolution and also may be extended for good cause as necessary to ensure the integrity and completeness of the Investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to account for NYU breaks or vacations, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or to address other legitimate reasons. Any extension of the timeframes other than for Administrative Resolution, and the reason for the extension, will be shared with the parties in writing.

2. **Hearing Guidelines:** At any hearing under these Procedures, the following guidelines below will apply:

   a. **Advisors:** Each of the Complainant and Respondent has the right to be accompanied at the hearing and any meetings by an advisor of his/her choice who is not otherwise a party

CONFIDENTIAL STUDENT RECORD

SA-357

or witness involved in the Investigation. While the advisor may be present, the advisor may not speak or otherwise participate in the hearing or meetings, may not address the Adjudicator or question witnesses, and must comport him/herself in a manner that is not disruptive to the hearing or meetings.

b. **Presence at Hearing:**

   i. A Complainant or Respondent is not required to participate in person at the hearing in order for the hearing to proceed.

   ii. A Complainant or Respondent may request alternative testimony options that would not require physical proximity to the other party, including testifying via a remote electronic method. This request should be made no less than five business days prior to the hearing.

   iii. If despite being notified of the date, time, and location of the hearing, the Respondent or Complainant is not in attendance, the hearing may proceed and sanctions may be imposed. In doing so, the Adjudicator will consider the available testimony and evidence. In the absence of clear evidence that emergency circumstances beyond the control of the Complainant or Respondent prevented such person from being present, the decision of the Adjudicator will stand.

c. **Questioning:** The Complainant and Respondent will not be permitted to directly question one another, but will be allowed to propose questions to the Adjudicator who will screen the questions for appropriateness and relevance.

d. **Hearing Format:** The Adjudicator has the discretion to designate the hearing format. The following hearing format is presented as a general example:

   i. The Adjudicator will explain the hearing process, provide an opportunity to all parties to ask questions about procedures, and read the charges.

   ii. The Investigator will provide a brief statement summarizing the Investigation. The Adjudicator may then pose questions to the Investigator, including, in the discretion of the Adjudicator, questions suggested in writing by the Complainant and/or Respondent.

   iii. The Adjudicator may pose questions to the Complainant, including, in the discretion of the Adjudicator, questions suggested in writing by the Respondent. The Complainant may then supplement the information provided to the Adjudicator with a brief statement.

   iv. The Adjudicator may pose questions to the Respondent, including, in the discretion of the Adjudicator, questions suggested in writing by the Complainant. The Respondent may then supplement the information provided to the Adjudicator with a brief statement.

   v. The Adjudicator will then hear from witnesses determined by the Adjudicator to have information that is relevant to the matter, first on behalf of the Complainant and then on behalf of the Respondent. Each witness will be questioned by the Adjudicator and, as appropriate, the Complainant and Respondent will be given an opportunity to pose questions to the witness through the Adjudicator (if one party is provided an opportunity to question a witness, the other party will be provided the same opportunity).

   vi. At the conclusion of the presentation of all witnesses, the Complainant, and the Respondent will each be given a brief final opportunity to address any outstanding issues of fact and to make an impact statement.

Effective: August 25, 2017

NYU_00029051

SA-358

    e. **Audio Recording:** An audio recording will be made of the hearing.  The recording will be maintained by NYU for at least five years from the date of the hearing. A written transcript of the hearing will not be prepared.  Requests to listen to the audio recording of a hearing should be made to OSC.

These hearing guidelines may be supplemented as determined appropriate by the OSC Administrator or the Adjudicator.

**C. Determination of Violation and Sanctions; Notice of Outcome**.  At the conclusion of the hearing, the Adjudicator will determine whether there is sufficient information, by a preponderance of the evidence, to support a finding of responsibility for a violation of the Policy.   The Adjudicator will (1) determine if there is a violation and (2) if so, the Adjudicator will determine the appropriate sanction(s).

In determining the appropriate sanction(s), the Adjudicator will consider a number of factors, including:

> · the nature of the conduct at issue, including whether it involved violence;
> · the impact of the conduct on the Complainant;
> · the impact or implications of the conduct on the NYU community;
> · any previous conduct violations by the Respondent, both at NYU or elsewhere, as well as any criminal convictions;
> · whether the Respondent has accepted responsibility for the conduct;
> · maintenance of a safe and respectful environment conducive to learning; and
> · any other mitigating, aggravating, or compelling circumstances to reach a just and appropriate resolution in each case.

The Adjudicator may also consider restorative outcomes that, taking into account the safety of the NYU community as a whole, allow a Respondent to develop insight about their responsibility for the behavior, learn about the impact of the behavior on the Complainant and the community, and identify how to prevent or change the behavior.  Sanctions may be issued individually, or a combination of sanctions may be imposed.

The potential sanctions for a violation of the Policy, as set forth in the University Student Conduct Procedures, include: Warning, Censure, Disciplinary Probation, Restitution, Suspension of Privilege, Suspension from NYU, No Contact Directive, Dismissal from NYU, and Transcript Notation.  Potential sanctions for a violation of the Policy also include requiring the Respondent to engage in a course of counseling, education or training.

Where the conduct found to have violated the Policy also constitutes a "crime of violence" as defined under New York State Education Law § 6444(6), and where the sanction(s) imposed included either a suspension or expulsion, the transcript of the Student Respondent shall include the applicable notation on his or her transcript: "Suspended after a finding of responsibility for a code of conduct violation" or "Expelled after a finding of responsibility for a code of conduct violation." If a Student Respondent withdraws from NYU with a charge of a violation of the Policy pending, a notation will be made on such student's transcript that he/she "Withdrew with conduct charges pending."  If a withdrawing Respondent declines to complete the disciplinary process and the University elects, in its discretion, to defer scheduling a hearing until the Respondent returns to NYU, the notation of withdrawal will become permanent in the event that the Respondent does not return within eighteen (18) months.

Effective: August 25, 2017

CONFIDENTIAL STUDENT RECORD

**Transcript Notation Removals:** If the Adjudicator's decision provides for a transcript notation, a Respondent may request that such notation be removed, provided that he/she has met any applicable requirements listed in the Adjudicator's decision prior to making a request.  However, a transcript notation reflecting a suspension cannot be removed until one year after the conclusion of the suspension. Transcript notations of an expulsion shall not be removed. In the event that a finding of responsibility is vacated for any reason, any such transcript notation shall be removed.

**Notification of Outcome:** The Complainant and Respondent will be notified simultaneously in writing (which may include email) of the outcome of a hearing, relevant findings of fact, the rationale for the outcome, including the sanction, and the options for appeal within five business days of date of the completion of the hearing, unless circumstances warrant extending that timeframe.

**D.  Right to Appeal.**   The Complainant or Respondent may appeal the determination to the NYU Sexual Misconduct Appeal Panel within five (5) business days. Grounds for an appeal are limited to (1) a material procedural error, (2) previously unavailable relevant evidence that could affect the outcome; and/or (3) the sanction being substantially disproportionate to the violation.  Each party will be notified if the other party files an appeal, and will be provided the opportunity to submit a responsive appeal statement within five (5) business days of being notified.  Appeal statements should be no more than three (3) pages and must be submitted by the Complainant or Respondent (not by an advisor).  The parties, however, do not appear before the Appeal Panel.  The appeal will be decided by the Appeal Panel within fifteen (15) business days of the date that the responsive statement is due, regardless of whether any responsive statement is submitted, unless the circumstances of the appeal warrant an extension.  All persons serving on the Sexual Misconduct Appeal Panel must have training or experience with respect to the adjudication of Prohibited Conduct and must also be impartial and free from bias or conflict of interest.  Following its review, the Appeal Panel may either (a) affirm the Adjudicator's determination, (b) alter the sanctions rendered, if raised as a ground for appeal, or (c) send the matter back to an Adjudicator for further proceedings consistent with its decision.  Unless the Appeal Panel sends the matter back to the Adjudicator for further proceedings, the decision of the Appeal Panel is final and the matter is closed.

Effective: August 25, 2017

NYU_00029053

SA-360

# Exhibit 13

SA-361

TRANSCRIPTION – February 23, 2022

Page 1

```
 1        UNITED STATES DISTRICT COURT

 2        SOUTHERN DISTRICT OF NEW YORK

 3      _____
                                     )
 4      JOHN DOE,                    )
                                     )
 5                   Plaintiff,      )
                                     )
 6                                   )
                                     )
 7            -against-              )    Case No.:
                                     )    1:20-cv-01343(GHW)
 8                                   )
                                     )
 9      NEW YORK UNIVERSITY,         )
                                     )
10                   Defendant.      )
        _____)
11

12

13

14

15

16        Transcribed from an audio recording

17           NYU Administrative Hearing

18

19

20

21

22

23

24           Court Reporter:

25           Katrina Dearborn
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-362

TRANSCRIPTION – February 23, 2022

Page 2

```
 1              (VOLUME I)
 2         MS. MAEDER:  Okay.  We are
 3    recording.
 4         MR. JOLLEY:  All right.  I'm going
 5    to have you -- I'm going to try to turn
 6    this laptop in different directions so
 7    that you can see the layout of the room.
 8         Good afternoon, almost evening,
 9    everybody.  Early morning for some of
10    you, I think.  Right, John
11         John  Yes.  Yes.
12         MR. JOLLEY:  Thank you for getting
13    up so early.
14         Let me call a time on this.  It's
15    4:31 p.m., Eastern time -- New York
16    time.  And I'm going to officially call
17    this hearing to order.
18         Our process requires that we make a
19    recording of the hearing, and so I'm
20    going to ask everyone to go around who
21    is here or participating in person or
22    virtually.  Just either say your name
23    and what role you're playing today, like
24    say, "I'm the respondent.  I'm the
25    complainant."  And if you could just
```

SA-363

TRANSCRIPTION – February 23, 2022

Page 3

```
1          speak up so that we can catch it all on
2          the recording. So I'm going to begin.
3              My name's Craig Jolley.  My job
4          here at NYU is I'm the director for the
5          office of student conduct.  The role
6          that I'm playing today is I am the
7          adjudicator for this case, and it's my
8          job to look through all of the evidence,
9          make an evaluation, an analysis as to
10         whether or not there's been a violation
11         of the university's policy and –– and
12         make a decision for both of you.  So ––
13             MR. MILLER:  and I'm Will Miller
14         from the General Counsel's office, and
15         I'm here today as the advisor to the
16         adjudicator.
17             MR. JOLLEY:  I'm going to flip you
18         all the way around.  I don't mean to
19         make you all dizzy over there.
20             MR. HODGE:  Hi.  I'm Sam Hodge. I'm
21         a Title IX investigator with the office
22         of equal opportunity.
23             MR. JOLLEY:  Okay.  And can I have
24         everyone online go?  And then I'll bring
25         it over.  John
```

SA-364

TRANSCRIPTION – February 23, 2022

Page 4

```
1          MR. [Doe]   I'm [John]  I am the

2     respondent.

3          MR. JOLLEY:  Okay.

4          MR. [Doe]   I have my advisor

5     here -- one of them.

6          MS. STAHL:  Lauren Stahl, the -- a

7     wellness counselor here at the NY

8     University.

9          MR. JOLLEY:  Good to see you.

10          MR. McFARLANE:  I'm -- I'm Allen

11     McFarlane, Respondent Facilitator.

12          MR. JOLLY:  Hello, Allen.  How are

13     you?

14          MR. McFARLANE:  Doing great.

15          MR. JOLLEY:  Are you in your

16     office?

17          MR. McFARLANE:  Yes.

18          MR. JOLLEY:  Okay.  It looked

19     familiar.

20          Chris --

21          MS. JANIK:  Hi.  I'm Christine

22     Janik.  I m here as a support person.

23          MS. [Roe]   I'm [Jane Roe]

24     I am the

25          MR. [Doe]   I couldn't hear
```

SA-365

TRANSCRIPTION - February 23, 2022

Page 5

```
1        that.
2            MS. ▇▇▇▇   I'm ▇▇▇▇▇▇▇
3        and I'm the complainant.
4            MS. MAEDER:  Hi.  My name is
5        Colleen Maeder.  I am the assistant
6        director for student conduct and I'm the
7        administrative coordinator for the
8        hearing.
9            MR. JOLLEY:  Okay.  So I'll bring
10       you back to me now and I'll bring you
11       down.
12           So the purpose of our hearing today
13       is -- well, let me just say, I -- before
14       I begin, I -- you know, the hearing
15       today, it -- there is some formality to
16       it.  I'm going to follow some steps.  But
17       I just want to be clear, like, it's not
18       court.  We're -- we're not a court of
19       law.  We're at the end of the day.
20       We're at school trying to figure out if
21       schools were -- school rules were
22       violated.  So even though we'll follow
23       some formality, I'd like to have, like,
24       permission to use first names.  Is that
25       all right with you, ▇▇▇▇
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

TRANSCRIPTION - February 23, 2022

Page 6

```
 1          MS. ███████  Yes.

 2          MR. JOLLEY:  ███████ is that okay

 3     with you?

 4          MR. ███████  "███████."

 5          MR. JOLLEY:  ███████  Okay. Hard █,

 6     right? ███████  Okay.

 7          MR. ███████  Yes.

 8          MR. JOLLEY:  ███████

 9          Can I use first names on the --

10     with you?  As I -- I've constructed this

11     whole thing around your first names.  I

12     think if I start to use mister --

13          MR. ███████  That's (inaudible)

14     fine.

15          MR. JOLLEY:  Okay.

16          -- I'll get confused if I start

17     saying mister or miss or that.

18          So the purpose of today's hearing

19     is to hear the evidence, and for me to

20     hear the from both of you and to

21     determine whether or not ███████ has

22     engaged in conduct that's in violation

23     of a policy here at NYU called the

24     sexual misconduct relationship violence

25     and stalking policy.
```

SA-367

TRANSCRIPTION – February 23, 2022

Page 7

```
 1            Specifically, Jane  has alleged

 2      that she was subjected to sexual

 3      misconduct, specifically non consensual

 4      sexual contact, sexual harassment,

 5      sexual exploitation, and stalking over a

 6      period that I have that's spanning from

 7      September of 2017 to May 2018.  And the

 8      reason for that is I know that there's

 9      some back story between the two of you

10      in your relationship prior to John being

11      a student at NYU.  But for the purposes

12      of this hearing, I'm focusing on the

13      allegations that relate to the time that

14      you were here, John  as an NYU student.

15         Okay.  I'll get some background on

16      history, but I really want to kind of

17      dive into what started it in the fall of

18      seven -- 2017. Okay?

19            Furthermore, in addition to those

20      allegations, Jane 's further alleged

21      that John violated a no-contact

22      directive that was issued on April 22nd,

23      2018 by continuing to engage her in

24      person, by phone, and electronic

25      messaging.
```

SA-368

TRANSCRIPTION - February 23, 2022

Page 8

```
 1              So I know that both of you have
 2         seen the very extensive report that was
 3         put together by Sam and the OEO team.
 4         You both have been able to read it and
 5         review it and comment on it.
 6              I will say to both of you that
 7         there's a lot here, as you all know.  I
 8         mean, 100-and-some pages -- a few
 9         hundred pages.  I have read everything.
10         I have read all of the attachments.  I
11         have listened to and viewed all of the
12         submitted videos and all of the
13         voicemails, so I've already reviewed all
14         of that, I want you to know.  I'm not
15         sort of like just starting fresh here.
16         Okay.
17              The standard -- at the end of this,
18         the purposes I run, I -- really, this is
19         important because now I like really want
20         to hear from the two of you.  I have
21         some specific questions for each of you.
22         But what we won't do tonight is we're
23         not going to, like, rehash this whole
24         thing.  This has been going on for a
25         very long time, and I want to try to
```

TRANSCRIPTION – February 23, 2022

```
 1          minimize for both of you, to the extent
 2          that I can, of you not having to retell
 3          the whole stories over and over again.
 4          Okay.  Just know that I've read
 5          everything and I'm going to look at some
 6          specific parts that I want to talk with
 7          each of you about.
 8              At the end of all of that, it will
 9          be my job to look at all the evidence
10          and make a determination.  Now the
11          standard of evidence that I use is
12          something that's called the
13          preponderance of the evidence.  I'm sure
14          that Mary and the investigators and
15          Colleen have all explained this to you,
16          but I'll just say it again here is that
17          it's not a criminal court.  It doesn't
18          work like where it's beyond a reasonable
19          doubt.  The standard of evidence that
20          schools use and NYU uses is something
21          called preponderance of the evidence,
22          which is really a more likely than not
23          standard.
24              Here's the order that were going to
25          go in this evening.  I know it's —
```

SA-370

TRANSCRIPTION - February 23, 2022

Page 10

```
 1          it's late for us and early for you all
 2          in Australia.  We're going to begin --
 3          we'll try to get through -- I'm going to
 4          manage time as efficiently as possible,
 5          but we're going to take whatever time we
 6          need to make sure that I have a full
 7          understanding from both of you.  Okay.
 8          So not phoning this in or rushing it.
 9          We'll take the time that we need, but
10          I've structured it so that we can be as
11          efficient as possible.  Okay.
12              We'll begin with hearing from Sam.
13          Sam is going to give us an overview of
14          the investigation.  What I'm not going
15          to ask Sam to do is recap everything,
16          because I have the two of you here that
17          I'd rather hear it direct -- I don't
18          need Sam to tell me what you all told
19          him, right.  So I really just want to
20          have him give me an overview of the
21          investigation of what the staff did and
22          give me a timeline.
23              I may have some questions for him,
24          but I really don't because I know how
25          the process works.  But if either of you
```

TRANSCRIPTION - February 23, 2022

Page 11

```
1        have questions for him, I -- about,
2        really, procedurally, like what happened
3        or anything about the investigation,
4        I'll give you the opportunity.  But I'd
5        like to get through Sam so that I can
6        get to talking with the two of you.
7        Right.
8            So once were done with Sam, then
9        Jane    you and I are going to spend
10       some time talking.  Okay.
11           MS. Roe      M-hm.
12           MR. JOLLEY:  And I want to hear
13       your perspective on this.  I have some
14       questions for you.  I want to be clear,
15       and I'm going to say this to both of
16       you, my jo -- by asking you questions,
17       I'm not meaning to throw you on the
18       defensive, or I don't want you to feel
19       like I'm attacking you.  It's just that
20       that's my job, right --
21           MS. Roe      Right.
22           MR. JOLLEY:  -- is to ask you
23       questions and make sure I have a full
24       understanding of it -- of your
25       perspective on this.
```

SA-372

TRANSCRIPTION – February 23, 2022

Page 12

```
1              John  as  Jane   and I are talking,
2         you and your advisors -- you know, I
3         know that it's really hard to just kind
4         of have to sit and listen and not -- I
5         know you feel like you want to respond,
6         and I'm going to ask you to just hold
7         that.  You and I will have time together
8         too.
9              I'm going to ask a lot of
10        questions, and, you know, I may ask a
11        lot of the questions even that you would
12        have.  But what I'm going to ask you to
13        do is, if you have additional -- after
14        I'm done, and I'll give you a warning
15        when I'm wrapping up with  Jane   -- if
16        you have additional questions, I'm going
17        to have you put those in writing and
18        send those to Colleen.
19             MS. MAEDER:  Email.
20             MR. JOLLEY:  Or by email.  I'm
21        going to have you email those to
22        Colleen.  And then I'll take a look at
23        them.  If they're on point, I will ask
24        them.  If I feel like they're redundant
25        or it's already been asked and answered,
```

SA-373

TRANSCRIPTION – February 23, 2022

Page 13

```
 1              I may pass on a question or I may modify
 2         a question, but -- within my discretion,
 3         but I want to make sure that I get a
 4         chance to see if there are any
 5         additional questions you have after
 6         Jane  and I wrap up. Okay?
 7              MR. Doe      Fair.  And you don't
 8         want any, um -- like, you just want the
 9         question, you don't want any details,
10         like regarding --
11              MR. JOLLEY:  Yeah.
12              MR. Doe      -- pertinence to why
13         --
14              MR. JOLLEY:  Yeah.
15              MR. Doe      -- that question
16         might be.
17              MR. JOLLEY:  You'll -- if I -- if I
18         need to ask why you're asking a
19         particular question, I'll ask for
20         clarification. Okay?
21              MR. Doe      Fair.
22              MR. JOLLEY:  But -- and the same
23         will go for both of you, um, that your
24         questions can't -- I mean, I don't need
25         you to be responding through your
```

SA-374

TRANSCRIPTION - February 23, 2022

Page 14

```
 1            questions.  You'll get a chance when
 2            it's, you know, your turn to talk.
 3                 So we're going to do that.  You
 4            know, depending on where we are in the
 5            evening, maybe we'll take a break at
 6            that point.  I just want to -- between
 7            the two of you.  But after -- after
 8            we're done talking, then John   it's
 9            going to shift.  Then it's your and I's
10            time together.  Okay.  Then I'm going to
11            go through this again with you.  Again,
12            I have a limited number of questions for
13            you.  Not to make you feel defensive or
14            anything, but really because I've got to
15            get an understanding of your perspective
16            on this.
17                 MR.  Doe    Right
18                 MR. JOLLEY:  And Jane   same
19            thing, as I'm talking with John  if you
20            have additional questions when I'm done,
21            you can write those down and then give
22            them to Colleen and --
23                 MS.  Roe    Okay.
24                 MR. JOLLEY.  Okay.
25                 Once I've had a -- and I'll -- I'll
```

SA-375

TRANSCRIPTION — February 23, 2022

Page 15

```
1           say to you both that that's —— for me,

2           that's the most important part of

3           tonight, is for me to be able to talk

4           with each of you individually.  You

5           know, we do these hearings still so that

6           in real time each of you can hear what

7           the others are saying and give you the

8           opportunity to ask questions, too.  But

9           really, it's me and you, really,

10          talking, the three of us. Okay?  I know

11          that there's a number of others present.

12              Once we get through that, though, I

13          know that there were some additional

14          witnesses that contributed to the

15          report.  I've read all of the witnesses

16          statements, and so I think a couple of

17          them are going to —— may be joining us.

18          Two ——

19              MS. MAEDER:  Two of them.

20              MR. JOLLEY:  Two will be joining by

21          phone.  Is it ███████and ██████

22              MS. Roe████     Yes.

23              MR. JOLLEY:  Is that right?

24              MS. Roe████     Yes.

25              MR. JOLLEY:  Okay.  I don't have a
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

TRANSCRIPTION – February 23, 2022

Page 16

1        lot of questions for them.  I mean, I've
2        -- I've read what they've said, and
3        you've read what they said, but I -- I
4        have a couple of questions for them, but
5        I would also give each of you the
6        opportunity to submit questions if you
7        have questions for them.
8              MS. Roe        Okay.
9              MR. JOLLEY:  Okay.
10             All right.  So once we get through
11       the two of you, and I get to talk to --
12       just briefly with -- to the two
13       witnesses, we'll take another break, and
14       then I'm going to give each of you the
15       opportunity to prepare any closing
16       remarks.  I'll give you some more
17       guidance on closing remarks at the end,
18       but just keep in mind it's not court, so
19       your closing remarks don't need to be
20       some, you know, big recap of all the
21       evidence.  It really is just final
22       thoughts.  Just a brief statement.  No
23       more than a few minutes. Okay? And I'll
24       give you some more directions when we
25       get to that part of the hearing.

SA-377

TRANSCRIPTION - February 23, 2022

Page 17

```
1            The role of advisors -- there's a
2       number of advisors here.  Some of you
3       have been advisors before, so I just
4       want you to know that I -- I -- we're
5       happy to have you here and appreciate
6       you being here to be support.  I'm sure
7       Colleen has already told you, you also
8       know that your role is to be a silent
9       support or a whispering support, I
10      guess, for your students.  You don't
11      actively participate in the hearing.
12      Okay?
13          Good?  Does any -- are we ready to
14      begin?
15          Okay.  It's 4:42, and we're going
16      to begin with Sam.
17          Sir, what I would like to do --
18      you'll hear me.  I'll be off-camera,
19      you'll be hearing me if I have
20      questions.  But I'm going to turn you so
21      that you can see Sam, okay?
22          Does that look good, Sam? It's
23      shooting in the dark here.
24          MR. HODGE:  Good morning and good
25      evening, everyone.
```

SA-378

TRANSCRIPTION - February 23, 2022

Page 18

```
 1          MR. Doe     (Inaudible.)
 2          MR. HODGE:  So as a title IX
 3    investigator -- can you hear me?
 4          MR. Doe     Cannot see.  We
 5    can't see.
 6          MR. HODGE:  Oh.
 7          MR. Doe     There you go.
 8          MR. HODGE:  All right.  Sorry about
 9    that.
10          MR. JOLLEY:  Picture in the way.
11          MR. HODGE:  As a title IX
12    investigator, my job is to be neutral
13    and be an objective factfinder.  In that
14    role, I gather evidence, I prepare a
15    draft report, and then after I've done
16    that, the parties -- either the
17    respondent or complainant have an
18    opportunity to review the evidence that
19    I have gathered and a summary of the
20    witnesses that I have interviewed.  And
21    then we issue, after we've heard from
22    the parties, a final report if there is
23    sufficient evidence.
24        In this matter,  there was
25    sufficient evidence for an adjudicator
```

TRANSCRIPTION – February 23, 2022

Page 19

```
 1          to consider whether or not an NYU policy

 2          was violated, and we passed it on to the

 3          office of student conduct.  The title IX

 4          investigators that were involved in this

 5          matter were myself, Lauren Stahl, she's

 6          the deputy title IX coordinator, and

 7          Jacqueline Cornell, a former title IX

 8          investigator who is no longer with NYU.

 9              I won't go through the description

10          of the allegations on the direction of

11          the adjudicator, but I would refer you

12          to the report, which I believe

13          encapsulates the description.

14              There are numerous attachments, A

15          through H, which are all in the report.

16              To give a procedural history, on

17          April 22nd, 2018 we received a report

18          from the complainant of a concern

19          regarding NYU's sexual misconduct

20          policy.  And on April 22nd the

21          respondent became aware of those

22          allegations as a no-contact order was

23          issued on that day, as well.

24              On May 17th of this year, the

25          complainant was interviewed.  On July
```

TRANSCRIPTION - February 23, 2022

1          10th, the respondent was interviewed.
2          And on October 2nd, draft report was
3          issued with the return date of October
4          12th.
5              On October 5th, one of the parties
6          requested an extension for review of
7          response, and a new return date was set
8          for October 22nd.
9              On October 23rd, the office of
10         equal opportunity found that there was
11         sufficient evidence, and we issued a
12         final report and referred this matter to
13         the office of student conduct.
14             I believe I've covered the bases.
15             Craig, is there anything else you
16         would like me to go over?
17             MR. JOLLEY:  I would just like to
18         ask if you could just give me the
19         run through of the attachments.
20             MR. HODGE:  Sure.
21             MR. JOLLEY:  Go through, like -- I
22         know that you've got a list on here, but
23         if you can maybe just give me, like,
24         what you got and --
25             MR. HODGE:  Yeah.

TRANSCRIPTION – February 23, 2022

Page 21

```
 1          MR. JOLLEY:  -- what I can find in

 2       here. So --

 3          MR. HODGE:  So attachment A is a

 4       copy of all of the relevant policies

 5       that's are -- were in effect at

 6       different points of the allegations.

 7          MR. JOLLEY: M-hm.

 8          MR. HODGE:  B is a written

 9       statement, which contains both emails,

10       messages, images, and videos that have

11       been compiled by the complainant.  She

12       submitted a multi page document, along

13       with multiple files of audio and video,

14       which have all been included as part of

15       the report.

16          C is a copy of the no-contact

17       directive emails that were given to both

18       parties, notifying them that a

19       no-contact order directive had been put

20       in place.  We also had a written

21       statement with messages and images that

22       we received from the respondent. That's

23       attachment D.  And then we received

24       additional evidence from ██████  And

25       those messages -- Ms. ███████  who --
```

SA-382

TRANSCRIPTION - February 23, 2022

Page 22

```
1          those messages are included as
2          attachment E.  And then we have an
3          incident report that was created by the
4          department of public ser -- safety.  And
5          that's attachment F.  And then G and H,
6          respectively, are the complainant's
7          response to the draft report and the
8          respondent's response to the draft.
9             MR. JOLLEY:  Okay.  And for clarity
10         purposes, Sam, I just want to make sure
11         that I got my policies in place.  I'm
12         looking at conduct -- the allegations
13         against John  as it relates to his time
14         here as an NYU student --
15            MR. HODGE:   M-hm.
16            MR. JOLLEY:  So I think that I'm
17         looking at the August 25th, 2017 and
18         April 19th policies, right?  The October
19         13th, 2016 policy?
20            MR. HODGE:  That was included
21         because, as you referenced in your
22         introduction, some of the conduct
23         occurred when -- or is alleged to have
24         occurred when John  was a student at the
25         University of Connecticut --
```

TRANSCRIPTION – February 23, 2022

Page 23

```
1           MR. JOLLEY:  Right.  Right.
2           MR. HODGE:  -- visiting NYU.  And
3       we included that policy, as Jane
4       Roe was a student at NYU --
5           MR. JOLLEY:  Right.
6           MR. HODGE:  -- when that conduct
7       was occurring.
8           MR. JOLLEY:  All right.  Cool.
9           But for -- I will just say for --
10      for clarity purposes -- sorry for --
11      John I'm not -- I'm not consider --  I
12      mean, I want to hear it to the extent
13      that it creates -- establishes context.
14      But I can't hold John responsible for
15      violation of NYU policy when he wasn't
16      an NYU student when you were a student
17      at the University of Connecticut.  So I
18      just want to be clear about that on the
19      policies, as I'm not applying that
20      policy to somebody who was a non-NYU
21      student at the time.  Okay?
22          Let me just -- I'm going to ask
23      either of you if you have questions for
24      the investigators that -- and I don't
25      know if you do.  It's more -- I'm just
```

TRANSCRIPTION – February 23, 2022

Page 24

1          -- procedurally, do you have any
2     questions about their investigation?
3          If you do --
4          MR. Doe    I might.
5          MR. JOLLEY:  -- I'm going to ask
6     that you submit those to Colleen.
7          Jane   do you have any questions
8     for Sam?
9          MS. Roe    No.
10         MS. MAEDER:  And John   I saw your
11    hand go up.   Should I expect a question
12    from you?
13         MR. Doe    Yes.
14         MS. MAEDER:  Okay.
15         MR. JOLLEY:  Okay.  We'll wait for
16    that by email.
17         MS. MAEDER:  I just want to make
18    sure I'm -- I get it.
19         MR. JOLLEY:  And while we're
20    waiting, I'm just going to see if I have
21    any other questions for you, Sam.  Okay?
22         MR. HODGE:  Uh-huh.
23         MS. MAEDER:  John   let me know when
24    you sent it to, just so I know when to
25    expect it.

SA-385

TRANSCRIPTION - February 23, 2022

Page 25

```
1          MR. Doe      There.

2          MR. JOLLEY:  (Inaudible.)

3     Good?

4          MR. Doe      Yes.

5          MS. MAEDER:  I'll let you know when

6     I get it.

7          MR. Doe      (Inaudible.)

8          MR. JOLLEY:  She's waiting for it.

9     Hold on.

10         MS. MAEDER:  I keep refreshing.

11         John  I got it.  I'm passing it to

12    the adjudicator.

13         MR. JOLLEY:  Yeah, I think I know

14    the answer to that question, but I'm

15    going to pose it to Sam.

16         Sam, the attachments that were

17    included in the attachments that I can't

18    -- John  if you have a specific page

19    number where that shows up -- I saw that

20    as well -- if you could reference that.

21         MR. Doe      Yeah.  It's

22    attachment -- it's the one on the

23    attachment to evidence.  It's called

24    evidence.pdf.

25         MR. JOLLEY:  There's a -- there's a
```

SA-386

TRANSCRIPTION - February 23, 2022

Page 26

```
1              ref -- there's an attachment to one of
2              the emails that says "evidence.pdf," is
3              that -- do you know --
4                   MR. HODGE:  Which --
5                   MR. JOLLEY:  -- offhand what that
6              is?
7                   MS. MAEDER:  I can -- I'm going to
8              --
9                   MR. HODGE:  What attachment is it?
10                  MS. MAEDER:  It's in attachment B.
11                  MR. JOLLEY:  D as in dog?
12                  MS. MAEDER:  B.
13                  MR. JOLLEY:  B.
14                  MS. MAEDER:  It is one of the ones
15             that's on one hub, but it's also in the
16             report.  It's in attachment B.
17                  MR. HODGE:  Yeah, I know which --
18                  MR. JOLLEY:  Can -- can you --
19                  MR. HODGE:  -- one it is.
20                  MR. JOLLEY:  -- just explain --
21                  MR. HODGE:  Yeah.
22                  MR. JOLLEY:  -- what that
23             attachment was and if it's embedded
24             elsewhere within the body of the report?
25                  MR. HODGE:  Yes.
```

SA-387

TRANSCRIPTION – February 23, 2022

Page 27

```
 1          MR. JOLLEY:  I think it is, but I
 2     just want to --
 3          MR. HODGE:  So attachment B, as I
 4     mentioned before, was a submission made
 5     by Ms. Roe
 6          So when we received that
 7     attachment, she prepared a multi page
 8     documents, which is the pdf labeled
 9     "evidence." That's everything that you
10     see paper-wise for attachment B.
11          MR. JOLLEY:  B, right.
12          MR. HODGE:  And then in addition to
13     that, she turned over videos, audio, and
14     pictures.  And all of that was put on
15     one hub.  So the videos and audio you
16     got through a one hub as attachment B.
17     But then the PDF, which included all of
18     the commentary and discussion of what
19     the photos were, all that stuff, was all
20     part of the email attachment.
21          MR. Doe         It was a --
22          MR. HODGE:  So it's all in there.
23          MR. Doe         It was a
24     (inaudible) --
25          MR. HODGE:  Yeah.
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

SA-388

TRANSCRIPTION - February 23, 2022

Page 28

```
 1            MR. Doe       -- the report. Okay.
 2            MR. HODGE: Yeah, yeah, yeah.
 3            MR. Doe        I feel like
 4       (inaudible.)
 5            MR. HODGE: Yeah.  Sorry about
 6       that.
 7            MR. JOLLEY: Nope.  That's good.
 8       That was a great clarification.  Thank
 9       you, John
10            And so I understand, that PDF is
11       embedded into the report in what is
12       attachment B.
13            MR. HODGE:  Correct.
14            MR. JOLLEY: And then give me just
15       one second.  I -- well, I think it's
16       one, two, three --
17            MR. HODGE:  And for reference, the
18       PDF begins on page 114.  And that's the
19       beginning of the PDF that we received.
20       And it's labeled "evidence" on the title
21       page.
22            MR. Doe        Okay.  I just wanted
23       to clarify and make sure that that was
24       (inaudible).
25            MR. JOLLEY:  And I have reviewed 27
```

SA-389

TRANSCRIPTION - February 23, 2022

Page 29

```
 1          pieces of media, a combination of videos
 2          and voicemails that were submitted, and
 3          audio files that were submitted, so --
 4          okay.
 5              Any other procedural questions
 6          about the report or the role that the
 7          office of -- office of equal opportunity
 8          played?
 9              Good?  Can I get a yes out loud?
10          MR. Doe   Yes.
11          MR. JOLLEY:  Yes, okay, for the
12          record.  Thank you.  The recording can't
13          pick up the thumbs up.
14              Okay. Let's move on, then.  This is
15          where I really want to get to speaking
16          with the two of you.  So, John  I'm
17          going to turn you over so you'll have a
18          profile so you can see the whole lay of
19          the room.
20              Okay.  You don't have to look at
21          (inaudible) if you don't want to.  It's
22          me and you. Okay.
23          MS. Roe    Okay.
24          MR. JOLLEY:  All right.  So let's
25          begin.
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-390

TRANSCRIPTION - February 23, 2022

Page 30

```
1          Jane   I guess, let's start with

2      --

3          MS. MAEDER:  (Inaudible.)

4          MR. JOLLEY:  Oh, yeah, let's bring

5      you back first so we can hear you.

6      Better.

7          Ready?

8          MS. Roe      Yes.

9          MR. JOLLEY:  Okay.  I don't -- we

10     don't know each other, right?  And I know

11     that it's -- it's hard to, like, talk

12     about a lot of this stuff with, like, a

13     whole room of people or something like

14     that.  But to the extent that I can try

15     to just have a conversation with you,

16     we'll get through it together.  Okay?

17         MS. Roe      All right.

18         MR. JOLLEY:  Tell me just a little

19     bit about you.  Tell me a little bit

20     about you.  I don't need to know your

21     whole life story but, you know, what

22     year are you, where's home, all of that.

23         MS. Roe      So I am a third-year

24     student.  I m a junior.  My home is

25     originally India.  Now I live in Jersey.
```

TRANSCRIPTION – February 23, 2022

Page 31

```
1           MR. [Doe]   The audio is cutting

2      out.  I can't hear anything.

3           MR. JOLLEY:  Okay.  We need to put

4      him up -- well, try to bring you closer.

5      Or do we want to put it on phone --

6      well, let's keep trying it and let me

7      know.  Keep me posted if it --

8           MR. [Doe]   Sure.

9           MR. JOLLEY:  How it is.

10          MS. MAEDER:  Can you hear now,

11     [John]

12          MR. [Doe]   Yes.

13          MR. JOLLEY: Okay.

14          MS. MAEDER:  Okay.

15          MS. [Roe]   Okay.  So I'm a

16     third-year student.  I -- home is in

17     Jersey, and -- do you want to know what

18     I study --

19          MR. JOLLEY: Yeah.

20          MS. [Roe]   -- or anything like

21     that?

22          MR. JOLLEY:  What do you study?

23          MS. [Roe]   I study ecological

24     design -

25          MR. JOLLEY:  Okay.
```

SA-392

TRANSCRIPTION - February 23, 2022

Page 32

```
 1          MS. ▓Roe▓  -- in the context of
 2    South Asia.  Yeah.  That was it.
 3          MR. JOLLEY:  Okay.  Good enough.
 4          MS. ▓Roe▓   Yes.
 5          MR. JOLLEY:  Tell me how you -- and
 6    again, I note there were some things in
 7    the report about the history before --
 8          MS. ▓Roe▓   Yeah.
 9          MR. JOLLEY:  -- ▓John▓ began.  Can I
10    just get -- how did you guys meet?  And
11    how would you describe how your
12    relationship evolved over that time
13    before he came to NYU?
14          MS. ▓Roe▓   Sure.  We met at an
15    internship that we did together at Yale
16    over my -- between my junior and senior
17    year of high school.  And we didn't talk
18    too much during the actual internship.
19    ▓John▓ reached out after the internship
20    was over.  We became friends then, and
21    we used to talk often.
22          I would describe him as a good
23    friend at the time.  And we sort of --
24    it was -- I'm not -- I wouldn't call it
25    officially dating, but we were sort of
```

SA-393

TRANSCRIPTION — February 23, 2022

Page 33

```
 1          in the relationship starting January of
 2          2016, I believe.
 3               And we didn't meet too often.  My
 4          parents are extremely strict.  And they
 5          did not like me being friends with John
 6          -- or they didn't even know dating him
 7          was a possibility or anything.
 8               MR. JOLLEY:  Sure.
 9               MS. Roe      They were really
10          angry when they found out that I was in
11          touch with him after they told me not to
12          be.  And I, despite this, continued my
13          relationship with John    They even
14          called him up at one point in time, told
15          him not to talk to me, like --
16               MS. MAEDER:  Can I just interrupt?
17               MS. Roe      Yeah.
18               MS. MAEDER:  He's having trouble
19          here.
20               John  can you hear us?  You said --
21          I just got an email from you saying it
22          was very difficult to hear and it's very
23          choppy.
24               MR. Doe      Yeah.  I think the
25          complainant needs to speak up and, also,
```

SA-394

TRANSCRIPTION – February 23, 2022

Page 34

```
 1          the paper rattling from Mr. Jolley's
 2          paper is -- is creating some
 3          interference.  But like I said,
 4          (inaudible.)
 5              MR. HODGE:  We'll have to put him
 6          on the phone.
 7              MS. MAEDER:  Okay.  I don't know if
 8          there is a -- okay.  We might have to
 9          put everyone on a phone just so that the
10          interference goes away.  I want to make
11          sure that you're able to hear everything
12          and it doesn't cut in and out, and I'm
13          worried about with Skype, that it's
14          cutting in and out.  I don't want you to
15          miss something, John
16              MR. JOLLEY:  Allen, are you having
17          trouble hearing?
18              MR. McFARLANE:  I'm having trouble
19          hearing the complainant.
20              MR. JOLLEY:  Okay.
21              MR. McFARLANE:  That's -- that's
22          the only thing I'm -- and then your
23          paper rattling.
24              MR. JOLLEY:  Okay.  All right.  I'm
25          going to bring it -- I'll bring it
```

SA-395

TRANSCRIPTION - February 23, 2022

Page 35

```
 1          closer and around so that you can hear.

 2          Okay?

 3              MS. MAEDER:  If we were to --

 4              MR. JOLLEY:  And I would encourage

 5          you to maybe turn off the video, too, if

 6          that -- if it -- if part of it is

 7          cutting out.

 8              MS. MAEDER:  And I could try to

 9          turn off our video, as well, and that

10          might make the connection better.  I

11          just need to make sure if you guys can

12          either type in the box so it pops up, or

13          you email me directly and I keep

14          checking it.

15              MR. Doe    Okay.

16              MS. MAEDER:  But if I turn off the

17          video, it might help with all of that.

18          Okay?

19              MR. Doe    Okay.

20              MS. MAEDER:  All right.  So I'm

21          going to connect -- John  email me and

22          I'll keep checking.

23              MR. Doe    And I can message

24          you on Skype as well if need be?  Or do

25          you want email?
```

SA-396

TRANSCRIPTION – February 23, 2022

Page 36

```
 1            MS. MAEDER:  You can message on
 2       Skype.  It's just I'm not sitting right
 3       in front of it, so I might not be able
 4       -- I'll -- I can see you typing now.
 5            MR. Doe  Sure.
 6            MR. JOLLEY:  (Inaudible.)
 7            MS. MAEDER:  Actually, it's right
 8       in front of me right now, so I will see
 9       it if you start to type.
10            Allen, if you want to turn off your
11       video, you can too.  If not, you can --
12            MR. HODGE:  I think we can just
13       have --
14            MR. McFARLANE:  Okay.
15            MR. HODGE:  -- this be a call, but
16       then leave the video up and just put
17       that on mute so he could still see but
18       he would hear everything through a call.
19            MR. JOLLEY:  Yeah.  I'm --
20            MR. HODGE:  Just an idea.
21            MR. JOLLEY:  Yeah.  We'll try that,
22       maybe, to see --
23            MS. MAEDER:  Yeah.
24            MR. JOLLEY:  -- let's see if this
25       helps.  Let's try this, okay.  And move
```

SA-397

TRANSCRIPTION – February 23, 2022

Page 37

```
 1              --
 2              MR. [Doe]   And if we could just
 3       go over the details that you just stated
 4       once more, because I just didn't really
 5       hear them.  It sort of cut off after you
 6       had asked how we met and our
 7       interactions, then, like, just about --
 8       just a little ways into that, after she
 9       had stated that our friendship started,
10       and I believe she said January --
11              MR. JOLLEY:  All right.
12              MR. [Doe]   -- or something.
13              MR. JOLLEY:  All right.  I'm going
14       to repeat the question.  I want you to
15       talk with me, [Jane]
16              MS. [Roe]   Sure.
17              MR. JOLLEY:  [John]  I'm going to ask
18       you not to address her directly.  Okay?
19              MR. [Doe]   Sure.
20              MS. MAEDER:  Okay.
21              MR. JOLLEY:  We have him?
22              MS. MAEDER:  Yeah.
23              MR. JOLLEY:  All right.
24              A brief background of your
25       relationship with him.  I don't need a
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com |  866-4Team GE

SA-398

TRANSCRIPTION - February 23, 2022

Page 38

```
 1              -- a long explanation. I want to get to
 2              focusing on his time here at NYU.
 3                   MS. Roe      Yes.
 4                   So we became friends in the fall of
 5              2015, kind of started -- we were sort of
 6              in a relationship starting January 2016.
 7              After he asked me multiple times, I then
 8              -- I -- I felt he was, like, a bit
 9              coercive.  I also didn't really want to
10              continue being in the relationship, so
11              around April of that year I tried to end
12              things -- end the relationship with him.
13              And he didn't respond really well.  He
14              got quite angry and said -- I mean, he
15              said that there wouldn't be anyone else
16              except me who would understand him and
17              his problems.  And he was -- like, he --
18              he said things that sounded suicidal to
19              me, and things like that.  And then we
20              remained in a relationship until the
21              following year.
22                   So we met -- we met a couple of
23              times.  We met at Six Flags.  That
24              interaction made me really
25              uncomfortable. It was fine at first,
```

SA-399

TRANSCRIPTION – February 23, 2022

Page 39

```
 1            then he asked me to, like, lift my shirt
 2            up.  And he, like, forced me to lift my
 3            shirt up.  He, like -- and things like
 4            that happened at Six Flags.
 5                 I didn't tell him right after that
 6            episode that that made me uncomfortable.
 7            I didn't know what to say to him.
 8                 And after that we continued being
 9            in a relationship.  I tried ending it
10            several times, although, there were
11            times where it was a fine relationship,
12            like, I was -- it wasn't like I was
13            constantly trying to get out of it.  It
14            was like every few months I would kind
15            of try to get out of it.  And he wasn't
16            happy with the -- with that.
17                 So, yeah, that was basically before
18            NYU -- are you -- is this before I came
19            to NYU or --
20                 MR. JOLLEY:  So I want to get to
21            you coming --
22                 MS. Roe      -- yeah.
23                 MR. JOLLEY:  -- to NYU and him
24            being at UConn.
25                 MS. Roe      Yes.
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

TRANSCRIPTION — February 23, 2022

Page 40

```
 1              MR. JOLLEY:  Okay.  Just again --

 2              MS. ▮Roe▮   Yeah.

 3              MR. JOLLEY:  -- just -- and this

 4    really just helps me to have context.

 5              MS. ▮Roe▮   Right.

 6              MR. JOLLEY:  I'll start asking more

 7    detailed questions when --

 8              MS. ▮Roe▮   Sure.

 9              MR. JOLLEY:  -- he comes to NYU.

10    Okay?

11              MS. ▮Roe▮   Sure.

12              MR. JOLLEY:  But I know that you --

13    the two of you went to different schools

14    --

15              MS. ▮Roe▮   Yes.

16              MR. JOLLEY:  -- right, for your

17    first year?

18              MS. ▮Roe▮   Right.  Uh-huh.

19              MR. JOLLEY:  You were here and he

20    was at UConn?

21              MS. ▮Roe▮   Uh-huh.  Yeah.

22              MR. JOLLEY:  Did he come to visit

23    you?

24              MS. ▮Roe▮   Yes.

25              MR. JOLLEY:  How many times, if you
```

SA-401

TRANSCRIPTION – February 23, 2022

Page 41

```
 1            -- ballpark do you think that he came
 2       to visit you here at NYU?
 3            MS. Roe     I think it -- it was
 4       about 12 to 14 times --
 5            MR. JOLLEY:  Okay.
 6            MS. Roe     -- that he came to
 7       visit.  Yeah.
 8            Initially, I -- he had told me
 9       every time he was coming to visit.  I
10       agreed to him coming.  It was -- I
11       wanted him to come.  And I had also been
12       going through, like, some personal
13       issues at the time.  He helped me
14       through that.  But during those visits,
15       there were a few instances where he
16       sexually assaulted me, which made me
17       increasingly uncomfortable as the year
18       went on to him coming.
19            And I think there were a couple of
20       instances where he came without much
21       warning, and I -- yeah, it just became
22       increasingly uncomfortable with him
23       coming.
24            And then I ended up ending,
25       officially, the relationship in around
```

SA-402

TRANSCRIPTION — February 23, 2022

Page 42

1       March of 20 -- 20 -- I'm not sure.  I

2       think 2017, I believe.

3           MR. JOLLEY:  That would be right

4       according to the timeline that I have.

5           MS. Roe  Yes.

6           MR. JOLLEY:  Because he comes to

7       NYU --

8           MS. Roe  Yeah.

9           MR. JOLLEY:  -- in the fall of --

10          MS. Roe  Uh-huh.

11          MR. JOLLEY:  -- '17, right?

12          MS. Roe  Yes.

13          And he did come to visit me one

14      more time after that that year.

15          MR. JOLLEY:  Okay.  Between March

16      and when he arrived on campus --

17          MS. Roe  Yes.

18          MR. JOLLEY:  -- in August?

19          MS. Roe  M-hm.

20          MR. JOLLEY:  When did you find out

21      that he was going to be coming to NYU?

22          MS. Roe  He told me he was

23      thinking of applying.

24          I looked at -- I did look at his

25      essay, I think, when he was applying --

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-403

TRANSCRIPTION - February 23, 2022

Page 43

```
 1              MR. JOLLEY:  Okay.
 2              MS. Roe      -- to NYU.
 3          I told him I didn't want him to
 4      come because of the past instances of
 5      assault and just, like, being
 6      uncomfortable with him.  And I was
 7      uncomfortable with him coming, but he
 8      had told me he was just considering it,
 9      that kind of thing.
10          Then he ended up telling me he's
11      not coming anymore.  This was all over
12      the summer --
13              MR. JOLLEY:  Okay.
14              MS. Roe      -- of 2017.
15              MR. JOLLEY:  This was the summer of
16      '17?
17              MS. Roe      Yeah.
18              MR. JOLLEY:  Okay.
19              MS. Roe      He told me he wasn't
20      coming.  And then he -- he accidentally
21      called me one day, and I saw that he was
22      at Washington Square Park.  So I asked
23      him if he had transferred.  And he told
24      me he had.  And then I found out he had
25      also transferred into my major, which he
```

SA-404

TRANSCRIPTION — February 23, 2022

Page 44

```
 1              wasn't in at UConn, and also into my
 2              residence hall.
 3                   MR. JOLLEY:  Where did you live at
 4              the time?
 5                   MS. [Roe]  I lived in
 6              University Hall --
 7                   MR. JOLLEY:  Okay.
 8                   MS. [Roe]  -- at NYU.
 9                   MR. JOLLEY:  So he transferred into
10              the same school and he lived in U Hall?
11                   MS. [Roe]  Yeah.
12                   MR. JOLLEY:  You both lived in U
13              Hall?
14                   MS. [Roe]  Same major and
15              everything.
16                   MR. JOLLEY:  Okay.
17                   MS. [Roe]  Yeah.
18                   MR. JOLLEY:  In the report you said
19              that -- and there was quotations around
20              this, that you were shocked and angry
21              about that
22                   MS. [Roe]  Yes.
23                   MR. JOLLEY:  Do you want to tell me
24              about that? Why were you shocked and
25              angry when you learned that he had
```

SA-405

TRANSCRIPTION — February 23, 2022

Page 45

```
1         transferred to NYU?
2            MS. Roe       Well, firstly,
3         because a lot of the time while I was at
4         NYU he used to say that he would never
5         have been here -- like, he would be  --
6         he didn't like the school.  He didn't
7         even know of the school.  When he
8         visited it, he found it really ugly.  It
9         was so expensive.  All of these things.
10        He often said that my major just seemed
11        kind of ridiculous.  And so I was really
12        shocked when he was even thinking of
13        applying.  Also, he had, like, full
14        scholarship -- almost full scholarship
15        at UConn and, like, nothing here, so
16        he's, like -- I just thought it was
17        crazy to make that leap.  And also, I
18        didn't know -- and, like, it would have
19        been one thing to try to transfer to
20        NYU, but, like, also into my residence
21        hall and to my major, which he wasn't
22        studying at the time and he had talked
23        negatively of before.  So I -- that's
24        why I was shocked.  And also, what --
25        when I came to my room at U Hall for the
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-406

TRANSCRIPTION — February 23, 2022

Page 46

```
 1          first time, there was, like, a present
 2          he had left for me outside the door,
 3          which meant he had found my room in that
 4          whole building.  So that is why I was
 5          shocked and angry. Yeah.
 6              MR. JOLLEY:  Okay.  How often did
 7          you see each other through the fall of
 8          2000 -- that first --
 9              MS. Roe      Yeah.
10              MR. JOLLEY:  -- we'll take the
11          first -- because it sounds like there
12          was a little bit of fall semester and
13          the spring semester.
14              MS. Roe      Right.
15              MR. JOLLEY:  So I want to talk just
16          a little bit about the fall semester.
17              MS. Roe      Yes.
18              MR. JOLLEY:  How often did you see
19          each other during the fall semester?
20              MS. Roe      We saw each other
21          quite frequently.  I would say several
22          times a week.  I was really angry at him
23          at first when he came, and then he was
24          -- I don't know -- pretty coercive.
25          Plus I also kind of went with it.  Like
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-407

TRANSCRIPTION – February 23, 2022

Page 47

```
 1              I -- he apologized.  I sort of accepted
 2         it, and we resumed being friends.
 3              And then I went over to his room a
 4         lot.  I slept at his room several times
 5         over the semester.  I hung out with him
 6         a lot.  I -- yeah.  He -- yeah, that.
 7              MR. JOLLEY:  Okay.  Did -- you said
 8         you slept in his room fairly regularly.
 9              MS. ███████  Yeah.
10              MR. JOLLEY:  Did he ever sleep over
11         in your room?
12              MS. ███████  No.
13              MR. JOLLEY:  Okay.  So I'm going to
14         -- this is where I'm going to ask you
15         some personal questions --
16              MS. ███████  That's fine.
17              MR. JOLLEY:  -- and I fully -- I'm
18         sure Christine has talked to you about
19         this.
20              I recognize that these may be
21         uncomfortable, especially talking with a
22         guy that you don't know, right --
23              MS. ███████  Yeah.
24              MR. JOLLEY.  -- about maybe some
25         intimate sexual types of behavior.
```

SA-408

TRANSCRIPTION - February 23, 2022

Page 48

```
1          MS. [Roe]  Yeah.
2          MR. JOLLEY: But I just -- I -- I
3     need to really have an understanding of
4     what the extent of the --
5          MS. [Roe]  Sure.
6          MR. JOLLEY: -- relationship was.
7          MS. [Roe]  Yeah.
8          MR. JOLLEY: So can you talk to me
9     a little bit during the fall --
10         MS. [Roe]  M-hm.
11         MR. JOLLEY: -- when you did stay
12    over, when the two of you did spend time
13    together.  What was the extent of your
14    physical relationship?
15         MS. [Roe]  For the most part, I
16    literally just slept over. I didn't --
17    for the most part, there was not too
18    much intimacy.  I think we kissed a
19    couple of times, and also he -- yeah, I
20    think that was kind of it.
21         We discussed potentially having
22    sex, but I didn't want -- I felt too
23    uncomfortable.  We didn't actually go
24    through with it.  Yeah.  That was kind
25    of it.
```

SA-409

TRANSCRIPTION – February 23, 2022

Page 49

```
 1              MR. JOLLEY:  Okay.  So I heard you
 2        say kissing.  Was there ever -- was
 3        there touching between the two of you
 4        that happened on sexually intimate
 5        parts; your breasts, your buttocks,
 6        groin area, genitals?
 7              MS. Roe       No.  Not -- not --
 8        no.
 9              MR. JOLLEY:  All right.
10              MS. Roe       Not there.
11              MR. JOLLEY:  And did he ever touch
12        you in any of those areas?
13              MS. Roe       I think a couple of
14        times -- I don't know.  I was sort of in
15        the middle ground of being kind of
16        uncomfortable with it but, like, I
17        wasn't sure.  Like I -- it wasn't -- I
18        don't think that was on his -- his fault
19        if he did at the time.  Yeah.
20              MR. JOLLEY:  Well, tell me about
21        that.  What -- what -- what was the
22        activity that you felt uncomfortable
23        with?
24              MS. Roe       Well, even just,
25        like, the intimacy we had, it was -- it
```

SA-410

TRANSCRIPTION – February 23, 2022

Page 50

```
 1        was uncomfortable just because of the
 2        backdrop from the past.
 3              MR. JOLLEY:  I understand.
 4              MS. Roe       And, like, it was,
 5        like, I didn't quite -- I wasn't 100
 6        percent comfortable, but I didn't always
 7        verbalize this, just because I almost
 8        kind of wanted to take control of the
 9        situation --
10              MR. JOLLEY:  Sure.
11              MS. Roe         -- unlike what I had
12        before.  So yeah.  But there was, like,
13        a couple of instances -- there was, I
14        think, one time where he asked me to
15        perform oral sex.  And that made me,
16        like, gag because I was really uncomfort
17        -- like, I was just -- I didn't like the
18        idea of it because of the past
19        incidents.  And yeah, that made me
20        uncomfortable.
21              MR. JOLLEY:  So just so that I'm
22        clear on that, that was while he was
23        here at NYU --
24              MS. Roe       This was --
25              MR. JOLLEY:  -- he asked you to
```

TRANSCRIPTION - February 23, 2022

Page 51

```
 1          perform oral sex?
 2               MS. Roe      Yes.
 3               MR. JOLLEY:  And had the two of you
 4          engaged in type of sexual activity
 5          before? I don't need -- between the two
 6          of you.
 7               MS. Roe      No.
 8               MR. JOLLEY:  Okay.  So when he
 9          asked you to do that --
10               MS. Roe      M-hm.
11               MR. JOLLEY:  -- did you attempt to
12          do oral sex --
13               MS. Roe      I --
14               MR. JOLLEY:  -- or, like, what
15          happened?
16               MS. Roe      Yeah.  I almost did,
17          but right before I did it, I felt way
18          too uncomfortable, so I stopped.
19               MR. JOLLEY:  Okay.
20               MS. Roe      Yeah.
21               MR. JOLLEY:  All right.  As I asked
22          you, like, the detailed questions about
23          this, right --
24               MS. Roe      Yeah.
25               MR. JOLLEY:  -- I'm very -- I do
```

SA-412

TRANSCRIPTION — February 23, 2022

Page 52

```
 1          this for a living, so I'm very  clinical
 2          --
 3               MS. [Roe]   Right.
 4               MR. JOLLEY:  -- so nothing you say
 5          will embarrass me by -- in any way.
 6               MS. [Roe]   That's fine.
 7               MR. JOLLEY:  Did -- did you ever
 8          touch his penis when that happened?
 9               MS. [Roe]   Yes.
10               MR. JOLLEY:  Okay.
11               MS. [Roe]   Yeah.
12               MR. JOLLEY:  And did you ever have
13          it in your mouth or --
14               MS. [Roe]   I think yes --
15               MR. JOLLEY:  Okay.
16               MS. [Roe]   -- I -- yeah, I
17          think I did for a second, and then I
18          stopped after that.
19               MR. JOLLEY:  Okay.  And how -- what
20          did you communicate to him when that
21          happened?
22               MS. [Roe]   I said -- I mean,
23          yeah, I had -- like, I physically kind
24          of gagged to it because -- yeah, I just
25          had the physical reaction, plus I also
```

SA-413

TRANSCRIPTION - February 23, 2022

Page 53

```
 1              said I -- I was too uncomfortable.

 2                  And he said -- yeah, I said it was

 3              too comfortable --

 4                  MR. JOLLEY:  Okay.

 5                  MS. Roe      -- and I stopped.

 6                  MR. JOLLEY:  Okay.

 7                  MS. Roe      Yes.

 8                  MR. JOLLEY:  You mentioned in the

 9              report that there was -- I'm talking

10              about prior to him being at NYU, but

11              during this time also, that there were

12              times that you -- you believe that when

13              you were sleeping that he touched your

14              breasts?

15                  MS. Roe      Right.

16                  MR. JOLLEY:  Do you want to tell me

17              about that?

18                  MS. Roe      Yes.

19                  The -- there -- yeah, there were

20              times where I woke up to him touching my

21              breasts or I didn't know that he had

22              done -- done anything like that, and I

23              saw -- I found pictures on his devices

24              of me, like, not -- not him touching me,

25              but yeah, I found pictures of myself --
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-414

TRANSCRIPTION - February 23, 2022

Page 54

```
 1            MR. JOLLEY:  Okay.
 2            MS. [Roe]    -- from when I was
 3       asleep.
 4            MR. JOLLEY:  I'm going to ask you
 5       about the pictures here --
 6            MS. [Roe]    Yeah.
 7            MR. JOLLEY:  -- in a little bit.
 8            MS. [Roe]    Yes.
 9            MR. JOLLEY:  I've got that on the
10       list.  Okay.
11            MS. [Roe]    Okay.
12            MR. JOLLEY:  But as it relates to
13       him touching your breasts --
14            MS. [Roe]    M-hm.
15            MR. JOLLEY:  -- you -- did I hear
16       you right, did you said you woke up to
17       him touching your breasts?
18            MS. [Roe]    Yeah.  There was one
19       time where I woke up to him.  Yeah.
20            MR. JOLLEY:  And was that over
21       clothes or was that on your bare
22       breasts?
23            MS. [Roe]    That was bare
24       breasts.
25            MR. JOLLEY:  Okay.  In your
```

SA-415

TRANSCRIPTION - February 23, 2022

Page 55

```
 1          response to the draft report -- it's in
 2          -- it in attachment G --
 3               MS. Roe       Yeah.
 4               MR. JOLLEY:  -- you say "there were
 5          many incidents where I did not consent
 6          to our physically intimate actions" --
 7               MS. Roe       Uh-huh.
 8               MR. JOLLEY:  -- right?
 9               We've talked about a -- we've
10          talked about the touching of the
11          breasts.  Are there other instances --
12          I guess talking right now just in the
13          fall of 2017 --
14               MS. Roe       Right.
15               MR. JOLLEY:  -- that first
16          semester.  Were there other incidents
17          where you stayed over or were there -- I
18          guess I'm trying to get an understanding
19          --
20               MS. Roe       M-hm.
21               MR. JOLLEY:  -- of what were the
22          many incidents that you did not consent
23          to for the physically intimate actions?
24               MS. Roe       There were -- there
25          was one incident where he asked me to
```

SA-416

TRANSCRIPTION – February 23, 2022

Page 56

```
 1            come in the shower with him, and he
 2            repeatedly asked, so I went into the
 3            shower with him.
 4                 And he said, "You can keep your
 5            clothes on.  Just come into the shower."
 6            And I was super uncomfortable with
 7            taking my clothes off, but then when I
 8            was in the shower, he insisted that I
 9            take my shirt off.  And, yeah, I said no
10            at first but he, like, started to do it
11            himself.  And then I -- then I did it
12            myself.  I took off the shirt.  Yeah.
13                 MR. JOLLEY:  And then you assist --
14                 MS. Roe      Yeah --
15                 MR. JOLLEY:  -- took it off
16            yourself?
17                 MS. Roe       -- and then I took
18            the shirt off.
19                 MR. JOLLEY:  -- yourself?
20                 MS. Roe      Yeah.
21                 MR. JOLLEY:  When was that, if you
22            had to ballpark when that was?
23                 MS. Roe      I guess towards the
24            end of the fall semester, yeah.
25                 MR. JOLLEY:  Okay.  Did the two of
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-417

TRANSCRIPTION — February 23, 2022

Page 57

```
1              you ever have sexual intercourse?
2              MS. Roe        No.
3              MR. JOLLEY:  And I saw that in your
4         -- there was never a time that -- did he
5         penetrate your vagina, either with his
6         fingers or his penis?
7              MS. Roe        No.
8              MR. JOLLEY:  Okay. Did he ever
9         touch you on your vagina -- vagina or
10        genital area or groin areas?
11             MS. Roe        Yes.
12             MR. JOLLEY:  Tell me about that.
13             MS. Roe        That was -- yeah,
14        that was over my clothing.  He -- that
15        was consensual but then I asked to stop.
16             MR. JOLLEY:  And did he stop?
17             MS. Roe        And then he did.
18             MR. JOLLEY:  Okay.  Good.
19             MS. Roe        Yeah.  There was a
20        couple of times but this -- where it
21        was un consensual, but that was before
22        fall of 2017.
23             MR. JOLLEY:  I understand.
24             MS. Roe        So yeah.
25             MR. JOLLEY:  Okay.
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-418

TRANSCRIPTION - February 23, 2022

Page 58

```
 1              MS. Roe      Yeah.
 2              MR. JOLLEY:  Are there any other
 3         instances of sexual activity that
 4         occurred during that fall semester that,
 5         from your perspective, were not
 6         consensual, that I haven't asked you
 7         about already?
 8              MS. Roe      No, other than --
 9         I'm not sure -- yeah, no.
10              MR. JOLLEY:  Okay.
11              I read in the report that initially
12         what I thought was -- the word was you
13         called it off with him.
14              MS. Roe      M-hm.
15              MR. JOLLEY:  At first I thought it
16         was end of the fall, but I see that
17         later you clarified that that was in
18         February?  Or when did you  --
19              MS. Roe      Yeah.
20              MR. JOLLEY:  -- so I guess, when
21         did you call it -- I'm using the words
22         "call it off" because that's what you
23         said in there.
24              MS. Roe      Right.
25              MR. JOLLEY: So when did you call it
```

TRANSCRIPTION – February 23, 2022

Page 59

```
1        off with him and what does call it off
2        mean?
3              MS. Roe         Right.
4              MR. JOLLEY:  Help me understand
5        that.
6              MS. Roe         So I -- as in -- so
7        after the fall semester, I don't think I
8        went over to his room.  I think there
9        might have been, like, two times I went
10       over to his room, potentially.
11             MR. JOLLEY:  We both still in U
12       Hall?
13             MS. Roe         We were both still
14       in U Hall.
15             MR. JOLLEY:  Okay.
16             MS. Roe         But soon after the
17       spring semester started, I stopped going
18       over to his room.  And then in February
19       I officially said, I don't want to talk
20       to you.
21             And by call it off, I just meant
22       just, like, end relations, pretty much.
23       Just not even be friends.
24             MR. JOLLEY:  And how did you when
25       you say you told him?  Was it in person
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-420

TRANSCRIPTION - February 23, 2022

Page 60

```
 1              --
 2              MS. ████    Yes.
 3              MR. JOLLEY:  -- over the Internet?
 4              MS. ████    I told him in person
 5      and over text --
 6              MR. JOLLEY:  Okay.
 7              MS. ████    -- because -- I
 8      think I initially told him over text.
 9      And then I told him in person as well.
10              MR. JOLLEY:  Okay.  How did he
11      respond?
12              MS. ████    He didn't respond
13      well.  He was really angry that I would
14      do that to him.  And he also threatened
15      me -- or not threatened me.  He was --
16      sent me messages saying he was suicidal,
17      that -- yeah, that -- and he showed me
18      physical cuts on his arm that he had
19      made.  And he said that there wouldn't
20      be anyone else that could understand him
21      or his perspective.  And he said it was
22      really unfair that I was ending
23      everything with him after he had done so
24      much for me.  Yeah.
25              MR. JOLLEY:  Okay.  Once you called
```

SA-421

TRANSCRIPTION – February 23, 2022

Page 61

1           it off in February and he responded that

2           way -- I know we're going to get into

3           March.  I guess, between, like, that the

4           first month, February -- we're going to

5           get into March and April and May --

6                    MS. Roe          Yeah.

7                    MR. JOLLEY:  -- where --

8                    MS. Roe          Sure.

9                    MR. JOLLEY:  -- some of these more

10          serious allegations that you raised --

11                   MS. Roe          Yeah.

12                   MR. JOLLEY:  -- kind of come into

13          play.  But between February and March

14          after that, like, did you see him at

15          all? Was there a time where you didn't

16          see each other?

17                   MS. Roe          Yeah.

18                   MR. JOLLEY:  I also know you had

19          common friends at this point, then, too,

20          right?

21                   MS. Roe          Right.

22                   MR. JOLLEY:  Okay. So  --

23                   MS. Roe           Right.

24                   MR. JOLLEY.  -- tell me about that.

25                   MS. Roe          So I didn't -- I

SA-422

TRANSCRIPTION - February 23, 2022

Page 62

```
1              tried not to see him on -- like, alone
2              on my own.  If we ever saw each other,
3              it was in the presence of friends,
4              because we had mutual friends.  But I
5              tried not to talk to him.
6                  MR. JOLLEY:  Did you stay over at
7              all --
8                  MS. Roe      No.
9                  MR. JOLLEY:  -- during that time?
10                 MS. Roe      I did not.
11                 MR. JOLLEY:  Okay.
12                 MS. Roe      Yeah, so I didn't
13             see -- I tried to have no contact.  I --
14             we -- I'm not sure when spring break
15             exactly was, but I know we -- that might
16             be later.  I'm not sure.
17                 MR. JOLLEY:  It's a little bit
18             later.
19                 MS. Roe      Yeah.  So before
20             this --
21                 MR. JOLLEY:  Yeah.
22                 MS. Roe      -- that was -- yeah,
23             I didn't see him one on one.
24                 MR. JOLLEY:  Okay.  I want to talk
25             about the incident on March 10th.
```

SA-423

TRANSCRIPTION - February 23, 2022

Page 63

```
1              MS. [Roe]    Yeah.
2              MR. JOLLEY:  If -- if -- those of
3        you who are looking at the report --
4              MS. [Roe]    Yeah.
5              MR. JOLLEY:  -- I'm looking at page
6        six right now of the report.
7              MS. [Roe]    Right.
8              MR. JOLLEY:  There was this
9        incident where you talked about that he
10       -- you said -- your words were he became
11       really angry --
12             MS. [Roe]    Yeah.
13             MR. JOLLEY:  -- with you and the
14       group.  What dorm was that in?  It
15       doesn't say.  Was that at U Hall?
16             MS. [Roe]    That was at U Hall
17       in my room.
18             MR. JOLLEY:  Okay.  Tell me -- just
19       tell me about that.  What happened?
20             MS. [Roe]    So [John] and a few of
21       our other friends were in my room.  I
22       think -- we were just playing board
23       games, I think.  They were there 'til
24       late.  It was three, I think, in the
25       morning when everyone decided to leave.
```

SA-424

TRANSCRIPTION - February 23, 2022

Page 64

1          John had become increasingly

2          agitated as the night had gone on

3          because -- like, he didn't like my

4          comfort level with the friends we had.

5          I think because he had those friends

6          first.  And he just, in general, didn't

7          like me being close to other people,

8          especially those people that were guys,

9          because in the fall semester I didn't

10         -- I didn't talk to a lot of people,

11         practically.  Yeah, I didn't talk to a

12         lot of people.  So when I made friends

13         and they were almost all guys, I don't

14         think he liked that.  And also, he's --

15         like, they made jokes at him, as they

16         did with everyone else as well.  But

17         when I laughed along any time at those

18         jokes, he became really angry.  He would

19         text me.  Like, every time we hung out,

20         he would text me the whole time with

21         just a lot of aggressive messages,

22         saying that he needed to talk to me

23         alone, and that, like, what I was doing

24         wasn't right.  And just a lot of other

25         things.  So -- so yeah.

**SA-425**

TRANSCRIPTION – February 23, 2022

Page 65

```
 1              MR. JOLLEY:  During the March 10th
 2       incident, after that and had all the
 3       friends together, you talked about that
 4       he came to your room and was banging on
 5       your door.
 6              MS. Roe       Yes.
 7              MR. JOLLEY:  Tell me about that.
 8              MS. Roe       So once everyone
 9       left, John  I think, left with them
10       there.  But as soon as everyone actually
11       left U Hall, he came back to my room and
12       tried to -- so they were all heading to
13       a different residence hall to hang out
14       more, I think.  And so he stayed at my
15       door and said -- he was basically
16       banging on it saying, like, don't dare
17       to, like, go with them.  Like, you want
18       to hang out with them but not with me.
19       Like, just, I think, threats to come in
20       and --
21              MR. JOLLEY:  Did he come in?
22              MS. Roe       No, he didn't,
23       because I left the door locked.
24              And then a friend called me asking
25       if I wanted to come to Ruben Hall where
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

SA-426

TRANSCRIPTION — February 23, 2022

Page 66

```
 1        everyone else was.  And I said, I don't
 2        think I can come because he's outside my
 3        door.  And so one of them came to pick
 4        me up.
 5             MR. JOLLEY:  Okay.
 6             MS. Roe    And -- yeah.  And he
 7        came -- John came with us when we went
 8        to Ruben because he refused to leave
 9        when my friend --
10             MR. JOLLEY:  So he went with you
11        and your friend to -- back to Ruben?
12             MS. Roe    Yeah.
13             MR. JOLLEY:  Okay.  I understand
14        March is your birthday?
15             MS. Roe    Yes.
16             MR. JOLLEY:  Tell me about the Max
17        Brenner's dinner for your birthday.
18             MS. Roe    Yes.
19             MR. JOLLEY:  And how did that come
20        together?
21             MS. Roe    Right.  So it --  I
22        think this was actually a little bit
23        after my birthday -- or maybe it was the
24        day before.  I don't remember.
25             So --
```

SA-427

TRANSCRIPTION – February 23, 2022

Page 67

```
 1          MR. JOLLEY:  You said March --
 2     when's your birthday?
 3          MS. [Roe]  12th.
 4          MR. JOLLEY:  Okay.  You said March
 5     12th in the report, so it was --
 6          MS. [Roe]  Okay.  So it was my
 7     birthday.  Okay.
 8       So prior to this [John] had gotten me
 9     a lot of presents for my birthday
10     following -- this was, I think, the one
11     time we had actually met without other
12     people around.  He had given me
13     presents.
14          MR. JOLLEY:  Okay.  This was at the
15     restaurant?
16          MS. [Roe]  This was before.
17     This was at U Hall --
18          MR. JOLLEY:  Okay.
19          MS. [Roe]    -- that he gave me
20     a few presents.
21          MR. JOLLEY:  What did he give you?
22          MS. [Roe]  He gave me a book
23     and it was, like -- I don't know, I'm
24     really into environmentalism.  It was a
25     book about trees and a compost bin that
```

SA-428

TRANSCRIPTION - February 23, 2022

Page 68

```
1          I had needed.  He gave me presents --
2          those presents.  And yeah, so I thanked
3          him for those.  Like I -- I -- I think I
4          accepted them.  Like I didn't -- I
5          wasn't angry at him or anything at the
6          time.  But then, like, I -- between this
7          period when he gave me the present --
8          this wasn't on the day.  This was, I
9          think, a while before.  There was just
10         more interactions between us that
11         weren't good.  Like I -- like he was
12         angry at me while we were hanging out
13         with friends.  I didn't continue to talk
14         to him in this time period, so -- then
15         at Max Brenner, I thought we were just
16         going -- I didn't know this was like a
17         birthday thing.  And so I was with one
18         of my friends.  We had both gone to
19         Carlisle hall and had met a bunch of our
20         other friends.  And we had decided that
21         we'll go to Max Brenner's after. Because
22         I think the friend I was with wanted to
23         spend some time with me on her own, so
24         we left.  And then they all wanted to
25         hang out more and go to this different
```

SA-429

TRANSCRIPTION – February 23, 2022

Page 69

```
 1          place.  So we met up later.  And then a
 2          bunch of people backed out, and it ended
 3          up just being [John] who I didn't know --
 4          I don't think I knew who was going to be
 5          there for sure, and [____], who was
 6          another friend of ours.  And --
 7               MR. JOLLEY:  So it was the three of
 8          you that dinner?
 9               MS. [Roe]    And my friend --
10               MR. JOLLEY:  Okay.
11               MS. [Roe]    -- [____].
12               MR. JOLLEY:  So the four of you --
13               MS. [Roe]    The four of us,
14          yeah.
15               MR. JOLLEY:  -- had dinner at Max
16          Brenner's?
17               MS. [Roe]    Max Brenner's.
18          Yeah.
19               MR. JOLLEY:  Okay.
20               MS. [Roe]    I didn't know it was
21          a birthday dinner, and then he insisted
22          on me making it -- [John] insisted on
23          making it a birthday celebration.  He
24          brought out, like, some dessert with
25          like -- I don't know -- they sane happy
```

SA-430

TRANSCRIPTION — February 23, 2022

Page 70

```
 1          birthday. And, like, they paid for my
 2          meal, and that made me kind of angry,
 3          because he was expecting me to be
 4          thankful for that.
 5              MR. JOLLEY: Did he pay for
 6          everyone's meal, or did the three of
 7          them cover your meal? Do you remember?
 8              MS. Roe      I'm not sure.
 9              MR. JOLLEY: Okay.
10              MS. Roe      Yeah.
11              MR. JOLLEY: And why were you
12          angry? Tell me about that.
13              MS. Roe      It was just --
14          like, there had been so much tension
15          between us in the past while, and he
16          knew I didn't want to talk to him. But
17          despite that, he kind of like forced
18          this on me. And in front of everyone, I
19          had to be, like, thankful and -- because
20          he -- it was an expensive place, and he
21          paid all this money. And, like, I
22          didn't feel like that made up for
23          everything that had happened.
24              And in the past, often when he did
25          all these, like, nice things, got me
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-431

TRANSCRIPTION – February 23, 2022

Page 71

```
1              food and things like that, he either,
2              like, asked me pay it back to him later
3              and, like, forced me, saying that I owed
4              him money for those things or just,
5              like, used those as an upper hand
6              against me.  Like, I did all this for
7              you.  How can you stop talking to me --
8                   MR. JOLLEY:  Okay.
9                   MS. Roe        -- or leave me or
10             things like that.  Yeah.
11                  MR. JOLLEY:  Okay.  Thank you.
12                  Are you all right?
13                  MS. Roe        Yeah.
14                  MR. JOLLEY:  I'll give you a breath
15             because there's something that I want to
16             look at.  Okay?  Just give me a second.
17                  MS. Roe        Sure.
18                  MR. JOLLEY:  Shortly after the
19             birthday celebration you had -- I think
20             it's a text exchange with him.
21                  MS. Roe        M-hm.
22                  MR. JOLLEY:  It's on April 2nd.
23                  MS. Roe        Yeah.
24                  MR. JOLLEY:  It's -- it's in your
25             large attachment B.
```

GregoryEdwards, LLC │ Worldwide Court Reporting
GregoryEdwards.com │ 866-4Team GE

SA-432

TRANSCRIPTION – February 23, 2022

Page 72

```
1              MS. [Roe]   Yes.
2              MR. JOLLEY:  Did you put the page
3         numbers on here?  Or is this actually --
4              MS. [Roe]   I'm not sure.   I
5         think the
6              MR. JOLLEY:  Yours has page numbers
7         on it, though, right?
8              MS. [Roe]   Yeah, yeah, I do.
9              MR. JOLLEY:  On 132, tell me what
10        sparked -- everything that I see there
11        on the left, those -- I'm looking at
12        those four columns.
13             MS. [Roe]   Yeah.
14             MR. JOLLEY:  And were -- I believe
15        that that's him writing in caps; is that
16        correct?
17             MS. [Roe]   Yes.  M-hm.
18             MR. JOLLEY:  Tell me what sparked
19        this chain -- this correspondence from
20        him.   Do you remember the context of
21        that?
22             MS. [Roe]   Yes.   So I think
23        this follows up from the previous
24        conversation -- like, the past few
25        pages.   And it's -- it was basically him
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

TRANSCRIPTION - February 23, 2022

1          telling me that -- that he was really

2          sad that I stopped talking to him, like

3          people -- other people were stopping --

4          like they weren't -- he was losing

5          friends and that he was feeling suicidal

6          and all of that.  And I was really

7          afraid because he was angry and also --

8          like, he just seemed really volatile.

9          And so I was at Ruben with friends, and

10         I was afraid that if he saw me with

11         those people, he would get more

12         aggravated.  So I said okay, you can

13         talk to me.  I'll be at Ruben.

14             And then as he was coming there, I

15         just got -- I got really freaked out,

16         and I left because I was like, I don't

17         know what he's going to do.  I'm alone

18         here.  And then I left. I think I

19         left -- like, I was sleeping all over

20         -- I was sleeping at friends' places at

21         this time because I was afraid of

22         sleeping at U Hall.  So I think I went

23         to Lipton to my friend's place that

24         night.

25             And he got really angry when he

SA-434

TRANSCRIPTION - February 23, 2022

Page 74

```
 1          arrived at Ruben and I wasn't there.
 2              Yeah.  I think what it --
 3              MR. JOLLEY:  Okay.
 4              MS. Roe       Oh, and then he
 5      threatened    I think he was threatening
 6      to tell my parents and my roommate
 7      everything that was going on.  Yeah.
 8              MR. JOLLEY:  Okay.  And then
 9      there's another message from him in that
10      same attachment.  It goes back on 128.
11              MS. Roe       Yeah.
12              MR. JOLLEY:  This is messages that
13      he sent to your mom?
14              MS. Roe       Let me open 128.
15              MR. JOLLEY:  I'm looking at 129.
16              MS. Roe       Yeah.
17              MR. JOLLEY:  Tell me about that.
18              MS. Roe       Yes.  So he sent
19      these messages to my mom.  This was on
20      April 2nd.
21              Yeah, he basically --
22              MS. MAEDER:  The page number is
23      128.
24              MS. Roe       Right.
25              Yeah, he basically -- I wasn't
```

SA-435

TRANSCRIPTION – February 23, 2022

Page 75

```
 1          responding to him, and when he got --
 2          when he gets -- when he gets really
 3          angry, he would either send my parents a
 4          missed call or, like, he sent these
 5          messages to my mom.  And, like, he
 6          didn't want to get on their bad side, so
 7          he would pretend like he was concerned
 8          about me.  But this, like, always got me
 9          in so much trouble.  And I told him this
10          several times, that you texting my
11          parents -- like, he knew, like, it
12          severely damaged my relationship with my
13          parents.  And yeah, he sent these to my
14          mom, saying that -- that he was super
15          concerned.
16              I wasn't sure who we all was.
17          Like, he said, "we're all really
18          concerned." I'm not sure what the reason
19          for concern was, other than the fact
20          that I wasn't responding to him.
21              MR. JOLLEY:  Okay.
22              MS. Roe    So yeah.
23              MR. JOLLEY:  We're moving into
24          April.
25              MS. Roe    Yeah.
```

SA-436

TRANSCRIPTION - February 23, 2022

Page 76

```
 1            MR. JOLLEY:  There were a couple of
 2    incidents that you shared with the OEO
 3    investigators on April 6th and April
 4    7th.
 5            MS. Roe       Yeah.
 6            MR. JOLLEY:  I'm looking at page
 7    seven of the report.  Tell me what --
 8    tell me about those.  And you said that
 9    he sent you threatening emails and
10    messages.  Are those in -- are those
11    what's part of included in --
12            MS. Roe       Yeah.
13            MR. JOLLEY:  -- B, also?
14            MS. Roe       M-hm.
15            MR. JOLLEY:  I saw those.
16            MS. Roe       Yeah.
17            MR. JOLLEY:  Okay.  I just wanted
18    to make sure that that's what we're
19    talking about.
20            MS. Roe       Right.
21            MR. JOLLEY:  And then you said that
22    he threatened -- threatened you and told
23    you that he was going to contact you
24    every day and make your life a living
25    hell --
```

SA-437

TRANSCRIPTION – February 23, 2022

Page 77

```
 1          MS. Roe      Yeah.

 2          MR. JOLLEY: -- if you didn't talk

 3     to him.

 4          MS. Roe      Yeah.

 5          MR. JOLLEY: Is that in the -- is

 6     that in the text, or is that something

 7     he said to you?

 8          MS. Roe      I think that was a

 9     text message.  I think in his statement,

10     he had also said, like, he did say those

11     things.  He did -- they showed him those

12     text messages, and he had attested that

13     he did say that --

14          MR. JOLLEY: All right.

15          MS. Roe      -- about making my

16     life a living hell.

17          MR. JOLLEY: I -- I know that some

18     other statements will come later.

19          MS. Roe      Right.  Sorry.

20          MR. JOLLEY: I just didn't -- and

21     I'll go back and look again.

22          MS. Roe      Yeah.

23          MR. JOLLEY: But I didn't see where

24     -- on that time frame, April 6th or

25     April 7th, where he had made a text
```

SA-438

TRANSCRIPTION — February 23, 2022

Page 78

```
 1        statement.
 2            And it's okay if you can't find it
 3        right now.  I'll go back and look.  But
 4        I just -- I was wondering if there was a
 5        specific -- a specific text that you
 6        were referring to where he said back in
 7        April -- early April that he was going
 8        to make your life a living hell if you
 9        didn't talk to him.
10            MS. Roe     I mean, he did say
11        that if I didn't -- I mean, what I see
12        right now is that --
13            MS. MAEDER:  What page number?
14            MS. Roe     Page 136 or 137.
15            MR. JOLLEY:  Okay.
16            MS. MAEDER:  Page 136 and 137.
17            MS. Roe     -- that -- like, if
18        I didn't confirm cutting things -- like,
19        cutting off from -- he wanted me to stop
20        talking to our friends.
21            MR. JOLLEY:  Right.
22            MS. Roe     And if I didn't do
23        that, that things would implode, I think
24        he says.  I think I -- there was some
25        more explicit text message, but I'm not
```

TRANSCRIPTION – February 23, 2022

Page 79

```
1          sure where it is right now.
2               MR. JOLLEY:  I'm looking at 136.
3               MS. ▮Roe▮  Uh-huh.
4               MR. JOLLEY:  I want to ask you
5          about a couple things here.
6               MS. ▮Roe▮  Yeah.
7               MR. JOLLEY:  Wherein, on 136, that
8          first box
9               MS. ▮Roe▮  Yeah.
10              MR. JOLLEY:  -- there's a statement
11         of, "so I'm asking you not to hang out
12         with anyone, period."
13              MS. ▮Roe▮  Yeah.
14              MR. JOLLEY:  Is that referencing
15         the group of friends?
16              MS. ▮Roe▮  Yeah.
17              MR. JOLLEY:  Okay.
18              And then the 4th box, which is on
19         the far right where he says, "I would
20         like your confirmation or" -- or --
21         think it's supposed to be of -- "things
22         are just going to implode among friends
23         and with you.  If you don't want my
24         contact, then you need to comply with
25         this, because that is the only way
```

TRANSCRIPTION - February 23, 2022

```
 1        things will work."
 2             Is -- can you -- do you see that
 3        part?
 4             MS. Roe       Yeah, I do.
 5             MR. JOLLEY:  What was your -- I
 6        mean, I'll ask him, too.  But what was
 7        your understanding what he was saying
 8        there?
 9             MS. Roe       It was just that he
10        wants my confirmation that I'll stop
11        talking to all of our friends.  Otherwise
12        things would implode, which I think
13        would refer to him telling my parents
14        everything, or just -- I don't know --
15        whatever.  I'm not sure exactly what
16        that threat is.  And if that -- if he --
17        and he said, if you don't want to my
18        contact, like, if you need me to stop
19        talking to you --
20             MR. JOLLEY:  Okay.
21             MS. Roe       -- then you need to
22        comply with this, basically.
23             MR. JOLLEY:  And the comply was to
24        stop hanging out --
25             MS. Roe       Stop hanging out.
```

SA-441

TRANSCRIPTION – February 23, 2022

Page 81

```
 1            MR. JOLLEY:  -- with the friends?
 2            MS. [Roe]     And yeah, stop
 3       talking to them.  Yeah.
 4            MR. JOLLEY:  So if I've got this
 5       right, from -- I just want to make sure
 6       that I got it right on what your
 7       perspective was.  It was stop talking to
 8       the friends --
 9            MS. [Roe]     Yeah.
10            MR. JOLLEY:  -- and then I will
11       stop talking to you.  Is that --
12            MS. [Roe]     Yes.
13            MR. JOLLEY:  Is that what your
14       understanding of it is?
15            MS. [Roe]     Yeah.  Stop talking
16       to friends and I'll stop talking to you,
17       otherwise --
18            MR. JOLLEY:  If you --
19            MS. [Roe]     -- things will
20       implode.
21            MR. JOLLEY:  Okay.
22            MS. [Roe]     Yeah.
23            MR. JOLLEY:  And what is implode?
24       How did you interpret that?
25            MS. [Roe]     I think it's telling
```

TRANSCRIPTION – February 23, 2022

Page 82

```
 1            my parents everything, and also just --
 2            like, he was calling me every day and
 3            sending voicemails and, like -- yeah,
 4            basically harassing me.  I think
 5            continuing that.
 6                 MR. JOLLEY:  All right.  And I did
 7            listen to some of those voicemails that
 8            were sent on April 8th --
 9                 MS. Roe         Yes.
10                 MR. JOLLEY:  -- and 9th and 11th.
11                 MS. Roe         Yeah.
12                 MR. JOLLEY:  And there were two
13            voicemails, also, that he left for your
14            mom on April 8th?
15                 MS. Roe         Yeah. M-hm.
16                 MR. JOLLEY:  Okay. And I listened
17            to both of those.
18                 MS. Roe         Let me find those.
19            Yeah.
20                 MR. JOLLEY:  Okay.
21                 MS. Roe         This was the April
22            8th one.  And yeah, this was the second
23            one.
24                 MS. MAEDER:   John has requested a
25            break, Craig.
```

SA-443

TRANSCRIPTION - February 23, 2022

Page 83

```
 1            MR. JOLLEY:  Okay.
 2         John  I'm just going to -- I need
 3      to get through one more part, and then
 4      I'm going to -- just a couple more
 5      questions, and then we can take a break.
 6      Okay?
 7            MR.  Doe     Okay.
 8            MS. MAEDER:   John  did you hear
 9      that?
10            MR.  Doe     Yes.
11            MS. MAEDER:  Okay.
12            MR. JOLLEY:  Okay.  So that
13      correspondence from the 8th happened
14      because of April 6th and April 7th, and
15      then -- just give me one second -- I
16      listened to 13 different voicemails that
17      he left for you --
18            MS.  Roe     Yeah.
19            MR. JOLLEY:  -- or your mom.
20      Between that time and then what's going
21      to happen on April 20th, 21st, this is
22      the encounter in U Hall where --
23            MS.  Roe     Yeah.
24            MR. JOLLEY.  -- I've looked at the
25      two videos, right?
```

SA-444

TRANSCRIPTION – February 23, 2022

Page 84

```
 1              MS. [Roe]   Right.
 2              MR. JOLLEY:  There was also a
 3       couple of videos from April 8th.  I'm
 4       sorry, two of those were videos, so it
 5       wasn't -- it was one, two, three --
 6              MS. [Roe]   Oh.  Yeah.
 7              MR. JOLLEY:  -- four, five, six,
 8       seven, eight, nine, ten -- I've lis -- I
 9       listened to 11 voicemails and watched
10       those two videos.
11              MS. [Roe]   M-hm.
12              MR. JOLLEY:  All this was in the
13       context of what was going on April -- in
14       early April, right?
15              MS. [Roe]   M-hm, yeah.
16              MR. JOLLEY:  Okay.  All right.  All
17       right.
18              [John] has asked for a break.  I want
19       to keep going.  You could probably use a
20       break, too --
21              MS. [Roe]   M-hm.
22              MR. JOLLEY:  -- so why don't we do
23       this, let's give both of you a chance to
24       take a breath.  But let's try to take a
25       short break so that we can keep going.
```

SA-445

TRANSCRIPTION - February 23, 2022

Page 85

```
 1              So let's take a -- let's try to say a
 2         five-minute break.  If it needs to be a
 3         little bit longer, then we can --
 4              MS. Roe  That's fine.
 5              MR. JOLLEY:  -- but let's take a
 6         five-minute break.
 7              Jane  when we come back, I want
 8         to pick up around April 20th --
 9              MS. Roe  Sure.
10              MR. JOLLEY:  -- during the --
11         whatever happened on that day and what
12         happened between the two of you at U
13         Hall.  Okay?
14              MS. Roe  Right.  Okay.
15              MR. JOLLEY:  So for the record,
16         it's 5:39 right now.  We're going to try
17         to take a five-minute break -- five- to
18         ten-minute break.
19              MS. MAEDER:  Hi, John  So I will
20         connect.  I'm going to disconnect so
21         that way I'm not privileged to the
22         conversation or whatever you need to do.
23         And I'll reconnect in about five minutes
24         or so -- or I'll give you an update in
25         about five minutes or so.
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-446

TRANSCRIPTION - February 23, 2022

Page 86

```
1              MR. Doe        Sure.  Take care.
2              MS. MAEDER: All right.  Okay.  I'm
3         going to end call right now.
4              Do you guys want to go back to my
5         office?  You can do that.
6              MS. Roe        Sure.
7                  -  -  -  -  -
8         (End of Part 1 recording.)
9                  -  -  -  -  -
10       (Thereupon, a brief recess was taken.)
11                 -  -  -  -  -
12                (VOLUME II)
13                 -  -  -  -  -
14             MS. MAEDER: And we are back.
15             MR. JOLLEY: Okay.  Everyone, we're
16        back and it's 5:55 p.m. New York time.
17             Jane    there's just a few more
18        things that I want to walk through with
19        you.
20             And then John  if you want to start
21        preparing your questions and having them
22        ready to go, when Jane   and I get
23        through this, we'll be able to have you
24        send your questions to Colleen.  And
25        I'll be able to go through those.  Okay?
```

SA-447

TRANSCRIPTION - February 23, 2022

Page 87

```
 1          MR. ▮▮Doe▮▮   (Inaudible.)
 2          MR. JOLLEY:  I want to talk -- talk
 3     to you -- there was one question -- I
 4     want to just back up a little bit
 5     because in my questions, there was one
 6     that I missed that I wanted to ask you
 7     about.
 8          MS. ▮▮Roe▮▮   Sure.
 9          MR. JOLLEY:  And then I want to
10     talk about April 20th.  So --
11          MS. ▮▮Roe▮▮   Of course.
12          MR. JOLLEY:  I know that you said
13     that there were times when you woke up
14     and that he was touching your breasts --
15          MS. ▮▮Roe▮▮   Yeah.
16          MR. JOLLEY:  -- correct?
17          MS. ▮▮Roe▮▮   M-hm.
18          MR. JOLLEY:  Okay.  Did you say
19     anything to him or did you respond to
20     that?  Did he say anything about that?
21     Did you ever confront him with that?
22          I know that you -- I want to --
23     I'll get to the pictures in a bit, but I
24     just -- when that happened, did you
25     confront him or say anything?
```

SA-448

TRANSCRIPTION — February 23, 2022

Page 88

```
 1          MS. ████████  Right when that
 2     happened I didn't, because he would stop
 3     as soon as I woke up.
 4          MR. JOLLEY:  Okay.
 5          MS. ████████  But --
 6          MR. JOLLEY:  Was that one occasion?
 7     Or did that happen more than once?
 8          MS. ████████  I can think of about
 9     two occasions of that.
10          MR. JOLLEY:  Okay.  And then you
11     said that with the photos, that -- how
12     did you come -- you said in the report
13     that he took photos of you while you
14     were sleeping.
15          MS. ████████  Yeah.
16          MR. JOLLEY:  How did you come to
17     know that?
18          MS. ████████  So I was at his
19     place, and he was, like, in the closet.
20     I think changing -- or I don't know --
21     getting something.  I don't know.  And I
22     was taking -- I took a picture from his
23     phone, like, out of his window.
24          MR. JOLLEY:  M-hm.
25          MS. ████████  Like, he had a view
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-449

TRANSCRIPTION – February 23, 2022

Page 89

```
 1          of the Chrysler building, or whatever.
 2          And I took a picture.  And then I went
 3          back to look at it, and, like, I swiped
 4          because I had taken a few.  And then I
 5          saw a picture of me while I was asleep.
 6          And then I confronted him about it.  I
 7          --
 8              MR. JOLLEY:  What -- in what state
 9          of dress were you?
10              MS. MAEDER:  Can you just speak up
11          a little bit, as well?
12              MS. ▓Roe▓:  Yes.
13              MS. MAEDER:  Thank you.
14              MS. ▓Roe▓:  I --
15              MR. JOLLEY:  What state of dress
16          were you in in that picture was the
17          question.
18              MS. ▓Roe▓:  I didn't have
19          anything -- or, like, he had moved my
20          clothes up so you could, like, see --
21          yeah, you could see the upper half of my
22          body.  And he --
23              MR. JOLLEY:  Were your breasts
24          exposed in that picture?
25              MS. ▓Roe▓:  Partially, yeah.
```

SA-450

TRANSCRIPTION – February 23, 2022

Page 90

```
 1          MR. JOLLEY:  Okay.
 2          MS. [Roe]    And then he –– then
 3     I asked him to show me the rest of the
 4     photos on his phone and on his laptop.
 5     And he really didn't want to, but I made
 6     him show them to me himself.  And he
 7     opened up his laptop and he –– we
 8     scrolled back –– like, way back.  And he
 9     had just so many, like, scattered
10     through all of his pictures.  He had a
11     lot of them.
12          MR. JOLLEY:  A lot of what?
13          MS. [Roe]    A lot of pictures of
14     me that he had taken that I was unaware
15     of.
16          MR. JOLLEY:  While you were
17     sleeping?
18          MS. [Roe]    While I was
19     sleeping.
20          MR. JOLLEY:  Okay.  Can you give me
21     an estimate of about how many pictures
22     he had of you taken while you were
23     sleeping?
24          MS. [Roe]    I'd guess, like,
25     around 20.
```

SA-451

TRANSCRIPTION – February 23, 2022

Page 91

```
 1              MR. JOLLEY:  About 20?

 2         MS. Roe        Yeah.

 3              MR. JOLLEY:  Okay.  And were you in

 4    nude or were you in any states of

 5    undress in any of these pictures?

 6         MS. Roe        It was mostly, like,

 7    my -- either -- yeah, either you could

 8    see my breasts or you could see my

 9    stomach, or -- like, most of them he

10    had, like, moved up my shirt.  Yeah.

11              MR. JOLLEY:  Okay. And your breasts

12    were exposed in these pictures?

13         MS. Roe        Not all of them, but

14    --

15              MR. JOLLEY:  Okay.

16         MS. Roe        -- some of them were

17    showing.

18              MR. JOLLEY:  Okay.

19         MS. Roe        Yeah.

20              MR. JOLLEY:  Okay. You referenced

21    -- before we get to April 20, you've

22    referenced a couple of times that he has

23    threatened to contact your parents --

24         MS. Roe        M-hm.

25              MR. JOLLEY:  -- and has contacted
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

SA-452

TRANSCRIPTION - February 23, 2022

```
 1        your parents.
 2              MS. Roe     M-hm.
 3              MR. JOLLEY: -- but in relation to
 4        telling them about your relationship or
 5        --
 6              MS. Roe     Yeah.
 7              MR. JOLLEY: -- did he ever make
 8        any express threats that he was going to
 9        send the pictures -- those pictures to
10        your parents?
11              MS. Roe     Yes.
12              MR. JOLLEY: Tell me about that.
13              MS. Roe     He told me several
14        times, I think in person and -- I'm not
15        sure if it was over text or not.  I
16        think -- I'm not sure if he mentioned
17        the pictures of me while I was sleeping,
18        but I think he mentioned the pictures of
19        just like us together, just like hanging
20        out or doing whatever.  He mentioned
21        that for sure over text, but I'm not
22        sure about the explicit pictures.  But
23        he said to me several times in person
24        that he would send those to my parents
25        if I didn't talk to him or didn't cut
```

SA-453

TRANSCRIPTION – February 23, 2022

Page 93

```
 1         off from my friends or -- yeah, if I
 2         didn't have -- like, if I didn't
 3         maintain relations with him, basically.
 4                MR. JOLLEY: I understand.  Thank
 5         you.
 6                MS. Roe      Yeah.
 7                MR. JOLLEY: All right.  Let's talk
 8         about -- and I'm not sure that I have
 9         exact clarity on which day this was, if
10         it was April 20th or 21st or --
11                MS. Roe      Yeah.
12                MR. JOLLEY: -- 22nd, because I see
13         the videos are -- have a different date
14         on them and --
15                MS. Roe      Okay.
16                MR. JOLLEY: So maybe you can help
17         me out.  And I understand -- I
18         understand that it's one of -- one of
19         those days --
20                MS. Roe      Yeah.
21                MR. JOLLEY: -- 20th, 21st, 22nd.
22                MS. Roe      For sure.
23                MR. JOLLEY: Can you tell me --
24                MS. Roe      Yeah.
25                MR. JOLLEY: This is around his
```

SA-454

TRANSCRIPTION - February 23, 2022

Page 94

```
1          birthday, correct?
2              MS. [Roe]    Yes.
3              MR. JOLLEY:  Okay.  I'm looking at
4          page 7, I guess, is where I'm starting.
5          And then we can talk about the videos
6          and --
7              MS. [Roe]    Oh, sure.
8              MR. JOLLEY:  -- the texts that --
9          what happened on this day?
10             MS. [Roe]    So page 7, April
11         20th -- so April 20th was actually not
12         his birthday.  It was the day before his
13         birthday.  This was -- this was open mic
14         night with, like, South Asia Society.  I
15         was organizing the event.  And he didn't
16         come -- I think -- yeah, he didn't -- I
17         mean, he definitely didn't come to the
18         event.  And a lot of our mutual friends
19         were there.  And after the event, my --
20         like, our friends and I were hanging out
21         at the event.  And yeah, so he got
22         really angry through the event.  And,
23         like, I was MC-ing, so every time I
24         would, like, check my phone between, I
25         would see, like, he had sent multiple
```

**SA-455**

TRANSCRIPTION − February 23, 2022

Page 95

```
 1          messages to me saying −− like, he was
 2          just really angry I was hanging out with
 3          people on the night before his birthday.
 4          And he was, like, threatening to contact
 5          my parents.  He was like, if you don't
 6          talk to me in 10 minutes, like, you have
 7          10 minutes or −− and even after the
 8          event ended, and, like, I was with my
 9          friends, he kept sending me a lot of
10          messages.  I would block the number, and
11          he would create new numbers and send new
12          messages.
13               And so that night −− and then he
14          started threatening me to the point,
15          like, where I was really afraid that he
16          was either going to hurt himself or send
17          something to my parents.  So then I told
18          him that I would meet him at U Hall,
19          like, I didn't want to create a scene at
20          the actual place I was.  So I went to
21          U−Hall and I met with him, and he was
22          just extremely angry.  Like, I −− I
23          don't think I've ever seen him that
24          angry before.  And −−
25               MR. JOLLEY:  And where did you meet
```

**SA-456**

TRANSCRIPTION – February 23, 2022

Page 96

```
 1          -- where at U-Hall did you meet?  Was
 2     this in your room or his room or the
 3     hallway?
 4          MS. Roe    It was the
 5     hallway -
 6          MR. JOLLEY:  Okay.
 7          MS. Roe    -- of some floor
 8     because I --
 9          MR. JOLLEY:  Okay.  Is it where  --
10     is this where the video was taken?
11          MS. Roe    This is where the
12     video was taken.
13          MR. JOLLEY:  And where the walls --
14     where you have a glass --
15          MS. Roe    Yes.  This is a
16     window.
17          MR. JOLLEY:  -- so it's one of the
18     upper floors?
19          MS. Roe    It's one of the
20     upper floors.
21          MR. JOLLEY:  Right.
22          MS. Roe    Yes.
23          MR. JOLLEY:  It's got to be at
24     least -- I used to live in that building
25          --
```

SA-457

TRANSCRIPTION — February 23, 2022

Page 97

```
 1              MS. ███Roe███    Right.
 2              MR. JOLLEY:  -- so I don't remember
 3         what floors they start glass, but --
 4              MS. ███Roe███    It's probably like
 5         12 or something like that.
 6              MR. JOLLEY:  Yeah.  Okay.
 7              MS. ███Roe███    So it was one of the
 8         upper floors.  I didn't want to go to
 9         his room.
10              MR. JOLLEY:  What time was this at,
11         this encounter in the hallway happened?
12              MS. ███Roe███    So this was post
13         midnight.  I'm guessing around 1:00.  I
14         was really afraid because he said, if
15         you don't show up here in 10 minutes or
16         something --
17              MR. JOLLEY:  M-hm.
18              MS. ███Roe███    -- that he wasn't --
19         or that he was going to create -- I
20         don't know if he -- he was going to send
21         things to my parents or something.
22              MR. JOLLEY:  Did he tell you that,
23         or was that written somewhere?
24              MS. ███Roe███    It was over text.
25         Yeah, I think there in the -- when you
```

SA-458

TRANSCRIPTION – February 23, 2022

Page 98

```
 1          go to the --
 2              MR. JOLLEY:  I don't -- you --
 3              MS. Roe  Also, there were
 4          some messages that I don't have in here
 5          because I couldn't -- like, my WhatsApp
 6          got deleted, but -- but he was -- some
 7          of these where he says, well, if --
 8              MS. MAEDER:  What page is that,
 9          just so Craig has it, too?
10              MS. Roe  189.
11              MS. MAEDER:  So it's page 189 --
12              MR. JOLLEY:  Okay.
13              MS. MAEDER:  -- we're looking at.
14              MR. JOLLEY:  Let's take a look at
15          that together.  Okay?
16              MS. Roe  So -- yeah, he says,
17          well, if you think what -- I think if
18          you thought what I did earlier would
19          cause problems, you're in for a hell of
20          a ride.  I'll give you until one.  After
21          that, it will go bad.  I want a response
22          in WhatsApp in nine minutes --
23              MR. JOLLEY:  Nine minutes.
24              MS. Roe  -- which I did
25          respond, too.  But I don't have those in
```

SA-459

TRANSCRIPTION — February 23, 2022

Page 99

```
 1        here.
 2            And there -- there were just a lot
 3        more messages.  And all these pictures,
 4        he was basically threatening to send to
 5        my parents.  So, like, this is -- the
 6        picture received, this is the real one.
 7        Like, the second picture you see on the
 8        second panel --
 9            MR. JOLLEY:  M-hm.
10            MS. Roe     -- that was a
11        picture, like, I had sent my parents.
12        Like, I was out on my birthday.  And,
13        but, he is like, the real one is the one
14        where he's also in it.
15            MR. JOLLEY:  M-hm.
16            MS. Roe     Like, he's
17        threatening with that.  Who took the
18        picture with, like, the one that's at
19        Max Brenner of just me.  Like, who else
20        was there?
21            He's just basically saying, like,
22        that he's going to --
23            MR. JOLLEY:  That he is with you.
24            MS. Roe     That he's with me --
25            MR. JOLLEY:  Right.  Got it.
```

SA-460

TRANSCRIPTION — February 23, 2022

Page 100

```
1        MS. ▓Roe▓   -- and that he can
2     send this to my parents.  Yeah.
3        MR. JOLLEY:  So when you went to go
4     meet him in the hallway of U Hall --
5        MS. ▓Roe▓   Yes.
6        MR. JOLLEY:  -- sometime after
7     1:00 a.m. --
8        MS. ▓Roe▓   Right.
9        MR. JOLLEY:  -- right, what
10    happened?
11       MS. ▓Roe▓   So I got there.  He
12    -- I guess he just confronted me and was
13    really angry.  Like, he yelled for a
14    while.  He was just like, how -- like, I
15    did so much for you on your birthday.
16    Like, you're treating me really badly.
17    Like, you're -- like, I'm going to make
18    your life hell if you don't -- like, if
19    you keep up this kind of thing.  And
20    then I -- like, and he wouldn't stop,
21    like, even after I said, like, okay, I
22    understand.  Like, I just wanted to kind
23    of get off the hook and, like, get him
24    to calm down because I was really
25    worried.
```